RAMIRO RUBI IBARRA, currently confined on death row in the Texas Department of Criminal Justice, Institutional Division, petitions this Honorable Court, pursuant to 28 U.S.C. § 2254 *et. seq*, to issue a writ of habeas corpus and to order that his conviction for capital murder and sentence of death be vacated.

## PROCEDURAL HISTORY

The District Court of McLennan County, Texas, 54th Judicial District, entered the judgment under attack.

Petitioner was charged by indictment with the felony offense of Capital Murder. Mr. Ibarra entered a plea of not guilty.

Jury selection commenced on August 12, 1997, in the 54th District Court of McLennan County, Texas, the Honorable George H. Allen, presiding. The presentation of evidence began on September 8, 1997, and the jury returned a verdict of guilty on September 17, 1997. The jury then found Petitioner would be a continuing threat to society, and there were not sufficient mitigating circumstances to warrant a life sentence.

Petitioner was then sentenced to death by lethal injection on September 22, 1997. Petitioner filed a Motion for New Trial, which was overruled on December 5, 1997. Petitioner then timely filed Notice of Appeal

The Texas Court of Criminal Appeals affirmed the conviction and sentence on October 20, 1999 in *Ibarra v. State*, 11 S.W.3d 189 (Tex.Crim.App. 1999).

Petitioner filed a timely petition for writ of certiorari in the Supreme Court of the United States, which denied certiorari on October 2, 2000. *Ibarra v. Texas*, No. 99-8794.

On June 21, 1999, Mr. Ibarra filed an "Application for Writ of Habeas Corpus Seeking Post-Conviction Relief From a Death Sentence" with the 54th Judicial District Court of McLennan County, Texas.

On March 1st, 2001, the 54th Judicial District Court forwarded to the Texas Court of Criminal Appeals its recommendation that relief be denied on all of Mr. Ibarra's claims.  The Texas Court of Criminal Appeals adopted those Findings and Conclusions  and denied Mr. Ibarra relief on all claims.  *Ex parte Ibarra*, No. 48,832-01 (Tex.Crim.App. April 4th, 2001). This Court appointed Attorney Hunt on March 12th, 2002.

This Court originally ordered Attorney Hunt to file an Application for a Writ of Habeas Corpus by May 15th, 2002.  Notwithstanding this Court's order to file the Application by May 15th, 2002, Attorney Hunt filed an original Petition along with a motion for leave to amend his Application in order to comply with the one-year statute of limitations imposed on an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court by 28 U. S. C. § 2244(d).  This one-year statute of limitations ran on April 4th, 2002.

Petitioner's motion for leave to file an amended application was granted on April 5th, 2002.  This order instructed Petitioner to file an amended Application no later than July 1, 2002.  Petitioner's first amended Application for Writ of Habeas Corpus was timely filed.

On June 19, 2003, Mr. Ibarra filed an application for post-conviction writ of habeas corpus in the 54th District Court of McLennan County raising a claim under the new rule announced in *Atkins v. Virginia*, 536 U.S. 304 (2002).  On September 30th, 2004, this Court granted Petitioner's motion to stay these proceedings to allow him to pursue his *Atkins* claim in

state court.

On March 24, 2005, while his petition alleging mental retardation was pending before the convicting court, Ibarra filed a subsequent application for writ of habeas corpus asserting that his rights under the Vienna Convention on Consular Relations (VCCR) had been violated, and that this violation should be reviewed pursuant to *Case Concerning Avena and Other Mexican Nationals* (Mex. v. U.S.A.), 2004 I.C.J. 128 (Mar. 31, 2004), and the related *Presidential Determination of February 28, 2005*.

After a hearing on September 18, 2006, the trial court entered findings of fact and conclusions of law holding that Ibarra is not an individual with mental retardation.

On November 15, 2006, the Court of Criminal Appeals decided *Ex parte Medellin*, 223 S.W.3d 315, 352 (Tex. Crim. App. 2006), a case involving a functionally indistinguishable Vienna Convention claim from Ibarra's. In *Medellin*, the state court held that the International Court of Justice (ICJ) decision does not preempt the state procedural requirements for consideration of a subsequent application for writ of habeas corpus.

On September 26, 2007, the Texas Court of Criminal Appeals issued an order adopting the convicting court's recommendation that relief be denied on the mental retardation petition, and dismissing the VCCR petition for failure to satisfy the Art. 11.071, §5 requirements. *Ex parte Ibarra*, No. 48,832-02 & 03 (Tex.Crim.App. Sept. 26, 2007) (per curiam). A petition for writ of certiorari seeking review of that order was filed with the Supreme Court of the United States on December 24, 2007. On May 19th, 2008, the United States Supreme Court denied certiorari on Mr. Ibarra's claims. *Ibarra v. Texas*, No. 07-9355.

On May 28th, 2008, this court again continued the stay of Federal proceedings to allow Petitioner to exhaust his claim based on *Wiggins v. Smith*, 539 U.S. 510 (2003). On October 1st, 2008, the *Wiggins* claim was rejected by the Texas Court of Criminal Appeals for failure to satisfy the Art. 11.071, §5 requirements. See *Ex Parte Ibarra*, No. WR-48,832-04 (Tex. Crim. App. October 1st, 2008).

On October 21st, 2008, this court granted an agreed motion to lift the stay of proceedings and entered an agreed briefing schedule for submission of this habeas petition and subsequent pleadings. This petition is due by January 5th, 2009 and thus is timely filed.

## STATEMENT OF FACTS

Petitioner was charged by indictment with capital murder. The offense was committed on March 5, 1987, and Petitioner was originally indicted on May 27, 1987. A Motion to Suppress Evidence was granted based on the improper issuance of a search warrant. Following that action, the charges were dismissed on July 29, 1988. No further action was taken on the case until July 24, 1996, when another search warrant was obtained. Petitioner was then indicted again on September 18, 1996. (1 C.R. 11-12).

The victim was Maria De La Paz Zuniga, a 16 year old Mexican national who was living with her mother and brother in Waco, Texas. During the day she generally stayed with two small children at the house. (29 R.R. 45). On the day she was killed, her brother, Francisco Zuniga, went to the house around 1:00 p.m., having previously arranged to take her to the store. (29 R.R. 44-45). As he approached the house, he noticed the children outside, which was unusual. Zuniga attempted to get into the house, but it was locked. (29 R.R. 45-49). Zuniga

pushed the door open, and began looking for his sister. He finally found her in one of the bedrooms, lying face up. (29 R.R. 49-53). He shook her, and could obtain no response. Zuniga then went out into the street to get help, and was picked up by Alma Rosa. (29 R.R. 53-54). After checking on the victim herself, Rosa took Zuniga to call for help. (29 R.R. 79-85).

The Zuniga house was located on the same street as a business, RPM Manufacturing. Troy Wells took his wife to work there the morning of the incident, arriving shortly after 8:00 a.m. (29 R.R. 98-99). Wells saw a late 60's Camaro parked across the street, which he thought was somewhat unusual. Wells identified the Camaro as being primer red, in bad shape, with a bent antenna, and mismatched rims. (29 R.R. 103). Wells also saw a Hispanic man walking towards the car. According to Wells, the man was looking around, without raising his head up. He described him as having messy hair, with a mustache, and wearing a red shirt. (29 R.R. 106-108). Wells was subsequently able to identify the car after seeing it at the police station. (29 R.R. 111-112). He was also shown a photographic line-up at the police station, in which he identified someone other than Petitioner. (29 R.R. 116-117). Wells was then shown Polaroid photographs of only Petitioner, and he identified him. (29 R.R. 119, 135-137). Wells was later asked to view a line-up, in which he picked out Petitioner. (29 R.R. 120-121).

Lori Peterson was Wells' wife at the time of the murder. Like Wells, she saw the Camaro parked across the street. (29 R.R. 150-152). She also observed a Hispanic male in his mid 30's. Peterson described the individual as wearing tan pants, a blue shirt, and red flannel shirt. She also indicated he had a moustache and messed up hair. (29 R.R. 154). Peterson also identified the car after seeing it at the police station. Like her husband, she was unable to pick

Petitioner out of the photographic line-up.  However, she also subsequently identified Petitioner in a live line-up.  (29 R.R. 168-169).

Another worker was Doreen Kennedy.  Kennedy testified she arrived at work at approximately 8:15 a.m.  (30 R.R. 207).  On her way to work, she drove by the house, and had to wait for a train, which crossed the street between the house and the business.[1]  She noticed the house was quite, which was unusual because there were generally children outside.  (30 R.R. 207-208).  As she pulled in to park, she saw Wells' car, and then saw him pull away.  (30 R.R. 211).  Kennedy also saw a Hispanic male, whom she described  as wearing a plaid shirt with dark squares and khaki pants.  She also indicated the individual had dark tousled hair, and a dark moustache.  (30 R.R. 212-214).  Kennedy first saw the individual on the opposite side of the tracks.  After the train passed, she later saw him walk toward the house, stop in the driveway, and look back.  (30 R.R. 214-217). Kennedy also saw an older Camaro, which she was able to identify.  (30 R.R. 217-218).  Like Wells and Peterson, she was also unable to pick anyone out of the photographic line-up.  (30 R.R. 226).

Waco Police officer Ramon Salinas was assigned to investigate the case.  After interviewing Wells, Peterson, and Kennedy, he attempted to determine the identity of the person they saw.  He talked with the victim's brother, Francisco Zuniga, who indicated he knew someone named Ramiro who had a car similar to the one described by the witnesses.  (31 R.R. 368).  Based on that information Salinas was able to locate Petitioner, and went to talk with him.  (31 R.R. 369-371).  He found him at home, with his two brothers.  After observing what Salinas

---

Ramiro Rubi Ibarra—Petition for Writ of Habeas Corpus

thought were scratch marks on his face,[1] Petitioner was placed under arrest. (31 R.R. 379-382).

Officers then obtained a consent to search his car, which was in the driveway. Petitioner also

consented to a search of the house. (31 R.R. 388-391). Various items of clothing were taken

from the house, none of which were used as evidence. In the car, officers found pieces of yellow

wire, which they testified was similar to the wire which was wrapped around the victim's throat.

(30 R.R. 294, 31 R.R. 356-357).

Zuniga was found lying on her back on the bed, in one of the bedrooms. She appeared to

have been beaten in the face. (30 R.R. 269). She had a yellow wire wrapped around her neck

and shoulders. (30 R.R. 270). Zuniga's dress was pulled up over her waist, and her underwear

appeared to have been ripped. (30 R.R. 270-271). She also had a wound to her hand, where it

appeared a piece of flesh was missing. (30 R.R. 273). According to the pathologist, Dr. Edward

Kilbane, the cause of death was ligature strangulation, cause by the yellow wire. (31 R.R. 519).

Kilbane also concluded there had been some type of anal penetration. (31 R.R. 520). Zuniga

also had a number of contusions and abrasions which were consistent with a defensive struggle.

(31 R.R. 525-526).

Swabs were taken from both the anal and vaginal canals, which contained seminal fluid.

(31 R.R. 537). Loose hairs were also found on the victim's chest and neck area. (30 R.R. 275).

Several other hairs were also found on the victim's clothes and bedding.[2] (35 R.R. 747-749).

---

1 According to Salinas this was significant because the condition of the victim's hands indicated she may
have scratched her assailant.

2 The bedding was examined several times. The first time was by the Dallas County Sheriff's Department
Physical Evidence Section. They did not recover any hairs or fibers from the evidence they examined. (35
R.R. 700-704). Several hairs were not recovered until the evidence was re-examined in 1996.

The various hairs were compared to Petitioner's hair.  According to Charles Linch, a trace evidence technician with Southwest Institute of Forensic Science, there were eight facial hairs recovered from the victim and the bedding, which were similar to Petitioner's (35 R.R. 758).  According to Linch, all 8 hairs had similar "pigmentation and medullation."  Additionally, he found eight pubic hairs on the victim and her clothing, which were similar to Petitioner.  (35 R.R. 762).[3]  However, due to the nature of pubic and facial hairs in general, Linch could not exclude Petitioner, or most any other Hispanic, as being the contributor of the hairs.  (35 R.R. 765).[4]

Evidence from the rape exam, as well as Zuniga's clothing, was unsuccessfully submitted for DNA analysis in 1988 and 1990.  (4 R.R. 100-103, 82).  The items were subsequently submitted to Gene Screen in Dallas, Texas in 1996.  Sperm was found in both the vaginal and anal swabs, as well as on a portion of the panties.  A sample of Petitioner's blood was analyzed, and there was testimony that Petitioner's DNA matched that on the anal swab and panties.  (37 R.R. 991-996).  According to the technician who performed the tests for Gene Screen, Judith Floyd, there was a 1 in 166,667,000 chance that the material came from a Hispanic other than Petitioner.  (37 R.R. 996-997).  Petitioner attacked the reliability of both the DNA evidence, as well as the hair comparisons.  Many of the hairs Linch examined in 1996 were also examined in 1986 by Tim Fallon, who was also working for Southwest Institute of Forensic Science.  At the

---

3 This included three from the lower thigh, two from the bed cover, one between the victim's legs, one from her panties, and one from her slip. *id.*

4 According to Linch, facial hair does not have as many distinctive characteristics.  As a result, the best he can generally do is identify it as facial hair, and assign it a racial group.  (35 R.R. 766-767).  As for pubic hair, Linch testified there is a high degree of similarity among Hispanics.  (35 R.R. 772).

---

time, Fallon concluded several of the pubic hairs were consistent with those of the victim, and none were similar to Petitioner's hair.  (37 R.R. 1072-1073).[5]  Dr. Paul Goldstein, a professor of genetics at the University of El Paso attacked the DNA testing procedure.  According to Goldstein, the control dots which indicate the validity of the test, were not apparent, and for that reason the test could not be used.[6]  (41 R.R. 1389-1392).  Goldstein also identified numerous problems with the testing procedure, as well as a lack of quality control.  Those problems included the failure to change the bleach solution daily,  (41 R.R. 1349); the failure to ensure the pipettes were calibrated correctly, (41 R.R. 1354-1357); and the failure to use an antibody to "hot-start" the initial reaction.  (41 R.R. 1373-1376).  Additionally, a control test for the anal swab indicated there was not sufficient DNA to test.  (41 R.R. 1385-1386).  Dr. Goldstein concluded that he would not accept any of the tests because of these problems.  (41 R.R. 1395-1396).

Petitioner attempted to establish an alibi through his brothers.  Both testified that he had gone out the night before and came home extremely intoxicated.  They both testified he was asleep when they left for work that morning at 7:00 a.m., and was there when they returned.  They also testified that Petitioner had been injured on the job earlier that week, which was the cause of the injuries he had.  (40 R.R. 1260-1279; 41 R.R. 1308-1318).

---

5  The pubic hair Fallon testified was similar to the victim was the same hair Linch testified was similar to Petitioner. (37 R.R. 1073-1074). Fallon did testify there were facial hairs which were similar to Petitioner's, but that facial hair was not all that distinctive. (37 R.R. 1071-1072).

6  These dots are indicators of whether there is sufficient DNA to conduct a valid test. Dr. Goldstein testified the dot was not sufficiently present on the sample for the anal swab and the panties. (41 R.R. 1393). On another test, the control dot was very faint, which Dr. Goldstein testified was inconsistent with the other test. (41 R.R. 1394).

Petitioner also presented testimony from Norman Moore, who also worked at a business near the Zuniga home.  According to Moore, he saw a maroon Pontiac Grand Prix drive by the house at approximately 10:30 a.m.  He testified that two "rough dressed" raunchy "spanish looking" guys were in the car.  According to Moore, he saw the car pull into the Zuniga's driveway and leave. (39 R.R. 1172-1190).  In conjunction with Moore, Petitioner attempted to establish that Zuniga was killed later in the morning.  Bryan Gregory was a UPS driver who generally called on RPM during the noon hour.  He testified that on the day of the incident, he heard screams coming from the direction of the house when he drove by the house.  He testified that he mentioned that to Peterson, but could not see any activity in the house. (40 R.R. 1226-1236).

Finally, Dr. Robert Bux, a pathologist with Bexar County Forensic Center attempted to corroborate Petitioner's story concerning the injuries to his face.  According to Bux, the injuries were healing wounds, which were anywhere from 24-48 hours old. (40 R.R. 1238-1251).  Therefore, since Salinas arrested Petitioner within 8 hours of the murder, the wounds could not have been inflicted by the victim.

The jury rejected Petitioner's alibi, and found him guilty of capital murder.

During punishment, the state presented evidence of other misconduct.  Peter Gandera, Petitioner's nephew, testified that Petitioner sexually assaulted him 3 - 4 times when he was eight years old. (94 R.R. 1545-1558).[7]  His mother, Olga Gandera, testified that Petitioner had a bad reputation for sexually inappropriate behavior. (44 R.R. 1580-1584).  Mary Diaz had a

---

[7] Charges of this offense had been filed in Bell County, and were pending at the time of trial.  Petitioner was subsequently convicted, and sentenced to life.

Ramiro Rubi Ibarra—Petition for Writ of Habeas Corpus                                    Page 10

relationship with Petitioner for approximately 9 years while she was still married.  According to Diaz, Petitioner threatened her and assaulted her on several occasions.  (44 R.R. 1681-1693).  Her daughter, Tonya Diaz, testified Petitioner touched her breast on one occasion in 1983.  (44 R.R. 1670-1675).  Greg Raines, a jailer with the McLennan County Sheriff's department testified he caught Petitioner masturbating in his cell while standing in front of a window.  (44 R.R. 1723-1726).

Following the guilty verdict, Petitioner cut his throat and was taken to the hospital.  The state portrayed the incident as some type of scam.  Although his jugular was severed, there was testimony Petitioner did not lose a great deal of blood, and was never in danger.  (44 R.R. 1586-1592, 1612-1616).  There was also testimony Petitioner was attempting to fake his responses to make his condition appear worse.  (44 R.R. 1610).  Finally, Dr. Richard Coons testified that Petitioner would be a continuing threat to society.  (46 R.R. 1731-1740).

Petitioner's wife and sister testified on his behalf.  According to his sister, Sabina Ibarra, Petitioner came to Waco to help support the family.  She testified their family was a close one.  (47 R.R. 1763-1770).  Petitioner's wife also testified for him.  (47 R.R. 1770-1801).

The jury found Petitioner would be a continuing threat to society.  They also found there were not sufficient mitigating circumstances to warrant a life sentence.  As a result, Petitioner was sentenced to death.

## SUMMARY OF CLAIMS FOR RELIEF

1. ***Ex post facto* and Due process violations:**  Following his arrest in 1986, a search warrant was obtained for Petitioner's blood and hair.  That warrant was issued by the County Judge of

---

McLennan County, who was not a court of record.  For that reason, the search warrant was invalid, and a Motion to Suppress was ultimately granted.  At the time, the Code of Criminal Procedure prevented the state from obtaining a second search warrant.  That law changed in 1995.  Once it did, another search warrant was obtained for Petitioner's blood and hair.  Those samples were then compared to physical evidence recovered from the victim and the scene, which linked Petitioner to the offense.

The Constitution prohibits not only *ex post facto* laws in Article I, § 9, but also retroactive laws through the due process clause of the Fourteenth Amendment.  A law is retroactive, when it affects vested, substantive rights.  Petitioner suggests his right to be free from another search warrant was a vested, substantive right.  It ripened at the time the first search warrant was executed.  As such, any law which authorized the state to execute another search warrant, based on the same facts as the first one,  violates the requirements of due process.

**2. Sixth Amendment right to speedy trial and effective assistance of counsel, Eighth Amendment's prohibition on cruel and unusual punishment, Fourteenth Amendment due process violations.**  After a Motion to Suppress was granted, the original indictment was dismissed and Petitioner was released from custody.  Nothing was done on this case until the law changed in 1995.  At that time, the case was re-activated, and another search warrant was obtained.  Petitioner was indicted again in 1996, approximately 9-1/2 years after the murder. The due process clause of the Constitution prohibits pre-accusation delay which prejudices a defendant, and is taken for tactical reasons.  Petitioner suggests the delay here was clearly taken

---

Ramiro Rubi Ibarra—Petition for Writ of Habeas Corpus                    **Page 12**

for tactical reasons. No further investigation was done during the time the case was pending. Instead, the state essentially waited for the law to change, so they could obtain another search warrant. Petitioner suggests that constitutes a tactical delay. Further, the Supreme Court has indicated that pre-execution delay can render the death penalty cruel and unusual. For the foregoing reasons, Petitioner's rights to a speedy trial and the effective assistance of counsel, to be free from cruel and unusual punishment, and his right to due process were violated.

**3. Impermissible search and seizure violating the Fourth Amendment**. During the initial investigation, officers obtained a general description of an individual seen near the scene of the offense. They also obtained a description of a car. Officers contacted the victim's family, and were told they knew someone who fit that description. They ultimately went to Petitioner's house. Petitioner opened the door, and officer Ramon Salinas observed what he thought were scratches on his face. Knowing that the victim possibly scratched her assailant, Salinas immediately placed Petitioner under arrest. He then obtained consent to search both the house and the car. At that point in time, Salinas only knew that Petitioner may have been near the scene, and that he had scratches which could have been caused by the victim. Salinas did nothing to determine where Petitioner had been, or where the scratches had come from. While he may have had enough information to raise reasonable suspicion, Petitioner suggests he did not have enough information to constitute probable cause. Therefore, the consent he gave almost immediately following his arrest was invalid. Under the Fourth Amendment, the government violates a defendant's constitutional rights by executing a search or seizure without probable cause. The only two excuses which may be potentially applicable here are those dealing with

individuals found in suspicious places, and those where the officer has information that the suspect is about to escape. Petitioner suggests his own home cannot be a suspicious place. Further, there was no information that he was about to escape. Therefore, his warrantless arrest was improper, and the consent he gave almost immediately following the arrest was invalid.

**4. Unduly suggestive identification procedures: Sixth Amendment confrontation clause and Fourteenth Amendment due process violations.** Three eyewitnesses who testified at trial described an individual seen near the Zuniga's house on the day of the offense. They generally described a Hispanic male about 30 years of age, 5'9" to 5'10" tall, strong built, black hair and mustache, wearing Khaki pants and a blue and black checkered shirt, walking from the direction of the house toward the red primered Camaro. Salinas arrested Petitioner later that day and took Polaroid pictures of him.

None of the three was able to positively identify Petitioner in a photographic lineup. The Polaroid picture was shown to one of the witnesses following the photographic lineup, and two of the witnesses was taken to a police impound lot where Petitioner's automobile was the only red-primered Camaro present. Petitioner moved unsuccessfully before trial to suppress the identification made by these witnesses as a result of the unduly suggestive procedures used by the State, because the original photographic display was impermissibly suggestive. Also, the suggestive procedure gave rise to a substantial likelihood of misidentification. The combination of these errors led to a violation of the Sixth Amendment's confrontation clause and Fourteenth Amendment's guarantee of due process.

**5. Admission of testimony regarding decedent's fear of Petitioner violating the Sixth**

Amendment's confrontation clause, the Eighth Amendment's cruel and unusual punishment clause, and the Fourteenth Amendment's right to due process. Petitioner was acquainted with the victim and her family, having lived next to them for a period of time. The state presented testimony that the victim was afraid of Petitioner, without offering any specifics. Such testimony was offered to prove the victim's state of mind, as well as to show the relationship of the parties. Petitioner was denied the opportunity to confront and cross examine the victim concerning the statement she allegedly made to her brother. Petitioner also suggests this admission of hearsay at least implicates a Constitutional to due process.

**6. Admission of testimony regarding Petitioner's reputation for sexually inappropriate behavior, violating the Sixth Amendment's confrontation clause, the Eighth Amendment's cruel and unusual punishment clause, and the Fourteenth Amendment's right to due process.** Petitioner's sister-in-law was called to testify that his reputation for sexually inappropriate behavior was bad. That opinion was apparently based on one incident, during which Petitioner rubbed on his wife in the hall of their house during a phone conversation. It is well settled that reputation testimony must be based on something more than knowledge of a specific instance. That was the only basis for the testimony in this case, and for that reason it was not admissible.

**7. The Texas capital sentencing scheme violates the Eighth Amendment's cruel and unusual punishment clause and the Fourteenth Amendment's right to due process.** Under the current death penalty sentencing scheme, there is no appellate review of the jury's ultimate decision to impose the death penalty. While the issue of future dangerousness is reviewed, the

---

mitigating issue is not. To pass constitutional muster, there must be meaningful appellate review, which provides a final check on the jury's decision. The Texas scheme falls short in that respect, and therefore, is unconstitutional.

**8. Ineffective Assistance of Counsel.** Petitioner's right to the effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Texas law was violated as a result of trial counsel's failure to investigate, develop and present available mitigation evidence, as well as evidence rebutting portions of the state's case in aggravation.

**9. Mr. Ibarra's execution would violate the Eighth Amendment's Prohibition against the execution of individuals with mental retardation.** On June 20, 2002, the Supreme Court held that the Eighth Amendment's ban on excessive and cruel and unusual punishments prohibits the execution of individuals with mental retardation. *Atkins v. Virginia*, 536 U.S. 304, 321 (2002). Credible evidence exists that Mr. Ibarra has mental retardation. Mr. Ibarra underwent an evaluation by Carol M. Romey, Ph.D. on June 9 and June 10, 2003, and her testing established Mr. Ibarra's IQ at 65, well within the mentally retarded range. Numerous witnesses have been located to attest to Mr. Ibarra's adaptive deficits due to his mental retardation. Furthermore, Mr. Ibarra's retardation occurred prior to the age of 18, and his retardation was likely due to the combination of numerous documented risk factors in his early life. Because Mr. Ibarra is mentally retarded he is ineligible for the death penalty.

**10. The Texas Sentencing Scheme violates the Sixth Amendment by not requiring a jury to determine the essential factual element to the offense of capital murder of the lack of**

**mental retardation .** Two Supreme Court cases recently decided, *Ring v. Arizona*, 536 U.S. 584 (2002) and *Atkins v. Virginia*, 536 U.S. 304, 321 (2002), when read together, clearly indicate that an essential element of capital murder is the lack of mental retardation, because this factual determination increases the maximum authorized punishment to a sentence of death. This element is therefore required to be proven to a jury beyond a reasonable doubt just as all elements of a crime must be proven. The Texas sentencing scheme does not require such a jury finding and to that extent is unconstitutional. This lack of jury fact finding regarding an essential element of the offense invalidates the resulting sentence and requires that the case be remanded for a new trial.

11. **Violation of Vienna Convention on Consular Relations.** Petitioner was a citizen of Mexico at the time of his arrests, even though he had been in the country for a number of years. Both Mexico and the United States are signatories to the Vienna Convention. That Convention provides that citizens of a foreign country shall be advised of the right to consult with their consul when arrested. Petitioner was not advised of that right either during his initial arrest in 1986, or his subsequent arrest in 1996. Neither was he advised of such right at any time during the time in between. Petitioner suggests the Vienna Convention is binding on the State of Texas, and it was clearly violated. As a result, he was prevented from seeking the help and guidance of the Mexican Consulate. Petitioner suggests the blatant disregard of a foreign treaty cannot be ignored, and for that reason, his conviction must be reversed.

## ARGUMENT AND AUTHORITIES

### Point of Error Number One

The trial court erred in overruling Petitioner's motion to suppress evidence, where the issuance of second warrant violated prohibitions against ex post facto and retroactive laws contained in the Constitution, in that the law was changed seven years after a search warrant had been issued for Petitioner's blood and hair.

Shortly after his original arrest in 1986, a search warrant was obtained for Petitioner's blood and hair. Those samples were compared with evidence recovered from the victim and the scene, and an indictment was returned on May 25, 1987. The search warrant was subsequently declared invalid because it was not issued by a court of record, and the indictment was dismissed. (4 R.R. 34-36). Following that action, officers made at least two unsuccessful attempts to obtain DNA samples from sutures taken from Petitioner at the jail. (4 R.R. 103, 82-83). They also discussed the possibility of obtaining another search warrant, and were advised they could not do so. (4 R.R. 83).

J. R. Price, who had taken over the case, learned the law governing second search warrants changed in September, 1995, and sought another search warrant. (4 R.R. 87). On July 24, 1996, a search warrant was issued by Judge Joe Carroll, District Court Judge for the 27th District Court in Bell County, Texas. (4 R.R. 88). That search warrant authorized officers to take samples of defendant's "blood, saliva, body hair, and seminal fluid and/or semen". The search warrant was executed on the same date, July 24, 1996. According to the inventory filed in connection with the return, officers seized two whole blood samples, one saliva sample, head hair samples, moustache hair samples, beard hair samples, and pubic hair samples. (7 R.R. Exhibit 7).

---

The second search warrant was issued pursuant to Article 18.01 Tex. Code Crim. Proc., which was amended in 1995. Prior to September 1, 1995, that statute provided as follows:

> Only the specifically described property or items set forth in a search warrant issued under subdivision 10 of Article 18.02 of this code or property or items enumerated in subdivisions (1--9) of Article 18.02 of this code may be seized. *Subsequent search warrants may not be issued pursuant to subdivision 10 of Article 18.02 of this code to search the same person, place, or things subjected to a prior search under subdivision 10 of Article 18.02 of this code.* (emphasis added).

Article 18.02 was amended by the 74th Texas Legislature, which amendments took effect on September 1, 1995. That section now provides that a subsequent search warrant can be issued as long as it is issued by a judge of a district court, a court of appeals, or the supreme court. The search warrant in this case was issued in accordance with the amended Article 18.01, which defendant suggests is an improper retroactive application of the statute.[8]

Petitioner filed a Motion to Suppress Evidence prior to trial, arguing the issuance of a second search warrant was improper. (1 C.R. 48-50). That motion was denied prior to trial. (29 R.R. 3).

The Constitution contains two separate guarantees. Article I, Section 9 guarantees the right to be free from *ex post facto* laws, while the Fourteenth Amendment confers the right to be free from the retroactive enforcement of new laws. See *Rubino v. Lynaugh*, 845 F.2d 1266 (5th Cir. 1988) indicating that a habeas court has the authority to determine questions regarding retroactive enforcement of new laws or doctrines.

In the Supreme Court decision in *Collins v. Youngblood*, 497 U. S. 37 (1990), the court

---

8   The legislature attempted to make this statute retroactive by providing that:

The change in law made by this Act applies regardless of whether a search warrant under Subdivision (10), Article 18.02, Code of Criminal Procedure, was issued before, on, or after the effective date of this Act.

held that those cases holding the *ex post facto* clause prevented the application of laws which affected matters of substance were no longer valid. Instead, only those laws which make an act criminal that was not, or increased the punishment for a crime already committed, run afoul of the *ex post facto* clause. In so holding, the court noted the term *ex post facto* has had a consistent meaning throughout the years, and there was no reason to interpret the state provision differently than the federal provision.

Petitioner suggests the right to be free from search and seizure is a substantive right. Both the constitution, as well as the statutes, provide narrow exceptions to that right. Not only had a defendant been protected from such intrusions, the legislature had also prohibited the state from breaching a defendant's privacy more than once. The significance of this protection was recognized by the State of Texas in *Gordon v. State*, 640 S.W.2d 743 (Tex. App. - San Antonio, 1982). There, the court noted the prohibition against obtaining second search warrants was to prevent general exploratory searches of the same person, place or thing so as to constitute harassment.

Based on the above decisions, Petitioner suggests application of the amendments to Article 18.01 clearly violates the prohibitions against *ex post facto* and retroactive laws. First, defendant suggests he had a vested right to be free from further search warrants once the first one was executed. That right accrued at the time the first warrant was executed. As such, Petitioner suggests it is similar to a limitations defense since at that point in time, he could successfully move to prevent any further search warrants directed at him. Further, Petitioner suggests the particular search in this case implicates substantive rights. Clearly, everyone has

---

the right to be free from search and seizure.  That right is more significant when it involves intrusions on the individual himself, rather than merely his property.  The warrant in this case was not a search warrant in the normal sense, where property was searched.  Instead, Petitioner himself was subjected to a forced search.  Hair was pulled from his head, chest, body, and pubic area.  Further, blood was taken from him without consent.  It is hard to imagine a more significant intrusion on an individual's liberty than what was done during the execution of this warrant.

Petitioner suggests he had a vested substantive right to be free from a second search, once the original warrant was executed.  Thus, the issuance of a second search warrant based on amendments to Section 18.01, constitute the application of a retroactive law which is prohibited by the Constitution. For these reasons, Petitioner suggests the trial court erred in denying his Motion to Suppress. Such error clearly resulted in harm.

Using samples obtained from Petitioner, the state compared his blood and hair with evidence recovered from the crime scene and the victim. Such examination established that Petitioner's DNA type was the same type as a semen on the victim's panties, and a swab taken from the victim. (37 R.R. 991-996).  Additionally, there was testimony that Petitioner's hair was similar to a number of facial and pubic hairs found on the victim, and at the crime scene. (35 R.R. 758-762).  Such evidence was critical to the state's case. Without it, they could only place him at the scene, early in the morning the day she was killed. In fact, the State clearly did not feel they had a case without the physical evidence, and dismissed the prosecution in 1988. Therefore, Petitioner suggests he can establish he was harmed by this error, and the conviction

must be reversed.

## Point of Error Number Two

Petitioner's Sixth Amendment right to a speedy trial and effective assistance of counsel, the Eighth Amendment's prohibition on cruel and unusual punishment, and his Fourteenth Amendment right to due process were violated, where the state delayed bringing an indictment for over nine years solely to obtain a tactical advantage over Petitioner, which delay resulted in actual prejudice to him in that the state was able to obtain a search warrant which they had previously been prohibited from doing.

As noted above, Petitioner was charged with an offense which was committed on March 6, 1987. He was originally indicted for this offense on May 25, 1987. That indictment was subsequently dismissed on the state's motion on July 29, 1988, and Petitioner was released from custody. (R RR. 41-42). He was indicted in this cause on September 8, 1996, some nine and a half years after the offense was committed.

The charges were originally dismissed after a Motion to Suppress Evidence was granted. (4 R.R. 35). Various items of physical evidence were recovered during the investigation, which included semen samples, as well as hair recovered from the victim's body and clothing. A search warrant was obtained to gather samples of Petitioner's blood and hair, which was then compared with the physical evidence. That warrant was issued by the County Judge of McLennan County, Texas. At the time he was unable to execute an evidentiary search warrant because he did not preside over a court of record, and therefore, it was invalid. (4 R.R. 35-36). Without samples from Petitioner, no comparisons could be made and the physical evidence was

---

useless.

  At the time Petitioner was originally charged, the Texas Code of Criminal Procedure prevented the state from obtaining a second search warrant.  Thus, the state was prevented from obtaining further samples from Petitioner.  The case was closed, since there was no further investigation to be done.  (4 R.R. 37).  According to Officer Ramon Salinas, he had thoroughly investigated the case, which included interviewing all the witnesses and gathering all the physical evidence.  Salinas did not feel any further investigation was necessary, and the case could have been ready for trial.  (4 R.R. 37).  At the time the case was closed, the state could only hope that they would somehow be able to obtain samples from Petitioner.  That chance came when the law was revised in 1995.

  Salinas left the police department shortly after the charges against Petitioner were dismissed, and no one immediately took it over.  Detective J. R. Price asked to have the case assigned to him in December, 1990.  (4 R.R. 72).  Before he took over, nothing had been done on the case since evidence had been sent for analysis in 1988.  Petitioner had been in a fight in the jail in 1988, and required sutures.  The sutures were retained, in an attempt to obtain Petitioner's blood sample.  (4 R.R. 99-100).  The sutures were submitted to Life Codes, a private DNA laboratory, who advised there was not enough material to conduct a test.  (4 R.R. 100, 103).  Price re-submitted the material to Gene Screen in 1990, who also concluded there was not enough DNA to analyze.  (4 R.R. 82-83).  Price then discussed the possibility of obtaining another search warrant, and was advised he could not do so by both the District Attorney's Office, and the police department's legal advisors.  (4 R.R. 83).

---

Through his legal advisor, Price learned the law governing second search warrants had been changed in September, 1995. (4 R.R. 87). After discussing the matter with the legal advisor, Price obtained a search warrant on July 24, 1996. (4 R.R. 88). Pursuant to that warrant, hair and blood samples were again obtained from Petitioner. Those samples were then compared to physical evidence recovered from the victim, her clothing, and her bedding, and introduced at Petitioner's trial.

Price established that Petitioner's case essentially lay dormant from the time it was first dismissed. Other than re-submitting the sutures in 1990, no investigation was conducted, and there was nothing further to do. (4 R.R. 92). The only thing left to do, was obtaining samples from Petitioner, which could not legally be done. As it turns out, the case presented against Petitioner was identical to the one which would have been presented in 1988, with the exception of the physical evidence.

### Speedy Trial

Prior to trial, Petitioner filed a motion to dismiss the indictment, based on the violation of his right to a speedy trial. (1 C.R. 41-43, 117-122). Following a hearing, the motion was denied. (29 R.R. 2).

The Sixth Amendment to the United States Constitution and the due process clause of the Fourteenth Amendment guarantee an accused person's right to a speedy trial. The Sixth Amendment generally applies to delay following the filing of formal charges. *See, United States v. Marion,* 404 U.S. 307 (1971). The due process clause, however, provides a remedy for pre-accusation delay, as well as delay cause by the dismissal and subsequent refiling of charges.

*See, United States v. McDonald*, 456 U.S. 1 (1982). Under the due process clause, pre-indictment delay, or pre-accusation delay, will warrant relief if a defendant can establish the delay (1) caused substantial prejudice to his right to a fair trial, and (2) was an intentional device by the state to gain a tactical advantage. *United States v. Lovasco*, 431 U.S. 783 (1977).

Petitioner recognizes this is a heavy burden, which rarely will be met. In most cases, a defendant cannot show the delay was taken for the purpose of obtaining a tactical advantage. However, under the unique facts of this case, Petitioner suggests he can establish the delay was for that purpose.

There should be no doubt that a tactical delay violates the due process clause. In both *Marion,* and *Lovasco,* this was conceded by the government, and accepted by the court. *Lovasco, supra* at 431 U.S. 796, N. 17. While that much is settled, what is a tactical delay has never been defined. To do so, Petitioner suggests tactical delay must be contrasted with investigative delay. ("Investigative delay is fundamentally unlike delay undertaken by the government solely to gain tactical advantage over the accused.") *Lovasco, supra*, 431 U.S. at 795. In most cases, the delay is for further investigation. See, e.g. *Lovasco, supra* (investigation continued while action deferred); *McDonald, supra* (same). Certainly that is proper, and justified. However, where the delay is not for investigative reasons, Petitioner suggests it inches towards constituting a tactical delay. Similarly, the delay may be the result of negligence, carelessness, or simply the lack of sufficient resources. *Lovasco, supra.* While that may occasionally warrant relief in unusual circumstances, it still does not equate with tactical delay.

In this case, Petitioner suggests he has clearly established the delay was for tactical

reasons.   The only reason Petitioner was not indicted sooner, was the hope that the law would ultimately change, and another search warrant could be obtained.   No new evidence surfaced over the nine years, nor would any be expected since no further investigation was done.   The delay in this case was not for further investigation, but in the hope the law would change.   If ever there was a case warranting a finding of tactical delay, Petitioner suggests this is it.

The state may claim the delay in this cause was for further investigation.   However, to hold what the state did here was investigation, is to engage a tortured construction of the term. Investigation contemplates some action taken to uncover or develop evidence.   The normal construction of that term encompasses witness interviews, and efforts to recover physical evidence.   Here, the physical evidence was already there, and comparisons had already been made.   As such, the state did not do anything new.   All they ultimately did was obtain another sample from Petitioner, which they could not do before.   Once those samples were obtained, they merely did again what they had done before.[9]   Petitioner suggests that cannot constitute "investigation" as that term is normally construed.

There should be no doubt the delay caused substantial prejudice to Petitioner.[10]   Prior to obtaining the new search warrant, the state had no physical evidence linking Petitioner to the scene.   As such, they could only rely on the witnesses who placed Petitioner at the scene.   They also had evidence that Petitioner had scratches which he could have received during the

---

9  Petitioner recognizes that DNA testing changed over the years.   However, it still involved the same process of comparing samples from the victim with samples from Petitioner.   What changed was the testing, and not the evidence itself.

10  Whether or not a finding of prejudice is required is open to debate.   Normally, a finding of prejudice is encompassed by a finding that the delay was taken for tactical reasons.   Such "tactical reasons" will almost always result in prejudice to a defendant, since that will be  underlying purpose.

Ramiro Rubi Ibarra—Petition for Writ of Habeas Corpus                                    Page 26

altercation with the victim. Thus, the case was entirely circumstantial, and weak. For that reason, the case was dismissed. With the physical evidence, however, the circumstantial evidence became stronger. Not only was there evidence which placed Petitioner at the scene, there was also physical evidence linking him to the offense. That physical evidence was obtained solely as result of the delay in proceedings. Therefore, Petitioner suggests he clearly has established actual prejudice in this case.

While Petitioner recognizes that finding a due process violation in this case may appear harsh, Petitioner suggests this is a unique situation, and the remedy is required if any respect for the law is to be engendered. Clearly, the legislature had evidenced its intent to limit the state to only one search warrant. The state was bound by that law, and forced to comply with it. They should not be allowed to wait for an unlimited amount of time to bring charges, solely in hopes the law would change. To allow such a result comes close to authorizing the passage of a law to convict a single defendant.

This case is also unlike those where scientific techniques may be developed over the years. In such a situation, it can be argued the investigation is continuing. In some cases, officers may not have sufficient evidence to obtain a conviction. However, continued investigation coupled with the development of new scientific evidence, may yield sufficient evidence. In that situation, the delay is for investigative and not tactical reasons. However, the state cannot argue here they intentionally delayed prosecution in the hope that scientific techniques would advance. Instead, the only reason for delaying the case was to await a change in the law. Petitioner suggests that is not proper, and for that reason relief should be granted.

**Cruel and Unusual Punishment**

Imposition of the death penalty after a delay of many years violates the Eighth Amendment's prohibition against cruel and unusual punishment.  In *Gregg v. Georgia*, 428 U.S. 153 (1976), the Supreme Court held that the Eighth Amendment does not prohibit capital punishment. The Court's decision in *Gregg* "rested in large part on the grounds that (1) the death penalty was considered permissible by the Framers, . . . and (2) the death penalty might serve "two principal social purposes: retribution and deterrence," *Lackey v. Texas*, 514 U.S. 1045 (1995) (memorandum of Justice Stephens joined by Justice Breyer respecting the Court's denial of Certioriari).  In *Lackey*, Justice Stephens explains that an execution after an extended delay can very well be cruel and unusual punishment because the additional deterrent effect of execution after an extended delay would be only marginal.  Justice Stephens reminds us that as Justice White noted in his concurrence in *Furman v. Georgia*, 408 U.S. 238 (1972), when the death penalty  "ceases realistically to further these purposes, . . . its imposition would then be the pointless and needless extinction of life with only marginal contributions to any discernible social or public purposes. A penalty with such negligible returns to the State would be patently excessive and cruel and unusual punishment violative of the Eighth Amendment." *Furman v. Georgia*, at 312; see also *Gregg v. Georgia*, 428 U.S. at 183 ("The sanction imposed cannot be so totally without penological justification that it results in the gratuitous infliction of suffering").

It is clear that executing Petitioner in this case after such a long delay serves no reasonable penological purpose.

---

## Point of Error Number Three

The trial court erred in denying Petitioner's Motion to Suppress, where officers did not have probable cause to arrest him, and therefore his consent to search was invalid.

During the course of investigating this offense, Officer Ramon Salinas interviewed Wells, Peterson and Kennedy. From that, he obtained a description of a Hispanic male, approximately 30 years of age, 5"9' to 5"10' tall, black hair and a moustache, wearing khaki pants, and a blue and black checkered shirt. According to these witnesses, they observed this individual near the house, and saw him walking toward a red primered Camaro. Armed with that information, Salinas talked with members of the victim's family, and asked if they knew anyone who fit that description. Antonio Zuniga told Salinas that he knew someone named Ramiro who drove a car which fit that description. (31 R.R. 368). He also gave Salinas a general location as to where he thought Ramiro lived. (31 R.R. 369). Salinas went to the general area, and talked with individuals there. One eventually identified the house where an individual with a similar car lived. Salinas then established surveillance on the house. (31 R.R. 370).

At approximately 6:00 p.m. Petitioner and his two brothers returned from the grocery store, and went inside their house. (31 R.R. 371, 376). Salinas and other officers arrived shortly thereafter. Salinas ran the registration on the car, and discovered it was registered to Ramiro Ibarra. (31 R.R. 377). Salinas knocked on the door, identified himself as a police officer, and stated he was looking for Ramiro. Petitioner identified himself, and opened a screen door. (31 R.R. 379). According to Salinas, Petitioner fit the general description given by the three witnesses. Salinas also observed what he believed were recent scratch marks. (31 R.R. 380).

He was aware that there had been a struggle and that skin underneath the victim's fingernails indicated she may have scratched her assailant. (31 R.R. 369, 381). Armed with that information, Salinas immediately placed Petitioner under arrest. Salinas took him outside, and took pictures of his face. At the police station they also had him remove his shirt, and took pictures of his chest. (31 R.R. 392). Meanwhile, other officers went inside and searched the residence. Petitioner's car sitting in the driveway, was also searched. Both those searches were done through consent, which was obtained after Petitioner was placed under arrest. (31 R.R. 388).

Prior to trial, Petitioner filed a Motion to Suppress Evidence. (1 C.R. 48-51). Relying on testimony from the original pre-trial hearing, the trial court denied the motion. (29 R.R. 4). Evidence of yellow wire recovered from Petitioner's car was subsequently introduced over objection. (30 R.R. 294). There was testimony that although it was not identical to the wire wrapped around the victim's throat, it was similar. (30 R.R. 270-271).

**Probable Cause is Required for Valid Arrest**

It is well settled that under the Fourth Amendment, the government violates a defendant's constitutional rights by executing a search or seizure without probable cause. *United States v. Kye Soo Lee*, 898 F.2d 1034, 1039 (5th Cir. 1990). But where there is a reasonable and articulable suspicion that a person has committed or is about to commit a crime, limited searches and seizures are permissible under the Fourth Amendment despite the lack of probable cause. *See Kye Soo Lee*, at 1039 (referring to the reasonable suspicion standard enunciated in *Terry v. Ohio*, 392 U.S. 1 (1968).

---

Ramiro Rubi Ibarra—Petition for Writ of Habeas Corpus                    Page 30

Petitioner suggests that while the arresting officers may have had sufficient information to arouse their suspicion and justify further investigation under *Terry v. Ohio*, they did not have probable cause to make a warrantless arrest.

At the time Petitioner was placed under arrest, Salinas only knew that Petitioner fit the general description of someone seen near the house. Salinas did not know when the victim was murdered. Thus, there was no way to know whether that individual was in some way linked to the murders. The only additional information Salinas had was that the victim may have scratched her assailant. Believing that the marks on Petitioner were scratch marks, he assumed that it was him. Petitioner suggests, however, that is not sufficient to establish probable cause. The information Salinas had at the time was nothing more than suspicion, which is far short of probable cause.

The consent to search was obtained immediately following Petitioner's arrest. As such, Petitioner suggests it is not valid. If an officers' detention of a defendant has exceeded the scope of a permissible *Terry* stop, a subsequent " '[c]onsent to search may, but does not necessarily, dissipate the taint of a [prior] fourth amendment violation.' " *United States v. Dortch*, 199 F.3d 193, 201 (5th Cir.1999). When a court evaluates consent given after a Fourth Amendment violation, the admissibility of the challenged evidence turns on a two-pronged inquiry: 1) whether the consent was voluntarily given; and 2) whether the consent was an independent act of free will. *United States v. Chavez-Villarreal*, 3 F.3d 124, 127 (5th Cir.1993). "The first prong focuses on coercion, the second on causal connection with the constitutional violation." *Id.*

Under the fruit-of-the-poisonous-tree doctrine, "all evidence derived from the

---

exploitation of an illegal search or seizure must be suppressed, unless the Government shows that there was a break in the chain of events sufficient to refute the inference that the evidence was a product of the Fourth Amendment violation." *United States v. Rivas*, 157 F.3d 364, 368 (5th Cir.1998). The request for consent occurred immediately after and as a direct result of the violation, and so there can have been no break in the chain of events which would refute any such inference.

As part of the impermissible search, officers recovered yellow wire, which was similar to that found on the victim. Petitioner suggests he was harmed by that evidence. As discussed above, the case was a circumstantial one. Petitioner attacked the reliability of the scientific evidence, and the eye witness testimony was suspect. As such, any other physical evidence was critical. The wire in this case was just such evidence, since it possibly linked Petitioner to the murder.[11] Therefore, Petitioner suggests the state cannot establish beyond a reasonable doubt that the evidence did not contribute to his conviction, and for that reason, his conviction must be reversed.

### There Were No Exigent Circumstances to Justify the Arrest

As discussed above, Petitioner was placed under arrest at his house after Salinas observed what he thought were scratch marks on Petitioner's face. Petitioner suggests there was no probable cause to make the arrest. Even if there was, Petitioner suggests there was no exception authorizing his arrest without a warrant.

There clearly was no evidence of the presence of any exigent circumstances that would

---

11   As noted above, detective Price testified the wire was similar to that found on the victim. Petitioner's boss also testified they used the same type of wire where Petitioner worked, although the wire on the victim and the wire in Petitioner's car were clearly of a different gauge. (39 R.R. 1107-08, 1111-14)

justify the warrantless arrest in this case.  Although Salinas did have information Petitioner was

an illegal alien, he admitted that in and of itself did not give him the authority to conduct a

warrantless arrest.  (Pre-Trial 69).  Salinas also knew Petitioner had been in the country for at

least five years.  *id.*  He had some ties, indicated by the registration of his automobile.  Thus,

Petitioner suggests the fact he was an illegal alien, does absolutely nothing to suggest Petitioner

might flee or attempt to escape.   The only basis for such a conclusion would be speculation and

conjecture, which is clearly not sufficient.

In this case, Salinas could have easily secured the scene, and presented the information

he had to a neutral magistrate.   Alternatively, he could have pursued his investigation, to

determine whether Petitioner was linked to the offense, or had a legitimate explanation for the

scratches on him.  He did neither, but instead rushed to judgment.   The reason for the warrant

requirement is to prevent such action, and to assure an individual will only be placed under arrest

where there is sufficient reason to do so.   This is especially true when a defendant is arrested in

his own home.

### Point of Error Number Four

The trial court erred in refusing to exclude identification testimony where the identification was

the result of an impermissibly suggestive procedure conducted prior to trial, violating the Sixth

Amendment's confrontation clause and the Fourteenth Amendment's guarantee of due process.

As discussed above, Wells, Peterson and Kennedy, all described an individual seen near

the Zuniga's house on the day of the offense.  They generally described a Hispanic male about

30 years of age, 5'9" to 5'10" tall, strong built, black hair and mustache, wearing Khaki pants and

a blue and black checkered shirt, walking from the direction of the house toward the red

primered Camaro.  Salinas arrested Petitioner later that day and took Polaroid pictures of him.

Wells, Peterson and Kennedy were all shown a picture lineup.  Both Peterson and

Kennedy viewed the lineup on March 25, while Wells viewed it on April 3, 1986.  (Pre-Trial

71).  Neither Peterson or Kennedy were able to identify anyone.  (Pre-Trial 74).  Wells was

shown the same lineup, and made a tentative identification.  He pointed to Petitioner's picture,

and stated he "looked familiar."  He then said if he had to pick someone, he would pick another

individual.  (Pre-Trial 75).  Salinas then took out the Polaroid pictures he had taken of Petitioner,

and showed them to Wells.  (Pre-Trial 76).  After he looked at those pictures, he then picked

Petitioner.  (Pre-Trial 76).

A live lineup was subsequently conducted on May 22, and Wells picked out Petitioner.

(Pre-Trial 77).  Peterson also identified Petitioner.  (Pre-Trial 80).  Kennedy, however, picked

out and identified someone else.  *id.*

On approximately March 7, 1986, Salinas took Wells and Peterson to the police parking

lot and asked them if they could see the car they described the day before.  Petitioner's car was

the only red primered 1968 Camaro out there, and they both identified it.  (R. Pre-Trial 81-83).

Kennedy was shown photographs of three cars, and she picked out Petitioner's car.  (R. Pre-Trial

83-84).

Prior to trial, Petitioner filed a Motion to Suppress Identification.  (1 C.R. 55-57).  He

also filed a Motion to Suppress the Identification of his automobile.  (1 C.R. 72-73).  The trial

court reviewed the testimony from the original pre-trial hearings, and denied both motions.  (29

---

R.R. 3).

In determining the admissibility of an in court identification following a pre-trial process,

the Sixth Amendment's right to confrontation of witnesses, and the Fourteenth Amendment's

guarantee of due process require that an approach is taken which will minimize the likelihood of

misidentification. This is true because a witness whose memory has been tainted by

impermissibly suggestive pretrial identification procedures is irreparably damaged, rendering the

right to confrontation useless, since the witnesses' memory of the events has been altered.

### Due Process

The use of such a suggestive identification procedure clearly violates an accused's right

to due process. In *Simmons v. United States*, 390 U.S. 377, 384 (1968), the Court announced

that the use of a procedure "so impermissibly suggestive as to give rise to a very substantial

likelihood of irreparable misidentification" would violate an accused's Due Process rights. In

*Foster v. California*, 394 U.S. 440, 442 (1969), the Court found a due process violation in a

series of suggestive lineup confrontations. The opinion in *Simmons* instructs that "[d]espite the

hazards of initial identification by photograph," the court would not impose a blanket ban on

such identification procedures. Instead, the court held that the specific lineup procedure used in

each individual case must be examined and "convictions based on eyewitness identification at

trial following a pretrial identification by photograph will be set aside on that ground only if the

photographic identification procedure was so impermissibly suggestive as to give rise to a very

substantial likelihood of irreparable misidentification." *Simmons*, at 384.

In determining the admissibility of identification testimony, courts consider the five

---

factors enumerated in *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972),  (1) the witness'

opportunity to view the defendant at the time of the crime; (2) the witness' degree of attention at

the time of the crime; (3) the  accuracy of the witness' description of the defendant prior to the

identification; (4)  the witness' level of certainty when identifying the defendant at the

confrontation; and (5) the length of time elapsed between the crime and the confrontation. When

assessing reliability, courts may also consider the strength of other evidence against the

defendant.

 Petitioner suggests there was a clear likelihood in this case of misidentification.  Both

Wells and Peterson had a limited opportunity to observe the individual.  That opportunity was

suspect, since the individual was walking with his head down, and they could not get a clear

view of his face.  (Pre-Trial 125-126).  According to Wells, the individual was within his view

for 1 -2 minutes, although he did not keep his eye on him during that entire time. Wells initially

saw him at the railroad track, and looked at him then.  However, he had his infant son with him,

and went to take care of him.  According to Wells, the train had scared him, and he was trying to

calm him down.  (Pre-Trial 124-125).  After he did so, he looked back "a couple of more times".

Thus, it is clear his entire attention was not focused on the individual.  Not only was the train a

possible distraction, so was a screaming infant in the car.

 Concerning the accuracy of the description, both Wells and Peterson were only able to

give general physical descriptions.  While they generally fit Petitioner, there was a notable

difference.  All three witnesses, Wells, Peterson, and Kennedy, stated the individual only had a

mustache.  Peterson went so far in her statement as to say the individual had a mustache, with no

beard. (Pre-Trial 108-109). That description clearly did not match Petitioner, who had a full

beard when arrested later that afternoon. Petitioner suggests that not only is that factor

significant as it relates to the certainty of identification, it is also significant as to the

suggestiveness of the identification. While all three witnesses described an individual with a

mustache and no beard, both the photographic lineup and the live lineup contained only

individuals with beards. (Pre-Trial 111-112). Petitioner suggests that was highly suggestive,

and led to picking an individual with a beard just as Petitioner had.

   As for the level of certainty, clearly Wells and Peterson were uncertain at the

photographic identification. Wells was uncertain to the extent that he picked the wrong

individual. After he did so, Salinas then showed him the Polaroid photos, and told him that was

the individual in picture three. (Pre-Trial 133). Not surprisingly, after that was done Wells in

fact picked out number three.

   The length of time between the incident, and the identification, weighs somewhat in

Petitioner's favor. The live lineup was not held until almost a month later. That was after the

photographic lineup had been viewed, in which neither Wells nor Peterson could initially pick

out Petitioner. That was also after Wells had been shown pictures of Petitioner. Although

Salinas did not specifically tell Wells the pictures were of the person he suspected was involved.

Salinas testified it would have been clear to Wells that Petitioner was the suspect. (Pre-Trial 76-

77).

   In this case, the pre-trial identification procedure was clearly suggestive. Wells could not

make an identification, and in fact thought someone else was more like the individual he saw.

---

He was then shown three photographs, under circumstances which clearly suggested they were of the suspect. After that was done, Wells then picked out Petitioner. Petitioner suggests there was little likelihood he could have done anything else. Salinas did everything but explicitly tell him to pick out Petitioner. Any identification from then on was tainted. Petitioner suggests the totality of the circumstances was not enough to remove that taint. Wells was distracted, and had only a short period of time to view Petitioner. Further, he had no reason to try to focus on the identification. Clearly he was not certain, given the inability to make an initial identification. Thus, Petitioner suggests Wells should not have been allowed to identify Petitioner in Court.

### Confrontation

In his dissent in *United States v. Owens*, 484 U.S. 554, 567 (1988), Justice Brennan explained the importance of the Confrontation Clause of the Sixth Amendment in ensuring that defendants have a fair opportunity to cross examine the witnesses against them:

> . . . we have never before held that the Confrontation Clause protects nothing more than a defendant's right to question live witnesses, no matter how futile that questioning might be. On the contrary, as the Court's own recitation of our prior case law reveals, we have repeatedly affirmed that the right of confrontation ensures "an opportunity for effective cross-examination."

Rather than merely ensuring that a defendant can cross examine a live witness, no matter how tainted their testimony, "the Confrontation Clause's mission [is one] of "advanc[ing] a practical concern for the accuracy of the truth-determining process in criminal trials," *Ibid,* quoting *Dutton v. Evans*, 400 U.S. 74, 89 (1970).

---

In the instant case, the eyewitness testimony against Petitioner was so tainted that it cannot withstand constitutional muster.  Because of the impermissibly suggestive input from the investigator, the witnesses may have come to believe their misidentifications.  Because this belief was created by the investigator rather than their own recollections, there can be no opportunity to effectively cross examine these witnesses regarding their identifications of Petitioner.  Furthermore, Petitioner was clearly prejudiced by this evidence.  Other than Wells, Peterson was the only person who could place Petitioner near the scene.   That was a critical part of the state's case.  Therefore, Petitioner suggests the state cannot establish beyond a reasonable doubt that this error did not contribute to the verdict, and his conviction must be reversed.

### Point of Error Number Five

Admission of testimony regarding decedent's fear of Petitioner violated the Sixth Amendment's confrontation clause, the Eighth Amendment's cruel and unusual punishment clause, and the Fourteenth Amendment's right to due process.

The state established that Petitioner was acquainted with the victim prior to her death.  Approximately one month before the incident, one of the victim's brothers saw Petitioner coming out of the driveway.  When asked what he was doing, Petitioner said he was coming to exchange some books and magazines.  (30 R.R. 594).  According to Francisco Zuniga, Petitioner lived at the Economy Motel during the same time they were there.  (29 R.R. 52).  There was also testimony that Petitioner had been to the house where the victim was staying on occasion.

There was never any testimony concerning specific incidents between Petitioner and the victim.   However, the state attempted to introduce evidence that the victim was afraid of

---

Petitioner.  Petitioner's initial objections were sustained.  (30 R.R. 597-99, 604).  However, after making several attempts to introduce the evidence, the trial court finally allowed it in. (39 R.R. 1137-38).  Ultimately, the victim's sister and brother testified that the victim was afraid of Petitioner, without offering testimony of any specific incidents which may have caused this alleged fear.  (39 R.R. 1137, 40 R.R. 1431-32).

The error in this case was essentially one of confrontation.  That is, Petitioner was denied the opportunity to confront and cross examine the victim concerning the statement she allegedly made to her brother.  See, *United States v. Martinez*, 588 F.2d 495 (5th Cir. 1971).  Petitioner also suggests the admission of hearsay at least implicates the Eighth and Fourteenth amendments.

The Confrontation Clause of the Sixth Amendment, made applicable to the States through the Fourteenth Amendment, provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  United States Constitution, Sixth Amendment.  The Confrontation Clause "does not necessarily prohibit the admission of hearsay statements against a criminal defendant, even though the admission of such statements might be thought to violate the literal terms of the Clause."  Idaho v. Wright, 497 U.S. 805, 813 (1990).  The Confrontation Clause, bars the admission of some evidence that would otherwise be admissible under an exception to the hearsay rule.

Once a witness is shown to be unavailable, "his statement is admissible only if it bears adequate 'indicia of reliability.' Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be

---

Ramiro Rubi Ibarra—Petition for Writ of Habeas Corpus                                   Page 40

excluded, at least absent a showing of particularized guarantees of trustworthiness." *Id,* at 814-815.

According to the Supreme Court in *Idaho v. Wright*, the reason why there should be further showing of the trustworthiness of the out of court declaration is the same as the reasoning behind permitting exceptions to the hearsay rule:

> The theory of the hearsay rule . . . is that the many possible sources of inaccuracy and untrustworthiness which may lie underneath the bare untested assertion of a witness can best be brought to light and exposed, if they exist, by the test of cross-examination. But this test or security may in a given instance be superfluous; it may be sufficiently clear, in that instance, that the statement offered is free enough from the risk of inaccuracy and untrustworthiness, so that the test of cross- examination would be a work of supererogation. 5 J. Wigmore, *Evidence* § 1420, p. 251 (J. Chadbourn rev. 1974).

Justice O'Connor explained that these "'particularized guarantees of trustworthiness' required for admission under the Confrontation Clause must likewise be drawn from the totality of circumstances that surround the making of the statement and that render the declarant particularly worthy of belief." *Id,* at 820.

In the instant case, no particular instances were testified to which would justify the decedent's alleged fear of Petitioner. Additionally, there is no indication that the circumstances surrounding her alleged statements of fear would provide any "particularized guarantees of truthfulness" required for admission as an exception to the Confrontation Clause.

**Harm**

The evidence in this case was hotly contested.  As discussed above, the evidence tying Petitioner to the scene was circumstantial, with the exception of the physical evidence.  The eye witnesses were certainly subject to question, given both the limited amount of time they had to view the suspect as well as the identification procedure itself.  That left the physical evidence in the form of DNA tests and hair comparisons.  While that testimony was strong, it was also sharply contradicted.  The actual hair analysis was called into question, as were the procedures used to conduct the DNA testing.  Thus, the jury was left to resolve a serious conflict among experts.  In that situation, anything which tips the scale could be harmful.  Petitioner suggests the testimony in this case did just that.   The jury may have decided the case on the assumption that if the victim was afraid of Petitioner, then he must be the one who committed the murder.

Additionally, Petitioner suggests the nature of the testimony creates the possibility that the jury returned a verdict on an improper basis, which is to say, that the verdict violated the Eighth Amendment's prohibition against cruel and unusual punishments.  One of the most basic principles of modern death penalty jurisprudence is that "[sentencing] juries [must] be carefully and adequately guided in their deliberations." *Gregg v. Georgia*, 428 U.S. at 193. This is, in essence, the core holding of *Furman*: "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg*, 428 U.S. at 189.

This testimony's only purpose and effect was to either create sympathy for the victim, or prejudice against the defendant.  The result was the possibility that the jury returned a verdict of

guilt on something other than the evidence, resulting in a sentence of death based on arbitrary and capricious factors. Therefore, Petitioner suggests he was harmed by the introduction of this testimony, and for that reason his conviction and sentence must be reversed.

### Point of Error Number Six

The trial court erred in allowing testimony concerning Petitioner's reputation for sexually inappropriate behavior, where such testimony was based only on what a witness overheard concerning a specific act violated the Sixth Amendment's confrontation clause, the Eighth Amendment's cruel and unusual punishment clause, and the Fourteenth Amendment's right to due process.

One of the witnesses who testified at punishment was Petitioner's sister-in-law. She was also the mother of Peter Gandera, a young boy who Petitioner allegedly molested. Gandera testified concerning an incident she had observed involving Petitioner and her sister. According to Gandera, her sister received a phone call, and gave the phone to Petitioner. She indicated Petitioner came up behind her, and was rubbing himself up and down on her. Gandera felt that was offensive, since it was in the hallway of the house, where everybody could see. (45 R.R. 1574-76)

Petitioner objected to the testimony, based on relevance. Outside the jury's presence, the state attempted to justify the admission of the evidence as reputation testimony. They asked Gandera whether she had ever heard anyone discuss Petitioner's reputation for sexually inappropriate behavior. She ultimately admitted that she had heard her father talk about this

---

incident. (45 R.R. 1577-78).[12]  Her father apparently was the only person she had heard discuss

the situation.

Petitioner was denied the opportunity to confront and cross examine the declarant of the

statement on which this "reputation" evidence was based. Petitioner also suggests this admission

of hearsay at least implicates a Constitutional right to due process.  The error in this case was

essentially one of confrontation.  See, *United States v. Martinez*, 588 F.2d 495 (5th Cir. 1971).

Petitioner also suggests the admission of hearsay at least implicates the Eighth and Fourteenth

amendments.

The Confrontation Clause of the Sixth Amendment, made applicable to the States

through the Fourteenth Amendment, provides: "In all criminal prosecutions, the accused shall

enjoy the right . . . to be confronted with the witnesses against him."  United States Constitution,

Sixth Amendment.  The Confrontation Clause "does not necessarily prohibit the admission of

hearsay statements against a criminal defendant, even though the admission of such statements

might be thought to violate the literal terms of the Clause." *Idaho v. Wright*, 497 U.S. 805, 813

(1990).  The Confrontation Clause, bars the admission of some evidence that would otherwise be

---

12    The actual testimony was as follows:

Q. And have they, during the course of the time that you've been around there, has Mr. Ibarra and things that he has done, previous sexual activities, been the subject of discussion?

A. Only my dad, he's talked to people and told them what he had done, where he was like holding her.

Q. So your opinion of that, his sexual activity is based on what you've seen, plus what you have heard from other people?

A. We, yes.

Q. Including family members and other people?

A. Family members. (45 R.R. 1577-78)

---

Ramiro Rubi Ibarra—Petition for Writ of Habeas Corpus                                    Page 44

admissible under an exception to the hearsay rule.

Once a witness is shown to be unavailable, "his statement is admissible only if it bears adequate 'indicia of reliability.' Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness." *Id,* at 814-815.

According to the Supreme Court in *Idaho v. Wright,* the reason why there should be further showing of the trustworthiness of the out of court declaration is the same as the reasoning behind permitting exceptions to the hearsay rule:

The theory of the hearsay rule . . . is that the many possible sources of inaccuracy and untrustworthiness which may lie underneath the bare untested assertion of a witness can best be brought to light and exposed, if they exist, by the test of cross-examination. But this test or security may in a given instance be superfluous; it may be sufficiently clear, in that instance, that the statement offered is free enough from the risk of inaccuracy and untrustworthiness, so that the test of cross- examination would be a work of supererogation. 5 J. Wigmore, *Evidence* § 1420, p. 251 (J. Chadbourn rev. 1974).

Justice O'Connor explained that these "'particularized guarantees of trustworthiness' required for admission under the Confrontation Clause must likewise be drawn from the totality of circumstances that surround the making of the statement and that render the declarant particularly worthy of belief." *Idaho v. Wright,* at 820.

In the instant case, there is no indication that the circumstances surrounding the one

---

alleged incident forming the basis for the alleged bad reputation would provide any "particularized guarantees of truthfulness" required for admission as an exception to the Confrontation Clause.

Petitioner suggests this testimony substantially impacted the verdict. Petitioner had no prior criminal record. He was married, and had been gainfully employed since coming over from Mexico. There was a compelling argument for life, and anything which went against that could be damaging. The testimony here was of that nature, and for that reason Petitioner suggests he was harmed, and his sentence must be set aside.

### Point of Error Number Seven

Article 37.071, Tex. Code Cr. Proc., as applied by Texas Courts, is unconstitutional because it does not provide for meaningful appellate review, where the Court of Criminal Appeals has held it cannot review the jury's decision to impose the death penalty.

The offense in this case was committed in 1986, which was before the new Texas sentencing scheme established in Article 37.071, Tex. Code Cr. Proc. took effect. Apparently in response to *Penry v. Lynaugh*, 492 U.S. 302 (1989) ("Penry I") the legislature attempted to put a procedure in place which would allow the jury to give effect to any mitigating evidence which might be introduced. The method for doing so is a separate special issue, which is set forth in Article 37.071, Section 2(e):

> (e) The Court shall instruct the jury that if the jury returns an affirmative finding to each
>
> issue submitted under Subsection (b) of this article, it shall answer the following issue:

---

Whether taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

(f) The Court shall charge the jury that in answering the issue submitted under Subsection (e) of this article, the jury:

(1) Shall answer "yes" or "no";

(2) May not answer the issue "no" unless it agrees unanimously and may not answer the issue "yes; unless ten or more jurors agree.[13]

Petitioner's claim is based on the Court of Criminal Appeals' prior decision, concluding that it was not permissible for the court to review the jury's answer to the mitigating issue.  See, *Colella v. State,* 915 S.W.2d 834 (Tex. Cr. App. 1995)[14].

Article 37.071 essentially grants jurors unfettered discretion as to when they will impose the death penalty.  While such discretion is necessary to allow the jury to give effect to mitigating evidence, Petitioner suggests there must be some type of meaningful review of the jury's decision.  Otherwise, the procedure is subject again to being applied arbitrarily and capriciously, which was the defect which brought down Texas' original death penalty scheme.

A.  A fundamental guarantee of the Eighth Amendment, as well as due process, is that appellate

---

13   Instructions tracking this statute were submitted to the jury. (T. II 428-436).

14   In *Colella*, the court concluded that the weighing of mitigating evidence was a subjective determination, which could not be subject to appellate review.  It should be noted that conclusion is not dictated by any Texas Statute.  Instead, Art. 44.251(a), Tex. Code Cr. Proc., authorizes a court to reform a death sentence if there is insufficient evidence to support a negative answer to the second special issue.

courts will meaningfully review death sentences to ensure the sentence was not arbitrarily imposed, and was not the result of passion or prejudice.

Following *Furman v. Georgia,* 408 U.S. 238, the Texas legislature enacted Article 37.071 in an attempt to narrow the class of defendants eligible for the death penalty. They did that in two ways. One was to limit the types of murder subject to the death penalty. The other was to submit two special issues which the jury had to answer affirmatively. Under the post-*Furman* scheme, a jury's discretion was substantially narrowed. They did not have the alternative to impose a life or death sentence. Instead, they were limited to answering specific issues. See, *Jurek v. Texas,* 428 U.S. 262, 277 (1976) (Burger, J., concurring) (statute does not extend discretionary power to dispense mercy, and it should not be assumed that juries will disobey or nullify their instructions). In upholding the Texas scheme, this Court in *Jurek* emphasized the importance of appellate review, noting:

By providing prompt judicial review of the jury's decision in a court with statewide jurisdiction, Texas has provided a means to promote the evenhanded, rational, and consistent imposition of death sentences under law. Because this system serves to assure that sentences of death will not be "wantonly" or "freakishly" imposed, it does not violate the constitution. *Jurek,* at 277.

A companion case to *Jurek* was *Gregg v. Georgia*, 428 U.S. 153 (1976). Under the Georgia scheme, various aggravated circumstances are listed which the jury must find before a death sentence is warranted. The jury is then authorized to consider any other appropriate aggravating or mitigating circumstances, and determine whether a life or death sentence should

be imposed.  However, they are not required to find any mitigating circumstance in order to make a recommendation of mercy.  Thus, jurors in Georgia are essentially given discretion to impose life or death once an aggravating circumstance is found.  The Supreme Court found that scheme was constitutional, focusing on the appellate review provided in Georgia, noting:

> As an important additional safeguard against arbitrariness and caprice, the Georgia statutory scheme provides for automatic appeal of all death sentences to the State Supreme Court.  That Court is required by statute to review each sentence of death and determine whether it was imposed under the influence of passion or prejudice, whether the evidence supports the jury's finding of a statutory aggravating circumstance, and whether the sentence is disproportionate compared to those sentences imposed in similar cases. *Gregg v. Georgia,* 428 U.S., at 198.

The Court in *Gregg* also noted that proportionality review was intended to prevent caprice in the imposition of the death penalty.  428 U.S. at 205 (such review eliminates the possibility a person will be sentenced to death by an aberrant jury).  Both the majority and concurring opinions focused on appellate review in upholding the Georgia sentencing scheme.  See, 428 U.S. at 222 (White, Burger, Rehnquist, J., concurring), which Petitioner suggests emphasizes its importance in a constitutional death penalty scheme.

In *Pulley v. Harris*, 465 U.S. 37 (1984), the Court addressed the issue of whether proportionality review was required in every death penalty case.  In California, a defendant is not subject to the death penalty unless special circumstances are alleged in the indictment, and determined at the guilt stage.  If the defendant is found guilty and special circumstances are

found to exist, then a sentencing hearing is conducted. The jury is provided with a list of relevant factors, and called upon to determine whether a life or death sentence should be imposed. If a verdict of death is imposed, the trial judge must review the evidence and make an independent determination as to whether the weight of evidence supports the jury verdict. That determination must include the reasons for the judge's findings. If the death penalty is not set aside, there is automatic review by the California Supreme Court.

In *Pulley v. Harris,* the Court rejected a claim that proportionality analysis is required in every case. However, the Court again emphasized that effective appellate review is necessary for a capital sentencing scheme to pass constitutional muster. Focusing on the California procedure, the Court found the requirement that the trial judge specify his reasons for declining to modify the death sentence serves "to assure thoughtful and effective appellate review, focusing upon the circumstances present in each particular case." 465 U.S. at 53. In a concurring opinion, Justice Stevens reiterated that appellate review plays an essential role in eliminating the arbitrariness and capriciousness which infected most death penalty schemes struck down in *Furman.* He reviewed the cases upholding the various capital sentencing schemes, and noted that in each meaningful appellate review was provided.[15]

In *Clemons v. Mississippi*, 494 U.S. 738 (1990), the court addressed the proper scope of appellate review, addressing how an appellate court should handle a death sentence where the

---

15    The court noted that Texas and California are the only states which do not require proportionality review. However, as noted above, the two schemes differ because the death sentence is initially reviewed by the trial court in California. The trial court can modify the death sentence if that is appropriate and must state specific reasons for its decision which can then be reviewed by an appellate court. In effect, Petitioner suggests the trial court in California initially performs a proportionality review. That review distinguishes the Texas scheme, where there is no review by either the trial or appellate courts.

court concludes one of the aggravating circumstances is invalid or improper. The court found no problem with an appellate court reweighing the evidence, and determining whether the death sentence was appropriate based on the remaining evidence. In addressing the scope of such review, the court noted:

> We see no reason to believe that careful appellate weighing of aggravating against mitigating circumstances in cases such as this would not produce "measured consistent application" of the death penalty or in any way be unfair to the defendant. *It is routine task of appellate courts to decide whether the evidence supports a jury verdict and in capital cases in "weighing" States,[16] to consider whether the evidence is such that the sentencer should have arrived at the death sentence that was imposed.* And, as the opinion below indicates, a similar process of weighing aggravating and mitigating evidence is involved in an appellate court's proportionality review. Furthermore, this court has repeatedly emphasized that meaningful appellate review of death sentences promotes reliability and consistency.

*id.* 494 U.S. at 749. (emphasis supplied).

The court went on to address the importance of independently weighing the evidence, and noted that an automatic rule of affirmance in a "weighing state" would not be proper, because it would not provide the "individualized treatment" that results "from actual reweighing of the mix of mitigating factors and aggravating circumstances." *id.* 494 U.S. at 752.

---

16 Petitioner suggests Texas is now a "weighing" state. Under Art. 37.071, jurors now weigh all the evidence to determine whether a life or death sentence should be imposed. This is contrary to the former statutes, which merely asked the jury to answer two or three specific questions, and automatically set the sentence based on those answers.

The court addressed the scope of appellate review again in *Parker v. Dugger*, 498 U.S. 308 (1991) and stated:

> We have emphasized repeatedly the crucial role of meaningful appellate review in ensuring that the death penalty is not imposed either arbitrarily or irrationally (citations omitted). We have held specifically that the Florida Supreme Court's system of independent review of death sentences minimizes the risk of constitutional error. *id.* 498 U.S. at 739.

The court went on to note:

> It cannot be gainsaid that meaningful appellate review requires that the appellate court consider the defendant's actual record. What is important is an individualized determination on the basis of the character of the individual and the circumstances of the crime. *id.*

The court reversed the decision in *Parker v. Dugger,* because the appellate court did not make it's own independent determination as to the propriety of the death sentence. By failing to focus on the individual mitigating factors, the court concluded the defendant did not receive individualized sentencing.

B. The Texas Scheme now grants jurors unfettered discretion to impose the death penalty without any significant appellate review, where jurors are not limited in the facts they can consider and are not required to state the basis for their decision.

The Texas scheme currently in place is no longer the one upheld as constitutional in *Jurek*. In *Jurek,* the Court relied on the Texas requirement that appellate review is mandatory.

However, Petitioner suggests while such review was sufficient under the old scheme, it is not sufficient under the new.  Under the old scheme, a jury's discretion was substantially limited. They were only asked to answer specific special issues, which were easily determined from the facts.  Thus, an appellate court could easily review the record, and determine whether the answers were supported by the evidence.[17]   Review was not unlike sufficiency challenges to determinations of guilt.  Because there was no jury discretion, appellate review was eased.  Thus, there was no need for proportionality review, or any other type of review, beyond that limited to determining whether the issues were supported by the evidence.  Petitioner suggests that is now no longer the case.

As noted in *Pulley v. Harris*, Texas is one of the few states without some type of proportionality review.  Petitioner suggests it is now the only state without proportionality review where the jury is given unlimited discretion to impose a life or death sentence.  It is that distinguishing factor which calls the constitutionality of the Texas sentencing scheme into question.  Further compounding the problem is the lack of any procedure for the jury to specify what it's decision is based on, which would sharpen any type of meaningful appellate review.

Among the various states, the statutory scheme most similar to the one in Texas is Oregon's.  Like Texas, Oregon asks jurors to determine whether a defendant will be a future danger.  Also, like Texas, they recently amended their statutory scheme to allow the jury to consider mitigating evidence.  The procedure they chose was a separate special issue, asking whether the defendant should be sentenced to death or life.  An attack similar to the one raised

---

17   The standard consistently applied is whether, viewing the evidence in the light most favorable to the finding, any rational trier of fact could have answered the issues affirmatively. See, e.g., *Keeton v. State,* 724 S.W.2d 58 (Tex. Cr. App. 1987).

here was mounted on that statute, and addressed in *State v. Moore*, 927 P.2d 1073 (OR 1996). There, the defendant claimed the Oregon scheme violated his right to due process, because it prevented meaningful appellate review. The court rejected that claim by holding the jury's decision could be reviewed to determine whether it was rationally based on the evidence. In doing so, the court implied some form of appellate review must be provided for the statute to be constitutional.

Petitioner suggests the Texas death penalty scheme has come full circle. Jurors now have almost unlimited discretion in imposing the death penalty. While that procedure may be constitutionally required, it creates problems for appellate review. This exact dilemma was recognized in *Gregg*, where the defendant attacked the Georgia procedure as being too broad and vague. The Court rejected that claim, noting:

> Where the sentencing authority is required to specify the factors it relied upon in reaching its decision, the further safeguard of meaningful appellate review is available to ensure that death sentences are not imposed capriciously or in a freakish manner.

Petitioner suggests effective appellate review is the check on the jury discretion a capital sentencing scheme must provide to be constitutional. Jurors must be free to consider whatever evidence they may deem relevant to sentencing. With that discretion, however, is the risk it will be exercised arbitrarily or capriciously, or that the jury will rely on improper factors. That is where appellate review comes into play, because it can ensure that does not occur. Petitioner suggests the Supreme Court emphasized the importance of such review when it reinstated the death penalty. In *Woodson v. North Carolina*, 428 U.S. 280, 302 (1976), the court noted: