And there is no way under the North Carolina law for the judiciary to check arbitrary and capricious exercise of that power through a review of death sentences....

...While a mandatory death penalty statute may reasonably be expected to increase the number of persons sentenced to death, it does not fulfill *Furman's* basic requirement by replacing arbitrary and wanton jury discretion with objective standards to guide, regularize, *and make rationally reviewable the process for imposing a sentence of death.* (emphasis supplied).

The same concept was recognized in *Roberts v. Louisiana*, 428 U.S. 325, 335 (1976). (The Louisiana procedure neither provides standards to channel jury judgments, nor permits review to check the arbitrary exercise of the capital jury's *de facto* sentencing discretion.) Additionally, in *Zant v. Stephens*, 462 U.S. 862 (1983), the court noted independent review of the propriety of a death sentence provides a check on the arbitrary imposition of such a sentence.

In *California v. Brown*, 479 U.S. 538 (1987), the Court considered a challenge to an instruction compelling jurors to eliminate extraneous emotional factors from their deliberation. *Brown*, 479 U.S. at 539. Instead of violating the Eighth Amendment, the court found such an instruction benefitted the capital sentencing process by preventing jurors from making decisions based on evidence not presented at the trial. The court noted such an instruction enhances reliability by providing the opportunity for meaningful appellate review of a capital sentencing decision based solely on the evidence in the record. *Brown*, 479 U.S. at 543. Petitioner suggests all these decisions establish the jury's decision *to impose the death penalty* must be subject to some type of review.

Petitioner suggests there is now no meaningful appellate review of a death sentence in Texas. While the Court can still determine whether the first issue is supported by the evidence, a determination of whether a life or death sentence should be imposed is not subject to any appellate review. There is no procedure in place for the jury to specify what mitigating circumstances it may find to exist, or what aggravating circumstances it may find. In short, neither a trial judge nor an appellate court have any way of determining what the jury's decision is based on. As a result, there is no way to determine whether the jury's findings are supported by the evidence, or whether the decision was arbitrary or capricious. Petitioner suggests that renders the statutory scheme unconstitutional.

Under the current Texas Scheme as applied, a death sentence will be automatically affirmed where there is sufficient evidence to establish a defendant's eligibility for the death penalty.

As noted in *Parker v. Dugger,* a rule of automatic affirmance runs afoul of the Eighth Amendment. Where a death sentence is automatically affirmed, there necessarily can be no individualized determination of a defendant's "death worthiness". Petitioner suggests that rationale precludes a court from refusing to review a jury's selection decision.[18] In *Parker v. Dugger,* there was no doubt the defendant was eligible for the death penalty under the Florida statute. However, the fact he was eligible, and the death sentence had been imposed by the jury, did not preclude review by the Supreme Court. Further, it was not the eligibility selection itself

---

18  Death penalty decisions are in two phases, the eligibility decision and the selection decision. In the first phase, there must be some procedure in place to narrow the class of murders where the death penalty is available. In the selection decision, the jury must be given discretion to decide whether a death or life sentence is more appropriate under the particular facts and circumstances of that case. See, *Tuilaepa v. California,* 512 U.S. 567 (1994).

which was reviewed.  Instead, it was the selection decision.

Petitioner suggests meaningful appellate review encompasses both the eligibility decision, and the selection decision.  Under the current Texas Scheme, the court only reviews the eligibility decision.  If the evidence is sufficient to establish a defendant's eligibility for the death sentence, the sentence is affirmed.  There is no review of the selection decision, which Petitioner suggests is the current vice in the Texas Statute.  Just as the court could not refuse to review the defendant's death worthiness in *Parker v. Dugger,* Petitioner suggests Texas courts cannot refuse to review the jury's decision to impose the death sentence.

Petitioner suggests there is now no check on a jury's arbitrary or capricious decision to impose the death penalty in Texas.  Because the Court will not review the jury's ultimate decision to impose the death penalty, there is no remedy for a sentence which the Court may feel is arbitrary or freakish.  As a result, a defendant may be sentenced to life or death by different jurors, based on the same evidence.

For the foregoing reasons, Petitioner suggests the Texas Sentencing Scheme as currently applied is unconstitutional, and therefore, his sentence must be set aside.

### Point of Error Number Eight

Petitioner's right to the effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Texas law was violated as a result of trial counsel's failure to investigate, develop and present available mitigation evidence, as well as evidence rebutting portions of the state's case in aggravation.

A.      Applicable legal principles.

In determining whether trial defense counsel were ineffective in failing to adequately investigate and present the available mitigating evidence during sentencing, this Court must apply the standards set forth in *Strickland v. Washington,* 466 U.S. 668 (1984).  Under *Strickland*, the defendant "must show that counsel's representation fell below an objective standard of reasonableness," which must be judged under "prevailing professional norms." *Id.* at 688.  In evaluating a claim that counsel failed to adequately investigate, *Strickland* states that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691.

The *Strickland* standards were explained more fully in *Wiggins v. Smith*, 539 U.S. 510 (2003), which was tried in Maryland in October 1989.  In *Wiggins*, in reviewing the assertion of ineffective assistance of counsel for failing to prepare and present mitigation evidence, the Court defined the preliminary issue as a determination of "whether the investigation supporting counsel's decision not to introduce mitigating evidence of Wiggins' background *was itself reasonable*." 539 U.S. at 523 (emphasis in original).  In terms of the "prevailing professional norms" for the scope of a reasonable investigation, the Court considered "the professional standards that prevailed in Maryland in 1989," and "the standards for capital defense work articulated by the American Bar Association (ABA)" that provide that investigations into mitigating evidence "should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." *Id.* (quoting the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases [hereinafter "ABA Guidelines" or "Guidelines"] 11.4.I(C), p. 93

---

(February 1989)) (emphasis added).  The Court referred to the ABA Guidelines as "well-defined norms" for counsel's performance.  *Id.* (citing the ABA standards again).

In addition, in *Rompilla v. Beard*, 545 U.S. 374 (2005), which involved a 1988 trial, the Court cited and quoted the 1989 ABA Death Penalty Guidelines, which "applied the clear requirements for investigation set forth in the earlier Standards to death penalty cases." *Id.* at 387 n.7.  The Court also cited and quoted the 2003 ABA Death Penalty Guidelines as an "even more explicit" statement, but applying the same standards.  *Id.*  Thus, it is clear that the Court found that the 1989 Guidelines, as well as the 2003 Guidelines, describe the "well-defined" norms for counsel in capital cases tried before or after their publication in 1989 and revision in 2003.  *See also Hamblin v. Mitchell*, 354 F.3d 482 (6th Cir. 2003) (relying on both the 1989 and 2003 guidelines, the court found ineffective assistance of counsel in sentencing in 1983).[19]

The Guidelines simply provide the framework within which counsel performs in ensuring that constitutionally relevant and necessary evidence is presented to the sentencing jury.  In capital sentencing, the United States Supreme Court has held that the Eighth and Fourteenth Amendments require that sentencing procedures "focus the jury's attention on the particularized nature of the crime," *Gregg v. Georgia,* 428 U.S. 153, 206 (1976) (plurality opinion), while also allowing "the particularized consideration of relevant aspects of the character and record" of the

---

19 In *Hamblin*, the court noted:

> New ABA Guidelines adopted in 2003 simply explain in greater detail than the 1989 Guidelines the obligations of counsel to investigate mitigating evidence.  The 2003 ABA Guidelines do not depart in principle or concept from *Strickland, Wiggins,* or our court's previous cases concerning counsel's obligation to investigate mitigation circumstances.

*Id.* at 487.

individual defendant, *Woodson v. North Carolina,* 428 U.S. 280, 303 (1976).  Because "an

individualized decision is essential," *Lockett v. Ohio,* 438 U.S. 586, 605 (1978), the Eighth

Amendment mandates that the sentencer "not be precluded from considering *as a mitigating*

*factor,* any aspect of a defendant's character or record and any circumstances of the offense that

the defendant proffers as a basis for a sentence less than death," *id.* at 604.  Likewise, the

sentencer may not "refuse to consider, *as a matter of law*, any relevant mitigating evidence,"

*Eddings v. Oklahoma,* 455 U.S. 104, 114 (1982), such as a "troubled youth," *id.* at 107.[20]

Relevant mitigating evidence is not limited only to evidence that would "relate

specifically to petitioner's culpability for the crime he committed."  *Skipper v. South Carolina,*

476 U.S. 1, 4 (1986).  Likewise, there is no requirement that mitigating evidence even have a

"nexus" to the offenses or that the defendant make any showing that "the criminal act was

attributable" in any way to the mitigating factors.  *Tennard v. Dretke,* 542 U.S. 274, 286 (2004).

Relevant mitigating evidence includes any evidence that would be "mitigating" in the sense that

it "might serve 'as a basis for a sentence less than death.'"  *Skipper*, 476 U.S. at 5 (quoting

*Lockett*, 438 U.S. at 604).  *See also Lambright v. Schriro*, 490 F.3d 1103, 1115 (9th Cir. 2007)

("If evidence relating to life circumstances with no causal relationship to the crime were to be

eliminated, significant aspects of a defendant's disadvantaged background, emotional and mental

problems, and adverse history, as well as his positive character traits, would not be considered,

---

20  In *Eddings*, the sentencing judge believed that he was legally prohibited from considering as mitigation
that: the defendant was "raised without proper guidance"; his parents were divorced; he lived "without rules
or supervision" with a mother who was possibly an alcoholic and a prostitute; when he stayed with his father
he was subjected to "excessive physical punishment" and "physical violence"; he was "emotionally
disturbed"; "his mental and emotional development" were less than his 16-years-of-age; and he "had a
sociopathic or antisocial personality disorder."  *Id.* at 107.

even though some of these factors, both positive and negative, might cause a sentencer to determine that a life sentence, rather than death at the hands of the state, is the appropriate punishment for the particular defendant").

In essence, the fundamental Eighth Amendment premise is that if the sentencer fails to consider "those compassionate or mitigating factors stemming from the diverse frailties of humankind," an unacceptable risk exists that the death penalty will be imposed in spite of factors that warrant a less severe penalty. *Woodson*, 428 U.S. at 304. A jury can consider evidence in mitigation, however, only if trial defense counsel vigorously investigates and presents the available evidence.

"Because the scope of mitigation evidence which may be considered by the jury in sentencing is much broader than the range of relevant information which may be considered in determining guilt or innocence, counsel is under a greater obligation to discover and evaluate potential evidence of mitigation." *United States ex rel. Emerson v. Gramley*, 883 F. Supp. 225, 243 (N.D. Ill. 1995), *aff'd*, 91 F.3d 898 (7th Cir. 1996). *See also Frierson v. Woodford*, 463 F.3d 982, 989 (9th Cir. 2006) ("[t]he imperative to cast a wide net for all relevant mitigating evidence is heightened at a capital sentencing hearing").

The responsibility of the lawyer is to walk a mile in the shoes of the client, to see who he is, to get to know his family and the people who care about him, and then to present that information to the jury in a way that can be taken into account in deciding whether the client is so beyond redemption that he should be eliminated from the human community. *Battenfield v. Gibson*, 236 F.3d 1215, 1229 (10th Cir. 2001) (quoting Stephen B. Bright,

---

Advocate in Residence: *The Death Penalty As the Answer to Crime: Costly, Counterproductive and Corrupting*, 36 Santa Clara L. Rev. 1069, 1085-86 (1996)).

In short, the prevailing professional norms in 1997 when Ibarra was tried required, at minimum, that counsel attempt through the mitigation investigation and presentation of evidence to provide some "explanation for petitioner's criminal propensities and some basis for the exercise of mercy." *In re Lucas*, 94 P.3d 477, 481 (Cal. 2004). *See also Caro v. Woodford*, 280 F.3d 1247, 1258 (9th Cir. 2002) ("A little explanation can go a long way" and might make "the difference between life and death").

B.    Trial counsel's conduct was deficient.

Under the ABA Guidelines, investigation for the penalty phase of a capital trial "should begin immediately upon counsel's entry into the case," 1989 Guideline 11.4.1A; 1989 Guideline 11.8.3A, and should be conducted with the assistance of "trained investigators," 1989 Guideline 8.1 Commentary (quoting Goodpaster, *Effective Assistance of Counsel in Capital Cases*, 58 N.Y.U. L. Rev. 299, 344-45 (1983)), such as a "mitigation specialist," 2003 Guideline 4.1.A.1.[21]

Regardless of whether counsel retains a mitigation investigator or a specialist to prepare the social history report and present testimony, the "investigation should comprise efforts to discover all reasonably available mitigating evidence. . . ." 1989 Guideline 11.4.1C. "This duty is intensified (as are many duties) by the unique nature of the death penalty." 1989 Guideline 11.4.1 Commentary.

---

21 "The mitigation specialist compiles a comprehensive and well-documented psycho-social history of the client based on an exhaustive investigation; analyzes the significance of the information in terms of impact on development, including effect on personality and behavior; finds mitigating themes in the client's life history; . . . and works with the defense team and experts to develop a comprehensive and cohesive case in mitigation." 2003 Guideline 4.1 Commentary.

In fulfilling counsel's duties, the Guidelines specify that counsel should investigate the defendant's full history, including "medical history, (mental and physical illness or injury, alcohol and drug use, birth trauma and developmental delays); . . . family and social history (including physical, sexual or emotional abuse)." 1989 Guideline 11.4.1.D.2. Counsel must also interview "witnesses familiar with aspects of the client's history that might affect the . . . possible mitigating reasons for the offense(s), and/or other mitigating evidence to show why the client should not be sentenced to death." 1989 Guideline 11.4.1.D.3. Counsel's duty "is not discharged merely by conducting a limited investigation." *Lambright*, 490 F.3d at 1120. Counsel must "seek records, interview family members and friends, and obtain appropriate mental evaluations well in advance of trial." *Poindexter v. Mitchell*, 454 F.3d 564, 579 (6th Cir. 2006).

In cases involving a foreign national defendant, counsel has a duty to determine whether the defendant is in fact a foreign national and, if so, then counsel has a duty to advise the client of his rights, gain the client's consent, and "immediately contact the client's consular office and inform it of the client's detention or arrest." 2003 Guideline 10.6. *See also Murphy v. Netherland*, 116 F.3d 97, 100 (4th Cir. 1997) ("Treaties are one of the first sources that would be consulted by a reasonably diligent counsel representing a foreign national"); *Valdez v. State*, 46 P.3d 703, 710 (Okla. Crim. App. 2002) (trial counsel has a "duty to inform" the defendant of his right to contact the consulate). This is particularly important because the investigation is obviously more complicated and time-consuming when the bulk of the background investigation must be conducted in another country. Consulates can assist counsel, however, by "assisting in

investigations abroad," and other matters.  2003 Guideline 10.6 Commentary.

In this case, from the time of appointment in October 1996, CR Vol. I at 16-17, Ibarra's trial counsel, Walter Reaves and Angel Gavito, knew or reasonably should have known that Ibarra was a citizen of Mexico.  Indeed, Gavito had been appointed in April 1987 when Ibarra was first indicted specifically because Gavito is fluent in Spanish and Ibarra speaks very little English.  TR Vol. 5 at 2.  Counsel also knew, as police officers did, that Ibarra was an illegal alien, TR Vol. 6 at 4, and that his family was from Durango, Mexico, TR Vol. 41 at 1317-18; TR Vol. 46 at 1765.

Despite this knowledge, counsel did not contact the Mexican consulate to seek assistance.  Counsel failed to do so even though they were clearly aware of the significant role the Mexican consulate could have played.  As counsel described it in the direct appeal brief, notice to the consulate "is especially critical in a death penalty case where the sending state, such as Mexico, opposes capital punishment.  Such governments can be expected to offer extensive assistance and support to ensure that their citizens are not executed." Direct Appeal Brief at 46.  Indeed, "Mexico has a long history of providing financial and legal support to its nationals charged with capital crimes in the United States." *Marquez-Burrola v. State*, 157 P.3d 749, 764 n.13 (Okla Crim. App. 2007).  *See also Torres v. State*, 120 P.3d 1184, 1188 (Okla. Crim. App. 2005) (Even as of 1993, Mexico "provided extensive assistance to capital defendants," including "gathering of mitigation evidence and locating mitigating witnesses in Mexico and the United States").

Despite the DNA and other evidence against Ibarra,[22] and the fact that counsel knew the

---

22  Two eyewitnesses identified Ibarra as the man they saw outside the crime scene on the morning of the murder.  These eyewitnesses and a third identified Ibarra's car.  Ibarra knew the victim's family.  At the time of his arrest, just hours after the crimes, he had what appeared to officers to be scratch marks on his face,

---

Ramiro Rubi Ibarra—Petition for Writ of Habeas Corpus                    Page 64

state would seek the death penalty if convicted, counsel also failed almost completely to prepare

for sentencing and treated it as if it were an afterthought.  Specifically, while counsel requested

investigative assistance shortly after appointment, the funding request made no mention of the

need to investigate mitigation evidence in anticipation of sentencing.  CR Vol. I-19.  Even when

additional investigative funding was requested in July 1997, counsel still did not mention the

need to investigate mitigation evidence.  CR Vol. I-40.

Counsel never even acknowledged the possibility of a capital sentencing hearing in

pretrial motions or funding requests until August 27, 1997, when counsel requested and obtained

funding for a mental health evaluation of Ibarra.  CR Vol. I-154.  Counsel retained Stephen

Mark, M.D., a general psychiatrist, but spoke to him only briefly before the evaluation to request

a general "psych eval – re punishment phase" and to request a particular focus on the

unreliability of eyewitness testimony.  Exhibit (hereinafter "Exh." which also refers to exhibits

located in a separate volume of this filing) 1 (Dr. Mark's handwritten notes).  The only

information provided to Dr. Mark–on the date of his evaluation–was evidence relating to the

state's investigation and evidence of guilt.  Exh. 2 (Fax from Reaves to Mark dated 8/29/97).  On

August 29, 1997, Dr. Mark met with Ibarra a single time and learned, at least, from Ibarra about

his "impoverished youth" as one of thirteen children growing up "out in the country in

Mexico."[23]  Exh. 3 (Affidavit of Dr. Mark).  Nonetheless, counsel made no attempt to investigate

Ibarra's youth or his social history in Mexico.  They also narrowed the focus of Dr. Mark, their

---

neck, and chest. DNA testing matched Ibarra's DNA to semen evidence obtained from the victim's body and underwear.

23  Dr. Mark saw Ibarra one other time, on September 18, 1997, solely to examine the issue of competence following Ibarra's mid-trial suicide attempt.

only mental health expert, to the reliability of eyewitness identifications.  Exh. 4 (Letter from Reaves to Mark dated 9/10/97).

Counsel so completely ignored even the possibility of sentencing that it is clear that counsel suffered the "grandiose, perhaps even delusional belief" of acquittal.  *Cave v. Singletary*, 971 F.2d 1513, 1518 (11th Cir. 1992).  This is simply unreasonable in a capital murder case where "defense counsel must prepare for the eventuality that a guilty verdict may be returned" and capital sentencing reached regardless of counsel's beliefs and opinions.  *State v. Sullivan*, 596 So. 2d 177, 191 (La. 1992), *rev'd on other grounds*, 508 U.S. 275 (1993).  Indeed, counsel failed to even interview Ibarra's two brothers and one sister who lived in Texas at the time of trial.  To the extent counsel talked to these brothers at all, the discussion surrounded only guilt or innocence issues since they had lived with him and been present at the time of his arrest.  Exh. 5 (Affidavit of Silvano Ibarra Rubi).[24]  Their testimony was also limited to these issues.

Counsel's conduct was especially deficient here because it is beyond question that "an attorney must look into readily available sources of evidence," *Hall v. Washington*, 106 F.3d 742, 749-50 (7th Cir. 1997), and "an objective standard of reasonable performance for defense counsel in a capital case would have required counsel [at minimum] to inquire whether the defendant had been abused as a child," *Ex parte Gonzales*, 204 S.W.3d 391, 397 (Tex. Crim. App. 2006).

In addition to ignoring the development of mitigation evidence, counsel also ignored the need to investigate to rebut the state's sentencing evidence, which is also mandated.  *See*

---

24  Other than the affidavits of Dr. Mark, Agustin Rodriguez de la Gala, Carole Romey, Ph.D. and Pablo Stewart, M.D., all of the affidavits submitted as exhibits were written and signed in the Spanish language and translated into English.  Both the Spanish and English versions are included as one exhibit.

*Rompilla*, 545 U.S. at 386 n.5 ("[c]ounsel's obligation to rebut aggravating evidence extended

beyond arguing it ought to be kept out," and included a duty to investigate); 1989 Guideline

11.4.1.C (Counsel's "investigation should comprise efforts to discover all reasonably available . .

. evidence to rebut any aggravating evidence that may be introduced by the prosecutor").

Specifically, counsel were aware that the state would allege numerous extraneous offenses and

bad acts in sentencing.  CR Vol. I-146.  For example, the state specifically alleged in its pretrial

notice that between 1990 and 1995 (specifically 7/15/95), Ibarra had sexual intercourse with his

own daughter, Luz Magdalena Ibarra.  Nonetheless, counsel did not even attempt to interview

Magda, Exh. 6 (Affidavit of Luz Magdalena Ibarra), or Ibarra's wife, Maria, who was the source

of the allegation and lived in the local area in Texas.

Like counsel in *Wiggins*, Ibarra's trial defense counsel's conduct was deficient because

the evidence reveals that counsel failed to adequately investigate and the "failure to investigate

thoroughly resulted from inattention, not reasoned strategic judgment."  539 U.S. at 526.

Indeed, "the lack of preparation is striking and inexplicable," *Marshall v. Cathel*, 428 F.3d 452,

466 (3rd Cir. 2005), "in light of [counsel's] knowledge from the inception that the case would be

a capital one and that his client faced powerful [prosecutorial] evidence," *id.* at 472.

Counsel's almost complete failure to investigate for sentencing was deficient conduct.

*See, e.g., Poindexter*, 454 F.3d at 578-79 ("[C]ounsel failed to conduct virtually any

investigation, let alone sufficient investigation to make any strategic choices possible.  They did

not request medical, educational, or governmental records that would have given insight into [the

petitioner's] background. . . .  They did not consult with an investigator or mitigation specialist,

---

who could have assisted in reconstructing [the petitioner's] social history. They failed to

interview key family members and friends who could have described his upbringing"); *Harries*

*v. Bell*, 417 F.3d 631, 638 (6th Cir. 2005) (Despite the requirements of the ABA Guidelines to

investigate "to discover all reasonably available mitigating evidence," *id.* 638 (quoting ABA

Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases §

11.4.1(C), p. 93 (1989), counsel limited their investigation to a few phone calls with family

members, sending requests for information to some of the institutions in which the petitioner had

been confined, and interviewing the defendant, his co-defendant, and two state witnesses);

*Lambright*, 490 F.3d at 1118 (Counsel spent less than five hour preparing for sentencing and

"failed to do even a minimal investigation of 'classic mitigation evidence,' notwithstanding the

fact that he knew such evidence potentially existed"); *Correll v. Ryan*, 465 F.3d 1006 (9th Cir.

2006) (Counsel only met with the petitioner's father, sister, and brother once and at the same

time. He did not obtain school records, police reports on prior convictions, records from the

California Youth Authority, medical records, or psychiatric records).

Counsel's conduct in this case is even far more egregious than that of the trial defense

counsel found to be ineffective in *Wiggins*. Prior to trial, counsel in *Wiggins* arranged for a

psychologist to test Wiggins and had obtained a presentencing investigation report (PSI) and his

social services (DSS) records. Prior to sentencing, counsel filed a motion to bifurcate sentencing

so they could present evidence in the first phase that Wiggins was not directly responsible for the

murder (a finding required by state law for death eligibility) and in the second phase could

present mitigation. The court denied the motion. In opening statements, counsel argued both

---

issues and said that Wiggins had a difficult life and no prior convictions, but counsel presented no life history evidence during mitigation.

In reviewing the claim of ineffective assistance of counsel, the Supreme Court described the issue in the case as "not whether counsel should have presented a mitigation case. Rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of Wiggins' background *was itself reasonable.*" *Id.* at 523 (emphasis in original).

In *Wiggins*, the Court held that "[c]ounsel's decision not to expand their investigation beyond the PSI and the DSS records fell short of the professional standards that prevailed in Maryland and "similarly fell short of the standards for capital defense work articulated by the American Bar Association (ABA) – standards to which we have referred as 'guides to determining what is reasonable.'" *Id.* at 524 (quoting *Strickland, supra*, at 688; *Williams v. Taylor, supra*, at 396). Applying these standards, the Court found that, "[d]espite these well-defined norms, . . . counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." *Id.* (citing the ABA standards again). The Court found that "[t]he scope of their investigation was also unreasonable in light of what counsel actually discovered" in the records available to them because

> any reasonably competent attorney would have realized that pursuing these leads was
> necessary to making an informed choice among possible defenses, particularly given . . . .
> [that] counsel uncovered no evidence in their investigation to suggest that . . . further
> investigation would have been fruitless. . . .

---

*Id.* at 525 (citation omitted).

In assessing the reasonableness of an attorney's investigation, . . . , a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further. Even assuming [counsel] limited the scope of their investigation for strategic reasons, *Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy. Rather, a reviewing court must consider the reasonableness of the investigation said to support the strategy.

*Id.* at 527.

In *Wiggins*, "counsel chose to abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible." 539 U.S. at 527-28. "[C]ounsel were not in a position to make a reasonable strategic choice . . . because the investigation supporting their choice was unreasonable." *Id.* at 536. Counsel's conduct was deficient because the trial record revealed that the "failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment." *Id.* at 526.

Here, like in *Wiggins*, counsel failed to investigate, seek the assistance of a mitigation specialist, or to even seek the assistance of the Mexican consulate despite counsel's awareness of the following information, which was at least known to counsel through the evidence presented pretrial and during trial and sentencing:

- Ibarra was in the United States as an illegal alien. TR Vol. 6 at 4.

- Ibarra lived on a "ranch" in Mexico until 1973 when he came to the United States. TR

Vol. 6 at 33.

- Ibarra's father "worked on the land" while his mother "worked at home." TR Vol. 47 at 1764.

- When he was growing up, the Ibarra family lived in a "very humble" house that had only a kitchen and bedroom. TR Vol. 47 at 1764-65.

- Ibarra spent only six years in primary school and had three years of commercial career schooling in Mexico. TR Vol. 6 at 33.

- Ibarra was one of five brothers and six sisters living at the time of trial. TR Vol. 40 at 1263-64; TR Vol. 47 at 1764.

- Ibarra came to the U.S. to work so he could send money home to help support his family and he continually did so. TR Vol. 47 at 1766-67.

- Ibarra had a son born of Maria Gandara Ibarra in December 1985, but his son died, after an extended hospital stay, with holes in his heart when he was just one year old.   TR Vol. 47 at 1773.

- Ibarra had four other children with Maria. TR Vol. 47 at 1778.

- Ibarra had a daughter that was born in Mexico, but came to live with him for five years in the U.S. when she was an adult. TR Vol. 47 at 1793, 1795.

Counsel could not possibly have had a reasonable strategy not to investigate further with only the limited information available to them. In assessing whether counsel's conduct was reasonable in both *Wiggins* and *Williams*, the Court held that when counsel fails to adequately investigate or to make a reasonable decision after investigation, counsel's performance is

deficient because counsel cannot have a valid "strategy" not to pursue and present evidence that

is unknown to counsel due to a failure to adequately investigate. *Wiggins*, 539 U.S. at 527-28

("counsel chose to abandon their investigation at an unreasonable juncture, making a fully

informed decision with respect to sentencing strategy impossible"); *Williams*, 529 U.S. at 396

("the failure to introduce the comparatively voluminous amount of evidence that did speak in

Williams' favor was not justified by a tactical decision to focus on Williams' voluntary

confession" because "trial counsel did not fulfill their obligation to conduct a thorough

investigation of the defendant's background"). *See also Miller v. Dretke*, 420 F.3d 356, 363 (5th

Cir. 2005) ("While counsel may have made reasonable [trial] tactical decisions based on the

information that he had at the time, [this Court's] review must focus on whether the information

he possessed would have led a reasonable attorney to investigate further"); *White v. Roper*, 416

F.3d 728, 732 (8th Cir. 2005) ("the presumption of sound trial strategy founders . . . on the rocks

of ignorances").

More specifically, counsel's almost exclusive trial and sentencing focus on guilt-or-

innocence issues and a general denial of the state's evidence[25] cannot justify the failure to

---

25  Throughout the pre-trial period and the trial itself, counsel's exclusive focus was  challenging the
reliability of the state's case and asserting innocence. *See, e.g.*, TR Vol. 29 at 26.  In sentencing, defense
counsel's argument did not "focus[] exclusively on petitioner's direct responsibility," but included "a
halfhearted mitigation case...." *Wiggins*, 539 U.S. at 526.  Specifically, counsel presented the testimony of
Ibarra's youngest sister, Sabina, and his wife, Maria.  Sabina, who had not been interviewed or even prepared
for her testimony, Exh. 7 (Affidavit of Sabina Gonzales), testified briefly and very generally that Ibarra was
one of eleven siblings in a family that "worked on the land" and lived in a "very humble" house.  TR Vol.
47 at 1764-65.  After Ibarra came to the United States, he sent money home to help support the family and
he helped support Sabina when she came to the United States.  TR Vol. 47 at 1767-69.

Ibarra's wife, Maria, then testified.  She provided generally that five children were born of her union
with Ibarra, but the oldest died due to heart defects.  TR Vol. 47 at 1774-78.  She also testified that Ibarra
generally held a job.  Defense counsel then elicited testimony from her that Ibarra  was physically abusive
towards her two or three times a year but it was "nothing much."  TR Vol. 47 at 1786.  During cross-

---

investigate Ibarra's social and mental health history for sentencing. *See, e.g., Soffar v. Dretke*, 368 F.3d 441, 474, *amended*, 391 F.3d 703 (5th Cir. 2004) ("an actual failure to investigate cannot be excused by a hypothetical decision not to use its unknown results"). "[T]here was no strategic decision at all because [counsel] was ignorant of various other mitigation strategies he could have employed." *Battenfield*, 236 F.3d at 1229. *See also Williams v. Anderson*, 460 F.3d 789, 804 (6th Cir. 2006) (counsel's conduct was not excused by strategy to focus only on residual doubt "because defense counsel never conducted an investigation into mitigation before deciding to pursue residual doubt"). Indeed, preparation for sentencing in this case was especially important because "[t]his case may fairly be called a 'second stage' case," where "[t]he only real question appeared to be what punishment was appropriate." *Marquez-Burrola*, 157 P.3d at 767.

If counsel had simply notified the Mexican consulate of Ibarra's pending capital murder trial, Mexico "would have played as active a role as necessary to help" counsel, including assisting counsel with investigations in Mexico by locating and interviewing witnesses and obtaining affidavits and documentary evidence, and by ensuring that the Mexican witnesses would be available for testimony in the trial and/or sentencing. Mexico would have even assisted with funding, if counsel had been denied adequate funding by the trial court. Exh. 8 (Affidavit of Agustin Rodriguez de la Gala with Affidavit of Roberto Rodriguez Hernandez Attached).[26]

---

examination, the prosecution elicited testimony, as addressed previously, that Ibarra was sexually inappropriate with his daughter.

26  Mexico did not learn of Ibarra's case until after he was sentenced to death and they were notified by a reporter of the death sentence, but they immediately assisted trial counsel in filing a motion for new trial and

With or without the assistance of the consulate, if counsel had adequately investigated, the evidence would have revealed the following substantial mitigation evidence of extreme poverty, physical and mental abuse and anguish, mental retardation, and Posttraumatic Stress Disorder.

At least eight of Ibarra's living siblings, a former girlfriend in Mexico, his daughter from Mexico, and a former school teacher would have been available to testify about Ibarra's social history and background. Their testimony would have established that Ibarra is a Mexican citizen, born in the state of Zacatecas near the border with the state of Durango. He is one of thirteen children born to Pablo Ibarra and Candelaria Ibarra Rubi. Ramiro was the fourth born (DOB 5/10/54) with one older brother, Apolinar (DOB 10/18/48), and two older sisters, Rosario (DOB 9/15/50) and Maria de Jesus "Jesusita" (DOB 6/52). Exh. 9 (Affidavit of Apolinar Ibarra Rubi). His parents married in 1948 and lived on a "ranch" in Chalchihuites called Colonia Aurora. Exh. 9.

At first, the family lived in a little hut made out of stone and grass. Exh. 9; Exh. 10 (Affidavit of Rosario Ibarra Rubi). When Candelaria was pregnant with Ramiro they built a little room made of adobe. She "fainted all the time," as she did during all her pregnancies, because she was malnourished and often had nothing to eat, Exh. 9, and because she was forced by her husband to perform difficult physical labor during the pregnancy. Exh. 9; Exh. 10. Ramiro was born at home on the dirt floor in a difficult birth. Exh. 9. He did not start breathing for several minutes. Exh. 9; Exh. 10.

have since clearly established that they would have assisted Ibarra's counsel earlier if they had simply been notified and their assistance requested. Exh. 8.

The family eked out a bare survival by raising beans and corn on a small parcel of land. These crops not only had to feed the family, but also served as the family's only means of income. Exh. 11 (Affidavit of Joaquin Ibarra Rubi). When Ramiro was just a small boy, there was a freeze followed by a drought in Colonia Aurora that made it "impossible to cultivate the land," which meant "there was nothing to eat." Exh. 9, Exh. 10. Pablo left Ramiro and his older sister, Rosario, with his parents in Colonia Aurora and moved the rest of his family to Mexico City for a year or two until the drought ended. Exh. 9, Exh. 10.

In Colonia Aurora with his grandparents during the drought, when he was just two to four years old, Ramiro's diet primarily consisted of the fruit and leaves from prickly pear cacti and other things, such as wild greens, found in the fields. Exh. 10.

After the drought was over, the rest of the family returned to Colonia Aurora. Exh. 9. The family, which was continuing to grow, continued to live in extreme poverty and hunger.

> We didn't have water or electricity. We kept our things in cardboard boxes because we didn't have furniture. We didn't have beds either. We slept on woven grass mats. We used covers made of old clothing. We cooked our food with fire since we didn't have a stove.

Exh. 10. The children "experienced a lot of hunger." Exh. 9.

> Generally, the only thing we had for breakfast was oregano tea. . . . [I]n the afternoon, the only thing we had to eat almost every day were "air tacos." "Air tacos" are tortillas with salt. Once in a while, my mother would make beans. She would add water so that there would be enough food for the whole family. In reality, what we ate was bean broth. At

night, we normally drank tea.

Exh. 10.  Sometimes, when there was not a good harvest, the family "hardly ate."  Exh. 11.

They would have to survive on "wild cactus" with the thorns removed.  Exh. 12 (Affidavit of

Maria de Jesus Ibarra Rubi).  All the children experienced hunger, but it was worse for Ramiro,

because "[i]f there wasn't enough to eat, he would give his food to his younger brothers and

sisters" so they would have enough.  Exh. 13 (Affidavit of Pablo Ibarra).

In 1958, Pablo moved the family to Vicente Guerrero, Durango, because there was no

school at "the ranch" in Colonia Aurora.  Exh. 9.  Things were no better in Vicente Guerrero

than they were in Colonia Aurora.  While the family stayed in town, Pablo traveled around on a

donkey and "went from village to village looking for work."  Exh. 12.  The family barely

survived.  Candelaria would often pick up discarded scraps of food from the trash at a market

and give them to her children to eat.  Exh. 9.  The children would sometimes have to steal food

or pick wild fruit in order to have anything at all to eat.  Exh. 9.  Sometimes the children did not

have anything to eat for "two to three days" at a time.  Exh. 14 (Affidavit of Elvia Ibarra Rubi).

*See also* Exh. 5.

Both at "the ranch" and in Vicente Guerrero, the family drank and bathed in infected,

contaminated water from wells and from a river, which had "little organisms swimming in the

water" and contained "animal and human waste, dust, and trash."  Exh. 10.  The water would

frequently make them sick, but they were unable to afford medical care.  Exh. 9.

In Vicente Guerrero, the family lived in "at least 20 different places."  They would often

get evicted because Pablo could not pay the rent.  Exh. 9.  Sometimes the family would have to

move twice a month.  Exh. 5.

> Moving from house to house all the time was humiliating. . . .  It was also humiliating
>
> that we would go out in the street and each of us had a little cardboard box.  All we had
>
> was in those boxes.

Exh. 14.  "It was so common" for the family to be evicted that other children would tease them

and ask, "Did they throw you out of the house yet?"  Exh. 9.  Other children would also tease

them about their clothes, which were often patched or too big or too small because it was used

clothing that people gave them.  Exh. 5; Exh. 7; Exh. 9.

> The places they stayed, which "were in reality just little rooms," Exh. 5, Exh. 11, had

"dirt floors, corrugated iron or plastic roofs, [and] holes in the floor that were used as toilets,"

Exh. 9;  Exh. 11; Exh. 16 (Affidavit of Oralia Ibarra Rubi).  Some of these rooms did not even

have windows or doors and the family would have to just "hang a piece of cloth in the doorway."

Exh. 12.  They even lived in a garage, a "small pen for pigs," a room where "[p]art of the roof

had fallen off, so when it rained, water would come into the room."  Exh. 10.

> The family called one of these tiny places, where they lived when Ramiro was 11 or 12

years old, "The Dungeon."  Exh. 10; Exh. 11.

> "The Dungeon" did not have windows or light.  I remember that we all got full of lice
>
> when we were living in "The Dungeon."  It was so cold and humid, that my mother and
>
> Apolinar got gravely ill.  They had fevers and chills.  I now realize they had something
>
> like pneumonia.  They were sick for a long time, something like two to three months.

Exh. 10.  *See also* Exh. 9; Exh. 11; Exh. 14.  The family was "desperate because as the days

---

Ramiro Rubi Ibarra—Petition for Writ of Habeas Corpus                                    Page 77

went by, the sickness got worse.  There was not money to cure them." Exh. 14.  Ultimately,

Pablo got a loan from a friend to pay for a doctor's care.  Exh. 10; Exh. 11.

In another of these rooms, Ramiro's youngest sister, Paulita, died when she was only

about three months old.  The family did not know the exact cause but suspect it was because she

"was very skinny, malnourished because [her] mother wasn't eating" and could not adequately

feed her.  Exh. 9.

> She was sick for about a month.  She would cry and cry at night, but my parents couldn't
>
> afford to buy the medicine.  Since my parents didn't have money to take her to the doctor,
>
> they would give her home remedies like tea.  It was very sad for the family to see how
>
> poverty was taking one of our little sisters away and no one was able to do anything.
>
> This tragedy gave us a lot feelings of sadness and helplessness.

Exh. 14.[27]

Although they attended school, the children struggled because they "often went to school

hungry," which made it very difficult to "concentrate."  Exh. 12.  *See also* Exh. 10.  The family

could not afford adequate supplies so the children generally would have to "fight[] over a little

piece of pencil to do their homework."  Exh. 13.  "Once the pencil was used up, there was no

way to complete [their] homework."  Exh. 10.  They often did not have paper or notebooks and

if they did they had to work and purchase them for themselves.  Exh. 5.  They could not afford

books so they even had to "borrow books from classmates" or do their "homework with

classmates."  Exh. 7.  *See also* Exh. 5.  They would have to "eat less" just to get school uniforms

---

27 After Ramiro was already in the United States another brother was killed by a gunshot wound to his head.
Exh. 7.

because they had to pay or even barter corn or beans to have them sewn.  Exh. 13.  Because most of their homes had no electricity, the children would have to do their homework by candlelight.  Exh. 12.

Even more so than his siblings, Ramiro struggled in early development and in school.  He could not succeed, no matter how hard he tried, even with the help of his older sisters and his teachers.  When he was five years old, "he was very thin and small." [H]e talked like a two year old child.  He had a very bad pronunciation and his vocabulary was very limited.  He couldn't pronounce the few words he knew. Exh. 10.  "[H]e had problems learning. . . . He couldn't talk right.  He would talk really slow." Exh. 9.  "It was like Ramiro didn't understand."  Exh. 14.

Ramiro tried very hard in school but he was "very slow" and lacked the "intellectual capacity" to succeed even when his teachers gave him "special attention" and "special help." Exh. 15 (Affidavit of Victor Jasso).  He was unable to even solve simple problems encountered in plowing in the fields without help from his older brother, Apolinar.  Exh. 9; Exh. 14.

When he could not understand or could not do something, he would "get frustrated and he would start crying." Exh. 10.  He would also be anxious and lose sleep because he was not fulfilling even basic school requirements for materials required due to the family's poverty and he feared scoldings from his teachers.  Exh. 10.  He "was always very quiet," Exh. 14, and an "isolated child, who did not have friends," Exh. 10, or any emotional support or assistance except from his older brother, Apolinar, and his older sisters, Rosario and Jesusita.  In school, he was often ridiculed and teased by other children."  He was timid and would get beaten up often without defending himself.  Each time he would run to his older sisters to console him. Exh. 10;

---

Exh. 12.

When the children were not in school, they would return to Colonia Aurora to farm.  Exh. 11; Exh. 13.  When they were as small as six years old, they had to help care for the farm animals.  From the time they were nine or ten years old, they had to work in the fields planting and harvesting.  Exh. 5; Exh. 9.  They had to weed the crops by hand and even cut their own wood, all of which was "physical labor that was very hard and tiring."  Exh. 11.  They would start working "when the sun rose and would work all day long."  Exh. 5.

Even when they were in town, they were not allowed to go out and play and were isolated from other people.  Exh. 12.  They all had to work before and after school just to survive.  For example, from the time Ramiro was about eight or nine years old, he shined shoes in the town square.  Like all the other children, his money was given to Pablo to help support the family.  They lived with the obligations of adults and "[l]ife was work" for them.  Exh. 9.  *See also* Exh. 5; Exh. 11; Exh. 12.

When the children took jobs, the family's plight improved only slightly.

[W]e could buy a little bit more food, like beans, salt, sugar, and rice.  Once in a while, when we were little, my father would buy one or two cans of sardines (that was our luxury food).  We would apportion the little pieces of sardine amongst the whole family.  We would eat the sardines between fourteen people: twelve children, plus my mother and father.

Exh. 10.  Even when Pablo had enough money to spare a little for candy, there was no joy for the children.

---

Ramiro Rubi Ibarra—Petition for Writ of Habeas Corpus                                        Page 80

When we were children, my father would give us 20 cents to buy candy once in a while. The 20 cents was supposed to be for all the brothers and sisters. Back then, you could buy 2 to 3 small pieces of candy with 20 cents. My brother Apolinar would throw the coins on the roof of the house because he knew that it was impossible that with 20 cents there was going to be enough for everyone. I think he thought it was better that no one had candy rather than we suffer apportioning little pieces.

Exh. 10.

In addition to the poverty and the very basic hardships of life, Ramiro and his siblings suffered the cruelty of their father, who was "more violent than violence." Exh. 9. He was "authoritarian" and enforced his demands "with screams and blows." Exh. 11. He would beat his children "wherever the blows landed" with a belt, a rubber strap, a rope, a club, a cable, "a stick, a whip, whatever he could grab." Exh. 12. *See also* Exh. 7; Exh. 9; Exh. 10; Exh. 11. Sometimes the beatings would last for as long as ten minutes or until Pablo "was so tired that he couldn't hit anymore." Exh. 7. He would leave physical scars,[28] rope burns, and bruises on them and would sometimes beat them so hard that they could not even sit down in school. Exh. 5; Exh. 7; Exh. 9; Exh. 11; Exh. 12.

The violence would be prompted by things as simple as the small children not being able to maintain control of the few undernourished, "skinny" cows on the ranch or not being able to plant the crops by hand as fast as Pablo could plow with a horse. Exh. 5; Exh. 9; Exh. 11: Exh. 12. "Nothing his children did was enough." Exh. 5. Although the family was starving, Pablo

---

28 Apolinar still has a scar on his back from a beating more than fifty years ago. Exh. 9.

would beat his children even for accepting prickly pear cactus fruit from his own parents.  Exh. 12.  Even if he was angry with only one of the children, Pablo would beat all of them.  Exh. 10; Exh. 12.

The children had only themselves for protection against the violence.  Rosario would try to protect Ramiro.

He was defenseless.  Out of all my brothers and sisters, he was the one who needed the most protection.  Although I always tried, I wasn't always able to defend him.

Exh. 10.  In turn, Ramiro would "try to defend" his younger siblings when Pablo would beat them, Exh. 5.

Pablo was also cruel to his wife virtually daily and this cruelty was witnessed by Ramiro and the other children.  Pablo showed no emotion and rarely even talked to his wife.  Exh. 7.  When he did, he was "authoritarian and *machista* (male chauvinist)."  Exh. 10.  He would beat her in front of the children with an open hand or a closed fist.  Exh. 9.  He would even push her to the floor and "beat her and kick her until [he] would tire."  Exh. 5.  She almost always had "visible bruises" marking her body.  Exh. 5.

He would hit her for any little thing. For example, I remember one time my mother was cooking for all of us and accidentally served my father a burnt tortilla.  My father became very angry and started to hit her with his fist.  He then pushed her down and started to kick her in front of us.  When my father finished beating her, my mother resumed cooking.

Exh. 5.  He would beat her for asking him "for money or food" to feed her children, Exh. 12, and

---

Ramiro Rubi Ibarra—Petition for Writ of Habeas Corpus                                    Page 82

then go into violent rages at his wife if she had no more food to give him, Exh. 9.  He would beat

her even when she was pregnant.  Exh. 12.  She remained "submissive and docile" regardless of

his cruelty,  Exh. 11, but she would cry often because of the way she was treated and the

overwhelming sadness of her life, Exh. 5; Exh. 7; Exh. 14.

> The combined effect of the violence, poverty, and family dynamics of trauma on Ramiro
were dramatic and obvious.

> As a child, Ramiro was very quiet, calm and docile.  He was also very sentimental.  He
> did not express his feelings with words, but he cried very easily.  He cried about
> everything.  Whenever my father got mad, Ramiro would get frightened and he would
> start crying.  It didn't matter if my father was mad at Ramiro or if he was scolding
> another one of my siblings.  As soon as my father started scolding one of us, Ramiro
> would start crying.  Starting when Ramiro was about eleven years old, Ramiro would
> also cry when there was no food.  He also cried when the subject of us not having enough
> to eat came up.

Exh. 10.  It was around the age of eleven when Ramiro witnessed his mother's near death and he

was clearly affected by that, as well.

> I remember how Ramiro suffered and cried every time he saw my mother, he was in
> despair seeing that my mother was dying and that we couldn't do anything.  Ramiro
> would cry every day, every time he saw her and he kept asking me and my sisters if we
> had tended to her, he was very worried about my mother's health.

Exh. 10.

---

Ramiro Rubi Ibarra—Petition for Writ of Habeas Corpus                                    Page 83

Ramiro was also impacted by his father's extreme cruelty to his older sisters, who were his primary emotional support and physical caretakers in his childhood.  While Pablo often called his wife and all his children "'pendejos' (dumbasses)," Exh. 14; *see also* Exh. 14, he would also call his wife and daughters "a bunch of whores," Exh. 7; *see also* Exh. 5, and was especially physically cruel to them. Exh. 7; Exh. 9; Exh. 12.

When his oldest daughter, Rosario, who was unwed, became pregnant, Pablo beat her and then kicked her out of the house.  Exh. 12.  She went to stay in the home of one of Pablo's friends.  Pablo followed her there and beat her again. Exh. 9.  It hurt Ramiro a great deal to see her treated this way, Exh. 14, because she had always tried to protect and shield him from the world.  Finally, Ramiro worked up the nerve to help her leave the area.  Exh. 9.

Jesusita, Ramiro's other older sister, became pregnant when she was attacked and brutally raped while coming home from work one night.  Exh. 12.  She was afraid to tell anyone for fear of Pablo's reaction.  When Pablo learned of the pregnancy, he refused to believe that she was raped and gave her "a severe beating" and locked her in "a tiny closet the size of a single bed."  Her mother and siblings, including Ramiro, would have to sneak food in to her when he was gone.  She gave birth on the dirt floor with no doctor or midwife there.  Ramiro found her and gave her a shirt to wrap the baby in.  He then took her in and put her on a bed.  Pablo, however, locked her in the closet again with her baby until his own father intervened.  Exh. 12.  She stayed in the closet for at least a month.  Exh. 9; Exh. 12.

Through all of this, "Ramiro cried frequently" and "was serious and sad."  Exh. 11.  He worried a lot about his siblings.  Exh. 11.  When they were literally outside in the rain, he would

try to shelter them. Exh. 14. He would do things for them like making a stand where his younger brother could shine shoes. Exh. 11. He would give them his food when there was not enough for all of them. Exh. 9; Exh. 13. He would make sandals for them from an old, abandoned tire. Exh. 12. He would "try to defend" them, without much success, when Pablo beat them. Exh. 5. He only managed to work up the nerve to defy his father's cruelty and authoritarian manner to defend his younger siblings or help his older sisters, who had always tried to protect him.

Ramiro left the home shortly after Jesusita's baby was born because he wanted to help his siblings. Exh. 12. He followed his older brother, Apolinar, to the United States "for one reason only: hunger." Exh. 9. Ramiro would send money home to help support his younger siblings. Exh. 5; Exh. 7; Exh. 11; Exh. 14. When he visited from the United States, he would also bring clothing for them. Exh. 16 (Affidavit of Oraliz Ibarra Rubi).

As an adult in the United Status, Ramiro would often think of his past and the hunger and violence he and his family experienced. He would cry and have nightmares because he would become "overwhelmed by his feelings." Exh. 9. He would talk "of the poverty and the abuse" in his childhood and struggle to think of ways "to solve [the] family's problems." Exh. 5. He cried "many times" because he was unable to help the family in Mexico more. Exh. 5.

Ramiro was also concerned about his daughter, Magda, in Mexico. Her mother, Paula, was Ramiro's teenage girlfriend, whom he always treated with kindness. Exh. 17 (Affidavit of Paula Tovar). He would send money to purchase clothes and school supplies for Magda and he would visit her when he was in Mexico. Exh. 6; Exh. 7. When she was seventeen years old, she

came to the United States and lived with Ramiro and his wife and children in Temple, Texas. She was living with him at the time of his arrest in 1996. Exh. 6. Although Ramiro's wife's testimony during cross-examination by the state implied that he may have been sexually inappropriate with Magda,[29] this was not true. Magda described their relationship as "like a normal daughter and father" with respect for each other. As she put it simply, "I love my father very much and respect him. He never violated me. He never took advantage of me." Exh. 6.

If counsel had conducted a complete background investigation, the need to have intelligence testing conducted would have been apparent from the descriptions of Ibarra by his siblings and his teacher. *See, e.g., Rompilla*, 545 U.S. at 392 (if counsel had adequately investigated and obtained relevant records and their experts had reviewed the information, the

---

29 Despite the state's characterization of her as a "little girl," Magda was almost eighteen years old when she first came to the United States to live with her father.

Q.    When you – you were living at the house and staying at home and doing your job, every time that Ramiro took the little girl Luz into the bedroom and shut the door, weren't you?

A.    Yes. But they were in there playing the guitar or studying.


Q.    They stayed in there for hours, didn't they?

A.    Every now and then, but they would also be watching TV.

Q.    And you also told us how you used to watch Ramiro kiss her on the mouth.

A.    Yes. I saw that about twice.

Q.    And every time you complained about it, every time you dared say anything, he beat the hell out of you, didn't he?

A.    Yes, every now and then.

TR Vol. 47 at 1796. The prosecution even implied that she may not have even been his daughter, which could easily have been rebutted with a copy of her birth certificate, which reflects that he is her father. Exh. 18 (Birth Certificate of Luz Magdalena Ibarra).

---

experts, like "their post-conviction counterparts," would have "found plenty of 'red flags'

pointing up to a need to test further"). The psychological testing conducted in 2003 by Carol

Romey, Ph.D., revealed that Ibarra's "intellectual functioning is significantly impaired" and he

is mentally retarded with an IQ of 65. While he "worked carefully at assigned tasks" in testing,

"his efforts at improving the quality of his work were not successful. He often repeated the same

errors over and over as he attempted so [sic] solve problems and perform tasks." Exh. 19

(Affidavit and curriculum vitae of Carol Romey, Ph.D.).

Likewise, if counsel had provided the complete social history to the defense

psychiatrist,[30] he would have concluded as Pablo Stewart, M.D., a forensic psychiatrist, has that

Ibarra suffers from Posttraumatic Stress Disorder. He "has suffered from Posttraumatic Stress

Disorder (PTSD), chronic, severe since his early childhood" as a result of his

> experiencing and witnessing the extreme violence perpetrated by his father throughout
>
> his childhood and experiencing the near death of his mother and older brother and the
>
> actual death of a younger sister due to the extreme poverty in which they lived.

Exh. 20 (Affidavit and curriculum vitae of Pablo Stewart, M.D.). As a result of the PTSD, and

his low IQ, which impairs "his ability to deal constructively with the trauma he has

---

30  Specifically:

> A defense attorney in the sentencing phase of a capital trial has "a professional responsibility to
> investigate and bring to the attention of mental health experts who are examining his client[ ] facts
> that the experts do not request." Regardless of whether a defense expert requests specific information
> relevant to a defendant's background, it is defense counsel's "duty to seek out such evidence and
> bring it to the attention of the experts."

*Hovey v. Ayers*, 458 F.3d 892, 925 (9th Cir. 2006) (citations omitted) . *See also Smith v. Stewart*, 189 F.3d
1004, 1012 (9th Cir. 1999) ("A lawyer who should have known but does not inform his expert witnesses
about essential information going to the heart of the defendant's case for mitigation does not function as
'counsel' under the Sixth Amendment").

---

experienced," Ibarra is "sad and withdrawn." He can be tender and very caring at times, such as caring for his siblings, but is also sometimes "prone to controlling, sometimes violent conduct."

The contrast between the sensitive, caring behavior described by siblings and the controlling, violent behavior described at trial is consistent with Ramiro Ibarra's background and cognitive ability, and is a direct result of his suffering from Posttraumatic Stress Disorder. Ramiro Ibarra spent all of his formative years watching his father struggling in vain for control of his own circumstances and expressing his frustration with violence directed (often arbitrarily) at weaker targets such as his wife and children. The trauma produced by extreme poverty and a violent, authoritarian upbringing created in Ramiro Ibarra the same sense of lack of control over circumstances that exerted such influence over his father. And like his father, whose dominant example he had seen and experienced for many years, Ramiro sought opportunities to exert control where his limited intellect permitted him to find them. In his case, the targets were his wife (as was the case with his father), a girlfriend, and, if the prosecution's evidence was correct, the homicide victim. While homicide was a more extreme outcome than any known outcome brought about by his father, the causal factors – desperation for control and resort to violence in response to that desperation – were the same.

Exh. 20.

In short, if trial counsel had adequately performed the investigation, counsel would have had available strong lay and expert testimony concerning Ibarra's troubled childhood of extreme poverty and violence, evidence of his mental retardation, and evidence of PTSD, which had a direct connection to the crimes in this case in a fashion that provided the explanation for the

otherwise seemingly inexplicable crimes.  Again, this case is much like *Wiggins*, only counsel's conduct was even more egregious here.

> Given both the nature and the extent of the abuse petitioner suffered, we find there to be a reasonable probability that a competent attorney, aware of this history, would have introduced it at sentencing in an admissible form.  While it may well have been strategically defensible upon a reasonably thorough investigation to focus on Wiggins' direct responsibility for the murder, the two sentencing strategies are not necessarily mutually exclusive.  Moreover, given the strength of the available evidence, a reasonable attorney may well have chosen to prioritize the mitigation case over the direct responsibility challenge, particularly given that Wiggins' history contained little of the double edge we have found to justify limited investigations in other cases.

*Wiggins*, 539 U.S. at 535.

In this case, counsel did not just assert that Ibarra was a participant, but not the actual killer, which was the case in *Wiggins*.  Here, counsel chose to assert innocence in the face of overwhelming evidence, which left them and, ultimately, Ibarra in the unenviable position of having claimed innocence during the trial and then facing the same jury in sentencing with no mitigation argument whatsoever other than counsel's limited argument that Ibarra's life should be spared for his children's sake.  Even this argument back-fired and proved more aggravating than mitigating, due to counsel's failure to rebut the allegation that Ibarra had been sexually inappropriate with his daughter, Magda.  Specifically, in rebuttal, the prosecution destroyed counsel's arguments concerning Ibarra's children.

What about whatever he was doing with Luz, his own daughter.  Sure, they were in the

bedroom taking guitar lessons, uh-huh, for hours at a time.  His wife talked about

witnessing him kiss her on the mouth. . . .

Is it going to be easy to see the father of [sic] his children without a father?  Yes, it is.

But given all the evidence you've heard in this case, it is a sad, hard thing to say, but how

could they not be better off without him?

TR Vol. 47 at 1842.

If counsel had conducted the complete investigation and made a reasonable strategic

decision in light of all the available evidence, counsel reasonably would have viewed this case as

one where the findings should not have been contested or counsel should have presented only a

question of reasonable doubt without asserting actual innocence.  Indeed, this case is one where

fully informed "counsel's strategic calculus" would have been different and reasonable counsel

would have realized that "avoiding execution [was] the best and only realistic result possible."

*Florida v. Nixon*, 543 U.S. 175, 191 (2004) (quoting 2003 Guideline 10.9.1 Commentary).  To

achieve that result counsel "must consider in conjunction both the guilt and penalty phases in

determining how best to proceed," *id.* at 192, and must "strive at the guilt phase to avoid a

counterproductive course," *id.*, such as presenting logically inconsistent strategies in the trial and

sentencing, *id.* at191 (citing, *inter alia*, Lyon, *Defending the Death Penalty Case: What Makes

Death Different?*, 42 Mercer L.Rev. 695, 708 (1991) ("It is not good to put on a 'he didn't do it'

defense and a 'he is sorry he did it' mitigation.  This just does not work.  The jury will give the

death penalty to the client and, in essence, the attorney")).  In short, reasonable counsel for a

defendant facing overwhelming evidence of guilt should "attempt[] to impress the jury with his candor and his unwillingness to engage in 'a useless charade.'" *Id.* at 192 (citation omitted).

Even if counsel still would have chosen to assert innocence during the trial, counsel's continued reliance on the argument of innocence or lingering doubt was clearly unreasonable in sentencing. [31] Specifically, where the jury had already convicted the defendant, "'lingering doubt' was not a viable option" and the defense had "nothing to lose" then by presenting social history and mental health evidence in mitigation. *Douglas v. Woodford*, 316 F.3d 1079, 1090-91 (9th Cir. 2003). Counsel's "clear duty at that point was to shift his focus away from absolving [the defendant] . . . – certainly, the evidence for the guilt phase had not worked for that purpose – to saving his life." *Marshall*, 428 F.3d 452 at 469. Nonetheless, here:

> Simply stated, defense counsel's penalty-phase strategy was to argue to the jury-which had convicted [the defendant] of murder unanimously and beyond a reasonable doubt-that he was a good guy and that his life should be spared because he was actually innocent.

*Outten v. Kearney*, 464 F.3d 401, 415 (3rd Cir. 2006). This clearly was not a reasonable strategy.

---

31 At minimum, even if counsel could still reasonably argue innocence, the state presented evidence of past behavior and crimes in aggravation and the available mitigation evidence "would have provided the jury an explanation" for the past behavior, *Jefferson v. Terry*, 490 F. Supp. 2d 1261, 1328 (N.D. Ga. 2007), rather than just general denials with no evidence supporting the arguments.

C.    Counsel's deficient conduct was prejudicial in sentencing.

A finding of prejudice under *Strickland* requires that Ibarra "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. *Strickland* defined "reasonable probability" as a "probability sufficient to undermine confidence in the outcome" of the proceeding. *Id.* at 692. This test is not, however, an outcome determinative inquiry. In other words, "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Id.* at 694. Thus, "a defendant need *not* show that counsel's deficient conduct more likely than not altered the outcome in the case." *Id.* at 693 (emphasis added). Prejudice is established if "there is a reasonable probability that *at least one juror* would have struck a different balance" but for counsel's errors. *Wiggins*, 539 U.S. at 537 (emphasis added). In determining prejudice, this Court must "evaluate the totality of the evidence—'both that adduced at trial, and the evidence adduced in the habeas proceeding[s].'" *Wiggins*, 539 U.S. at 536 (quoting *Williams*, 529 U.S. at 397-98).

Here, counsel ignored the very basic premise of capital sentencing that the case in mitigation should prove the "rhyme" and "reason" for the crimes when possible. *People v. Morgan*, 719 N.E.2d 681, 708 (Ill. 1999). *See also Marquez-Burrola*, 157 P.3d at 766 ("One important purpose of mitigation evidence is to humanize the defendant in the eyes of the jury and, if possible, to explain what might have driven him to commit the crime"). Counsel also ignored the basic premise that "social background" evidence can be "critical for a jury to

consider when deciding whether to impose a death sentence" because it is the type of evidence that can "invoke[] sympathy" even when the crimes are of a "gruesome nature." *Douglas*, 316 F.3d at 1090. Indeed, "the failure to present important mitigating evidence in the penalty phase can be as devastating as a failure to present proof of innocence in the guilt phase." *Karis v. Calderon*, 283 F.3d 1117, 1135 (9th Cir. 2002).

Here, Ibarra's counsel "made no attempt to explain" how Ibarra could commit such "a horrendous crime, although mental health evidence providing such an explanation was at his fingertips." *Smith v. Mullin*, 379 F.3d 919, 939-40 (10th Cir. 2004). In short, due to counsel's failure to present, "anything at all about the defendant . . . . [a]n individualized sentence, as required by law, was . . . impossible." *Brownlee v. Haley*, 306 F.3d 1043, 1074 (11th Cir. 2002).

The only information the jury heard about Ramiro Ibarra as an individual (beyond the state's negative allegations) was the very limited information detailed previously. This information provided nothing more than a "hollow shell," *Collier v. Turpin*, 177 F.3d 1184, 1201 (11th Cir. 1999), which was completely inadequate when "[t]he jury was called upon to determine whether a man . . . they did not know would live or die," *id.* at 1204. *See also Lewis v. Dretke*, 355 F.3d 364, 368 (5th Cir. 2003) (mitigation evidence that is simply "conclusional" or "skeletal testimony" is "wholly inadequate to present to the jury a true picture"). This left Ibarra in a similar position to the defendant in *Pursell v. Horn*, 187 F. Supp. 2d 260 (W.D. Pa. 2002). The court described it as a situation where in the eyes of the jurors "the man was a mere skeleton: a young killer with a prior criminal record and a girlfriend, nothing more and nothing less. Had [his] lawyer tapped into the mitigating evidence available to him, however, he would

---

have added flesh, bones, a mind, and a heart" to the defendant. *Pursell v. Horn*, 187 F. Supp. 2d 260, 386 (W.D. Pa. 2002). The court concluded that without mitigation the jury "did not have the chance to see [the defendant], the man. It did not have the opportunity to feel sympathy or pity." *Id.* at 386.

Ibarra's jury heard nothing of the horrors of his childhood, the mental illness he developed as a direct result of the physical and mental torment he endured, or his limited intellect. This information was mitigating in its own right but also provided an explanation for the crimes in this case and for the aggravation evidence presented by the state in sentencing.

Instead of the complete void of information and the skeleton before them, the jurors should have heard the evidence of the defendant's "troubled background and his emotional stability and what led to the development of the person who committed the crime." *Ainsworth v. Woodford*, 268 F.3d 868, 878 (9th Cir. 2001). This evidence could have easily been presented through "first-hand accounts from those who knew Petitioner best." *Powell v. Collins*, 332 F.3d 376, 400 (6th Cir. 2003). Failure to present this evidence was prejudicial, in the same fashion as in *Wiggins*, where prejudice was found because counsel did not discover, in part, "powerful" evidence of severe abuse from the defendant's parents, as well as the defendant's "diminished mental capacities." *Id.* at 534-35. The Court found:

> Wiggins' sentencing jury heard only one significant mitigating factor – that Wiggins had no prior convictions. Had the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a difference balance.

*Id.* at 537. *See also Hamblin*, 354 F.3d at 493 (In light of the "substantial evidence of a childhood in which abuse, neglect, violence and hunger were common," the court was convinced that had the available evidence been presented "at least one juror would have voted against the death penalty").

The prejudice is especially clear because the void of information about Ibarra's history, character, and mental status "played into the prosecution's theory that the only explanation for the murders was that [Ibarra] was simply an 'evil' man." *Anderson v. Sirmons*, 476 F.3d 1131, 1147 (10th Cir. 2007). Specifically, during closing arguments in sentencing, the state promoted the image of Ibarra as a man without a conscience that repeatedly "victimizes, rapes, and sodomizes." After detailing the state's evidence, the prosecutor noted:

How do they get to that point? . . .

What is it that resides in a man that makes him capable of doing that? . . . [W]hat resides in him, along with seemingly normal characteristics that make him capable of that kind of violence, committing those types of atrocities against children? We don't know. Maybe it's not something he has extra, it may be something that he doesn't have, like Dr. Coons said, a conscience or imagination. Remember when Paz's mother was up here, she talked about a dream, the dreams a girl has, big dreams. How can you look at a child and not recognize the traumas that they have? If you look at the innocence that a child has, the promise that they have, the questions, and instead of recognizing it for what it is and letting it flower, you take it and twist it and you make it perverted into something disgusting. . . .

TR Vol. 47 at 1817-18.  Counsel continued:

> You can search this entire case from when we started. . . .  There's nothing mitigating. . . . He has abused, he has used violence, he has harmed.  He's done irreparable harm. . . . We cannot give him a conscience. . . .  Don't know how he got there, but we know that that's what he is. . . .

TR Vol. 47 at 1820.  Just before the case went to the jury for deliberations, the prosecution concluded as follows:

> I can mourn for the lost opportunities he had that he didn't take advantage of.  At one time in his life, he was a little boy, he had aspirations and dreams, and somewhere along the way, he took a step, a wrong step, and he took another wrong step and then another, and then another, until you have a journey through life and it's turned to the dark side of life . . . .

TR Vol. 47 at 1845.

What was obviously missing from the case in mitigation, as pointed out by the prosecution, was "how" Ibarra reached the point at which he could commit acts of control, violence and ultimately capital murder.  The jury also did not hear that Ibarra had not "lost opportunities," but had never even had any to begin with.  If the full evidence had been presented, the jury would have been able to view Ibarra through the lens of the innocent child he had been and how he was damaged by the physical cruelties, extreme poverty, and PTSD, combined with limited intellect, that he endured.   In short, as the prosecutor argued:

> How can you look at a child and not recognize the traumas that they have?  If you look at

the innocence that a child has, the promise that they have,  the questions, and instead of

recognizing it for what it is and letting it flower, you take it and twist it . . . .

TR Vol. 47 at 1817-18.  Ibarra's life and mental status were corrupted in precisely this same

fashion.  That was his mitigation and the "rhyme" and the "reason" for the crimes.  The failure to

present this evidence was clearly prejudicial.  *See Commonwealth v. Alvarez*, 740 N.E.2d 610,

618 (Mass. 2000) (holding that prejudice is clearly established "[w]here, as here, the very matter

as to which defense counsel has been ineffective becomes one of the linchpins of the

prosecutor's closing").

In short, Ibarra was prejudiced in the same fashion as the defendant in *Ex parte Gonzales*,

204 S.W.3d 391 (Tex. Crim. App. 2006), because, if counsel had performed adequately, the

evidence would have established, at minimum, that Ibarra experienced and witnessed childhood

abuse by his father and his resulting PTSD.  If Ibarra's jury had been able to place his

"excruciating life history on the mitigating side of the scale, there is a reasonable probability that

at least one juror would have struck a difference balance."  *Wiggins*, 539 U.S. at 537.

D.      This claim for relief is not procedurally barred.

Because state court remedies with respect to this claim were only recently exhausted

through presentation of the claim to the Texas Court of Criminal Appeals in a Subsequent

Application for Post-conviction Writ of Habeas Corpus pursuant to Article 11.071, §5, Ibarra

anticipates that the state will contend the claim is procedurally barred.  For the reasons set forth

below, it is not.

1.      Relevant legal principles.

---

A federal court reviewing a state court judgment may not reach the merits of the claim where a prior state reviewing court applied an independent and adequate state law ground to deny relief. *Coleman v. Thompson*, 501 U.S. 722 (1991). To make the determination of whether a state court's resolution of a claim is based on an independent and adequate state ground, a federal court naturally looks to the state court's decision. "When a state court decision *fairly appears* to rest primarily on federal law, *or to be interwoven with the federal law*, and when the adequacy and independence of any possible state law ground is *not clear* from the face of the opinion, we will accept as the most reasonable explanation that the state court decided the case the way it did because it believed that federal law required it to do so." *Michigan v. Long*, 463 U.S. 1032, 1040-41 (1983) (emphasis supplied). *See also Coleman v. Thompson*, 501 U.S. 722, 733 (1991) (reaffirming the *Long* principle).

When resolution of a state procedural law question depends upon a predicate federal constitutional ruling, the state-law prong of the court's holding is not independent of federal law, and a federal court may address the merits of the claim. *Ake v. Oklahoma*, 470 U.S. 68, 75 (1985); *Smith v. Texas*, 550 U.S. ___, 127 S.Ct. 1686, 1698 (2007) (a state court's predicate "error of federal law" in resolving a state procedural question does not preclude federal review); *Delaware v. Prouse*, 440 U.S. 648, 652-653 (1979) (state court decision is not based on an independent state ground where the resolution of a state law question involves an interpretation of what federal law requires to state a claim for relief). Under these circumstances, the federal court may review the claim because "[i]f the state court misapprehended federal law, '[i]t should be freed to decide . . . these suits according to its own local law,'" and not under a mistaken

---

interpretation of federal law. *Prouse*, 440 U.S. at 653 (quoting *Missouri ex rel. Southern R. Co. v. Mayfield*, 340 U.S. 1, 5 (1950)).

In short, when a state procedural law question depends, in part, on resolution of a federal constitutional question, a presumption exists that a state court decision is *not* based upon an independent and adequate state ground if the state court does not *clearly and expressly* state that its decision is "based on bona fide separate, adequate, and independent grounds." *Long*, 463 U.S. at 1041. *See also Coleman*, 501 U.S. at 733; *Harris v. Reed*, 489 U.S. 255, 266 (1989); *Caldwell v. Mississippi*, 472 U.S. 320, 327 (1985). As the Supreme Court explained in *Coleman*:

> [F]ederal courts on habeas corpus review of state prisoner claims, like this Court on direct review of state court judgments, *will presume* that there is no independent and adequate state ground for a state court decision when the decision "fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion." In habeas, if the decision of the last state court to which the petitioner presented his federal claims fairly appeared to rest primarily on resolution of those claims, or to be interwoven with those claims, and did not clearly and expressly rely on an independent and adequate state ground, a federal court may address the petition.

*Coleman*, 501 U.S. at 734-35 (citations omitted and emphasis supplied).

Federal law thus places the burden on the state court to clearly and expressly show the state-law ground of decision if federal review of a claim is to be precluded.

---

To bar federal review, the state procedural rule must also be "adequate." To be adequate, the rule must be "firmly established and regularly followed. ... Only a firmly established and regularly followed state practice may be interposed by a State to prevent subsequent review . . . of a federal constitutional claim." *Ford v. Georgia*, 498 U.S. 411, 424 (1991) (*citing James v. Kentucky*, 466 U.S. 341 (1984) (internal quotation marks omitted)). *See also Barr v. City of Columbia*, 378 U.S. 146, 149 (1964) (state procedural rules "not strictly or regularly followed" may not bar federal review); *Rosales v. Dretke*, 444 F.3d 703, 707 (5th Cir. 2006) ("If the state law ground is not firmly established and regularly followed, there is no bar to federal review and a federal habeas court may go to the merits of the claim.").

The adequacy of a procedural ground invoked by a state court is a question of federal law, which can and must be resolved by the federal court itself *de novo*. *Johnson v. Mississippi*, 486 U.S. 578, 587 (1988) ("[W]e have consistently held the question of when and how defaults in compliance with state procedural rules can preclude our consideration of a federal question is itself a federal question"); *see also Rosales v. Dretke*, 444 F.3d 703, 707 (5th Cir. 2006) ("The adequacy of a state law ground to preclude federal court review of federal constitutional claims is a federal question which is reviewed by this court *de novo*").

Federal courts may not defer to state courts which exploit flux and inconsistencies in their own law in order to deny inmates meaningful review of federal claims unpredictably. *See, e.g., Gosier v. Welborn*, 175 F.3d 504, 507 (7th Cir. 1999) (state court rule inadequate because state courts applied it inconsistently in "incompatible lines of authority," resulting in a "wavering course of state law" that gave defendants no meaningful notice of procedural

---

requirements); *Martin v. Maxey*, 98 F.3d 844, 848 (5th Cir. 1996) (state rule inadequate when state court failed to enforce it in cases similar to petitioner's).  The Supreme Court has emphasized that procedural rules bar federal review only when there is no doubt about the existence of the rule and its applicability to the defendant's conduct in the particular case.  *See Lee v. Kemna*, 534 U.S. 362, 377 (2002) (failure to lodge objection when error of judge's ruling was "not in doubt" constituted valid procedural bar).

2.      The CCA's dismissal of this claim was not independent of federal law and does not preclude merits review by this Court.

In an unsigned *per curiam* order, the CCA disposed of Ibarra's ineffective assistance of counsel claim, in relevant part, as follows:

> We have reviewed Applicant's claim for relief and find that it does not meet the
> requirements for consideration of subsequent claims under Article 11.071, Section 5.
> Therefore, we dismiss this subsequent application.

*Ex parte Ramiro Rubi Ibarra*, slip op., No. WR-48,832-04 (Tex. Crim. App. Oct. 1, 2008).

Prior to 2007, there was virtually unanimous agreement in the courts that an order such as the one issued in Ibarra's case was facially adequate and independent.  In 2007, however, the Texas Court of Criminal Appeals explained its interpretation of the state procedural bar found in Article 11.071, Section 5 and explicitly held that review of successive applications for habeas relief encompasses a review of whether there is an "antecedent showing of 'sufficient specific facts'" of a federal constitutional claim to merit further review.

In *Ex parte Campbell*, 226 S.W.3d 418 (Tex. Crim. App. 2007), the CCA explicated how

it conducts a Section 5(a) assessment of a subsequent application where it is alleged that the

facts were not available at the time the prior application was filed:

> To satisfy section 5(a)(1), a subsequent application must contain sufficient specific facts
> establishing that "the current claims and issues have not been and could not have been
> presented previously in a timely initial application or in a previously considered
> application filed under this article or Article 11.07 because the factual or legal basis for
> the claim was unavailable on the date the applicant filed the previous application."  We
> have interpreted this to mean that, to satisfy Art. 11.071, § 5(a), 1) the factual or legal
> basis for an applicant's current claims must have been unavailable as to all of his
> previous applications; and 2) *the specific facts alleged, if established, would constitute a*
> *constitutional violation that would likely require relief from either the conviction or*
> *sentence.*

*Id.* at 421.

In other words, despite absence of such language in the state's successor statute, the

CCA's subsequent writ jurisprudence does entail consideration of the merits of a federal claim.

As the CCA held in *Campbell*, "Applicant also must jump over the rest of the section 5(a)(1) bar.

That is, his application must allege sufficient specific facts that, if proven, establish a federal

constitutional violation sufficiently serious as to likely require relief from his conviction or

sentence."  *Id.* at 422 (emphasis added and internal footnote omitted).

Ibarra argued to the CCA that he should be allowed to proceed in state court on his

ineffective assistance of counsel claim because it was previously unavailable to him and the facts

---

alleged, if proven, would establish a violation of the United States Constitution. Ibarra's application was, in fact, dismissed pursuant to Section 5. However, because Section 5 includes a federal component and because characterizing the dismissal as an abuse of the writ does not of its own force constitute an independent and adequate state law ground, this order does not end the inquiry. As discussed above, federal law places the burden on the state court to clearly and expressly show the state-law ground of decision if federal review of a claim is to be precluded. By issuing a brief order saying only that Ibarra's claim was barred by Section 5, the CCA failed to "clearly and expressly" demonstrate that the basis of its decision was a state procedural rule rather than the federal component of Section 5 acknowledged in *Ex parte Campbell, supra*.

As the Fifth Circuit explained in *Ruiz v. Quarterman*, 504 F.3d 523 (5th Cir. 2007):

This settled principle [of adequate and independent state procedural bars] gives to state courts control over the federal review of their opinions. It has become a rote rule at the fingertips of every writing member of state courts of last resort-where studied ambiguity or clarity in the decisional footing is an art form and an absence of clarity in an opinion is seldom inadvertent. Calibrated uncertainty can play a mediating role in garnering support for an outcome. To the point, that the CCA did not make clear that its decision rested on an independent state ground opens the merits of Ruiz's *Wiggins* claim to federal review. At best, the CCA did not make clear whether it relied on state or federal law in dismissing Ruiz's application. As the CCA is keenly aware, its choice of language was made against a background legal standard-which directs the CCA in either granting an application for consideration of subsequent claims or dismissing that application as an

abuse of the writ-that is interwoven with federal law.

The Texas Code of Criminal Procedure, as interpreted by the CCA, provides for subsequent applications where (1) the factual or legal basis for the subsequent claim was previously unavailable and (2) where the facts alleged would constitute a federal constitutional violation that would likely require relief from either the conviction or sentence. The boilerplate dismissal by the CCA of an application for abuse of the writ is itself uncertain on this point, being unclear whether the CCA decision was based on the first element, a state-law question, or on the second element, a question of federal constitutional law.

*Id* at 527 (internal citations omitted).

Just as in *Ruiz*, the CCA in Ibarra's case could have, had it chosen to do so, clearly stated that it was rejecting the ineffective assistance of counsel claim on the basis of an adequate and independent state ground.  Rather than doing so, however, the court issued a boilerplate dismissal that failed to clearly and expressly state the basis of the dismissal.  Because a Section 5 dismissal is, by the CCA's own description in *Ex parte Campbell*, necessarily interwoven with federal law, this Court must presume the dismissal was not adequate and independent.  Ibarra is therefore entitled to merits review of his ineffective assistance of counsel claim.

### Point of Error Number Nine

Mr. Ibarra's execution would violate the Eighth Amendment's Prohibition against the execution of individuals with mental retardation

A. *Atkins v. Virginia*

---

On June 20, 2002, the Supreme Court held that the Eighth Amendment's ban on excessive and cruel and unusual punishments prohibits the execution of individuals with mental retardation. Reversing its prior decision in *Penry I*, the Court concluded that "the Constitution places a substantive restriction on the State's power to take the life of a mentally retarded offender." *Atkins v. Virginia*, 536 U.S. 304, 321 (June 20, 2002)(internal quotation marks omitted). The Court rested its conclusion on two grounds.

First, the Court found persuasive that, at the time of *Penry I* in 1989, only two death penalty states and the federal government had banned the execution of offenders with mental retardation. *Id.* at 313-14. However, since that time, an additional sixteen states had prohibited the use of the death penalty for those with mental retardation. The Court noted that it "is not so much the number of States that is significant, but the consistency of the direction of change." *Id.* at 315. These enactments, "[g]iven the well-known popularity of anticrime legislation," provided the Court with "powerful evidence that today our society views mentally retarded offenders as categorically less culpable than the average criminal." *Id.* In its search for a national consensus, the Court relied upon the fact that the legislatures passing the laws voted "overwhelmingly in favor of the prohibition." *Id.* The Court also looked to the opinions of social and professional organizations with "germane expertise," such as the American Psychological Association, the opposition to the practice by "widely diverse religious organizations," international practice, and polling data. *Id.* at 316 n.21. While "by no means dispositive," these factors bolstered the Court's opinion that a consensus opposing the practice existed "among those that have addressed the issue." *Id.* Finally, the Court noted that even in

those states that retained the death penalty for those with mental retardation, only five had

actually carried out the execution of an individual with mental retardation since *Penry I.* *Id.*

Because the practice had become "truly unusual," it was "fair to say," according to the Court,

that "a national consensus has developed against it." *Id.*

The second reason the Supreme Court advanced for banning the execution of offenders

with mental retardation was that "this consensus unquestionably reflects widespread judgment

about the relative culpability of those with mental retardation and the relationship between

mental retardation and the penological purposes served by the death penalty." *Id.* at 317. The

Court noted that, due to their impairments, defendants with mental retardation "have diminished

capacities to understand and process information, to communicate, to abstract from mistakes and

learn from experience, to control impulses and to understand the reactions of others." *Id.* These

deficiencies, the Court held, while not justifying an exemption from criminal liability, do

diminish a person's personal culpability to the extent that neither of the justifications advanced

by states in support of the death penalty – retribution and deterrence – would be served by

permitting the execution of individuals with mental retardation. *Id.*

Retribution in the capital context had been limited to ensuring that "only the most

deserving of execution are put to death." *Id.* at 319. Because the "just deserts" rationale

necessarily depends on the culpability of the offender, the most extreme punishment was deemed

excessive due to the "lesser culpability of the mentally retarded offender." *Id.* And, because

capital punishment can serve as a deterrent only when a crime is the result of premeditation and

deliberation, no deterrence interests are served. *Id.* This type of calculus, the Court noted, is at

---

the "opposite end of the spectrum" from the behavior of those with mental retardation because of

their cognitive and behavioral impairments. *Id.*

The Court also opined that, due to the impairments of individuals with mental

retardation, a host of factors – from the increased risk of false confessions, difficulties in

communicating with counsel, and their lesser ability due to limited communication skill to

effectively testify on their own behalf or express remorse – created, "in the aggregate," an

unacceptable "risk of wrongful executions" for defendants with mental retardation. *Id.* at 321.

In short, the Court held that its "independent evaluation of the issue reveals no reasons to

disagree with the judgment of the legislatures that have . . . concluded that death is not a suitable

punishment for a mentally retarded criminal," and thus the Constitution "places a substantive

restriction on the State's power to take the life of a mentally retarded offender." *Id.* (internal

quotation marks omitted).

B.  The Standard for Determining Mental Retardation

The American Association on Mental Retardation ("AAMR")[32] defines mental

retardation as: (1) subaverage general intellectual functioning (i.e., an IQ of approximately 70 to

75 or below) existing concurrently with (2) related limitations in two or more of the following

applicable adaptive skill areas: communication, self-care, home living, social skills, community

use, self-direction, health and safety, functional academics, leisure, and work; and (3) onset

before the age of eighteen.  American Association on Mental Retardation, *Mental Retardation:*

*Definition, Classification, and Systems of Supports* 5 (9th ed. 1992) [hereinafter "1992 AAMR

---

32   Effective January 1, 2007, AAMR officially became the American Association on Intellectual and
Developmental Disabilities (AAIDD).  In the interest of avoiding confusion, the organization will be referred
to as the AAMR in this document.

Manual"].  The American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV-TR") employs a definition that is nearly identical to the one set out in the 1992 AAMR Manual.[33]  The Supreme Court has expressly relied on the 1992 AAMR Manual's three-prong definition of mental retardation, *see Atkins*, 536 U.S. at 309 n.3; *Penry I*, 492 U.S. at 307-09 n.1.

In late May 2002, the AAMR released the latest version of its manual.  Mental retardation is redefined as "a disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills.  This disability originates before age 18."  American Association on Mental Retardation, *Mental Retardation: Definition, Classification, and Systems of Supports* 1 (10th ed. 2002) [hereinafter "2002 AAMR Manual"].  The three diagnostic criteria are the same, but the new manual places a greater emphasis on adaptive behavior deficits and describes those deficits in a different way.  In the 2002 AAMR Manual, adaptive behavior is described as "the collection of conceptual, social, and practical skills that have been learned by people in order to function in their everyday lives."  *Id.* at 73.  In assessing deficits in adaptive behavior, the 2002 AAMR Manual stresses that "[l]imitations in adaptive behavior affect both daily life and the ability to

---

33   The DSM-IV-TR defines mental retardation as follows:

> The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A), that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety (Criterion B).  The onset must occur before age 18 years (Criterion C).

American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 41 (4th ed., text rev. 2000) ("DSM-IV-TR"); *see Atkins*, 536 U.S. at 309  n.3 (setting out American Psychiatric Association's definition with approval).