respond to life changes and environmental demands." *Id.* at 91.

The 1992 AAMR Manual defined adaptive behavior by focusing on ten specific skills. The 2002 AAMR Manual shifts to three broader domains of adaptive behavior. The three broader domains of conceptual, social, and practical skills in the new definition "are more consistent with the structure of existing measures [of adaptive behaviors] and with the body of research on adaptive behavior." *Id.* at 73. As the 2002 AAMR Manual illustrates, however, the ten skill areas listed in the 1992 definition can be conceptually linked to one or more of the three domains in the 2002 definition of mental retardation. *Id.* at 82.

Each of the three elements of the definition of mental retardation is an essential component of a professional diagnosis of the disability. The first component of the clinical assessment of mental retardation is measuring the magnitude of the individual's intellectual impairment. To be diagnosed with mental retardation, an individual must be found to be functioning at the very lowest intellectual level encountered in the general population, as measured by standardized intelligence tests. The intellectual functioning of any individual with mental retardation will fall within the lowest three percent of the entire population. *See Atkins*, 536 U.S. at 309 n.5 ("It is estimated that between 1 and 3 percent of the population has an IQ between 70 and 75 or lower, which is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition"); *but see* DSM-IV-TR 46 ("The prevalence rate of Mental Retardation has been estimated at approximately 1%"). Thus, the first prerequisite for a diagnosis of mental retardation is severely impaired cognitive functioning.

The second requirement serves to confirm the reality of the psychometric measurement

of the individual's severe impairment. The impairment must be observed to have "real-world" effects on the individual's life functioning. As the Supreme Court has noted, all people with mental retardation "have a reduced ability to cope with and function in the everyday world." *Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 442 (1985). The requirement of real, identifiable disabling consequences in the individual's life – of reduced ability to "cope with common life demands," DSM-IV-TR 42 – assures that the diagnosis applies only to persons with an actual, functional disability. *See* 1992 AAMR Manual at 38. Previous versions of the definition of mental retardation expressed this requirement in terms of "deficits in adaptive behavior," *see Penry I*, 492 U.S. at 308 n.1 (citing an earlier edition of the AAMR's classification manual), while more recent formulations employ the terms "related limitations" in "adaptive skill areas." 1992 AAMR Manual at 5; *see* DSM-IV-TR 42. According to the 2002 AAMR definition, the significant limitations in adaptive functioning are expressed in "conceptual, social, and practical adaptive skills." 2002 AAMR Manual at 73. Both sets of terms reflect the same concept: that the impairment in intellectual ability must have an actual impact on everyday functioning. *See id.* at 74 (noting that "most adaptive behavior instruments measure the skill level a person typically displays when responding to challenges in his or her environment") (internal quotation marks omitted).

The third prong of the definition of mental retardation is that the disabling condition must have manifested itself during the developmental period of life, before the individual reaches the age of eighteen. Requiring the disability to have occurred at birth or during childhood means that the individual's mental development during his or her crucial early years was affected by the

impairment of the brain's ability to function.  This element of the definition is derived from the understanding of modern neuroscience about the way the brain develops and the implications of its arrested development for cognitive impairment.  *See* 1992 AAMR Manual at 16-18.  The 2002 AAMR Manual identifies four main categories of risk factors for mental retardation – biomedical, social, behavioral, and educational – that can occur at the prenatal, perinatal, or postnatal stage of development.  *See* 2002 AAMR Manual at 127 (Table 8.1).  In practical terms, it means that any individual with mental retardation not only has a measurable and substantial disability now, but that he or she also had it during childhood, significantly reducing the ability to learn and gain an understanding of the world during life's formative years.

C.  Ramiro Ibarra has mental retardation

Credible evidence exists that Mr. Ibarra  has mental retardation. Mr. Ibarra underwent an evaluation by Carol M. Romey, Ph.D. on June 9 and June 10, 2003.     It is Dr. Romey's professional opinion that Mr. Ibarra has mental retardation.  Exh. 19 at 1.  Indeed, The evidence shows that: (1) Mr. Ibarra's IQ is 65; (2) he has significant limitations in his adaptive functioning; and (3) he exhibited these diagnostic features before the age of eighteen.

1. Mr. Ibarra Has Significantly Subaverage Intellectual Functioning

On June 9 and June 10, 2003, Dr. Romey evaluated Mr. Ibarra's intellectual functioning. Exh. 19. She administered the Wechsler Adult Intelligence Scale-WAIS III.  *Id.* at ¶ 9. Mr. Ibarra obtained an Full Scale IQ score of 65.[34] *Id.* at  ¶ 17. Mr. Ibarra's score places him in the 1st

---

34  The WAIS III is comprised of Verbal and Performance subtests.  Mr. Ibarra obtained a Verbal IQ score of 71.  Mr. Ibarra's Verbal IQ score plaed him in the 3rd percentile.  In a sample of 100 subjects, 97 would score higher than Mr. Ibarra.  Mr. Ibarra obtained a Performance IQ Score of 63.  Mr. Ibarra's Performance IQ score placed hin in the 1st percentile.  In a sample of 100 subjects, 99 would score higher than Mr. Ibarra. Appendix 1 at 4, ¶ 18.

percentile. *Id.* In other words, 99 subjects would have placed higher than Mr. Ibarra. Mr. Ibarra's

IQ score places him well within the mentally retarded range. *Id.*

A Full Scale IQ score is a measure of an individual's general intellectual functioning.

However, intelligence includes the ability to reason, plan, solve problems, think abstractly,

comprehend complex ideas, learn quickly, and learn from experience. 2002 AAMR Manual at

51. Mr. Ibarra evinced serious deficits in all areas that comprise intelligence during his

psychological evaluation. *See* Exh. 19 at 3, 4. Dr. Romey made the following observations:

> Mr. Ibarra's problem solving skills were confused and errors were repeated with limited
>
> evidence of the transferring of learning from one level to the next level of difficulty.
>
> Even with additional time beyond the allotted time, Mr. Ibarra was unable to complete
>
> the tasks. On several of the tasks, Mr. Ibarra worked with the testing materials upside
>
> down or turned sideways. He appeared to work with more ease with the testing materials
>
> were in these positions. He often shook his head as in disagreement with what he was
>
> seeing but was unable to correct his errors or improve the quality of his work.
>
> Furthermore, Mr. Ibarra was unable to increase or vary his work rate. Even on timed tests
>
> and when told to work as fast as he could, he was unable to change the rhythm and speed
>
> of his work. He worked carefully at assigned tasks, but his efforts at improving the
>
> quality of his work were not successful. He often repeated the same errors over and over
>
> as he attempted so solve problems and perform tasks.
>
> Mr. Ibarra had great difficulty identifying essential aspects of social scenes and placing
>
> the scenes in a sequential order. He evidenced serious difficulty in understanding basic

relationships between actions and actors, establishing cause and effect sequences, and setting priorities. *Id.*

2. Mr. Ibarra Has Deficits in Adaptive Functioning:

**Lifelong Poor Academic Performance**

Mr. Ibarra experienced lifelong academic problems. Apolinar Ibarra Rubi, Ramiro's brother, noted that Mr. Ibarra had problems learning as a child. Exh. 9 at 5. According to Apolinar, Mr. Ibarra's performance in school was consistently substandard. He stated:

> Ramiro would take longer to do things than the other kids. He had a hard time in school so someone always had to help him with his homework. Rosario and Jesusita would always help him solve math problems since he couldn't do it on his own. Sometimes, he would cry because he couldn't resolve things on his own. He would get quiet and he would start crying.

*Id.* at 4, 5. He also noted, "I don't know why, but when Ramiro was a boy, he had problems learning. It took him a lot of work." *Id.* at 5.

Rosario Ibarra, Ramiro's sister, also stated that Mr. Ibarra experienced a great deal of difficulty in school. She noted:

> Ramiro also had a lot of difficulty with school work. My sister Jesusita and I had to help with his homework. He couldn't do his homework on his own. For example, when he was seven or eight years of age, his teachers would ask him to copy a single word like "gato" (cat) or "perro" (dog) until he filled up the page. He would start off fine. But as he would start to fill up the page, he would start skipping letters and he would write

crooked.  By the end, he would only write one or two letters.  He had a difficult time

following instructions.  He also had a very difficult time with math.

Exh. 10 at 6.

Likewise, Maria de Jesus Ibarra Rubi, Ramiro's sister, reported that Mr. Ibarra "struggled

a lot with his studies.  He wasn't good with school work." Exh. 12 at 2.  In addition, Mr. Ibarra's

father noted that Mr. Ibarra had difficulty with school work.  Exh. 13 at 2.

Victor Jasso, also one of Mr. Ibarra's teachers, made the following observation, "With

respect to his intellectual abilities, Ramiro was very slow.  His intellectual capacity didn't help

him much." Exh. 15 at 1.  He went on to state:

Ramiro did not have the capacity that was required to excel. He needed special attention.

For example, when the class was doing exercises that I assigned to them, I would

separate Ramiro from the rest of the class and I would give him special help.

I taught my students spelling, reading, and composition.  I would need to explain to

Ramiro why a word was spelled a certain way.  For example, when there were words that

had different meanings, but had the same pronunciation like *vaya, valla,* and *baya.*  I

needed to explain those sorts of things to him. Normally, students of that age did not

require the attention or explanation that Ramiro required.  He was slow to understand

concepts.  He needed explanation.

Id.

**Impairments in Self Direction**

As a child, Mr. Ibarra experienced difficulty completing tasks independently. He required

---

extra attention and guidance of others.  Apolinar made the following observations of Ramiro:

> Ramiro and I were always together as kids.  I protected him all the time.  I would tell him
>
> what to do or say so that my father wouldn't hit him. . . .
>
> Ramiro was a slow child.  When you asked him or ordered him to do something, he
>
> would take a long time to do it.  It was like Ramiro didn't understand.  When we played,
>
> Ramiro would fall behind when it was his turn.  He was slow even in simple games like
>
> marbles.  When it was Ramiro's turn, Ramiro would not move, he didn't react until one
>
> of us would say, 'do it like this.'

Exh. 9 at 4.

> Ramiro and I worked in the fields together.  I always had to help him because he couldn't
>
> solve problems on his own.  For example, when he plowed, Ramiro's log was often
>
> getting stuck.  I would have to get off my horse to loosen and straighten the log every
>
> time it happened.

*Id.* at 5.

He noted that Mr. Ibarra would cry because he couldn't resolve problems on his own.  Id.

Elvia Ibarra Rubi, Mr. Ibarra's sister also recalled that Mr. Ibarra was consistently in

need of assistance.  She stated:

> Even though I was younger, I remember that my sister Chayo (Rosario) and my brother
>
> Apolinar were always helping Ramiro.  Chayo helped Ramiro with his school work.  It
>
> was like Ramiro didn't understand.  When they worked in the fields, Apolinar always
>
> helped Ramiro with his chores.  Apolinar protected Ramiro a lot. When Ramiro had

---

Ramiro Rubi Ibarra—Petition for Writ of Habeas Corpus                    Page 115

problems with the plow, Apolinar always helped him.

Exh. 14 at 2.

Victor Jasso, one of Mr. Ibarra's teachers, recognized that Mr. Ibarra was in need of extra guidance and support. As a result, he would suggest to Mr. Ibarra that he work with a classmate who was more intelligent than Mr. Ibarra when assigned group projects. Exh. 15 at 1.

**Impairments in Language**

As a young child, Mr. Ibarra exhibited impairments in language. Rosario stated:

When Ramiro was five years old, he was very thin and small. He looked like a two to three year old child. Not only did he look smaller than his age, he talked like a two year old child. He had a very bad pronunciation and his vocabulary was very limited. He couldn't pronounce the few words he knew.

Exh. 10 at 5.

Likewise, Apolinar recalled that when Mr. Ibarra was seven or eight years old, "One could not understand everything he said. It was as if he was missing letters. Everyone would ask, 'What did he say?'" Exh. 9 at 5. In addition, Apolinar made the following observation, "[R]amiro couldn't talk right. He would talk really slow." Id.

**Inability to Express Emotions with Words**

Rosario described Mr. Ibarra as a sentimental child who was unable to express his feelings with words. Instead, Mr. Ibarra "cried about everything." Exh. 10 at 5. She provided the following example:

Ramiro would get very easily frustrated. If he couldn't do something, he would cry. I

---

remember that when he was about five years old, he had a difficult time pushing a little

toy car he had.  When Ramiro couldn't push the toy car, he would get frustrated and he

would start crying.

*Id* at 6.

### Frequently Victimized By Others

Mr. Ibarra  was frequently victimized by school mates.  Rosario stated:

At school, kids teased Ramiro a lot.  Ramiro was very timid.  I remember that when

Ramiro was about ten years old, other kids beat Ramiro at school.  Ramiro came into the

classroom where Jesusita and I were.  Ramiro was crying with despair.  This was not the

only time that Ramiro was beaten up.  It happened often. . . Ramiro did not know how to

defend himself.  I would console him.

Exh. 10 at 6.  Rosario also noted that at home, Ramiro was in need of the most protection.  She

made the following observations:

I always believed I had to defend Ramiro.  He was defenseless.  Out of all my brothers

and sisters, he was the one who needed the most protection.  Although I always tried, I

wasn't always able to defend him.

*Id.* at 6.

Likewise, Apolinar stated that "At school, Mr. Ibarra's classmates teased Mr. Ibarra

about everything."  He confirmed that Rosario "always helped and protected Ramiro a lot."

Exh. 9 at 5.

Maria de Jesus Ibarra Rubi, Mr. Ibarra's sister, also recalled defending Mr. Ibarra from

---

classmates at school.  Exh. 12 at 2.

**Impaired Social Relations**

As a child, Mr. Ibarra exhibited impaired functioning in the area of social skills. Apolinar noted, "Ramiro didn't have friends . . . I never saw him with friends." Exh. 9 at 5.

**Substandard Hygiene**

According to Rosario, Mr. Ibarra also experienced a great deal of difficulty with hygiene. She commented that when Mr. Ibarra was seven years of age, she still had to accompany him to the bathroom.  She noted, "I had to clean him because he couldn't do it on his own."  Exh. 10 at 6.

**Ongoing Deficits in Adaptive Functioning**

Mr. Ibarra's performance during Dr. Romey's evaluation  further corroborates evidence of adaptive functioning deficits. Exh. 19 at 4.  Mr. Ibarra's self-esteem skills are significantly impaired. *Id.* at 5. Dr. Romey made the following observations:

His psychological profile evidences lifelong feelings of uselessness, dejection, pessimism, and discouragement.  He feels socially inadequate, worthless, and incompetent.  With very reduced inner resources for dealing with social demands, Mr. Ibarra becomes very anxious and distressed with few adaptive coping skills to reduce his inner turmoil.  He expresses many fears, difficulty in concentrating and mental disability caused by complexities of a social world he cannot understand or relate to.  He feels lost and anxious and unable to manage every-day stressors.

*Id.* His communications skills are also significantly subaverage. *Id.* at 4. In addition, he is unable to detect essential aspects in his visual world and fails to comprehend basic social scenes and processes. *Id.* at 5. As a result, his ability to work independently is severely impaired. *Id.* During the psychological evaluation, Mr. Ibarra had to be constantly re-directed.  He was unable to work without re-direction. He frequently stated that he did not understand and that he felt lost. *Id.*

### 3. Mr. Ibarra Exhibited Impairment Before the Age of 18

Mr. Ibarra's mental retardation is traceable to his childhood.  All the information upon which Dr. Romey relied for her diagnosis of mental retardation for Mr. Ibarra supports the conclusion that his disability originated before the age of eighteen.

D. Mr. Ibarra was exposed to significant risk factors for mental retardation

The 2002 AAMR Manual describes four categories of risk factors that may interact to cause mental retardation.  The four categories of risk factors are: (1) biomedical: factors that relate to biologic processes such as genetic disorders or nutrition; (2) social: factors that relate to social and family interaction, such as stimulation and adult responsiveness; (3) behavioral: factors that relate to potentially causal behaviors, such as dangerous (injurious) activities or maternal substance abuse; and (4) educational: factors that relate to the availability of educational supports mental development and the development of adaptive skills.  The 2002 Manual emphasizes that the "impairment of functioning that is present when an individual meets the criteria for a diagnosis of mental retardation usually reflects the presence of several risk factors that interact over time."

Mr. Ibarra was exposed to the following risk factors commonly associated with mental retardation:

**Traumatic Birth**

Apolinar recalled that when Mr. Ibarra, who was born on a dirt floor at home, was born, he did not breathe. It took several minutes before he started breathing. Exh. 9 at 1. Rosario described Mr. Ibarra's birth as "complicated." Exh. 10 at 2. She recalled that their grandmother was desperate because Mr. Ibarra was not breathing. *Id.* According to Rosario, Mr. Ibarra was purple and did not move for several minutes. *Id.*

**Maternal Malnutrition and Inadequate Prenatal Care**

Mr. Ibarra's mother failed to receive adequate nutrition during her pregnancy with Mr. Ibarra. Rosario reported that her mother was very skinny when she was pregnant with Ramiro. Exh. 10 at 2. She explained that the majority of the time she ate tortillas and salt because her parents did not have money to buy food. *Id.* She also recalled that her mother complained of pains during her pregnancy. She stated:

> When my mother was pregnant with Ramiro, my parents were building a little hut made out of adobe in La Colonia Aurora. My mother would complain and cry because she had to carry buckets of adobe and dirt up the hill where they were building the little hut. Once my mother would get to the top of the hill, she had to put the adobe and dirt on the floor in square molds. Once the mixture dried, she would lift the squares of dry adobe and she would place them to build the walls of the hut. My parents fought a lot because my mother complained of having pains and my father would tell her, "Move fast, come on,

you dumbass." My mother would cry and hug Aplolinar and me.

Exh. 10 at 1.

Apolinar noted that his mother was very malnourished during all of her pregnancies.

Exh. 9 at 3. He noted that she didn't eat or ate very little and fainted all the time.. Id.

**Brain Injury**

When Mr. Ibarra was approximately ten or eleven years of age, he fell from a fruit tree

and hit his head. As a result, he lost consciousness for approximately twenty minutes. Exh. 9 at

4 & Exh. 10 at 6. Mr. Ibarra was not taken to the doctor because his family did not have the

financial resources to do so. Exh. 10 at 6.

**Abject Poverty**

Mr. Ibarra's childhood was marked by abject poverty. Indeed, Mr. Ibarra's parents failed

to meet the most basic needs of Mr. Ibarra as well as his siblings.

For example, Mr. Ibarra and his family lacked adequate housing throughout Mr. Ibarra's

childhood. Mr. Ibarra's family moved with extreme frequency due to his parents' inability to

pay the rent. His siblings recall moving approximately twenty separate times. *See* Exh. 9 at 3,

Exh. 7 at 1, & Exh. 11 at 3. Apolinar provided the following description of the family's living

conditions, "The houses where we lived had dirt floors, corrugated iron, or plastic roofs, holes in

the floors that we used as toilets." Exh. 9 at 4.

Silvano stated:

When I was young, we always rented the houses that we would live in. The houses were

in reality just little rooms, about 3 meters long by 6 meters wide. They were made of

---

adobe and had dirt floors. We would all have to fit in that little space.  I remember that

sometimes we had to move at least two times a month because my father did not have

enough money to pay rent . . . . We never had a stable place to live until we had the

cardboard house.

Exh. 5 at 2.

Silvano recalled that on one occasion, the cardboard house became filled with water and

as a result, the cardboard became completely wet. *Id.* at 3.   When the cardboard dried, it became

hard and it broke easily.  *Id.*  Although the structure was damaged, the family was forced to

return to the dwelling after the flood passed.  *Id.*  Whenever it rained again, water passed through

the cardboard and everything inside would get wet. *Id.*

Rosario provided the following description of the dwellings in which the family resided:

Many of the rooms we lived in did not have windows, light, or water.  Sometimes, we

stayed in places that did not even have a door.  We would cover the entry way with a

piece of cloth.  We slept on the floor, on grass mats because we had no furniture.  We

would go to the bathroom in a hole on the floor.  On one occasion, we lived in the garage

of a house.  On another occasion, we lived in a small pen for pigs.  The pen did not have

doors or windows.  It did not have electricity or plumbing either.  We also lived in a

room owned by a woman named Mrs. Maria Zapata.  The little room was made of adobe.

Part of the roof had fallen off, so when it rained, water would come into the room.  When

we were inside the room, we also felt the air that was blowing outside.

Exh. 10 at 4.

Mr. Ibarra's parents also lacked money to buy clothing for the children.  Exh. 5 at 2, Exh. 7 at 2; Exh. 9 at 3.

In addition, adequate medical care eluded the family.  Elvia, Mr. Ibarra's sister,  stated:

We didn't have money to go to the doctor either.  I remember that on one occasion, my mother and my brother Apolinar were sick for about two months.  It was like typhoid fever.  We were desperate because as the days went by, the sickness got worse.  There was no money to cure them . . . .

I remember that my little sister Paolita died when she was about three months old.  She was sick for about a month.  At night she would cry and cry, but my parents didn't have the money to buy her medicine.  Since my parents didn't have money to take her to the doctor, they would give her home remedies like tea.  It was very sad for the family to see how poverty was taking on of our little sisters away and no one was able to do anything.  This tragedy gave us a lot of feelings of sadness and helplessness.

Exh. 14 at 1.

Pablo Ibarra, Mr. Ibarra's father, confirmed the family's struggles with poverty.  He stated:

We were very poor.  I had a lot of kids.  We lived in rented rooms, sometimes there wasn't even money to pay the rent on the due date.  The kids would be screaming and fighting over a little piece of pencil to do their homework.

Exh. 13 at 2.

---

Ramiro Rubi Ibarra—Petition for Writ of Habeas Corpus                    Page 123

**Malnutrition**

Mr. Ibarra and his family often lacked adequate food.  When Ramiro was two to three years old, a severe drought hit the region where Mr. Ibarra and his family were residing.  Exh. 10 at 2.  As a result, Mr. Ibarra's parents moved to Mexico City in search of work.  *Id.*  Mr. Ibarra and Rosario were left behind with their paternal grandparents.  The climate problem lasted three to four years.  Rosario stated:

> We became very weak because we did not have enough to eat.  We had no choice but to
>
> eat things my grandparents would find in the countryside like cactus leaves and quelites
>
> and verdolaga (different types of wild greens).

Id.

Even after the drought passed, the family continued to lack adequate food.  Silvano, Mr. Ibarra's brother, provided the following description of the family's dire circumstances:

> . . . [S] sometimes we had enough to eat and sometimes there was not enough food for all
>
> the family.  Even when there was sufficient food, we still ate very poorly.  There were so
>
> many of us to feed.  The only thing we had to eat almost every day was tortillas and
>
> beans, with chile . . . . We ate two times a day when there was barely sufficient food.
>
> Sometimes we ate once a day because we didn't have enough for two meals.  Sometimes
>
> we didn't have anything to eat for a day or more.

Exh. 5 at 2.

At times, the family's diet consisted of only tortillas with salt.  Exh. 11 at 2.  Other times, the family was forced to eat discarded food from the market.  Apolinar stated:

---

> My mother would go to the market to bring the refuse, the food that was being discarded,
> and that's what we would eat.  This was the way all of my childhood and adolescence
> was and Ramiro's also.  Whenever Ramiro would bring the scraps from the market, she
> would say, 'here it is, if you want, swallow it.'

Exh. 9 at 2.

In addition, the family did not have an adequate source of clean water.  Rosario provided the following description of the water the family drank from a well:

> The water was dirty, it had green larvae.  It had a brownish color.  One could see little
> organisms swimming in the water.  The reason the water was so dirty was that it came
> from the fields and it came contaminated with animal and human waste, dust, and trash.

Exh. 10 at 3.

Likewise, the family bathed in water that was polluted with animal and human waste.  *Id.* at 3.

**Domestic Violence**

Mr. Ibarra was exposed to severe violence throughout his childhood.  Mr. Ibarra's siblings consistently describe their father as an exceedingly violent individual.  Apolinar stated, "My father was more violent than violence."  Likewise, Silvano recalled the extreme violence in the home:

> . . . [M]y father would hit my mother in front of us and then push her to the floor.  Once
> my mother was on the floor, my father would start kicking her. He would beat her and
> kick her until my father would tire.  He would hit her for any little thing.  For example, I

---

remember one time my mother was cooking for all of us and accidentally served my

father a burnt tortilla.  My father became very angry and started to hit her with his fist.

He then pushed her down and started to kick her in front of us.  When my father finished

beating her, my mother resumed cooking.

Exh. 5 at 3.

Silvano recalled that his mother, who cried often,  had visible bruises most of the time.

He noted, "She suffered very much because of everything my father did to her.  *Id.* at 4.

Maria de Jesus recalled that her father hit her mother even when her mother was

pregnant.  She stated, "My father would beat her for the simple reason that she would ask him

for money or food.  He'd say, 'You know I don't have it," and then beat her for asking." Exh. 12

at 1.

**Inadequate Family Support**

Mr. Ibarra's parents failed to provide adequate support to Mr. Ibarra and his siblings.  For

example, they struggled tremendously in their educational endeavors because Mr. Ibarra's

parents were unable to provide  school supplies or books for the children.  *See* Exh. 7 at 2.

Silvano commented, "My father did not care that I did not have notebooks for school or that I

had to work in order to buy my own notebooks for school.  After I realized this, I never asked

anything from my father." Exh. 5 at 1.

Apolinar had the following to say about his parents' failure to provide adequate support:

My parents had thirteen children without thinking about the consequences.  For example,

they didn't think about what they were going to do to feed us.  They didn't talk with their

children either, with the exception of giving orders.  My parents were careless and

neglectful with their children.  If my father had had any brains in his head, he would have

been worried about feeding us.  But he never worried about feeding us.

Exh. 9 at 1.

Joaquin Ibarra, Mr. Ibarra's brother, also described a childhood marked by neglect and

inadequate family support.  He stated:

My parents cut off our feelings, they traumatized us.  This is something that Ramiro

suffered as well.  For example if we were late or something unexpected happened, my

parents didn't ask us what happened.  My parents would beat us with a belt. . . . If we

made a mistake, he would punish us.  He would give us more work.

Exh. 11 at 2.

**Child Abuse and Neglect**

Mr. Ibarra and his siblings suffered severe abuse at the hands of their father.  According

to Silvano, "There was always violence in the house.  If we did not do something correctly, my

father would beat us . . . He would beat us with anything he could find." Exh. 5 at 3.  Maria de

Jesus also described a childhood marked by serious physical abuse.  She stated:

I remember that when we were children sometimes our father would beat us so hard that

when we went to school, we couldn't sit down because of the beatings.  He would beat us

wherever the blows landed and he used his hands, a stick, a whip, whatever he could

grab.

Exh. 12 at 2.

---

**Point of Error Number Ten**

Mr. Ibarra's death sentence violates the Sixth Amendment because the jury verdict did not include a determination of an essential element of capital murder: that Mr. Ibarra is not mentally retarded.

An analysis of the current legal landscape, including a case decided by the Supreme Court, *Ring v. Arizona,* 536 U.S. 584 (2002), indicates that both judge and jury have a significant role to play in resolving a post-conviction *Atkins* claim. *Ring* involved a Sixth Amendment challenge to Arizona's judge-sentencing capital punishment scheme. Relying on the constitutional principles established in *Apprendi v . New Jersey,* 530 U.S. 466 (2000) (holding that the Sixth Amendment does not permit a defendant to be exposed to a penalty exceeding the maximum he would receive if punished according to the facts reflected in the jury verdict alone), Ring argued that *Apprendi* was irreconcilable with the Court's prior decision in *Walton v. Arizona,497U.S.* 639 (1990), which upheld Arizona's judge-sentencing procedure. The *Ring* Court agreed, overruled *Walton,* and held that the Sixth Amendment requires that any finding of fact that makes a defendant eligible for the death penalty must be unanimously made by the jury beyond a reasonable doubt. *Ring.* 536 U.S. at 603.

While *Ring* dealt specifically with statutory aggravating circumstances, it included "factfinding[s] necessary to ... put [a defendant] to death." *Ring,* 536 U.S. at 609. *Atkins* held that the Eighth Amendment prohibits a mentally retarded defendant from being sentenced to death. *Atkins,* 536 U.S. at 321. Because a mentally retarded defendant is no longer constitutionally eligible for the death penalty, mental retardation now becomes a factual issue

---

"that ... must be found by a jury beyond a reasonable doubt." *Ring,* 536 U.S. at 600.  In effect, the absence of mental retardation is "the functional equivalent of an element of [capital murder]." *Apprendi,* 530 U.S. at 494.

The judge still plays a very important role in this determination. Much like the current Texas practice with regard to the admissibility of a defendant's statements, eyewitness identification, and expert testimony, the constitutionally required procedure occurs in two steps. In the first step, the judge must make an independent judicial determination that the defendant does (or does not) have mental retardation, and whether the defendant is eligible for a death sentence under *Atkins,*

The reasons for the requirement of a distinct *judicial* determination of fact and law are discussed in *Jackson v. Denno,* 378 U.S. 368 (1964), and reiterated in *Crane v. Kentucky,* 476 U.S. 683 (1986): the enforcement of a federal constitutional prohibition against exposing retarded persons to a death sentence at the jury's discretion can hardly be left solely to a procedure whereby the jury makes the ultimate factual determination of the existence of the facts on which the prohibition turns.  In *Jackson,* for example, the Court stated "the *requirement* that the court make a pretrial voluntariness determination does not undercut the defendant's traditional prerogative to challenge the statement's reliability during the course of the trial." *Jackson,* 378 U.S. at 386 (emphasis added).  There is, in short, a due process mandate that the trial court make the initial determination whether the defendant's constitutional rights were violated. *Crane.* 476 U.S. at 687-88.  This is especially important in the context of a jury determination regarding mental retardation. The Supreme Court created the constitutional

prohibition in part as a result of recognition of the handicaps that retarded persons suffer in litigating issues in front of juries, which in turn exposes them to "a special risk of wrongful execution." *Atkins.* 536 U.S. at 321.  (noting: (1) the difficulty a mentally retarded person may have in testifying; (2) the possibility that a mentally retarded person's "demeanor may create an unwarranted impression of lack of remorse;" and (3) the possibility that evidence of mental retardation may enhance the likelihood that future dangerousness will be found by the jury).

In the second step of the process required for addressing and resolving an *Atkins* claim. The defendant who presents evidence of mental retardation has a right to insist that he not be sentenced to death unless the jury finds unanimously, beyond a reasonable doubt, that he is not mentally retarded.  *Ring* and *Atkins*, read together, say this very clearly.  Ring is explicit that the procedural rights guaranteed by Apprendi attach to elements that are added by Supreme Court "interpret[ations] of the Constitution to require the addition of an . . . element to the definition of a criminal offense in order to narrow its scope." Ring, 536 U.S. at 606.  It is equally clear that *Atkins* adds such an element.  The *Atkins* Court stated:  "Thus, pursuant to our narrowing jurisprudence, which seeks to ensure that only the most deserving of execution are put to death, an exclusion for the mentally retarded is appropriate." *Atkins*, 536 U.S. at 319.

In all cases where mental retardation is at issue, this two-step process sets the constitutional floor.  Mr. Ibarra is entitled to a judge and jury determination of mental retardation. His execution in the absence of this process would violate his Sixth, Eighth, and Fourteenth Amendment rights.

---

**Point of Error Number Eleven**

Mr. Ibarra's Rights Under the Vienna Convention Were Violated Where He Was Not Advised of His Right to Obtain Crucial Assistance from the Mexican Consulate

A. Introduction

Mr. Ibarra is a death row inmate whose rights under the Vienna Convention on Consular Relations (VCCR) were violated at the time of his arrests in 1986 and 1997 for capital murder. He is one of the 51 Mexican nationals specifically named in the *Avena* judgment of the International Court of Justice (ICJ). *See Avena and Other Mexican Nationals* (Mex. v. U.S.), 2004 I.C.J. 128 (Mar. 31) (hereinafter "*Avena*"). In *Avena*, Mexico brought suit against the United States on the ground that the United States had violated the rights of Mr. Ibarra and other Mexican nationals on death row in the United States under Article 36 of the Vienna Convention on Consular Relations, 21 U.S.T. 77, 596 U.N.T.S. 261 ("Vienna Convention"), a treaty to which the United States and Mexico are both parties. Among other things, Article 36 of the Vienna Convention requires authorities who detain a foreign national to notify the individual of his right to have his nation's consulate notified of the detention without delay, and to afford the detained individual the opportunity to communicate with and seek assistance from his nation's consulate, also without delay. The ICJ held that the United States had violated the rights of Mr. Ibarra and 51 other Mexican nationals under Article 36 and that, as a remedy, the United States was required to give judicial "review and reconsideration" to the convictions and sentences of the 51 Mexican nationals to determine if their convictions and sentences were affected by the Vienna Convention violation, without regard to procedural default rules that would prevent the

---

reviewing court from reaching the merits.

B. The Violation of the Vienna Convention

At the time of his 1987 arrest, Mr. Ibarra had been a resident of the United States for a number of years but did not have legal resident status.  He was at no time advised of his rights under the Vienna Convention, nor was he allowed the opportunity to contact the Mexican Consulate.  (51 R.R. 3).  This was in spite of the fact that the investigating police officer was aware Mr. Ibarra was not a United States citizen.  *Id.*[35]

Mr. Ibarra was arrested again in 1996.  Once again, he was not advised of the rights he possessed under the Vienna Convention.  (51 R.R. 10).  Indeed, neither the police, nor the prosecution, nor any person aware of his detention, notified him of his rights to seek consular assistance at *any* stage of his detention and capital murder trial.  The day Mr. Ibarra was sentenced to death, a Mexican reporter contacted the consulate of Mexico in Austin, Texas.  Consular officials immediately contacted defense counsel, as well as Mr. Ibarra's family members, to confirm his nationality and to offer their assistance.  Until this time, Mexican consular officials had been completely unaware of Mr. Ibarra's detention and were manifestly unable to provide consular assistance during his pre-trial detention and capital murder trial.  With the assistance of Mexican consular officials, Mr. Ibarra's counsel filed a motion for a new trial, based entirely on the violation of Article 36(1).  (2 C.R. 302-306).   The court denied the motion without comment on December 5, 1997.  The State does not dispute that Mr. Ibarra was not informed of his rights under the Vienna Convention. *Ibarra v. State*, 11 S.W. 3d 189, 197

---

35  Officer Salinas testified that he was not aware of the Vienna Convention, or of any rights it may have created.

(Tex. Crim. App. 1999).

When the Mexican consulate first made contact, defense counsel stated that he was unaware that Mr. Ibarra was a Mexican national—clear evidence of inadequate preparation for the penalty phase of the trial. *See, e.g., Williams v. Taylor*, 529 U.S. 362, 396 (2000) (holding that trial counsel has an "obligation to conduct a thorough [mitigation] investigation of the defendant's background."). Had the authorities complied with their obligations under Article 36 of the Vienna Convention, consular officers would have had ample opportunity to obtain substitute counsel, or to provide resources to make up for the deficiencies in his investigation, as described below.

C.    Mexico Has Provided Crucial Assistance Since Learning of Mr. Ibarra's Detention

Although Mr. Ibarra has resided in the United States almost exclusively since the age of 18, he does not speak or understand English and has an extremely limited education. He thus represents precisely the type of Mexican national who is must confused—and most vulnerable—when confronted with prosecution in the United States. The Government of Mexico became actively involved in Mr. Ibarra's defense immediately upon learning about his case, working with trial counsel to ensure that the violation of Article 36 was raised both in a motion for a new trial and on direct appeal.[36]

Were it not for the support and assistance of Mexico, it is unquestionable that Mr. Ibarra

---

36  In his direct appeal, Mr. Ibarra specifically asserted (in advance of the identical conclusion reached by the *LaGrand* and *Avena* Judgments) that "any potentially applicable default provisions do not prevent this court from considering this claim. . . Article 36, 2 of the Convention specifically provides that local law of the receiving state 'must enable full effect to be given to the purposes for which the rights accorded under this article are intended.'" On appeal, this Court refused to reach the merits of the Vienna Convention violation, holding that Mr. Ibarra had failed to timely raise the issue at the trial court level and had thereby failed to preserve the issue. *Ibarra v. State*, 11 S.W.2d 189, 197 (Tex. Crim. App. 1999).

would have been prevented from raising compelling and crucially important claims warranting habeas corpus relief.  The state-appointed representation provided to Mr. Ibarra in post-conviction proceedings was woefully deficient.  His court-appointed post-conviction lawyer never once visited him, failing to respond to Mr. Ibarra's letters or to communicate with him in any way.  Mr. Ibarra's "attorney" filed a five-page petition for writ of habeas corpus on his behalf in the state courts, raising a single legal argument that had already been considered and rejected on direct appeal.  It was only when lawyers funded by the Mexican Government contacted and interviewed Mr. Ibarra that he was finally informed that the state courts had denied his habeas petition nearly a year earlier.  With time running out on the one-year filing limit for his federal habeas corpus petition, Mexican consular assistance was the only thing standing between Mr. Ibarra and the total defaulting of habeas review in federal court.

When Mexico discovered that the post-conviction lawyer appointed by Texas had all but abandoned Mr. Ibarra, it took immediate steps to safeguard his legal rights.  Mexican consular representatives contacted the Governor of Texas and met with his legal counsel to express their concern over Mr. Ibarra's case.  Attorneys funded by Mexico moved for the appointment of habeas counsel in federal court.  The Mexican Government filed a letter in support, and requested that the court appoint an attorney or law firm with experience in capital habeas representation.  Mexico retained counsel to prepare Mr. Ibarra's federal petition for writ of habeas corpus, while awaiting the appointment of local counsel.  To assist with that hitherto neglected task, Mexico also retained a bilingual psychologist to assess Mr. Ibarra's mental status.

Mexico was prompted to retain a psychologist after a bilingual lawyer retained by Mexico met with Mr. Ibarra and observed his childlike behavior.  On June 9 and June 10, 2003, Carol M. Romey, Ph.D. evaluated Mr. Ibarra's intellectual functioning. Exh. 19.  Mr. Ibarra obtained an Full Scale IQ score of 65.  Ninety nine of 100 subjects would have placed higher than Mr. Ibarra, placing him well within the mentally retarded range.  *Id.*  During his psychological evaluation, Mr. Ibarra evinced serious deficits in all areas that comprise intelligence.  Dr. Romey made the following observations:

> Mr. Ibarra had great difficulty identifying essential aspects of social scenes and placing the scenes in a sequential order. He evidenced serious difficulty in understanding basic relationships between actions and actors, establishing cause and effect sequences, and setting priorities.

*Id.* at 5, ¶ 22.

Mexico has also undertaken an investigation into Mr. Ibarra's life-history.  The investigations has revealed evidence that Mr. Ibarra suffered from adaptive functioning deficits as a young child.  In addition, mitigation investigators uncovered compelling mitigating evidence as discussed below in Section F.

D. Prior Proceedings

1. The *Avena* Case in the International Court of Justice

As discussed above, Mr. Ibarra is one of the 51 Mexican nationals specifically named in the *Avena* judgment of the International Court of Justice.  Specifically, the ICJ adjudged that Texas authorities violated Mr. Ibarra's Vienna Convention rights.  In particular, the ICJ held that the United States—acting through various state and local officials—had breached its obligation under Article 36(1)(b) in the case of 51 Mexican nationals, including Mr. Ibarra, "to inform detained Mexican nationals of their rights under that paragraph." *Avena*, ¶ 106 (1).  In 49 of those cases, again including that of Mr. Ibarra, the ICJ also found that the United States breached Article 36(1)(b) when officials failed "to notify the Mexican consular post of the[ir] detention." *Id.* ¶ 106 (2).

In the cases of Mr. Ibarra and 48 other Mexican nationals, the ICJ further held that the United States had breached its obligation under Article 36(1)(a) "to enable Mexican consular officers to communicate with and have access to their nationals, as well as its obligation under paragraph 1(c) of that Article regarding the right of consular officers to visit their detained nationals." *Id.* ¶ 106 (3).   And, in the cases of Mr. Ibarra and 33 other Mexican nationals, the ICJ also held that the United States had breached its obligation under Article 36(1)(c) "to enable Mexican consular officers to arrange for legal representation of their nationals." *Id.* ¶ 106 (4).

The ICJ then turned to remedies.  It held that the United States must provide "review and reconsideration" of the convictions and sentences of Mr. Ibarra and the other Mexican nationals in whose cases it found violations.  *Id.* ¶¶ 121-122, 153(9).  The ICJ then specified the nature of

the review and reconsideration that the United States would need to provide to Mr. Ibarra: *first*, the required review and reconsideration must take place "within the overall judicial proceedings relating to the individual defendant concerned;" *second*, procedural default doctrines could not bar the required review and reconsideration when the competent authorities of the detaining State had themselves failed in their obligation of notification; *third*, the review and reconsideration must take account of the Article 36 violation on its own terms and not require that it qualify also as a violation of some other procedural or constitutional right; and *finally*, the forum in which the review and reconsideration occurs must be capable of "examin[ing] the facts, and in particular the prejudice and its causes, taking account of the violation of the rights set forth in the Convention." *Id.* ¶¶ 111-113, 120-122, 133-134, 138-141.

2. The Supreme Court's First Grant of Certiorari in *Medellín*

On December 10, 2004, the United States Supreme Court granted Certiorari in *Medellín v. Dretke,* a case that bore directly on Mr. Ibarra's case.  *See* Petition for Writ of Certiorari, Aug. 18, 2004, 2004 WL 2851246, *Medellín v. Dretke* (U.S.) (No. 04-5928); *see Medellín v. Dretke*, 543 U.S. 1032 (2004) (order granting certiorari). Specifically, the Court granted certiorari in Mr. Medellín's case to review two questions regarding the enforceability of the *Avena* judgment:

> 1. In a case brought by a Mexican national whose rights were adjudicated in the *Avena* Judgment, must a court in the United States apply as the rule of decision, notwithstanding any inconsistent United States precedent, the *Avena* holding that the United States courts must review and reconsider the national's conviction and sentence, without resort to

procedural default doctrines?

2.  In a case brought by a foreign national of a State party to the Vienna Convention, should a court in the United States give effect to the *LaGrand* and *Avena* Judgments as a matter of international judicial comity and in the interest of uniform treaty interpretation?

Id.

3. The Determination by the President of the United States to Comply with the Avena Judgment in the Case of Mr. Medellin and the 50 other Mexican Nationals

On February 28, 2005, after certiorari was granted in *Medellin*, President George W. Bush issued a signed, written determination that state courts must provide review and reconsideration to the 51 Mexican nationals named in the *Avena* judgment, including Ibarra , pursuant to the criteria set forth by the ICJ in the *Avena* judgment, notwithstanding any state procedural rules that might otherwise bar review of the claim on the merits.  The President declared:

> I have determined, pursuant to the authority vested in me as President by the Constitution and laws of the United States, that the United States will discharge its international obligations under the decision of the International Court of Justice in the *Case Concerning Avena and Other Mexican Nationals (Mexico v. United States of America (Avena)*, 2004 I.C.J. 128 (Mar. 31), by having State courts give effect to the decision in accordance with general principles of comity in cases filed by the 51 Mexican nationals addressed in that decision.

*See* Exh. 21 (Presidential Declaration).

4. The Supreme Court's Decision that Federal Habeas Adjudication was Premature in Mr.

Medellin's Case

On March 8, 2005, Mr. Medellín filed a motion in the U.S. Supreme Court, asking it to

stay the case before it in deference to the President and hold it in abeyance while Mr. Medellín

exhausted his *Avena* claim in Texas state court in accordance with the President's determination.

On March 24, 2005, Mr. Medellín filed a petition for a writ of habeas corpus in the Texas Court

of Criminal Appeals, requesting among other forms of relief, an evidentiary hearing on the

merits of his claim under the *Avena* judgment and the President's determination.

On May 23, 2005, the Supreme Court dismissed the writ of certiorari "[i]n light of the

possibility that the Texas courts will provide Medellín with the review he seeks pursuant to the

*Avena* judgment and the President's memorandum, and the potential for review in this Court

once the Texas courts have heard and decided Medellín's pending action." *Medellín v. Dretke*,

544 U.S. 660, 666 (2005). The Court based its decision that adjudication was premature on,

among other things, the requirement that "Medellín can seek federal habeas relief only on claims

that have been exhausted in state court. To gain relief based on the President's memorandum or

ICJ judgments, Medellín would have to show that he exhausted all available state-court

remedies." *Id.*

5. Mr. Ibarra's Subsequent Proceedings

After the President's order and the Supreme Court's dismissal in *Medellín*, Mr. Ibarra

filed a subsequent Application for Post Conviction Writ of Habeas Corpus in the 54th Judicial

District Court of McLennan County, Texas. On May 13, 2004, Mr. Ibarra's subsequent

Application for Post Conviction Writ of Habeas Corpus was transferred to the CCA under Texas Code of Criminal Procedure § 11.071.

6. Proceedings in the Texas Court of Criminal Appeals on *Medellín's, Avena,* and Presidential Determination Claims

Following the Supreme Court's dismissal, which effectively referred the case back to the Texas state courts, the CCA set Mr. Medellín's state petition for briefing and oral argument. The CCA heard oral argument from Mr. Medellín, the State of Texas, and the United States on September 14, 2005. On November 15, 2006, the court dismissed petitioner's application, holding that the application did not satisfy Texas Criminal Procedure Code Article 11.071, § 5, and that *Avena* and the President's determination do not preempt that provision of state law. *Ex parte Medellín*, 223 S.W.3d 315 (Tex. Crim. App. 2006).

With respect to the *Avena* judgment, the Texas court held that Mr. Medellín's claim was foreclosed by *Sanchez-Llamas v. Oregon*, 584 U.S. 331 (2006), which interpreted the Vienna Convention in a way inconsistent with the *Avena* judgment. With respect to the President's determination, the Court of Criminal Appeals concluded for a variety of reasons that the Presidential memorandum was not binding on it, with no single rationale commanding a majority.

E. The Supreme Court's Second Grant of Certiorari in the *Medellin* Case

Mr. Medellín filed a second Petition for Writ of Certiorari to the U.S. Supreme Court in January of 2007. The two questions presented were whether the President of the United States has the authority to require states to comply with the ICJ's ruling in *Avena* and whether American courts are bound by the ICJ's judgment in *Avena*. On April 30, 2007, the U.S. Supreme Court granted certiorari on both questions. *See Medellin v. Texas* 522 U.S. ___, 128 S.Ct. 1346 (2008). On March 25, 2008, the Supreme Court decided, by a vote of 6 to 3, that neither the *Avena* judgment nor the President's Determination automatically constitutes self-executing federal law that preempts state limitations on filing of successive habeas petitions and requires state courts to provide review and reconsideration pursuant to the *Avena* judgment. *Id.* at 1356-72.

When deciding *Medellin*, the Supreme Court held that an additional step by the political branches was necessary to comply with the *Avena* Judgment, including action by Congress to pass implementing legislation, 128 S. Ct. at 1369, or by the President "by some other means, so long as they are consistent with the Constitution," *id.* at 1371. In so holding, Justice Roberts, writing for the majority, specifically noted that "no one disputes" that the obligation to abide by the *Avena* judgment, which "flows from treaties through which the United States submitted to ICJ jurisdiction with respect to Vienna Convention disputes—constitutes an *international* law obligation on the part of the United States." *Id.* at 1356. Justice Roberts also stated that

> [I]n this case, the President seeks to vindicate United States interests in ensuring the reciprocal observance of the Vienna Convention, protecting relations with foreign

governments, and demonstrating commitment to the role of international law.  These

interests are plainly compelling.

*Id.* at 1367.

Justice Stevens concurred in the judgment but not the opinion, and writing for himself,

echoed that the United States' international obligation to provide review and reconsideration

under the *Avena* judgment was undisputed and urged action by Texas to "shoulder the primary

responsibility for protecting the honor and integrity of the Nation," *id.* at 1374, particularly

where "the costs of refusing to respect the ICJ's judgment are significant," *id.* at 1375.  Justice

Stevens also acknowledged the United States' affirmative and binding obligation to continue to

take all steps necessary to ensure compliance, stating "the fact that the President cannot legislate

unilaterally does not absolve the United States from its promise to take action necessary to

comply with the ICJ's judgment."  *Id.* at 1374.

Justice Breyer, joined by Justices Souter and Ginsburg, dissented, stating that the

Supremacy Clause of the U.S. Constitution demanded the state courts' compliance with the

*Avena* judgment, since "the treaty obligations, and hence the judgment, resting as it does upon

the consent of the United States to the ICJ's jurisdiction, bind[s] the courts no less than would

'an act of the [federal] legislature." *Id.* at 1376 (internal cites omitted).  Consistent with the

majority's opinions, Justice Breyer also recognized that noncompliance would exact a heavy toll

on the United States by "increas[ing] the likelihood of Security Council *Avena* enforcement

proceedings, of worsening relations with our neighbor Mexico, of precipitating actions by other

nations putting at risk American citizens who have the misfortune to be arrested while traveling

---

Ramiro Rubi Ibarra—Petition for Writ of Habeas Corpus                    Page 142

abroad, or of diminishing our Nation's reputation abroad as a result of our failure to follow the

'rule of law' principles that we preach." *Id.* at 1391.

F. Developments Since Medellin

Mr. Ibarra through undersigned counsel recognizes that current case law does not offer a

mechanism by which to seek enforcement of the *Avena* Judgment in U.S. courts.  However,

given the likelihood of imminent legislative or diplomatic implementation of *Avena* consistent

with the Supreme Court's requirements in *Medellin v. Texas*, *supra*, to abandon the claim at this

time would not be prudent.  Furthermore, the probability that Mr. Ibarra will soon receive the

"review and reconsideration" to which he is entitled under *Avena* (either by federal or state

implementation) provides compelling grounds for this Court to defer a decision on his Vienna

Convention claim.  Finally, nothing in *Medellin v. Texas* limits or even addresses the availability

of judicial remedies for the underlying Vienna Convention violation in this case, regardless of

the domestic enforceability of *Avena*.[37]

Developments since *Medellin* indicate that a concerted effort is being undertaken by the

---

37  Significantly, the *Medellin* Court emphasized that it was *not* denying the existence of rights and remedies
flowing from the Vienna Convention itself:

> The question is whether the Avena judgment has binding effect in domestic courts under the Optional
> Protocol, ICJ statute, and U.N. Charter.  Consequently, it is unnecessary to resolve whether the
> Vienna Convention is itself "self-executing" or whether it grants Medellin individually enforceable
> rights. . . . As in *Sanchez-Llamas*, 548 U.S., at 342-343, 126 S.Ct. 2669, we thus assume, without
> deciding, that Article 36 grants foreign nationals "an individually enforceable right to request that
> their consular officers be notified of their detention, and an accompanying right to be informed by
> authorities of the availability of consular notification."

*Id.* at 1357, n. 4.

---

Executive and Judiciary Branches to ensure that the U.S. meets its obligations to comply with *Avena*. Although the *Medellin* Court was deeply divided on the questions presented, the Justices were in unanimous agreement on one crucial issue: Congress possesses the clear constitutional authority to implement the requirements of *Avena*. *See Medellin*, 522 U.S. ___, 128 S.Ct. 1346 at 1368 ("[t]he responsibility for transforming an international obligation arising from a non-self-executing treaty into domestic law falls to Congress"); *id.* at 1374, n. 3 (Stevens, J., concurring) (discussing "Congress' implementation options" for ICJ decisions); *id.* at 1391 (Breyer, J., dissenting) (majority's holdings "encumber Congress with a task (postratification legislation)").

Responding swiftly to that unanimous determination, legislation was introduced in the U.S. House of Representatives in order to give full effect to Mr. Ibarra's right to effective "review and reconsideration" of the Article 36 violation in his case. As its title and description indicate, the Avena Case Implementation Act of 2008 (H.R. 6481) was intended to "create a civil action to provide judicial remedies to carry out certain treaty obligations of the United States under the Vienna Convention on Consular Relations and the Optional Protocol to the Vienna Convention on Consular Relations." Without opposition, the bill was formally enrolled as H.R. 6481 and was referred to the House Committee of the Judiciary. While the 110th Congress was prevented by time constraints from taking action on the bill, it is highly probable that suitable implementing legislation will be re-introduced as early as possible in the new Congressional session.[38]

---

38  All three sponsors of the Avena Case Implementation Act sit on the House Judiciary Committee, and it is thus likely that action will be taken expeditiously to implement *Avena* during the upcoming Congressional session.

At the state level, Texas State Senator Rodney Ellis has indicated his intent to propose implementing legislation at the earliest available opportunity. *See* Exh. 22. Indeed, Sen. Ellis has now introduced legislation for consideration by the Texas Senate that would authorize a motion for relief based on an Article 36 violation in cases resulting in death sentences. Under its provisions, Mr. Ibarra would be entitled "to obtain any appropriate relief required to remedy the harm done by the violation, including a vitiation of the death sentence." *See* Exh. 23, Text of S.B. 125, at section 2.

Furthermore, the *Medellin* Court recognized that the President "has an array of political and diplomatic means available to enforce international obligations. . . ". *Medellin*, *supra* at 1366; *cf. Sanchez-Llamas*, *supra* at 2682 ("[o]f course, diplomatic avenues--the primary means of enforcing the Convention--also remain open."). On June 17, 2008, Secretary of State Condoleezza Rice and Attorney General Michael B. Mukasey sent a letter to Texas Governor Rick Perry asking for Texas' help in complying with the *Avena* Judgment. *See* Exh. 24. The letter states that "[t]he United States attaches great importance to complying with its obligations under international law" and notes that the U.S. Supreme Court and the State of Texas both recognize "that the *Avena* judgment continues to bind the United States as a matter of international law." *Id*. at 1. Accordingly, the letter calls upon Texas to "take the steps necessary to give effect to the Avena decision with respect to the convictions and sentences addressed therein" and notes the federal government's continued efforts "to seek a practical and timely way to carry out our nation's international legal obligation." *Id*. at 2. This call for participation by Texas in efforts to implement *Avena* is consistent with Justice Stevens' admonition in *Medellin*

---

*v. Texas* that "Texas' duty [to protect the honor and integrity of the Nation] is all the greater since it was Texas that – by failing to provide consular notice in accordance with the Vienna Convention – ensnared the United States in the current controversy." *Medellin v. Texas*, 128 S. Ct. at 1374 (Stevens J., concurring). "Having already put the Nation in breach of one treaty," Justice Stevens wrote, "it is now up to Texas to prevent the breach of another." *Id.*

The importance of federal legislation was underlined by Texas Governor Rick Perry in his July 18, 2008, response to Secretary of State Rice's and Attorney General Mukasey's letter. Gov. Perry recognized the importance of the United States' international obligations under the VCCR, stating that "it is a matter best dealt with by our federal executive branch and Congress." Exh. 25. Moreover, Gov. Perry explicitly stated that with regard to any federal habeas case filed by "any individual under Texas custody and subject to *Avena*" that if the petitioner "has not previously received a judicial determination of his claim of prejudice under the Vienna Convention and seeks such review in a future federal habeas proceeding, the State of Texas will ask the reviewing court to address the claim of prejudice on the merits." *Id.* Mr. Ibarra's case surely fits these requirements since no previous court has applied a prejudice analysis to his Vienna Convention on Consular Relations claim.

G. Standard of Review

Review of Mr. Ibarra's Vienna Convention claims is proper in this Court. First, since Texas has consistently refused to address Mr. Ibarra's Vienna Convention claims on their merits, this Court is not obligated to defer to the state court's decision, and may review the matter *de novo*. See 28 U.S.C. §2254(d). The court below recognized that Mr. Ibarra had established an

---

undisputed factual basis for his Vienna Convention claims and also correctly identified the

federal law question at issue:

> In his eighth point of error, appellant claims his case should be reversed because he was
>
> not informed of his rights, upon arrest, as guaranteed by the Vienna Convention on
>
> Consular Relations.  This ratified treaty grants a foreign national who has been arrested,
>
> imprisoned, or taken into custody a right to contact his consulate and requires the
>
> arresting authorities to inform the individual of this right "without delay.". . . . Appellant
>
> maintains, and the State concedes, that he is a citizen of Mexico and that he was never
>
> informed of or accorded his right to free access to and consultation with the consular post
>
> of Mexico. We need not decide the merits of appellant's contention, however, as he failed
>
> to preserve this issue for review.

*Ibarra v. State*, 11 S.W.3d 189, 197 (Tex. Crim. App. 1999).  The state court never reached the

merits of the claim, instead finding that a state rule of procedure "has not been complied with

and error is waived." *Id.*   There has thus been no previous merits adjudication of any kind, let

alone one entitled to deference.  See, e.g., *Davis v. Sec'y for the Dep't of Corrs.*, 341 F.3d 1310,

1313 (11th Cir. 2003) (holding that deference to the state court decision was not required

because the court had not ruled on the merits of defendant's claim); accord *Moore v. Gibson*, 195

F.3d 1152 (10th Cir. 1999).

Second, the State of Texas has clearly indicated that it will waive the application of

procedural default to federal court merits review of Vienna Convention claims in cases such as

Mr. Ibarra's:

---

[I]f any individual under Texas custody and subject to Avena has not previously received a judicial determination of his claim of prejudice under the Vienna Convention and seeks such review in a future federal habeas proceeding, the State of Texas will ask the reviewing court to address the claim of prejudice on the merits.

Exh. 25, *Response of Governor Perry to Secretary of State Rice and Attorney General Mukasey*, at 1. Where the State waives a defense of procedural default, the district court may consider the merits of the petitioner's claims. See *Batchelor v. Cupp*, 693 F.2d 859, 863-64 (9th Cir.1982), cert. denied, 463 U.S. 1212 (1983); see also *Henderson v. Thieret*, 859 F.2d 492, 498 (7th Cir. 1988) (district court may not consider procedural default where State implicitly waives the defense); *Trest v. Cain*, 522 U.S. 87, 89 (1997) (reiterating that "procedural default is normally a 'defense' that the State is 'obligated to raise' and 'preserv[e]' if it is not to 'lose the right to assert the defense thereafter.'" (quoting *Gray v. Netherland*, 518 U. S. 152, 166 (1996)).

Third, to any extent that Mr. Ibarra's Vienna Convention claims might be regarded as adjudicated on the merits, this Court need not extend deference to those State court proceedings since they involved an unreasonable application of clearly established Federal law regarding the binding effect of consular treaties. See, e,g, *Hines v. Davidowitz*, 312 U.S. 52, 64-65 (1941) (treaties governing "the protection of the just rights of a country's own nationals when those nationals are in another country" are "entered into under express constitutional authority, and binding upon the states as well as the nation."); *Medellin*, 128 S.Ct. at 1365 (Court's finding "that an ICJ judgment may not be automatically enforceable in domestic courts does not mean the particular underlying treaty is not. Indeed, we have held that a number of the [consular] Treaties.

---

. . are self-executing…" (citing *Kolovrat v. Oregon*, 366 U.S. 187 (1961) and *Clark v. Allen*, 331

U.S. 503 (1947) as examples of judicial enforcement of consular treaty provisions)).   The fact

that the U.S. Supreme Court has yet to determine the full scope of the rights and remedies

conferred under the VCCR is no barrier to relief from this Court.   The existence of justiciable

rights and remedies under consular treaties is clearly established Federal law: extending that

well-settled rule to the plain language of the VCCR would "ma[k]e no new law" but would

instead merely "appl[y] the same clearly established precedent...".   *Wiggins v. Smith*, 539 U.S.

510, 522 (2003)(citing *Williams v. Taylor*, 529 U.S. 362 (2000).

H. Mr. Ibarra was Prejudiced by the Denial of His Vienna Convention Rights

1. The Violation of the Vienna Convention Caused Mr. Ibarra Substantial Prejudice That
Demands A New Trial.

        The International Court of Justice has called upon the courts of the United States to

assess the consequences of the undisputed violation of the Vienna Convention in Mr. Ibarra's

case.  Fortunately, the courts are not without guidance on how to evaluate such a claim.  The

United States Supreme Court has suggested that any claim under the Vienna Convention is

subject to a prejudice requirement. *Breard v. Greene,* 523 U.S. 371, 377 (1998) (*dicta*

suggesting that petitioner may only be entitled to relief for Vienna Convention violation where

violation had "some effect" on the fairness of the trial).  Courts considering Vienna Convention

claims have developed a three prong test for determining if a prisoner has demonstrated

prejudice: "(1) whether the defendant did not know he had a right to contact his consulate for

assistance; (2) whether he would have availed himself of the right had he known of it: and (3)

---

whether it was likely that the consulate would have assisted the defendant." *Torres v. State*, 120

P.3d 1184, 1186 (Okla. Crim. App. 2005); *see also id.* (noting that "[t]he majority of

jurisdictions considering the Vienna Convention question have adopted some version of this test.

The common thread in each is a threshold requirement that a defendant make some showing of

how his consulate would have aided him."); *United States v. Rangel Gonzalez,* 617 F.2d 529 (9th

Cir. 1980) (applying three-prong test to find prejudice warranting judicial relief).

2. Mr. Ibarra Did Not Know He Had a Right to Contact his Consulate for Assistance.

      Mr. Ibarra did not know, nor did anyone attempt to inform him of, his right to consular

assistance. Throughout all previous forums, in United States courts and in the International Court

of Justice, the State has never contested the fact that Mr. Ibarra was not informed of his rights

under the Vienna Convention, nor have they suggested that he had independent knowledge of his

rights. There can be no credible debate as to whether Mr. Ibarra has satisfied this first element

of the test.

3. Mr. Ibarra Would Have Contacted The Mexican Consulate Had He Been Apprised of His
Rights.

      Had Mr. Ibarra been properly informed of his right to consular notification upon arrest

–or at any time during his pre-trial detention – he would have sought out the consulate's help.

There was no reason why Mr. Ibarra would have hesitated to apprise the Mexican consulate of

his situation; quite the reverse, in fact. Mr. Ibarra had no criminal record in Mexico to conceal,

and was not wanted there by the authorities on any charges. His ties to Mexico and his native

culture were deep and enduring. Furthermore, Mr. Ibarra gratefully and immediately accepted

the consular assistance offered to him in his post-trial proceedings.  This is evidence of Mr. Ibarra's willingness to work with the consulate and is entirely consistent with the experience of Mexican consular officers in cases involving serious criminal charges.  There is nothing on the record in this case to support a finding that Mr. Ibarra would not have immediately invoked his right to consular notification.

4. Mexico Would Have Provided Substantial Assistance to Mr. Ibarra.

There is no question that Mexico would have provided substantial assistance to Mr. Ibarra throughout 1996, when he was detained on capital murder charges, had the consulate been aware of his existence.  Since at least 1920, the Mexican government has extended legal assistance to its nationals sentenced to death in the United States.  As early as 1921, upon the motion of Nobel laureate Octavio Paz, who was then a congressman in Mexico, Mexico appropriated special funding for criminal defense attorneys to represent Mexican nationals in United States courts.

The consular assistance that Mexico provides is particularly far-reaching in cases where a defendant is facing capital charges.  "The protection of Mexican nationals who face capital proceedings or capital trials is one of the highest priority of the Mexican Consular representatives.  All their efforts are focused on trying to avoid the imposition of the death penalty."  *Torres v. State*, 120 P.3d 1184, 1188 (Okla. Crim. App. 2005) (quoting the testimony of a senior Mexican Foreign Ministry official).   Those efforts have been singularly effective.  *See, e.g., Valdez v. State*, 46 P.3d 703, 710 (Okla. Crim. App. 2002)  (observing that the court "cannot ignore the significance and importance of the factual evidence discovered with the

assistance of the Mexican Consulate."); *Torres*, 120 P.3d at 1188 (petitioner "clearly showed

that the Mexican government would have expended considerable resources on the capital phase

of his case" which "would indeed amount to a showing of prejudice"); *see also Ledezma v. State*,

626 NW.2d 134, 152 (Iowa 2001) (Mexican "consular access may very well make a difference

to a foreign national, in a way that trial counsel is unable to provide."); Michael Fleischman,

*Reciprocity Unmasked: The Role of the Mexican Government in Defense of Its Foreign*

*Nationals in United States Death Penalty Cases,* 20 ARIZ. J. INT'L & COMP. L. 359, 365-74

(2003) (describing effectiveness of Mexico's "extensive and increasingly sophisticated program

of consular assistance" in capital cases over the last several decades).

A number of courts have thus already recognized the "significance and importance" of

the assistance provided by Mexican consular officials. *Valdez*, 46 P.3d at 710.  In the case of

Mr. Valdez, who was arrested in 1989, the Oklahoma Court of Criminal Appeals found that "the

Government of Mexico *would have* intervened in the case, assisted with Petitioner's defense, and

provided resources to ensure that he received a fair trial and sentencing hearing." *Id.*  (emphasis

added).  Mr. Ibarra was detained for trial some seven years after Mr. Valdez was arrested.  From

1989 to 1996, Mexico's involvement in the defense of its nationals only increased in intensity.

Before Mr. Ibarra's prosecution, for example, consular officials in Texas were heavily—and

successfully—involved in the defense of Ricardo Aldape Guerra, who was convicted and

sentenced to death in Houston without the benefit of consular assistance.  *See Guerra v. Collins*,

916 F.Supp. 620 (S.D. Tex. 1995); *Guerra v. Johnson*, 90 F.3d 1075 (5th Cir. 1996) (affirming

"the district court's factual findings of numerous instances of police and prosecutorial

misconduct" and granting habeas relief).

The fact that the Mexican government took an active interest in Mr. Ibarra's case immediately upon learning of it, and promptly sought to take a vigorous role in his defense from that time forward belies any argument that the consulate would have ignored any pleas for assistance from the client or his attorneys.  In light of the extensive consular assistance since provided to Mr. Ibarra and the yawning void created by its absence at trial, it is self-evident that the violation of Article 36 "harmed [Mr. Ibarra's] interests in such a way as to affect potentially" his conviction or sentence. *United States v. Rangel Gonzales,* 617 F.2d 529, 530 (9th Cir. 1980).

5. Even under a Stricter Prejudice Standard, The Record in This Case Clearly Establishes Overwhelming Prejudice

Discussing the third prong of the prejudice test in the case of one of the other *Avena* claimants, the highest court of Oklahoma determined:

> The issue is not whether a government can actually affect the outcome of a citizen's case, but whether under the Convention a citizen has the opportunity to seek and receive his government's help. This protection extends to every signatory of the Convention, including American citizens. It is often impossible to say whether a particular action in a criminal trial could affect the outcome. However, it is possible to show what particular assistance, if any, a government would offer its citizen defending against a crime in a foreign country. That is the right and privilege safeguarded by the Convention. This Court is unwilling to raise the bar beyond that which the Convention guarantees. If a

defendant shows that he did not know he could have contacted his consulate, would have

done so, and the consulate would have taken specific actions to assist in his criminal

case, he will have shown he was prejudiced by the violation of his Vienna Convention

rights.

*Torres*, 120 P.3d at 1187. Mr. Ibarra easily satisfies this burden: according to the test set forth in

*Torres*, the above facts are all that must be proven in order to entitle Mr. Ibarra to relief.

However, even under a more stringent test, Mr. Ibarra easily carries his burden. For example,

the factual showing made by Mr. Ibarra readily meets the prejudice standard applied in *Ex parte*

*Fierro*, 934 S.W.2d 370 (Tex. Crim. App. 1996).

On the record before this Court, there can be no question that Mexico's involvement in

Mr. Ibarra's case would have transformed the quality of his defense, and, at minimum, prevented

the imposition of a death sentence by (1) ensuring that trial counsel was effective and prepared;

and (2) providing critical resources for experts and investigators at both stages of the trial. To

make this assessment, the Court must consider the powerful assistance that Mexico has provided

to Mr. Ibarra since learning of his case-assistance it would have provided before and during his

trial, were it not for the violation.

Mexican consular assistance in capital cases is both comprehensive and continuous; that

assistance is by no means confined to the development and presentation of mitigating evidence

at the conclusion of a trial. Rather, Mexican consular protection officers are specially trained to

understand and respond to the various stages of a capital case, including active intervention to

facilitate plea agreements. As Mexico noted in its brief to the International Court of Justice in

---

Ramiro Rubi Ibarra—Petition for Writ of Habeas Corpus                    Page 154

*Avena,*

> Consular officers play two critical functions in the delicate, often protracted negotiations
> that lead to a plea bargain. First, consular officers meet with prosecutors, or present
> written submissions, that contain crucial mitigating evidence. Often, consular officers
> will have gathered this evidence themselves, in Mexico, after learning of the defendant's
> detention. The consulate commonly searches all archives and databases in Mexico to
> determine whether the defendant has a prior criminal record, and provides documentation
> of that search to defense counsel. Other times, consular officers will obtain school and
> hospital records that provide proof of a defendant's mental or physical condition.
> Sometimes, consular officers can explain cultural factors that mitigate the defendant's
> culpability.

See Exh. 26, Excerpt from Memorial of Mexico (20 June 2003), para. 63.   Over one three-year
period alone, "Mexican consular officers "played a vital role in persuading prosecutors to waive
the death penalty in at least thirty-eight cases…". *Id*. para. 64.  It is entirely probable that timely
consular involvement in Mr. Ibarra's case would have resulted in a reduced charge on the basis
of proof of diminished capacity.

One of defense counsel's responsibilities was to develop a compelling case in mitigation.
Indeed, an exhaustive investigation and preparation of a mitigation case is axiomatic in capital
defense strategy. *See Wiggins v. Smith*, 539 U.S. 510 (2003) (failure of trial attorney to
investigate defendant's background and present mitigating evidence violated Sixth Amendment
right to effective assistance of counsel); *see also Lewis v. Dretke*, 355 F.3d 364, at 368 (5th Cir.

---

2003) ("It is axiomatic – particularly since *Wiggins* – that [the decision not to present mitigating evidence] cannot be credited as calculated tactics or strategy unless it is grounded in sufficient facts, resulting in turn from an investigation that is at least adequate for that purpose.").

In the case of Ramiro Ibarra, the right of the Mexican Consulate to "arrange for his legal assistance" under Article 36(1)(c) rescued meaningful post-conviction review from the brink of disaster. Nothing could be less speculative than the effect of consular intervention and assistance on Mr. Ibarra's habeas appeals. His appointed counsel not only never contacted him, but failed even to inform Mr. Ibarra that his state petition had been denied. Without the consulate's intervention two months before the federal statute of limitations lapsed, Mr. Ibarra would have undoubtedly defaulted on his remaining avenues of appeal. Had that occurred, the newly-discovered evidence of his mental retardation and his mitigating social history so glaringly absent from the penalty phase would have been irretrievably lost to judicial review.

Even after his client cut his own throat following conviction and the jail reported that he was in an altered mental state, trial counsel did not seek to postpone the penalty phase, let alone thoroughly investigate mental health defenses. Post-conviction counsel was no less negligent, failing to communicate at all with Mr. Ibarra or to recognize and raise the obvious cues from the trial record itself that mental health should have been a core issue for both stages of the defense. Here, as in *Wiggins*, the information already known to trial counsel "would lead a reasonable attorney to investigate further." *Wiggins v. Smith, supra*, at 510.

Not surprisingly, the initial background investigation of Mr. Ibarra finally undertaken after his trial strongly revealed a wealth of mitigating evidence has never been investigated or

presented in this case.  The mitigating themes in Mr. Ibarra's life include the following:

- Mr. Ibarra was one of *thirteen* children born to his parents;

- Mr. Ibarra's childhood was marked by excruciating poverty;

- Mr. Ibarra and his siblings began working at a very young age in order to survive;

- Mr. Ibarra and his family routinely went hungry as the family lacked adequate food throughout Mr. Ibarra's childhood;

- Mr. Ibarra's family moved frequently due to his parents' inability to pay rent and their housing was consistently substandard;

- Mr. Ibarra's father was an exceedingly violent individual who routinely beat his children and wife;

- Mr. Ibarra and his siblings were  the victims of severe physical and emotional abuse by their father;

- Mr. Ibarra and his siblings severely physically and emotionally neglected by his parents during his entire childhood;

- Mr. Ibarra witnessed severe episodes of domestic violence between his father and mother as well as abuse of his siblings;

- Mr. Ibarra's mother, who was malnourished during her pregnancy with Mr. Ibarra, lacked adequate prenatal care;

- Mr. Ibarra's had a traumatic birth;

- Mr. Ibarra suffered from developmental delays as a child;

- Mr. Ibarra's performance in school was substandard;

- Mr. Ibarra exhibited significant limitations in adaptive functioning as a child;

- Mr. Ibarra was victimized by other children and was in need of extra protection and assistance;

- Mr. Ibarra sustained a head injury when he was a minor; and

- Mr. Ibarra suffers from Mental Retardation and Post Traumatic Stress Disorder.[39]

None of the abundant evidence already uncovered—none at all—would be available for judicial consideration if it were not for Mexican consular assistance and resources. Those same consular resources would have been forthcoming at trial, compelling the conclusion that, but for the violation of Article 36, Mr. Ibarra would not have been sentenced to death. Had counsel conducted even the most minimal investigation of his client's background, he would have discovered a wealth of truly compelling mitigating evidence. Because the consulate was unable to assist with the trial preparation, the jury never learned, for example, that Mr. Ibarra suffers from mental retardation or that he grew up in excruciating poverty.

It is well established that the failure to seek consular assistance on behalf of a Mexican national facing the death penalty falls below minimum standards of legal representation. *See Valdez v. State*, 46 P.3d 703, 710 (Okla. Crim. App. 2002) (granting post-conviction relief because it was ineffective assistance for trial counsel not to "inform Petitioner he could have obtained financial, legal and investigative assistance from his consulate"); *Torres v. State*, 120 P.3d 1184, 1188 (Okla. Crim. App. 2005) (finding petitioner was "actually prejudiced by the

---

39  For an extensive discussion of the mitigating evidence now present in Mr. Ibarra's case, please see *supra* Claim Number Eight.

failure to inform him of his rights under the Vienna Convention, and by counsel's acts or omissions which might have affected his sentencing"); *Deitz v. Money*, 391 F.3d 804 (6th Cir. 2004) (remanding non-capital case to determine if trial attorney's failure to "notify Deitz of his right to contact the Mexican consulate. . .deprived him of the effective assistance of counsel"); *Osagiede v. United States*, 543 F.3d 399 (7th Cir. Sept. 9, 2008) (finding trial counsel "was ineffective for failing to seek a remedy" for Article 36 violation and remanding non-capital habeas case for prejudice determination); *cf. Sanchez-Llamas v. Oregon*, 126 S. Ct. 2669, 2690 n.3 (2006) (Ginsburg, J., concurring) (recognizing viability of "an ineffective-assistance-of-counsel claim predicated on his trial counsel's failure to assert the State's violation of those [Article 36] rights."); *Murphy v. Netherland*, 116 F.3d 97, 100 (4th Cir. 1997) (in capital case, treaties such as the VCCR "are one of the first sources that would be consulted by a reasonably diligent counsel representing a foreign national.")

Had trial counsel alerted the local Mexican Consulate to Mr. Ibarra's predicament in the early stages of the case, the entire range of Mexico's extraordinary consular assistance would have been provided. The failure to seek and accept consular assistance in these circumstances can constitute ineffective assistance meriting reversal. *Marquez-Burrola v. State*, 157 P.3d 749 (Okla. Crim. App. 2007) (modifying death sentence to life imprisonment on finding that trial counsel was ineffective for failing, *inter alia*, to accept assistance offered by Mexican Consulate). As the *Marquez-Burrola* court observed, the appellate showing of prejudicial performance by trial counsel:

> . . . was accomplished with invaluable help from attorneys and mitigation specialists

working on behalf of the government of Mexico--the same professionals who had

repeatedly offered assistance to trial counsel, and who testified [at the evidentiary

hearing] that a thorough mitigation investigation might have been available before trial,

had trial counsel first sought funds from the district court to conduct it.

*Id.* at 766, n. 20.  If anything, the prejudicial effects of the absence of consular involvement are even more extensive in Mr. Ibarra's case.

Mr. Ibarra has made a substantial initial showing of prejudice arising from the violation of his Article 36 rights.  As in the case of Mr. Torres, there is a substantial likelihood that further investigation in preparation for an evidentiary hearing would reveal the full extent to which the Mexican Consulate would have provided "assistance in finding and presenting mitigating evidence in order to avoid the imposition of the death penalty."  *Torres,* at 1189-1190.

Mr. Ibarra Is Entitled To An Evidentiary Hearing

The *Avena* Judgment requires at a minimum that Mr. Ibarra receive an evidentiary hearing before a trial court to determine the effect of the Article 36 violation on his conviction and sentence.  *Avena* at 131.  According to the International Court of Justice, "it is for the courts of the United States to examine the facts, and in particular the prejudice and its causes, taking account of the violation of the rights set forth in the Convention."  *Id.* at 122.  In Texas post-conviction proceedings, trial courts perform the function of determining facts in the first instance.  Tex. Code Crim. P. art. 11.071 §9(a).  An evidentiary hearing in these circumstances would comport with Tex. Code Crim. P. Ann. art. 11.071, § 9.

This Court should thus provide the "review and reconsideration" that Texas now

concedes is required in Mr. Ibarra's case. *See* Exh. 25 (in cases such as Mr. Ibarra's, "the State of Texas will ask the reviewing court to address the claim of prejudice on the merits.") In the alternative, principles of legislative comity and judicial economy suggest that this Court should now stay its hand in deciding Mr. Ibarra's petition, so as to permit full consideration and adoption of implementing legislation by Congress and/or by the State of Texas. Rather than subjecting the parties—and the Court—to another round of habeas briefings in the aftermath of legislative enactment, Mr. Ibarra suggests that the prudent course of action would be to stay a decision on his Vienna Convention claim pending the outcome of the ongoing legislative and diplomatic initiatives.

CONCLUSION AND PRAYER FOR RELIEF

In view of the foregoing, RAMIRO RUBI IBARRA requests that this Honorable Court:

(1)    Issue a writ of habeas corpus, ordering the presence of Petitioner for a hearing at which proof may be offered as to the allegations of this petition;

(2)    Vacate Petitioner's conviction for capital murder and death sentence, or, in the alternative, vacate the judgment affirming his conviction and death sentence on direct appeal;

(3)    Allow Petitioner a reasonable time to amend this petition;

(4)    Grant any other relief as law and justice may require.

Respectfully submitted,
RUSSELL D. HUNT, JR.
Attorney at Law
811 Nueces Street
Austin, Texas 78701
Telephone: 512/930-0860
Fax: 512/857-0746

_____

RUSSELL D. HUNT, JR.
Texas State Bar Number 00790937
ATTORNEY FOR PETITIONER

## CERTIFICATE OF SERVICE

I hereby certify that I have this day caused a copy of this PETITION FOR WRIT OF HABEAS CORPUS and separate EXHIBIT VOLUME to be mailed, by first class mail, to the following on January __2__, 2009:

Attorney for Respondent:
Ellen Stewart-Klein
Assistant Attorney General
209 West 14th, 7th Floor
Austin, Texas 78701

Petitioner:
Ramiro Rubi Ibarra, TDC#999247
Polunsky Unit
3872 FM 350 South
Livingston, Texas 77351

_____
Russell D. Hunt, Jr.

## VERIFICATION

I hereby certify, under penalty of perjury, that the above and foregoing Petition For Writ of Habeas Corpus is true and correct.

_____
Russell D. Hunt, Jr.

Ramiro Rubi Ibarra—Petition for Writ of Habeas Corpus            Page 162