IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| RAMIRO RUBI IBARRA, | § | |
| Petitioner, | § | |
| | § | |
| | § | |
| v. | § | No. 02-CV-52 |
| | § | **Death Penalty Case** |
| | § | |
| NATHANIEL QUARTERMAN, | § | |
| Director, Texas Department of | § | |
| Criminal Justice, Correctional | § | |
| Institutions Division, | § | |
| Respondent. | § | |

## RESPONDENT QUARTERMAN'S ANSWER
## WITH BRIEF IN SUPPORT

Petitioner, Ramiro Rubi Ibarra,[1] was convicted by a jury and sentenced to

death in a Texas court for murdering Maria de la Paz Zuniga in the course of

committing aggravated sexual assault.  Having spent several years pursuing his

claims in state court, Ibarra now challenges the validity of his conviction and

sentence in this Court pursuant to 28 U.S.C. § 2254.  However, Ibarra fails to

demonstrate that he is entitled to relief.  He does not show that the state courts

unreasonably applied clearly established federal law, nor does he overcome the

---

[1]        Respondent Nathaniel Quarterman will be referred to as "the Director."

state courts factual findings with clear and convincing evidence. For these reasons, Ibarra's bid for federal habeas relief should be denied.[2]

## PETITIONER'S ALLEGATIONS

Ibarra raises the following allegations:

(1)    The trial court should not have overruled Ibarra's motion to suppress evidence obtained pursuant to a second search warrant because the issuance of the second search warrant violated constitutional prohibitions against ex post facto and retroactive laws due to the fact that the second search warrant for hair and blood samples was obtained and executed following a change in state laws permitting such action.

(2)    The State violated Ibarra's rights to a speedy trial and freedom from cruel and unusual punishment by the nine-year delay between his first and second indictments.

(3)    The police violated Ibarra's right to be free from unreasonable search and seizure because the consent Ibarra granted police to search his home was invalid because it followed an illegal warrantless arrest.

(4)    The police's utilization of "unduly suggestive identification procedures" violated his Sixth Amendment right to confront his accusers and his Fourteenth Amendment right to due process of law.

(5)    The trial court violated Ibarra's Sixth Amendment right to confront witnesses against him and his Fourteenth Amendment right to due process of law when it admitted testimony regarding Maria de la Paz's statements to her brother that she was afraid of Ibarra.

---

[2]    The Director further denies all allegations of fact made by Ibarra except those supported by the record and those specifically admitted herein.

(6)     The trial court violated Ibarra's Sixth Amendment right to confront witnesses against him, his Fourteenth Amendment right to due process of law, and his Eighth Amendment right to be free from cruel and unusual punishment when it admitted testimony that Ibarra's reputation for sexually inappropriate behavior was bad.

(7)     The Texas capital-sentencing scheme violates the Eighth Amendment's cruel and unusual punishment clause and the Fourteenth Amendment's due process clause in that there is no appellate review of the jury's answer to Texas's mitigation special issue.

(8)     Ibarra did not receive effective assistance of counsel during the punishment phase of trial because counsel failed to investigate, develop, and present available mitigation evidence, as well as evidence rebutting portions of the State's case.

(9)     Ibarra's execution would violate the Eighth Amendment's cruel and unusual punishment clause because he is mentally retarded.

(10)    Ibarra's death sentence violates the Sixth Amendment because the jury was not required to determine whether he was mentally retarded.

(11)    The State violated Ibarra's rights under the Vienna Convention on Consular Relations because he was a citizen of Mexico at the time of his arrest but was allegedly not advised of his right to consult with the Mexican consulate when arrested.

Petition at 17, 22, 29, 33, 39, 43, 46, 57, 104, 128, 131.

## STATEMENT OF THE CASE

Ibarra was convicted and sentenced to death by the 54th Judicial District Court of McLennan County, Texas, for the capital murder of Maria de la Paz Zuniga.  2 CR 294.[3]  Ibarra appealed his conviction and sentence to the Texas Court of Criminal Appeals, which affirmed in a published opinion.  *Ibarra v. State*, 11 S.W.3d 189 (Tex. Crim. App. 1999).  The United States Supreme Court denied Ibarra's petition for a writ of certiorari.  *Ibarra v. State*, 531 U.S. 828 (2000).

Ibarra then filed a state application for a post-conviction writ of habeas corpus.  SHCR-01 at 2.  The trial court made findings and conclusions, and the Court of Criminal Appeals entered an order holding that the findings and conclusions were supported by the record and denying state habeas relief.  *Ex parte Ibarra*, No. 48,832-01 (Tex. Crim. App. Apr. 4, 2001) (unpublished).

By agreement of the parties and pursuant to this Court's order, Ibarra filed a skeletal petition for federal writ of habeas corpus on April 4, 2002, and filed an amended petition on July 1, 2002.  DE 9, 12.  On June 19, 2003, Ibarra

---

[3]    "CR" refers to the clerk's record of documents on file with the court in Ibarra's state trial.  "RR" refers to the reporter's record of transcribed trial proceedings.  "SHCR-01, -02, -03, -04" refers to the transcripts of documents on file with the court in Ibarra's respective state habeas proceeding.  "SHRR-01, -02, -03, -04" refers to the state record of transcribed trial proceedings in Ibarra's respective state habeas proceedings where applicable.  All references are preceded by volume number and followed by page number where applicable.  "DE" refers to this Court's PACER docket sheet, followed by number.

requested leave of Court to file a second amended petition and attached a copy of that petition containing unexhausted claims based *Atkins v. Virginia*, 536 U.S. 304 (2002).  DE 15.  On June 23, 2003, the Court granted Ibarra's request and the petition was filed by the district court clerk.  DE 16, 17.  On September 30, 2004, this Court abated Ibarra's petition to allow him to exhaust his mental retardation claims in state court.   DE 35.  This Court continued Ibarra's abatement while he finished pursuing his third state habeas application containing Vienna-Convention claims.  DE 78.  Finally—and over the objections of the Director—this Court then continued the abatement in order for Ibarra to pursue a fourth state habeas writ on alleged ineffective assistance of trial counsel.  DE 88.

Ultimately, the Court of Criminal Appeals denied Ibarra's second writ as partly successive and partly meritless, and—in the same order—dismissed the third application as successive.[4]  *Ex parte Ibarra,* No. 48,832-02, -03 at "Order"

---

[4]     Ibarra filed a petition for certiorari appealing the denial of his Vienna-Convention claim.  The Supreme Court denied Ibarra's petition.  *Ibarra v. Texas*, 128 S.Ct. 2475 (2008).

(Tex. Crim. App. Sept. 27, 2007) (unpublished). The Court of Criminal Appeals likewise dismissed Ibarra's fourth application as an abuse of the writ. *Ex parte Ibarra,* No. 48,832-04 at "Order" (Tex. Crim. App. Oct. 1, 2008) (unpublished). Following the conclusion of state proceedings, this Court lifted its stay on October 21, 2009, and Ibarra refiled his federal petition on January 5, 2009. DE 98, 101.

## STATEMENT OF FACTS

### I.    Facts of the Crime

Ibarra sexually assaulted and strangled sixteen-year-old Maria de la Paz Zuniga to death in her family's home on the morning of March 6, 1987. 29 RR 42-45; 33 RR 519-20, 528, 536-37; 33 RR 519-530. Maria's brother, Francisco Zuniga, discovered her bruised, bloody, and partially undressed body on a bed around mid-day when he arrived to pick her up to go shopping. 29 RR 44, 51-52, 59; 30 RR 264, 269, 271; 33 RR 519, 525-26. The physical evidence—in particular blood found under Maria's fingernails—indicated that she had struggled to fend off her assailant. 30 RR 273; 31 RR 369; 33 RR 526, 531, 536, 545, 556.

Several witnesses gave police the description of a man seen in the area on the day of the offense, along with a description of his automobile—a primer-red Camaro. 24 RR 105-10; 29 RR 150-51, 154, 156, 182; 30 RR 205, 207, 215-18.

From their description, Maria's family identified Ibarra, a former neighbor. 29 RR 59-60,67; 31 RR 368; 39 RR 1139. Police located Ibarra at his home, where a Camaro registered to Ibarra was on the street nearby. 31 RR 371, 376-77. When police knocked on Ibarra's door, he answered wearing clothes matching the description provided by witnesses. *Id.* at 380-81. Ibarra also had fresh fingernail scratches on his face. 29 RR 285-86, 31 RR 380-82, 33 RR 546-47, 564-65, 568. Police placed Ibarra under arrest. 31 RR 382. Following his arrest, police discovered that Ibarra had additional scratches on his chest under his shirt. 30 RR 290-91. Police also discovered yellow wire, similar to that used to strangle Maria, in the trunk of Ibarra's Camaro. *Id.* at 270. The yellow wire was the only evidence taken from Ibarra's house or automobile the night of his arrest which was admitted into evidence at trial.

Police obtained a search warrant permitting them to take blood and hair samples from Ibarra for DNA comparison with evidence found at the scene of the crime. Ibarra was indicted for Maria's murder on May 27, 1987. Shortly thereafter, it was discovered that the search warrant had not been issued by the proper authority, and the evidence obtained pursuant to it was suppressed. At that time, Texas law did not permit the issuance of a second warrant.[5] As a

---

[5]    At the time, Texas Code of Criminal Procedure Article 18.01(d) provided in relevant part:

result, the State lacked the evidence to prove its case and voluntarily dismissed

the indictment against Ibarra.   Thereafter, Texas law regarding the issuance of

subsequent search warrants changed,[6] and a new warrant was issued for DNA

samples.   Ibarra was indicted for a second time on September 18, 1996.

At trial, evidence revealed that the blood found under Maria's fingernails

and semen left in Maria's body and on her undergarments matched DNA

samples taken from Ibarra.  37 RR 980-83, 991, 996-97, 998.   No fault was found

with the processes or procedures followed in conducting the DNA analysis.   38

---

Subsequent search warrants may not be issued pursuant to Subdivision (1) of Article 18.02 of this code to search the same person, place or thing subjected to a prior search under Subdivision (1) of Article 18.02 of this code.

And Article 18.02(10) provided:

A search warrant may be issued to search for and seize:

(10) property or items, except personal writings by accused, constituting evidence of an offense or constituting evidence tending to show that a particular person committed the offense.

[6]      In 1995, Article 18.02(d) was amended to permit the issuance of subsequent search warrants.  The revised Article 18.02(d) provided in relevant part:

A subsequent search warrant may be issued pursuant to Subdivision (1) of Article 18.02 of this code to search the same person, place or thing subjected to a prior search under Subdivision (1) of Article 18.02 of this code only if the subsequent warrant is issued by a judge of a district court, a court of appeals, the court of criminal appeals, or the supreme court.

Act of May 25, 1977, 65th Leg., R.S., ch. 237, 1977 Tex. Gen. Laws 640, 641 *amended by* Act of June 15, 1995, 74th Leg., R.S., ch. 670, § 1, 1995 Tex. Gen. Laws. 3642, 3643.

RR 1053.  Microscopic analysis did not exclude Ibarra as the source of head, facial, and pubic hairs found on Maria's body and clothing and in the bedding on which she was lying. 30 RR 274-76; 31 RR 52; 35 RR 749, 751, 754, 756-60, 783. Yellow wire matching the wire used to strangle Maria was readily available at Ibarra's place of work.  33 RR 1105-106.

## II.    Punishment Evidence

### A.    Evidence presented by the State

Rafael Gandera, Ibarra's nephew, testified that Ibarra had twice anally raped him when he was eight years old and then threatened to kill him if he told anyone.  45 RR 1547-556.  Around the same time Ibarra had also forced Rafael to "masturbate" him in the shower, and that Ibarra tried on one other occasion when Rafael was approximately eleven years old to force him to "grab his penis." *Id.*  Olga Gandera, Ibarra's sister-in-law, testified that his reputation for truth and veracity was bad and that his reputation for sexually inappropriate behavior was also bad.  *Id.* at 1573-578, 1585.  She also testified to circumstances suggesting that Ibarra had sexually abused her own son, Peter.  *Id.* at 1582-583.

Tanya Diaz testified that Ibarra had touched her breast inappropriately when she was eleven years old, and that she had immediately told her mother, Maria Luna Diaz, of the incident.  46 RR 1673-674.  Maria Luna testified she confronted Ibarra about the way he had treated Tanya, and he reacted by

arguing and beating her.  *Id.* at 1654, 1656, 1674, 1715.  Maria Luna also testified to several violent and sexually assaultive incidents with Ibarra in 1986 and 1987.  In particular, she testified that Ibarra had forced her to undress at knife point and threatened to kill her if she ever failed to do as she was told; that Ibarra threatened to strangle her and, in fact, wrapped a wire tightly around her neck and pushed her down, but released her when she begged for her life; that Ibarra beat her repeatedly when she refused to do as she was told; and that Ibarra threatened to lock her into a chastity belt or "sew [her] together" if she slept with her own husband.  *Id.* at 1685-691, 1709.

The State also introduced certified copies of the judgments Ibarra's prior convictions for unlawfully carrying a weapon, and a judgment of probation for driving while intoxicated.  *Id.* at 1667.  Temple Police Officer Peter Ramirez, Jr., testified that he had arrested Ibarra for misdemeanor theft on December 16, 1988.  Officer Ramirez explained that on that date, a witness had observed Ibarra take rope from the back of a pickup truck and place it in the trunk of his own car, and that upon his arrest police found the rope in Ibarra's car together with several college-level criminal justice books in English.  46 RR 1668.

The State then presented multiple witnesses to show that Ibarra did not behave while incarcerated.  Steve Merrick, a jailer at the McLennan County Sheriff's Department, testified that on July 6, 1988, Ibarra got into a fistfight

with another inmate on the basketball court and that Ibarra was injured and taken for medical treatment. *Id.* at 1719-720. Peggy Doris, a registered nurse responsible for health services at the McLennan County jail, testified that on a separate occasion Ibarra was uncooperative when he was brought in for medical treatment of a self-inflicted knife wound to the neck. 45 RR 1589-591. Laurie Boyette, a registered nurse at Hillcrest Hospital, testified that Ibarra attempted to fake unconsciousness when he was brought to the hospital to receive treatment for a cut. *Id.* at 1603-604, 1610. McLennan County Deputy Sheriff Greg Raines testified that he had observed Ibarra masturbating in front of a window overlooking Columbus Street where he could be seen by passersby. 46 RR 1725-726.

The victim's mother, Teresa Flores, testified that Maria's murder had affected everyone in the family very badly, and that she had never personally re-entered the home where Maria had been murdered. *Id.* at 1759-761. The State also elicited testimony from Ibarra's wife on cross-examination that Ibarra had severely beaten her on several occasions, even hitting her while she was pregnant. 47 RR 1791-792. She also testified that Ibarra had brought an eighteen-year-old girl whom he claimed to be his daughter up from Mexico to live with them, but Ibarra treated the girl like his wife, including kissing her on the mouth and taking the girl into the bedroom and spending hours with her there

behind closed doors.  *Id*. at 1794-96.

Dr. Richard Coons, a psychiatrist and the State's expert, stated that the circumstances of the offense indicated that it was an intentional act.  More importantly, Dr. Coons opined that an offender with Ibarra's history and sexual proclivities would constitute a continuing threat to society.  46 RR 1734-736, 1752-753.

**B.    Evidence presented by the Defense**

Sabina Ibarra Rubi, Ibarra's youngest sister, testified for the defense that Ibarra had come to the United States to find work and help their father support a family of eleven children.  47 RR 1765-767.  Sabina further testified that she had lived with Ibarra for several months upon her own arrival in the United States and that at that time he was supporting her, his wife and four children of his own.  *Id*. at 1768.

Maria Gandara Ibarra, Ibarra's wife, testified that she did not believe her nephew, Peter Gandera, when Peter told her that if he wanted to he could put Ibarra in jail, that she and Ibarra had a good relationship, and that she had told police some things about Ibarra that were not true because police got her mad by telling her that Ibarra was involved with other women.  *Id*. at 1785, 1787, 1801.

# BRIEF IN SUPPORT

## I.   Standard of Review

 This petition is subject to review under the amendments to the federal habeas corpus statutes embodied in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *Williams v. Cain*, 125 F.3d 269, 274 (5th Cir. 1997).  Under the AEDPA, "[t]his Court may not issue a writ of habeas corpus for a defendant convicted under a state judgment unless the adjudication of the claim by the state court '(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding.'" *Riddle v. Cockrell*, 288 F.3d 713, 716 (5th Cir. 2002) (quoting 28 U.S.C. § 2254(d)(1)-(2) (West 2002)).

The Supreme Court has explained that a state court decision is "contrary" to established federal law if the state court "applies a rule that contradicts the governing law set forth in [the Court's] cases," or confronts facts that are "materially indistinguishable" from a relevant Supreme Court precedent, yet reaches an opposite result.  *(Terry) Williams v. Taylor*, 529 U.S. 362, 405-06 (2000); *Hernandez v. Johnson*, 248 F.3d 344, 346 (5th Cir. 2001).  Alternatively,

a state court "unreasonably applies" clearly established federal law if it correctly identifies the governing precedent from the Supreme Court's precedents but unreasonably applies it to the facts of a particular case. *Williams,* 529 U.S. at 407-09; *Hernandez,* 248 F.3d at 346.

A federal habeas court's inquiry into unreasonableness should be objective rather than subjective, and a court should not issue the writ simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. *Williams,* 529 U.S. at 409-11; *Tucker v. Johnson,* 242 F.3d 617, 620-21 (5th Cir. 2001). Rather, federal habeas relief is only merited where the state court decision is both incorrect and objectively unreasonable. *Williams,* 529 U.S. at 411; *Martin v. Cain,* 246 F.3d 471, 476 (5th Cir. 2001). In other words, habeas relief is inappropriate when a state court, at a minimum, reaches a "satisfactory conclusion." *Williams,* 529 U.S. at 410-11 (citing *Wright v. West,* 505 U.S. 277, 287 (1992)).

Further, the Fifth Circuit has held that it is the state court's "ultimate decision" that is to be tested for unreasonableness, "not every jot of its reasoning." *Santellan v. Cockrell,* 271 F.3d 190, 193 (5th Cir. 2001); *see Neal v. Puckett,* 286 F.3d 230, 246 (5th Cir. 2002) (en banc) (holding that a federal court's "focus on the 'unreasonable application' test under § 2254(d) should be on

the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence"); *Catalan v. Cockrell*, 315 F.3d 491, 493 (5th Cir. 2002) (applying AEDPA deferential standard of review where state habeas writ was denied without explanation). Indeed, state courts are presumed to know and follow the law. *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). And, even where the state court fails to cite to applicable Supreme Court precedent or is unaware of such precedent, the AEDPA deferential standard of review nevertheless applies "so long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent]." *Early v. Packer*, 537 U.S. 3, 8 (2002).

Moreover, pre-AEDPA precedent forecloses habeas relief if a claim (1) is procedurally barred as a consequence of a failure to comply with state procedural rules, *Coleman v. Thompson*, 501 U.S. 722 (1991); (2) seeks retroactive application of a new rule of law to a conviction that was final before the rule was announced, *Teague v. Lane*, 489 U.S. 288 (1989); or (3) asserts trial error that, although of constitutional magnitude, did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (citation omitted).

## II.    Many of Ibarra's Claims Are Unexhausted And/or Procedurally Defaulted.

Ibarra never presented to the state courts claims one (that the second search was an ex post facto violation), five[7] (concerning Maria de la Paz's statement to her brother that she was afraid of Ibarra), and six (regarding admission of testimony that Ibarra's reputation for sexually inappropriate behavior).  Therefore, these claims are unexhausted and procedurally defaulted and, as such, they must be denied.  Additionally, although Ibarra presented claims eight (asserting ineffective assistance of counsel during the punishment phase of trial),  ten (regarding jury determination of mental retardation), and eleven (denial of consular access) to the state courts, he did so in a procedurally incorrect manner.  Thus, as explained below, these claims are also procedurally defaulted.

The exhaustion doctrine codified in 28 U.S.C. § 2254(b)(1) reflects a policy of comity consistently adhered to by the Supreme Court and the Fifth Circuit. *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 8-10 (1992); *Picard v. Connor*, 404 U.S. 270, 275, 277-78 (1971); *Dowthitt v. Johnson*, 230 F.3d 733, 745-46 (5th Cir. 2000).  Thus, before a federal court will entertain the alleged errors, a petitioner must have first provided the state's highest court with a fair opportunity to

---

[7]    As it pertains to the Eight and Fourteenth Amendments.

apply (1) the controlling federal constitutional principles to (2) the same factual allegations. *Duncan v. Henry*, 513 U.S. 364, 365-66 (1995); *Rose v. Lundy*, 455 U.S. 509, 522 (1982); *Anderson v. Harless*, 459 U.S. 4, 6 (1982); *Thomas v. Collins*, 919 F.2d 333, 334 (5th Cir. 1990).  This requirement is designed to give state courts the initial opportunity to pass upon and, if necessary, correct errors of federal law in a state prisoner's conviction.  *Picard*, 404 U.S. at 275-76.

Where a petitioner "advances in federal court an argument based on a legal theory distinct from that relied on in the state court, he fails to satisfy the exhaustion requirement." *Nobles v. Johnson*, 127 F.3d at 420 (citing *Vela v. Estelle*, 708 F.2d 954, 958 n. 5 (5th Cir. 1983)).  Moreover, state court remedies are not exhausted when "material additional evidentiary support [is presented] to the federal court that was not presented to the state court," even if the evidence "came into existence after the state habeas relief had been denied." *Dowthitt*, 230 F.3d at 745-46 (quoting *Graham v. Johnson*, 94 F.3d 958, 968 (5th Cir. 1996), and *Joyner v. King*, 786 F.2d 1317, 1320 (5th Cir. 1986)).

In order to satisfy exhaustion, all of the grounds raised in a federal application for writ of habeas corpus must have been "fairly presented" to the state courts prior to being presented to the federal courts.  *Dowthitt*, 230 F.3d at 745-46; *see also Nobles*, 127 F.3d at 420.  The Supreme Court has reasoned that the purpose of exhaustion "is not to create a procedural hurdle on the path

to federal habeas court, but to channel claims into an appropriate forum, where meritorious claims may be vindicated and unfounded litigation obviated before resort to federal court." *Keeney*, 504 U.S. at 10. "Comity concerns dictate that the requirement of exhaustion is not satisfied by the mere statement of a federal claim in state court." *Id.*

As Ibarra did not raise the first set of enumerated claims above (one, five, and six) either on direct appeal or in state collateral review, he has clearly failed to exhaust state court remedies. It is well-settled that habeas relief "shall not be granted" under any circumstances unless it appears that "the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1) (West 2009). It is equally clear, however, that Ibarra would be barred from raising these claims in a successive state habeas application under Texas Code of Criminal Procedure, Article 11.071, Section 5(a).[8] "Because [the exhaustion] requirement refers only to remedies still available at the time of the federal petition, it is satisfied if it is clear that the habeas petitioner's claims are now procedurally barred under state law." *Gray v. Netherland*, 518 U.S. 152, 161 (1996) (internal citations omitted); *see also Engle v. Isaac*, 456 U.S. 107, 125

---

[8]       Article 11.071, Section 5(a) provides that a state court may not consider the merits of or grant relief on claims presented in a successive state habeas application absent facts giving rise to a statutory exception. Ibarra has made no showing that one of the Article 11.071 exceptions would apply to allow review of these claims in state court.

n.28 (1982); *Castille v. Peoples*, 489 U.S. 346, 351 (1989); *Graham v. Johnson*, 94 F.3d at 969 ("exhaustion is not required if it would plainly be futile").

Nonetheless, such an unexhausted claim is subject to denial in federal court as procedurally defaulted. Further "[a]lthough AEDPA authorizes a district court to *deny* relief on an unexhausted claim, it does *not* authorize a district court to *grant* relief on an unexhausted claim, 'unless the State, through counsel, expressly waives the requirement'." *Alexander v. Johnson,* 163 F.3d 906, 908 (5th Cir. 1998) (emphasis added).

Although under *Harris v. Reed*, 489 U.S. 255, 265 (1989), federal review of a habeas claim is procedurally barred only if the last state court to consider the claim expressly and unambiguously based its denial of relief on a state procedural default,

> [t]his rule does not apply if the petitioner failed to exhaust state remedies and the court to which petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred. In such a case there is a procedural default for purposes of federal habeas regardless of the decision of the last state court to which the petitioner actually presented his claims.

*Coleman*, 501 U.S. at 735. In the instant case, just as in *Gray*, "the procedural bar which gives rise to exhaustion provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate

cause and prejudice for the default," or that the federal court's failure to consider the claim will result in a miscarriage of justice. *Gray*, 518 U.S. at 162 (barring claim on basis that claim would be barred in state court if it were presented there); *Coleman*, 501 U.S. at 750; *Nichols v. Scott*, 69 F.3d 1255, 1280 (5th Cir. 1995).

The Fifth Circuit has held that where a petitioner raises claims in federal court that have not previously been presented to the state courts, and Article 11.071, Section 5(a) would foreclose review of those claims if presented in a successive state habeas application, such is an adequate state procedural bar foreclosing federal habeas review of the claims. *Nobles*, 127 F.3d at 422; *Muniz v. Johnson*, 132 F.3d 214, 221 (5th Cir. 1998). Ibarra does not attempt to distinguish his case from *Nobles* and *Muniz*; nor does he attempt to demonstrate cause and prejudice for his failure to raise the claims in state court.[9] Finally, Ibarra does not attempt to show the miscarriage of justice exception. Thus, circuit precedent compels the denial of claims one, five, and six as procedurally defaulted.

It is also well-settled that federal courts "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support

---

[9]    Indeed, Ibarra does not even acknowledge the majority of his defaults.

the judgment." *Coleman*, 501 U.S. at 729; *Harris*, 489 U.S. at 262.  Thus, federal review of a habeas claim is procedurally barred if the last state court to consider the claim expressly and unambiguously based its denial of relief on a state procedural default.[10]  *Coleman*, 501 U.S. at 729 (1991); *Harris*, 489 U.S. at 265; *Amos v. Scott*, 61 F.3d 333, 338 (5th Cir. 1995).

As noted above, Ibarra did not raise the second set of enumerated claims (eight, ten, and eleven) until his later state habeas applications, which were dismissed in relevant part as abuses of the writ.  *Ex parte Ibarra,* Nos. 48,832-02, -03, -04 (citing Tex. Code Crim. Proc. art. 11.071 § 5).  Thus, the state court's dismissal of his claims as an abuse of the writ precludes federal habeas relief as a matter of law.  *See Fearance v. Scott,* 56 F.3d 633, 642 (5th Cir. 1995) (holding that pre-11.071 abuse-of-the-writ doctrine was strictly and regularly applied and, thus, was independent and adequate state procedural bar); *Emery v. Johnson,* 139 F.3d 191, 195-96 (5th Cir. 1997) (extending *Fearance* to Article 11.071 statutory abuse-of-writ doctrine); *Barrientes v. Johnson*, 221 F.3d 741, 758-59 (5th Cir. 2000); *Fuller v. Johnson,* 158 F.3d 903, 906 (5th Cir. 1998); *see also Moore v. Texas,* 535 U.S. 1044, 1047-48 (2002) (Scalia, J., *dissenting*) (recognizing Texas abuse-of-the-writ statute as independent and adequate state

---

[10]     A state court expressly and unambiguously bases its denial of relief on a state procedural default even if it alternatively reaches the merits of a defendant's claim.  *Fisher v. Texas*, 169 F.3d 295, 300 (5th Cir. 1999).

ground).

Again, Ibarra's default of his claims can only be excused if he can demonstrate (1) cause for the default and prejudice as a result of the alleged violation of federal law, or (2) a resulting "fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750-51. To establish "cause," a habeas petitioner must ordinarily identify circumstances external to the defense that prevented him from properly asserting the claim in state court. *McCleskey v. Zant*, 499 U.S. 467, 497 (1991) (citing *Murray v. Carrier*, 477 U.S. 478, 492 (1986)). Ineffective assistance of counsel cannot constitute "cause" unless deficiencies or omissions in counsel's performance both resulted in the default and amounted to constitutionally ineffective assistance of counsel at trial or on direct appeal. *Coleman*, 501 U.S. at 752. Moreover, the requisite showing of "prejudice" is significantly greater than that required to establish plain error. "The habeas petitioner must show 'not merely that the errors at . . . trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'" *Murray*, 477 U.S. at 493 (citing *United States v. Frady*, 456 U.S. 152, 170 (1982)).

Finally, a petitioner may come within the "fundamental miscarriage of justice" exception, (1) if, as a consequence of the identified constitutional error in the guilt-innocence phase and in light of new evidence, "it is more likely than

not that no reasonable juror would have convicted him," *Schlup v. Delo*, 513 U.S. 298, 329 (1995), or (2) if he establishes "by clear and convincing evidence that, but for the constitutional error at his sentencing hearing, no reasonable juror would have found him eligible for the death penalty" under state law. *Sawyer v. Whitley*, 505 U.S. 333, 350 (1992).

Ibarra's petition fails to acknowledge that many of his claims are procedurally barred, much less argue why this Court should review his clearly barred claims.[11] Thus, Ibarra presents no reason that might be considered cause and makes no argument on how he was prejudiced.  He also does not and cannot make any credible argument that he is actually innocent of either his crime or the death penalty.  Thus, the above enumerated claims should be barred from review and relief denied.

### III.   The Issuance and Execution of a Second Search Warrant for Hair and Blood Samples from Ibarra Did Not Violate the Constitutional Prohibition Against Ex Post Facto or Retroactive Laws and Did Not Violate Ibarra's Due Process Rights.  (Ground One)

In his first claim, Ibarra argues that the trial court should not have overruled his motion to suppress evidence obtained pursuant to the second search warrant for hair and blood samples because the issuance of that warrant violated constitutional prohibitions against ex post facto and retroactive laws.

---

[11]     With the exception of his *Wiggins* claim, addressed *infra*.

Petition at 17-22.  Ibarra bases his claim on the fact that the second search warrant was obtained and executed following a change in state law that retroactively permitted additional search warrants to be obtained.  As previously discussed, this claim is unexhausted and procedurally barred.  Notwithstanding, it is also entirely without merit.

Article I, Section 9 of the U.S. Constitution, commonly known as the Ex Post Facto Clause, provides that "No . . . ex post facto Law shall be passed."  Any statute which punishes as a crime an act previously committed, which was innocent when done, or which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense available according to law at the time when the act was committed, is prohibited as ex post facto.  *Collins v. Youngblood,* 497 U.S. 37, 52 (1990).  Thus, Ibarra's ex post facto claim is without merit because the change is Texas procedural law did not make an act criminal that was previously not, increases the punishment for a crime already committed, or deprive him of a substantive affirmative defense available according to law at the time the offense was committed.  The state statute merely authorized the issuance of a second search warrant.

Clearly, capital murder was an offense when Ibarra committed the act in question, and the maximum punishment was death.  The change in procedural

law that allowed the police to collect evidence of a crime they knew he committed is insufficient to demonstrate an ex post facto violation.  Accordingly, Ibarra's claim that the trial court erred in overruling his motion to suppress evidence obtained pursuant to the second search warrant because the issuance of that search warrant violated the ex post facto clause of the Constitution is entirely without merit.

Moreover, the issuance and execution of the second search warrant also failed violate the constitutional prohibition on retroactive laws.  In *Landgraf v. USI Film Products*, the Supreme Court stated, "A statute does not operate 'retrospectively' merely because it is applied in a case arising from conduct antedating the statute's enactment, or upsets expectations based in prior law." 511 U.S. 244, 269 (1994) (citing *Republic Nat. Bank of Miami v. United States*, 506 U.S. 80, 100 (1992) (Thomas, J., concurring in part and concurring in judgment)).  To this comment the Supreme Court attached a footnote containing several examples which are instructive in the instant case:

> Even uncontroversially prospective statutes may unsettle expectations and impose burdens on past conduct:  a new property tax or zoning regulation may upset the reasonable expectations that prompted those affected to acquire property; a new law banning gambling harms the person who had begun to construct a casino before the law's enactment or spent his life learning to count cards. If every time a man relied on existing law in arranging his affairs, he were made secure against any change in legal rules, the whole body of our law would be ossified forever.  Moreover, a statute is not

made retroactive merely because it draws upon antecedent facts for
its operation.

*Id.* at 269 n.24 (internal quotes and citations omitted).   Here, as in the examples
given by the Supreme Court,  Ibarra's reliance on the earlier version of Article
18.01 does not make him secure against any change in that law.

Ibarra nevertheless contends that he had a vested, substantive right to be
free from further search warrants once the first one had been executed because
such right was "similar to a *limitations defense* since at that point in time, he
could successfully move to prevent any further search warrants directed against
him."  Petition at 20 (emphasis added).  But based on clearly established law,
Ibarra's logic is in error.

In *Chase Securities Corp. v. Donaldson*, 325 U.S. 304 (1945), the plaintiff
brought an action against the defendant based on an alleged violation of the
Minnesota Blue Sky Law.  The defendant pleaded the bar of the statute of
limitations, and on an appeal to the Minnesota Supreme Court, he prevailed on
that issue.  During the process of retrial and appeal, however, the Minnesota
legislature removed the statute of limitations for certain classes of blue-sky
cases.  The plaintiff's case fit that category of case affected by the Minnesota
statute, and so the plaintiff reasserted his blue sky cause of action.

On appeal to the Supreme Court, the defendant contended the statute
violated the Fourteenth Amendment due process prohibition against retroactive

laws.  The Court rejected the argument because it reasoned that a statute of limitations does not extinguish a right but only barred the remedy.  325 U.S. at 314.  The plaintiff always has the right to seek recovery from the defendant, and the legislation only removed a bar to the remedy.  The statute of limitations was a legislative creation and the legislature could remove the statute to allow plaintiffs to pursue their remedy.

Here, the State always had the right under the Fourth Amendment to obtain and execute a search warrant based on probable cause and the legislation amending Article 18.01 only removed a bar to that search.  The bar to a second search warrant was a legislative creation, and the legislature could remove it, incidentally allowing the State to pursue its case against Ibarra.  The consequence that Ibarra lost the ability to prevent any further search warrants directed at him on this ground is of no moment.  Accordingly, Ibarra has failed to demonstrate a clear violation of his constitutional rights, and habeas relief is unwarranted.

## IV.   Ibarra's Sixth and Fourteenth Amendment Rights to Due Process, a Speedy Trial and Effective Counsel Were Not Violated by the Lapse of Time Between the Dismissal of His First Indictment and His Reindictment and Trial Nor Did the Delay Render His Sentence Cruel or Unusual Punishment.  (Ground Two)

In his second claim, Ibarra argues that the State violated his Sixth Amendment rights to a speedy trial and to effective assistance of counsel, the

Eighth Amendment's prohibition against cruel and unusual punishment, and his Fourteenth Amendment rights to due process of law in that the State did not bring an indictment against him for more than nine years after the offense. Petition at 22-28. Ibarra further contends the State delayed solely to obtain a tactical advantage over him. *Id.* at 25-26. But federal habeas relief on these inter-related claims is foreclosed by the findings of the state court.

### A. A one-year delay between indictment and trial does not violate the Speedy Trial Clause of the Constitution.

Ibarra's speedy trial claim is without merit. The calculation for speedy trial purposes begins when a formal indictment, information or actual arrest occurs. *See United States v. Marion*, 404 U.S. 307, 320 (1971). The period of time between the dismissal of the first indictment and the date of the re-indictment is excluded from consideration in determining whether there has been a speedy trial violation. *United States v. MacDonald*, 456 U.S. 1, 9 (1982); *United States v. Loud Hawk*, 474 U.S. 302, 310-12 (1986). Thus, where the State dismissed an indictment and later re-indicted, a court considering a speedy trial claim looks at the time elapsed between the re-indictment and the trial, *not* the time elapsed between the offense and re-indictment or the time between the offense and the trial.

Further, in determining whether a speedy trial violation has occurred, a court must consider: (1) the length of the delay; (2) whether the defendant

asserted his right; (3) the reason for the delay; and (4) the prejudice to the defendant. *Barker v. Wingo*, 407 U.S. 514, 530 (1972). As a threshold inquiry, the petitioner must demonstrate that the length of the delay is presumptively prejudicial. *Id.* "Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." *Id.* The Fifth Circuit generally requires a delay of one year to trigger speedy trial analysis. *Martin v. Maxey*, 98 F.3d 844, 848 (5th Cir. 1996).

Here, Ibarra was re-arrested on August 1, 1996, re-indicted on September 18, 1996, and the trial began on August 12, 1997—just mere days over twelve months after his arrest. 2 CR 19; 1 CR 11; 8 RR at cover. But, the Fifth Circuit's one-year threshold notwithstanding, "[t]here is no constitutional basis for quantifying into a specified number of days or months the speedy trial right." *Barker*, 407 U.S. 523. Thus, the Fifth Circuit has ultimately found that much longer delays between indictment or arrest and trial did not violate the right to a speedy trial. *See, e.g., United States v. Lucien*, 61 F.3d 366 (5th Cir. 1995) (twenty-eight months); *Fisher v. Hargett*, 997 F.2d 1095 (5th Cir. 1993) (thirty-two months); *Robinson v. Whitley*, 2 F.3d 562 (1993) (forty-four months).

Applying the *Barker* factors in the instant case likewise reveals that the twelve and one-half month delay following Ibarra's re-indictment was not a speedy trial violation. First, the length of the delay was only barely long enough

to require the *Barker* analysis in the first instance, being only twelve days beyond the Fifth Circuit's one-year threshold.  Second, the speedy trial clock is properly tolled in cases where responsibility for the delay lies with the defendant rather than the State.  *Nelson v. Hargett*, 989 F.2d 847, 852 (5th Cir. 1993). Here, the reason for the delay was at least as much the result of Ibarra's need to investigate and obtain the assistance of experts as from anything the State did.  *See, e.g.,* 1 CR 19 (Ibarra's motion to appoint investigator filed October 25, 1996); 1 CR 30, 34 (Ibarra's motion for appointment of DNA and hair expert witnesses filed on June 24, 1997); 1 CR 40 (Ibarra's motion for additional investigative funds filed on July 2, 1997).  And finally, as discussed more fully in the Director's due process argument below, Ibarra suffered no prejudice.

Accordingly, the state court's denial of Ibarra's speedy trial violation claim was entirely reasonable and does not warrant federal habeas relief.

**B.    The Due Process Clause of the Constitution does not require the State to elevate mere speed over the orderly expedition of justice.**

Ibarra's due process claim was likewise properly denied by the state courts for lacking merit.  There is no judicial power to order, or constitutional right to, a speedy indictment.  *MacDonald*, 456 U.S. at 8; *United States v. Delario*, 912 F.2d 766, 769 (5th Cir. 1990).  Rather, the applicable statute of limitations is the primary assurance against bringing an unduly stale criminal charge.  *United States v. Marion*, 404 U.S. 307 (1971).  Although the statute of limitations does

not fully define a defendant's rights with respect to the events occurring prior to indictment, the Due Process Clause has a limited role to play in protecting against oppressive delay. *United States v. Lovasco*, 431 U.S. 783, 789 (1977); *Marion*, 404 U.S. at 325. A defendant is entitled to relief for pre-indictment delay under the Due Process Clause only where he can show the delay: (1) caused substantial prejudice to his right to a fair trial, and (2) was an intentional device used to gain a tactical advantage over the accused. *Marion*, 404 U.S. at 325; *see also United States v. Gouveia*, 467 U.S. 180, 192 (1984) (due process requires dismissal of indictment where government's delay was deliberate device to gain advantage and delay caused accused actual prejudice). The Fifth Circuit has extended the second prong of the test to delays intentionally undertaken by the government for the purpose of gaining some tactical advantage and those for other impermissible, bad-faith purposes. *United States v. Crouch*, 84 F.3d 1497, 1514 (5th Cir. 1996).

In Texas, there is no statute of limitations for the offense of murder. Texas Code of Criminal Procedure Article 12.01(1). But under the two-prong test used to determine whether a defendant's due process rights were violated, Ibarra's claim clearly fails. The record is devoid of any proof that exculpatory evidence or witnesses became unavailable to Ibarra during the delay, and Ibarra provides none. Rather, the record reveals that the two alibi witnesses at the time of the

first indictment—Ibarra's brothers—both testified in the instant trial.  Notably, however, neither brother was able to offer an alibi for Ibarra because both were at work at the time of the murder and could not say with certainty where Ibarra was.   40 RR 1269-71.   Ibarra nevertheless contends he suffered prejudice because the delay enabled the State to collect additional evidence against him. A delay which permits the State to collect additional evidence does not support a finding of prejudice.  Such a delay is "investigative" in nature, and the prosecution of a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time.  *Lovasco*, 431 U.S. at 795.

Further, nothing in the record suggests the State intentionally delayed the case to gain a tactical advantage over Ibarra or otherwise acted in bad faith, and Ibarra provides none.  Because there is no limitation on the time within which to prosecute for murder, *see* Article 12.01(1), the State merely stopped investigating when it had no further access to evidence and re-opened its investigation when evidence became accessible pursuant to statutory changes. As the Supreme Court explained in *Lovasco*:

> [I]nvestigative delay is fundamentally unlike delay undertaken by
> the Government solely "to gain tactical advantage over the accused,"
> precisely because investigative delay is not so one-sided.  Rather
> than deviating from elementary standards of "fair play and
> decency," a prosecutor abides by them if he refuses to seek
> indictments until he is completely satisfied that he should prosecute

and will be able promptly to establish guilt beyond a reasonable doubt. Penalizing prosecutors who defer action for these reasons would subordinate the goal of 'orderly expedition' to that of 'mere speed.' This the Due Process Clause does not require. Thus, to prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time.

431 U.S. at 795.

Ibarra nevertheless contends that because the State did not continuously investigate him during the time period in question, to hold that the delay was investigatory rather than tactical "is to engage in a tortured construction of the term." Petition at 26. There is no requirement that police conduct continuous investigation. Even assuming *arguendo* there was no investigation during the intervening years, that fact does not, *ipso facto*, render the delay "tactical" rather than "investigative." A "tactical" delay requires some planning or foreknowledge that things will change to one's advantage with the passage of time. Ibarra fails even to provide evidence to support his claim that the State harbored some amorphous "hope" that the law would ultimately change, much less anything more. *Id.* at 26. To the contrary, he essentially admits that the case lay entirely dormant until the law on searches changed. Nor has Ibarra suggested what the State should have done differently. Because the change in law was not the result of any artifice or improper action on the part of the prosecutor or the

investigating detectives, there was absolutely no questionable activity or bad faith by the State in delaying prosecution.

Because Ibarra has failed to establish either prejudice or tactical delay by the State, his due process claim fails, and federal habeas relief must be denied.

### C.    The delay did not violate the Eighth Amendment prohibition against cruel and unusual punishment.

Ibarra's related argument that imposition of the death penalty following the nine-and-one-half year delay violates the Eighth Amendment prohibition against cruel and unusual punishment is equally without merit.  Ibarra cannot demonstrate that clearly established federal law was violated.  Indeed, the Eighth Amendment does not prohibit capital punishment, *Gregg v. Georgia*, 428 U.S. 153 (1976), even when an extended period of time has passed between the offense and the execution.  The execution following a nine-year incarceration on death row would be deemed modest in most states with capital murder statutes. Thus, the fact that Ibarra remained free for that period of time should not work to his further benefit.

The Supreme Court has interpreted the Cruel and Unusual Clause to prohibit punishment that offends the "evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101 (1958) (plurality).  In determining what standards have "evolved," the Supreme Court has looked to the standards of "modern American society as a whole." *Kennedy*

-34-

*v. Louisiana*, 554 U.S. ___ (2008); *Stanford v. Kentucky*, 492 U.S. 361, 369 (1989). But the present standards of decency do not deem cruel and unusual the delay occasioned by the legal system. And the Supreme Court has never established any bright-line test that a substantial delay is unconstitutional.

As Justice Thomas has stated:

I am unaware of any support in the American constitutional tradition or in this Court's precedent for the proposition that a defendant can avail himself of the panolopy of appellate and collateral procedures and then complain when his execution is delayed. Indeed, were there any support in our own jurisprudence, it would be unnecessary for proponents of the claim to rely on the European Court of Human rights, the Supreme Court of Zimbabwe, the Supreme Court of India, or the Privy Council.

*Knight v. Florida*, 528 U.S. 990 (1999) (Thomas, J., concurring in denial of certiorari on very similar argument). Indeed, although Ibarra points to *Lackey v. Texas*, 514 U.S. 1045 (1995) (memorandum opinion respecting denial of certiorari), he has no "clearly established federal law" for the purposes of the AEDPA. 28 U.S.C. § 2254(d). More importantly, Ibarra is seeking to create a new rule of constitutional law in violation of *Teague*. 489 U.S. at 301.

"[A] case announces a new rule if the result was not dictated by precedent existing at the time the defendant's conviction became final." *Id.* at 301. To date, no federal court has recognized such a theory of cruel and unusual punishment. Indeed, in *Lackey*, Justice Stevens invited state and lower courts to serve as "laboratories" in which the viability of this claim could receive further

study.  514 U.S. at 1045.  Yet the state courts have resoundingly rejected the delay in execution claim as meritless.  *See, e.g.*, *People v. Frye*, 959 P.2d 183, 262 (1998); *Ex parte Bush*, 695 So.2d 138, 140 (Ala.1997); *State v. Schackart*, 947 P.2d 315, 336 (1997); *Bell v. State*, 938 S.W.2d 35, 53 (Tex. Crim. App.1996); *State v. Smith*, 931 P.2d 1272, 1287-1288 (1996).  Moreover, no circuit has found that inordinate delay in carrying out an execution violates the condemned prisoner's Eighth Amendment rights.  *See, e.g., Allen v. Ornoski,* 435 F.3d 946, 959 (9th Cir. 2006); *Stafford v. Ward,* 59 F.3d 1025, 1028 (10th Cir. 1995); *McKenzie v. Day,* 57 F.3d 1493, 1494 (9th Cir. 1995); *Free v. Peters,* 50 F.3d 1362 (7th Cir. 1995).  In light of the utter lack of precedent, much less clearly established law on this point, Ibarra cannot show the state court erred in failing to grant relief on this claim.  For these reasons, federal habeas relief should be denied.

## V.    Ibarra's Fourth Amendment Claim Is Not Cognizable on Federal Habeas. Alternatively, The Trial Court's Refusal to Grant Ibarra's Motion to Suppress Evidence Obtained Incident to His Warrantless Arrest Comports with the Fourth Amendment Because the Detective Was Justified in Making the Arrest, and Ibarra Signed a Consent Form for the Search of His Automobile.  (Ground Three)

In this third claim, Ibarra argues the police violated his right to be free from unreasonable search and seizure because the consent he granted police to search his home and car was invalid as having resulted from an illegal warrantless arrest.  Petition at 29-33.  As a result, he contends the trial court

erred in admitting the yellow wire taken from the trunk of his automobile.  But Ibarra is not entitled to federal habeas relief on these inter-related claims because Fourth Amendment claims are not cognizable on federal habeas. Furthermore, federal habeas relief is foreclosed by the reasonable findings and conclusions of the state court.

A.    **Ibarra's Fourth Amendment claims are barred from federal habeas review.**

A claim of Fourth-Amendment error based on an allegedly unconstitutional search and seizure is not cognizable on federal habeas corpus review when the state has provided an opportunity for full and fair litigation of the claim. *Stone v. Powell*, 428 U.S. 265 (1976).

Ibarra was not deprived of the opportunity to litigate his Fourth Amendment claims.  1 CR 48-51.  Ibarra filed a pre-trial motion to suppress evidence seized pursuant to the search which occurred immediately following his arrest.  The motion called into question both the validity of the arrest and the validity of the consent to search resulting therefrom.  The trial court conducted a hearing on the motion and denied it.  29 RR 4.  Ibarra raised the issues again on direct appeal, where they were considered on the merits and rejected by the Court of Criminal Appeals. *Ibarra v. State*, 11 S.W.2d at 194-95. Because the state provided Ibarra an opportunity for full and fair litigation of his Fourth-

Amendment claims based on an allegedly unconstitutional search and seizure, they are not cognizable here.

**B.    Alternatively, federal habeas relief is foreclosed by the reasonable findings and conclusions of the state court.**

On direct appeal to the Court of Criminal Appeals, Ibarra argued that his warrantless arrest was made without probable cause such that his subsequent consent to search was invalid and the yellow wire taken from the trunk of his automobile should have been suppressed.   Ibarra Direct Appeal Brief at 26-30. The Court of Criminal Appeals rejected his argument, holding:

> We do not need to reach the issue of whether [Ibarra]'s consent was tainted because, even assuming the trial court erred in failing to suppress the complained-of evidence, [Ibarra] was not harmed by its admission.
>
> The only item obtained in the complained-of search and admitted into evidence at trial was some yellow wire taken from [Ibarra]'s automobile.  The victim in the instant case was strangled with yellow wire that was left wrapped and tangled around her neck and shoulder.  However, testimony at trial showed that the wire found in [Ibarra]'s vehicle was not the same gauge as that found on the victim.   Further, other testimony unrelated to the search revealed that [Ibarra] had access to the exact type of wire used to murder the victim.  Finally, various witnesses described [Ibarra] and his vehicle.  They noted [Ibarra] and his vehicle were by the victim's home the morning of the murder, the victim had skin and blood under her fingernails, [Ibarra] had what appeared to be fresh scratch wounds on his face and chest, and tests established that [Ibarra]'s DNA matched that of sperm recovered from the victim and her clothing.  Therefore, having reviewed the record as a whole, we are assured that the error, if any, did not influence the jury's deliberations to [Ibarra]'s detriment or had but slight effect.

*Ibarra v. State*, 11 S.W.3d at194-95 (internal citations omitted).  Because the state court considered and rejected Ibarra's claim on the merits, and because that decision was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding and was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, further review in this Court is foreclosed by the AEDPA.  28 U.S.C. § 2254.

More importantly, the warrantless arrest was fully justified.  The Fourth Amendment permits a duly authorized law enforcement officer to make a warrantless arrest in a public place upon a reasonable belief that a felony has been committed and that the person to be arrested had committed it, *United States v. Watson*, 423 U.S. 411 (1976), but permits such arrest in a suspect's home *only* where there has been consensual entry or exigent circumstances exist, *Payton v. New York*, 445 U.S. 573, 576, 590 (1980); *see also United States v. Richard*, 994 F.2d 244, 247 (5th Cir.1993).  But the Fifth Circuit has held that the expectation of privacy recognized in *Payton* does not exist when a felony suspect stands at the open door of his residence or is otherwise accessible to the public.  *United States v. Carrion*, 809 F.2d 1120, 1128 (5th Cir.1987) (doorway of hotel room); *United States v. Mason*, 661 F.2d 45 (5th Cir. 1981) (front door

of home); *see also United States v. Holland*, 755 F.2d 253, 255 (2nd Cir. 1985) (common hallway).

Here, the warrantless arrest of Ibarra was permissible because Detective Salinas, the arresting officer, knew that a murder had been committed and had a reasonable belief that Ibarra had committed it.  Detective Salinas had the following evidence before he went to Ibarra's residence: (1) witnesses had described an unfamiliar automobile near Maria de la Paz's residence on the morning she was found murdered; (2) the automobile was unusual, and the witnesses had described it in detail; (3) Ibarra owned an automobile identical to the one described by the witnesses; (4) witnesses had observed a Hispanic male walking away from Maria de la Paz's residence and in the direction of the automobile and had described the man to police in detail; (5) Maria de la Paz's brother knew Ibarra, knew his automobile and also gave Detective Salinas a description of him which matched the description given by witnesses; (6) Maria de la Paz's fingernails indicated that she had probably scratched her attacker; (7) witnesses had described the clothing worn by the Hispanic male in detail.

Once Detective Salinas arrived at Ibarra's house and Ibarra opened the door, the officer observed three additional pieces of evidence: (1) Ibarra's face was scratched, and the scratch marks were consistent with the knowledge the officer had concerning the probability that Maria de la Paz had scratched her

attacker; (2) Ibarra wore matching clothing the detailed description given by the witnesses; and (3) Ibarra looked down when the officer told him he was investigating the murder of a young girl.  These facts were sufficient in and of themselves to warrant persons of reasonable caution to believe that a murder had been committed and that Ibarra was the murderer.  Accordingly, Ibarra's complaint that Detective Salinas lacked probable cause to arrest him should be rejected.

Further, the warrantless arrest of Ibarra was permissible because Ibarra opened the door to his home for the officer granting consensual access thereto, and because Ibarra was placed under arrest at the threshold of that doorway. At a pre-trial hearing, Detective Salinas testified that he was wearing civilian clothing and was accompanied to Ibarra's door by another officer who was in uniform.  6 RR 53, 56.  Neither officer had a weapon drawn.  *Id.* at 55-56. Detective Salinas testified he knocked on Ibarra's door and Ibarra answered, at first opening only the inner door and leaving the outer, screen door closed.  *Id.* at 14.  Detective Salinas then addressed Ibarra in Spanish, asking to speak with him.  Ibarra said "sure" in Spanish and opened the screen door for the officer. *Id.* at 14-15, 56-57.  Because Ibarra and the officer could have continued to converse through the screen door, it is reasonable to infer that Ibarra opened that door to admit the officer into his home.  As soon as Ibarra opened the screen

door to admit the officer, the officer observed scratches on Ibarra's face and immediately placed him under arrest. 6 RR 16, 57. Because Ibarra consented to the officer's entry into his home by opening the outer, screen door, and because the officer arrested Ibarra at the threshold of his home, Ibarra's complaint that Detective Salinas violated the Fourth Amendment by arresting him at his home without a warrant should be rejected.

Finally, the warrantless arrest of Ibarra was permissible under the exigent circumstances exception.  Detective Salinas knew that Ibarra was an illegal alien who had ready access to an automobile. Detective Salinas also believed that Ibarra knew he was suspected in the murder of a young girl.  The delay required to obtain an arrest warrant might have provided Ibarra the opportunity to shower and to wash or destroy his clothing, thereby removing any physical evidence of the sexual assault and murder which might be on his person.  The delay might also have provided Ibarra the opportunity to flee. Accordingly, the officer made a proper warrantless arrest of Ibarra.

Because the warrantless arrest of Ibarra did not violate the Fourth Amendment, there was no basis to suppress evidence obtained pursuant to a search conducted with Ibarra's consent after that arrest.  Even assuming *arguendo* that the warrantless arrest violated Ibarra's Fourth Amendment rights such that his subsequent consent to search might be deemed invalid and

evidence seized pursuant to a consent search should have been suppressed, the Director submits that federal habeas relief is nevertheless unwarranted because Ibarra was not harmed by the admission of evidence obtained thereby.

The only evidence obtained in the search and admitted into evidence at trial was yellow wire taken from Ibarra's Camaro. 48 RR 294. Tim Fallon, the crime lab manager from the Bexar County Forensic Science Center, testified about the wire on Ibarra's behalf. 38 RR 1065. He made a comparison between the yellow wire found in the trunk of Ibarra's Camaro and the yellow wire which had been used to strangle Maria de la Paz Zuniga. Although Fallon admitted that he could not rule out the possibility that they each came from the same large roll, he told the jury that the wires were not similar because they were of different thicknesses. *Id*. at 1078-79. Thus, the wire did not tie Ibarra to the offense. However, even assuming that it did, the evidence was cumulative in that the State also introduced evidence that Ibarra had ready access to the type of wire used to strangle Maria de la Paz Zuniga at his place of work. *Id*. at 1105-06.

Because the evidence was meaningless at best, or cumulative of other evidence at worst, Ibarra suffered no prejudice by its admission. Accordingly, habeas relief should be denied.

## VI.   Witness Identification of Ibarra Was Properly Admissible as the Pre-trial Identification Procedures Were Not Unduly Suggestive and the Identification Was Based upon the Witness's Independent Recollection. (Ground Four)

Ibarra next argues that the State's utilization of "unduly suggestive identification procedures" violated his Sixth Amendment right to confront his accusers and his Fourteenth Amendment right to due process of law.  Petition at 14, 33-39.  On direct appeal, the Court of Criminal Appeals considered and rejected this argument on its merits.  *Ibarra v. State*, 11 S.W.3d at 195-96. Because the state court's decision was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding and was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, federal habeas relief should be denied.

An in-court identification is inadmissible when it has been tainted by an impermissibly-suggestive pre-trial photographic identification.  But, if the in-court identification has an origin independent of the improper identification procedure, it is still admissible.  *United States v. Crews*, 445 U.S. 463, 472-73 (1980); *United States v. Wade,* 388 U.S. 218, 87 S. Ct. 1926 (1967); *Doescher v. Estelle*, 616 F.2d 205, 206 (5th Cir. 1980) (holding that "any taint in pretrial identification is immaterial where, as here, the witnesses' in-court identification is based upon observation during commission of the crime").  The test is

-44-

whether, considering the totality of the circumstances, "the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377 384 (1968). If, however, the totality of circumstances reveals no substantial likelihood of misidentification despite a suggestive pre-trial procedure, subsequent identification testimony will be deemed "reliable," "reliability [being] the linchpin in determining the admissibility of identification testimony." *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977). The following five non-exclusive factors should be "weighed against the corrupting effect of any suggestive identification procedure in assessing reliability under the totality of circumstances": (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation." *Neil v. Biggers*, 409 U.S. 188, 199 (1972).

Applying the *Biggers* factors to the instant facts reveals that the in-court identification of Ibarra was not the result of an impermissibly-suggestive pre-trial procedure. Importantly, although Ibarra challenges three different witnesses' identifications—Wells, Peterson, and Kennedy—Ibarra admits only one (Wells) was shown the additional Polaroids. Thus, Peterson's inability to

pick Ibarra out of the photographic lineup but subsequent identification of Ibarra in the live line-up is not implicated in Ibarra's claim.  Nor does Ibarra explain how Kennedy's failure to identify him is relevant to his claim of error.

As to whether Wells's in-court identification was tainted, Ibarra cannot overcome the state's denial of his claim because the weight of the evidence indicates the reliability of Wells's identification.  Specifically, Wells was a reserve police officer at the time of the offense, and he had one to two minutes in which to view the offender.  6 RR 116, 124.  Wells explained that he was dropping his wife off at work when they saw the primer-red Camaro and a man walking towards them from the direction of the victim's house with his chin buried in his chest.  *Id.* at 118-19.  Because Wells and his wife felt the situation was unusual, they waited until another employee arrived before she got out of their vehicle to open up the business.  *Id.* at 118, 123.  Wells later gave police a general description of the man's height, hair, clothing, race, and weight which never changed and which matched petitioner's general appearance.  *Id.* at 79, 120, 123, 129-30.[12]

---

[12]    Regarding facial hair, Wells noted that he only saw a mustache that went past the corners of the suspect's mouth whereas when arrested, Ibarra had both a mustache and a beard.  This distinction is of little significance when one considers Wells's statement that the suspect had his head buried in his chest while he walked quickly towards the Camaro.  The position of Ibarra's head may have prevented Wells from seeing the full extent of his facial hair.

Detective Salinas showed Wells a photographic line-up on April 2, 1987—twenty-seven days following the instant offense. *Id.* at 71-3, 120-21. After pointing to Ibarra's picture and stating that he "looked familiar," Wells tentatively identified another individual, 6 RR 75, 120-21, whom the Court of Criminal Appeals acknowledged looked "remarkably similar," *Ibarra v. State*, 111 S.W.3d at 195 n.6. Detective Salinas then showed Wells two Polaroid photographs of Ibarra looking downward. 6 RR 121. Detective Salinas did not specifically indicate to Wells that Ibarra was the man arrested for the offense but did tell him that he was in the photo line-up. *Id.* at 76. After viewing the Polaroids, Wells pointed to Ibarra's picture as depicting the man he had seen the day of the offense. On May 22, 1987, Wells was shown a live line-up in which he identified Ibarra. *Id.* at 77-78, 121-22. At the pre-trial hearing, Wells testified that the photo line-up did not influence his decision in the live line-up. *Id.* at 122, 128. Wells further stated that he could identify petitioner in court and at the live line-up because he independently remembered him from the day of the offense. *Id.* at 122.

Because Wells's experience as a trained police officer and his concern for his wife would have heightened his ability to take in detail in spite of distractions and because Wells was able to give police an accurate general description of the offender which matched Ibarra's general appearance and never

changed, his in-court identification should be considered solid.  Further, Wells testified that his live line-up and in-court identifications of Ibarra were based on what he observed the morning of the offense and not on any intervening photographs he may have viewed.  Thus, both the independent origin and the balance of the *Biggers* factors indicate that the trial court did not violate Ibarra's Sixth Amendment right to confront his accusers or his Fourteenth Amendment right to due process of law.  For these reasons, federal habeas relief must be denied.

## VII. Testimony that Maria De La Paz Zuniga Was Afraid of Ibarra Was Properly Admitted or Otherwise Harmless.  (Ground Five)

In his fifth claim, Ibarra argues that the trial court violated his Sixth Amendment right to confront witnesses against him, the Eighth Amendment prohibition against cruel and unusual punishment, and his Fourteenth Amendment right to due process of law when it admitted testimony regarding Maria de la Paz Zuniga's statements to her siblings, Antonio and Lordes Zuniga, that she was afraid of  Ibarra.  Petition at 39-43.

At trial, Ibarra objected to the complained of testimony on grounds it was hearsay.  34 RR 597-99, 604; 39 RR 1137-138; 40 RR 1431-432.  On direct appeal, Ibarra argued that the complained-of testimony was irrelevant hearsay, the admission of which violated his right to confront witnesses.  Brief on Direct Appeal at 38-39 (not relevant because petitioner did not claim self-defense or

that offense committed in heat of passion), 40-41 (hearsay implicating confrontation clause).   The Court of Criminal Appeals rejected the claim, holding:

> In point of error seven, [Ibarra] claims the trial court erred in admitting testimony from the victim's sister and brother that the victim was afraid of [Ibarra].  [Ibarra] says the testimony was not relevant because [Ibarra] did not raise self defense or the defense of sudden passion.
>
> At trial, [Ibarra] objected on the ground the testimony was hearsay.  [Ibarra] made no objections regarding the relevance of the testimony.  Because his trial objection does not comport with the issue raised on appeal, he has preserved nothing for review.   Point of error seven is overruled.

*Ibarra v. State*, 11 S.W.3d at 196-97 (internal citations omitted).

Ibarra's argument in his brief on direct made no mention of the Eighth Amendment or Due Process Clause violations, and Ibarra raised no claim in regards to the complained-of testimony in his state application for writ of habeas corpus.  Direct Appeal Brief at 38-41; SHCR-02 at 1-6.

Because the state court rejected Ibarra's relevancy claim for failure to comply with Texas's contemporaneous objection rule, to the extent (if any) he attempts to re-raise a relevancy objection here, the claim is procedurally barred as having been denied on independent and adequate state grounds.  Further, because Ibarra never pressed his Eighth Amendment or Fourteenth Amendment Due Process Clause claims before the state court in any form or fashion, these

claims are unexhausted and procedurally barred for reasons discussed above.

Nevertheless, Ibarra is still not entitled to federal habeas relief on this claim.

### A.    Facts Relevant to the Claim

The three instances where the complained-of testimony arose are as

follows:

[State]:  Had you ever had any conversations with your sister about
Ramiro Ibarra?

[Witness:  Antonio Zuniga]  Yes.

Q.  Do you recall how long before?

A.  A few weeks.

Q.  Did what your sister tell you cause you to have concern for her?

A.  Yes, sir.

Q.  What did your sister tell you about Ramiro?

[Defense Counsel]:  I object to that, Your Honor.

The Court:  Sustained.

[State]:  Do you know how she felt about Ramiro Ibarra?

[Defense Counsel]:  Object to that, also, Your Honor, it calls for a
hearsay response.

[State]:  Your Honor, we offer that to show the state of mind of the
victim prior to her death.

[Defense Counsel]:  It's still hearsay, Your Honor, and I don't think
that's an –

-50-

[State]:  And we're also –

[Defense Counsel]:   – exception to the Hearsay Rule.

[State]:  We're also – it is an exception to the Hearsay Rule, Your Honor. And we're also entitled to show the relationship between the victim and the accused prior to the time of her death, 38 – Article 38.36.

The Court:  Sustain the objection.

[Defense Counsel]:  And the rules of still apply.

[State]:  Based on what you knew following the conversation with your sister, and based on your having seen Ramiro Ibarra near your house, do you have an opinion about whether or not your sister was afraid of Ramiro Ibarra?

A.  She told me that she –

[Defense Counsel]: Your Honor, excuse me.  I'm just still going to object.

The Court: Sustained.

[State]: Just, Antonio, tell us whether you had an opinion about whether or not she feared Ramiro Ibarra.

[Defense Counsel]: My objection still is that his opinion is going to be based on what she told her (sic) and it's just a back door of getting in hearsay.

[State]: Your Honor, it is based on – his opinion is based on what he saw and what he knew.

[Defense Counsel]:  And you asked him if it was based on his conversation with her, so it's based on hearsay.

The Court:  All right.  Ladies and gentlemen of the jury, I need to look at something.  Let's take about a ten-minute recess. We'll stand in recess until 9:50.

34 RR 597-99.  After the recess, the following exchange occurred:

[State to Antonio Zuniga]:  Do you believe [Maria] needed protecting from [Ibarra]?

[Defense Counsel]:  Your Honor, I'm going to object to that question.

The Court:  Sustain the objection.

34 RR 604.  Later, Antonio Zuniga was recalled as a witness, and the following testimony was offered:

[State]: * * * Remember when you testified in here one time and I asked you the question about, did you ever talk with your sister about Ramiro Ibarra?

[Witness: Antonio Zuniga]  Yes, sir.

Q.  During that conversation, did she ever tell you that she was afraid of him?

[Defense Counsel]:  And we'd make the same objection we have previous.

The Court: All right, now.  And go ahead.

[Defense Counsel]:  I make the same objection that we've previously made, Your Honor.  It's hearsay and it's not admissible under any permissible purpose.

The Court:  All right. For what purpose does the State seek to offer it?

[State]: We're offering it for the same purposes we did before, to show the state of mind of the victim in this case and that's basically it.

[Defense Counsel]: And the state of mind is not an issue.

The Court: Overruled. I'm going to admit it under 803(3).

[The State]: You can answer the question.

A. Yes. She told me that she was scared of him.

Q. Do you remember when she told you that?

A. It was several weeks before what [sic] happened.

42 RR 1431-432.

The State also called Maria de la Paz Zuniga's sister as a witness and she

testified in relevant part:

[State]: Do you know how Paz [i.e. Maria] – or do you know if Paz knew how Ramiro Ibarra was?

[Witness: Lordes Zuniga]: She knew him but she didn't know who he was.

Q. Do you know how she felt about Ramiro Ibarra?

[Defense Counsel]: Objection, Your Honor, that's going to be based on – objection, that's going to be based on a hearsay response as to what she told her.

The Court: For what purpose are you offering it?

[State]: Your Honor, we're offering it pursuant to the relationship between the accused and the victim. We're also offering it to show the state of mind of the decedent prior to death.

[State]:  An exception under 803.3 of the Texas Rules of Evidence, and it's also provided for under 38.36 of the Code of Criminal Procedure.

The Court:  Any other objections?  I'll overrule the objection.

[Witness]:  And what was the question?

[State]:  Do you know how Paz felt about Ramiro Ibarra?

A.  Yes.

Q.  How did she feel about Ramiro Ibarra?

A.  She was very afraid of him.

Q. How do you know that?

A.  On one occasion, I heard her telling that to my mother.

Q.  How did Paz seem when she was telling your mother that?

A.  She was crying and she hugged my mother.

Q.  How close in time was that to the time that Paz was murdered?

A.  I don't remember exactly, but I suppose that it was about two months before.

39 RR 1137-138.

## B.   The testimony was properly admitted under the Texas Rules of Evidence.

Regarding any claims of improperly admitted evidence, federal habeas relief is unwarranted because it is not a federal habeas court's function to review a state's interpretation of its own laws. *See Weeks v. Scott*, 55 F.3d 1059 (5th

-54-

Cir. 1995). This Court should not second-guess the trial court's determination of admissibility of evidence under state court rules.

Notwithstanding, the trial court's rulings were proper under Rule 803(3) of the Texas Rules of Evidence, which provides:

> RULE 803. HEARSAY EXCEPTIONS: AVAILABILITY OF DECLARANT IMMATERIAL
>
> (3) **Then Existing Mental, Emotional, or Physical Condition.** A statement of the declarant's then existing state of mind, emotion sensation, or physical condition (such as intent, plan motive, design, mental feeling, pain, or bodily health), but not including a statement of memory of belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

The trial court's ruling were also proper under the Code of Criminal Procedure which provides, in relevant part:

> **Art. 38.36 Evidence in Prosecutions for Murder**
> (a) In all prosecutions for murder, the state or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense.

Thus, this evidence was properly admitted under relevant state law.

## C.    The trial court's rulings did not run afoul of the Confrontation Clause.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy . . . the right to be confronted with the witnesses against

him." U.S. Const. amend. VI.  In *Crawford v. Washington*, the Supreme Court

explained that this Clause "reflects a judgment, not only about the desirability

of reliable evidence..., but about how reliability can best be determined."  514

U.S. 36, 61 (2004) (citation omitted).  Reaching back to the Framers's original

intent, the *Crawford* Court held that when the evidence at issue is "testimonial,"

the Sixth Amendment requires a showing of both unavailability and a prior

opportunity for cross-examination before testimonial evidence will be admitted.

*Id.* at 68.  The Court explained that "[w]hatever else the term ['testimonial']

covers, it applies at a minimum to prior testimony at a preliminary hearing,

before a grand jury, or at a former trial; and to police interrogations."[13]  *Id.*

---

[13]     This is a significant departure from the long-standing rule of *Ohio v. Roberts*, 448 U.S. 56 (1980).  Under *Roberts*,

> when a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable.  Even then, his statement is admissible only if it bears adequate "indicia of reliability."  Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception.  In other case, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.

448 U.S. at 66 (footnote omitted).  *Roberts* did not distinguish between testimonial and non-testimonial evidence.  *See Crawford*, 541 U.S. at 68 ("Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law-- as does *Roberts*, and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether.  Where testimonial evidence is at issue, however, the Sixth Amendment demands...unavailability and a prior opportunity for cross-examination.").

Here, Ibarra's complained-of testimony does not fall within the parameters of *Crawford* because it was not testimonial in nature.  Furthermore, *Crawford* is not retroactive.[14]  *Whorton v. Bockting*, 549 U.S. 406 (2006).

> ### 1.   The state court reasonably adjudicated this claim in light of clearly establish federal law existing prior to the Supreme Court's decision in *Crawford*.

Even assuming *arguendo* that Antonio and Lordes Zuniga's statements were hearsay, their admission did not *ipso facto* violate the Confrontation Clause.  The Sixth Amendment to the United States Constitution states that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." *Pointer v. Texas*, 380 U.S. 400, 403 (1965) (applying Sixth Amendment to the States as incorporated by the Fourteenth Amendment).  This right to confrontation, however, is not an unqualified right and has long been limited by the principles of reliability and trustworthiness to permit certain out-of-court statements that are deemed admissible without adversarial testing.  *See Bourjaily v. United States*, 483 U.S. 171, 181-84 (1987) (discussing Supreme Court jurisprudence balancing the

---

[14]    Ibarra's conviction was final well before the Supreme Court announced its decision in *Crawford* in 2004.  *See Barrientes v. Johnson*, 221 F.3d 741, 763 (5th Cir. 2001) (conviction is final for *Teague* purposes "when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied.").  The Court of Criminal Appeals rejected Ibarra's direct appeal on October 20, 1999, and the Supreme Court denied certiorari review on October 2, 2000—well before *Crawford* was announced.

Confrontation Clause with society's interest in accurate fact-finding).   The Supreme Court has established a framework for determining whether untested hearsay statements are admissible.   *Ohio v. Roberts*, 448 U.S. 56 (1980). Hearsay statements are sufficiently dependable and, thus, admissible against an accused when (1) "the evidence falls within a firmly rooted hearsay exception" or (2) the evidence contains "particularized guarantees of trustworthiness" making adversarial testing unnecessary.   *Id.* at 66; *Lilly v. Virginia*, 527 U.S. 116, 124-25 (1999).   A hearsay exception is firmly rooted if: (1) there exists current recognition under the Federal Rules of Evidence; (2) there exists widespread acceptance among the states; and (3) there exists longstanding acceptance of the hearsay exception.   *White v. Illinois*, 502 U.S. 346, 356 n.8 (1992).

The then existing mental, emotional, or physical condition exception has been codified in the Federal Rules of Evidence as a valid hearsay exception for more than twenty-five years.   Fed. R. Evid. 803(3).   Further, the exception has been either codified or provided for under case law in a majority of states.   And finally, the exception has longstanding common law roots dating back well over 100 years.   *See, e.g., Mutual Life Ins. Co. v. Hillmon*, 145 U.S. 285, 295 (1892). Because the then existing mental, emotional, or physical condition exception satisfies the "firmly rooted" standard as defined in *White*, 502 U.S. at 356 n.8,

the trial court did not violate Ibarra's Sixth Amendment right to confront witnesses against him when it admitted testimony regarding Maria de la Paz Zuniga's statements to her siblings that she was afraid of Ibarra.

However, even assuming not only that Antonio and Lordes Zuniga's statements were hearsay, but also that their admission violated the Confrontation Clause, federal habeas corpus relief should not be granted unless the error had a substantial and injurious effect or influence in determining the jury's verdict. *Lee v. Illinois*, 476 U.S. 530, 539-40 (1986); *see also Brecht*, 507 U.S. at 637; *Cupit v. Whitley*, 28 F.3d 532 (5th Cir. 1994) (erroneous admission of evidence does not merit federal habeas relief unless it is a crucial, critical, highly significant factor that renders the trial as a whole fundamentally unfair). Contrary to Ibarra's assertion, the witnesses' statements did not have such an effect or influence upon the jury's verdict because the evidence of Ibarra's guilt was overwhelming. Eyewitnesses observed Ibarra at the scene of the offense on the morning of the murder and were able to positively identify him at trial. Police observed scratch marks on Ibarra's face and torso the afternoon of the offense. Forensic experts found DNA material under the victim's fingernails indicating she had scratched her assailant. Ibarra's DNA matched the DNA material under the victim's fingernails and in her vagina. Accordingly, the error, if any, could not have had the requisite substantial and injurious effect or

influence upon the jury's verdict to warrant a grant of federal habeas relief. For all these reasons, federal habeas relief must be denied.

## VIII. Ibarra's Claims that the Admission of Testimony that His Reputation for Sexually Inappropriate Behavior Was Bad Violated His Sixth, Eighth and Fourteenth Amendment Rights Do Not Warrant Federal Habeas Relief Because the Admission Did Not Render His Trial Fundamentally Unfair. (Ground Six)

Ibarra claims that the trial court also violated his Sixth Amendment right to confront witnesses against him, the Eighth Amendment prohibition of cruel and unusual punishment, and his Fourteenth Amendment right to due process of law when it admitted testimony that his reputation for sexually inappropriate behavior was bad. Petition at 43-46. As discussed *supra*, these claims are unexhausted and procedurally barred. Additionally, they are entirely without merit.

On direct appeal, Ibarra argued to the Court of Criminal Appeals that, under state evidentiary rules, the complained-of testimony was inadmissible as reputation testimony because it was based solely on specific bad acts. *Ibarra v. State*, 11 S.W.3d at 198. The court rejected the claim finding that the complained-of testimony was properly admissible character testimony under Rule 405(a) of the Texas Rules of Criminal Evidence.[15] *Id.* at 198-99. The Fifth

---

[15]     The Court of Criminal Appeals noted that at the time of trial, the Texas Rules of Criminal Evidence and the Texas Rules of Civil Evidence had not yet been merged into a single set of rules. *Ibarra v. State*, 11 S.W.3d at 197 n. 8.

Circuit has stated that "[w]e may not consider the correctness of the evidentiary rulings of the Texas courts; our authority is limited to a determination of "whether there has been a constitutional infraction of [petitioner's] due process rights which would render the trial as a whole ""fundamentally unfair."" *Trussell v. Estelle,* 699 F.2d 256, 259 (5th Cir. 1983) (*citing Nelson v. Estelle,* 642 F.2d 903 (5th Cir. 1981)).  If evidence is wrongfully admitted, the evidentiary rulings present cognizable habeas claims only if they violate a particular constitutional right or if the rulings "render the petitioner's trial fundamentally unfair." *Cupit,* 28 F.3d at 536.   An erroneous admission of evidence renders a trial fundamentally unfair if relates to evidence that is "crucial, critical and highly significant."   *See Pemberton v. Collins,* 991 F.2d 1218, 1227 (5th Cir. 1993) (*citing Mullen v. Blackburn,* 808 F.2d 1143, 1145 (5th Cir. 1987)).

Given that Ibarra was not able to show that the evidence was improperly admitted under state law, this claim should fail.  Nevertheless, the complained-of testimony was a minor factor in comparison to the physical evidence and eyewitness testimony tying petitioner directly to the scene of the crime. Moreover, Ibarra's assertions that Gandera's testimony was based solely on one incident fails to note that Ibarra was also accused of molesting her son.  Indeed, given Ibarra's various sexually assaultive acts, he would have a hard time showing that Gandera's testimony was false much less that it was overtly

harmful.  Given the high standard of prejudice that Ibarra must meet, the state courts did not clearly err in denying relief.   Thus, federal relief is also unwarranted.

## IX. Appellate Review of Mitigating Circumstances Relating to the Punishment Issues in a Capital Case is not Required by the Constitution. (Ground Seven)

Ibarra also argues that the Texas capital-sentencing scheme violates the Eighth and Fourteenth Amendments in that there is no appellate review of the jury's answer to Texas's mitigation special issue during the penalty phase of trial.  But as shown below, the state court's decision was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court.  Indeed, the Court's precedent holds that a redetermination on appeal of the death sentence of one found to be death-eligible is *not* required under the Eighth Amendment.  *See McCleskey v. Kemp*, 481 U.S. 279, 308 (1987); *Pulley v. Harris*, 465 U.S. 37, 45-46 (1984).

The Eighth Amendment requirement of meaningful appellate review does not require an appellate court to independently re-weigh aggravating and mitigating evidence.  *Pulley*, 465 U.S. at 45-46; *McCleskey*, 481 U.S. at 308.  In fact, the Supreme Court has never held that the Constitution entitles a capital defendant to have an appellate court redetermine the jury's verdict on punishment.  *See Parker v. Dugger*, 498 U.S. 308, 321 (1991); *see also Caldwell*

*v. Mississippi*, 472 U.S. 320, 330-31 (1985) (noting that appellate courts are "wholly ill-suited to evaluate the appropriateness of death in the first instance"). On the contrary, the Court has held that "the sentencer may be given 'unbridled discretion in determining whether the death penalty should be imposed after it is found the defendant is a member of the class made eligible for the death penalty.'" *Tuilaepa v. California*, 512 U.S. 967, 979-80 (1994) (quoting *Zant v. Stephens*, 462 U.S. at 875).

Accordingly, the Fifth Circuit has emphatically upheld the constitutionality of the Texas courts' refusal to review the sufficiency of mitigating evidence. *See Moore v. Johnson*, 225 F.3d 495, 507 (5th Cir. 2000) (holding that "Texas followed Supreme Court instruction to the letter. No court could find that Texas had acted contrary to federal law as explained by the Supreme Court, and no benefit will arise from further consideration of the obvious"); *see also Woods v. Cockrell*, 307 F.3d 353, 359-60 (5th Cir. 2002); *Beazley v. Johnson*, 242 F.3d 248, 261 (5th Cir. 2001); *Hughes v. Johnson,* 191 F.3d 607, 621-23 (5th Cir. 1999).

Further, Ibarra's reliance on *Parker v. Dugger* for the proposition that meaningful appellate review would require a fact-intensive redetermination of his death sentence is misplaced. *Parker* holds that where the original sentencer at trial had considered an invalid aggravating factor, thus skewing its

consideration of aggravating and mitigating evidence, the state appellate court could effectively "cure" an otherwise invalid death sentence only by conducting harmless-error analysis or re-weighing the aggravating and mitigating evidence itself.  498 U.S. 308, 318-19 (1991).  Thus, the Court simply recognized that when a defendant is deprived of the individualized sentencing required by the Eighth Amendment, the appellate court must provide an individualized determination itself in order to affirm the death sentence.  *Id.*  The Court did not impose a requirement that an appellate court must independently re-weigh aggravating and mitigating evidence where the defendant received an individualized sentencing determination at trial.

Under the Texas capital-sentencing scheme, the constitutionally required narrowing function is performed by the penal statute's defining the offense of capital murder, which encompasses aggravating elements that distinguish capital murder from simple murder.  Tex Penal Code Ann. § 19.03 (Vernon 1988); *Jurek v. Texas*, 428 U.S. 262, 268-71 (1976) (opinion of Stevens, J., joined by Stewart and Powell, JJ.); *Lowenfield v. Phelps*, 484 U.S. 231, 243-46 (1988) (discussing narrowing function of Texas penal statute).  The jury's determination of guilt under the statute thus insures that the defendant comes within the narrowed class of death-eligible defendants.  *Jurek*, 428 U.S. at 270.  The Texas special issues accomplish the second constitutional requirement, the "selection"

or individualized sentencing decision, where the jury determines whether a death-eligible defendant should in fact receive that sentence. *See id.* at 271, 276. Once a defendant is determined to be death-eligible, the Eighth Amendment requirements for the selection decision are satisfied if the procedures "allow the jury to consider the character and record of the defendant and the circumstances of the crime." *Tuilaepa*, 512 U.S. at 972; *see also Saffle v. Parks*, 494 U.S. 484, 494 (1990). Thus, the Eighth Amendment's prohibition against arbitrary and capricious action in imposing the death sentence is not implicated by a lack of appellate review of the "selection" determination. *Tuilaepa*, 512 U.S. at 979-80; *Caldwell*, 472 U.S. at 330-31. Moreover, Ibarra's contention that Texas is now a "weighing state" is repudiated by the Supreme Court's decision in *Brown v. Sanders,* 546 U.S. 212, 219-20 (2006) (noting distinction is no longer important and needlessly complex).

Finally, to hold that such review of the special issues under Texas's scheme is constitutionally mandated would require the announcement and retroactive application of a new rule of constitutional law on federal habeas review, in violation of *Teague.*

X.   Ibarra's *Wiggins*[16] Claim Is Procedurally Defaulted.  In the Alternative, Ibarra's History Was Adequately Investigated by Trial Counsel.  (Ground Eight)

In his eighth ground for relief, Ibarra asserts that trial counsel failed to investigate, develop, and present crucial mitigation evidence concerning Ibarra's childhood history.  Petition at 57-103.  However, this claim is procedurally defaulted.  In the alternative, Ibarra fails to show that counsel failed to adequately investigated his childhood history or that Ibarra was prejudiced by such a failure.

A.   This claim is procedurally defaulted.

Ibarra presented this claim in his fourth state application for habeas corpus.  SHCR at 5-54.  The Court of Criminal Appeals found that this application did "not meet the requirements for consideration of subsequent claims under Article 11.071, Section 5."  *Ex parte Ibarra*, No. 48,832-04 at "Order."   Accordingly, Ibarra's claims are unequivocally procedurally barred because the state court's disposition of the claims relies upon an adequate and independent state-law ground, *i.e.,* the Texas abuse-of-the-writ statute.  28 U.S.C. §§ 2254(b), (c); *Vega*, 149 F.3d at 362; *Nobles*, 127 F.3d at 422.  Nevertheless, Ibarra argues that his claim is not procedurally defaulted because

---

[16]        *Wiggins v. Smith*, 539 U.S. 510, 527 (2003).

it is not clear that the Court of Criminal Appeals's decision was independent of federal law. Petition at 97-104. However, this argument is without merit.

There are three elements to the procedural default rule: (1) the state judgment at issue must rest on a state-law ground that is "independent" of the merits of the federal claim; (2) the state-law ground is an "adequate" basis for the court's decision; and (3) the state court actually relied upon the state-law ground to dispose of the case. *Harris*, 489 U.S. at 260-62. With respect to the last element, the Supreme Court has made clear that a "plain statement" invoking the court's reliance on the state-law ground is required only when it "fairly appears" from the "face of the opinion" that the state court rested its decision "primarily" on federal law or "to be interwoven with the federal law." *Michigan v. Long*, 463 U.S. 1032, 1042 (1983). In cases where the state-court opinion is facially relying on federal precedent and the state court does not plainly state it is relying on a state procedural rule to dispose of the case, federal courts may "accept as the most reasonable explanation that the state court decided the case the way it did because it believed federal law required it to do so." *Id.*; *see also Harris*, 489 U.S. at 265 (applying *Long* presumption to federal habeas cases)

Ibarra argues that when the Court of Criminal Appeals dismissed his subsequent application, it was not clear that the state court was relying on the

state procedural rule.   Specifically, he asserts that the Court of Criminal Appeals's order is ambiguous and therefore subject to the *Long* presumption that it was decided on federal law grounds.   However, the *Long* presumption does not apply if there is *no* indication in the relevant state court judgment itself that it rested on federal law grounds. The Supreme Court has previously rejected the notion that a state court's silence triggers a presumption that the decision rested on federal law grounds. *See Coleman,* 501 U.S. at 736-740.  In *Coleman,* the petitioner sought "a conclusive presumption of no independent and adequate state grounds in every case in which a state prisoner presented his federal claims to a state court regardless of whether it fairly appears that the state court addressed [the federal] claims." *Id.* at 737-738.

The Supreme Court rejected such a rule.  It reasoned that in cases where the state court was silent about the basis for its decision  or where federal law was *not* expressly invoked in the opinion  "it is simply not true that the 'most reasonable explanation is that the state judgment rested on federal grounds.'" *Id.* at 737 (*citing Long*, 463 U.S. at 1041).   Such a rule, the Court opined, would "unacceptably expand the risk that federal courts will review the federal claims of prisoners in custody pursuant to judgments resting on independent and adequate state grounds. " *Id.* at 738.  The Court went on to remind federal courts that they "have no power to tell state courts how they must write their opinions."

*Id.* at 739. And "where a state court, in the course of disposing of cases on its overcrowded docket, neglects to provide a clear and express statement of procedural default, or is insufficiently motivated to do so . . . respect for the State's interests [which] underlies the application of the independent and adequate state ground doctrine" does not permit a federal court to presume from a silent order that federal law controlled the disposition. *Id.*

While recognizing that a "broad presumption" might "ease the burden of inquiry on federal courts," the Court nevertheless held that in order to minimize the risk that the state procedural rules will go unhonored, "it remains the duty of the federal courts. . . to determine the scope of the *relevant* state court judgment." *Id.* at 739 (emphasis added). Indeed, "in the absence of a clear indication that a state court rested its decision on federal law, a federal court's task will not be difficult." *Id.* at 740.

Thus, federal courts must *not* presume that a state-court judgment rests on federal law, *unless* it "fairly appears" in the "relevant state court decision" that the decision rested "primarily" on federal law. *Id.*; *see also Amos*, 61 F.3d at 341, n. 26 (recognizing that the Supreme Court "declined to expand the *Harris* presumption to apply in all habeas cases presented to a state court in which the state court did not 'clearly and expressly' state that its judgment rests on state law and reiterating that presumption applied only when it fairly appears that

state court rested decision primarily on federal law"). Here, there was no clear indication that the state court was relying primarily on federal law when it disposed of Ibarra's claims.

In addition, Ibarra's argument overlooks the fact that a boilerplate dismissal containing the phrase "dismissed as an abuse of the writ" or a simple reference to Article 11.071, Section 5(a) *without more* has traditionally meant, and continues to mean in state and federal court, that the state court is refusing review *because* the factual and legal bases of the claims were previously *available* and nothing else.  In other words, a perfunctory order *is* the clear and specific language invoking the state procedural rule.  *See Hughes v. Quarterman*, 530 F.3d 336, 342 (5th Cir. 2008) ("[T]here is nothing in its perfunctory dismissal of the claims that suggests that [the state court] actually considered or ruled on the merits."); *see also Moore v. Quarterman*, 534 F.3d 454, 462-465 (5th Cir. 2008) (holding that "district court's assessment [that *Brady* claim was procedurally defaulted by abuse-of-the-writ doctrine] was undebatably correct").  Ibarra would have the Court of Criminal Appeals say more before federal courts honor the state procedural rule.  But the Supreme Court has held that the state court is not required to do so.

Given the historical treatment by the federal courts of the Court of Criminal Appeals's boilerplate language dismissing an application as "an abuse

of the writ" as an invocation of the state procedural rule, and nothing in the opinion to show otherwise, there is simply no reasonable basis on which to conclude that the state court rested its judgment in Ibarra's case primarily on federal law grounds.  Consequently, the state court's disposition of Ibarra's claims was "independent" of federal law.

Lastly, the *Ruiz* holding cited by Ibarra is fact-specific and does not support Ibarra's argument. *Ruiz v Quarterman*, 504 F.3d. 523 (5th Cir. 2007). In *Ruiz*, the Fifth Circuit applied the *Long* presumption to the state court's opinion because it determined that circumstances existing there rendered the boilerplate dismissal "ambiguous" with respect to whether the state-court decision rested on state or federal law.  Ruiz's state habeas application was dismissed by a four-judge plurality perfunctory order that read: "We have reviewed these claims and find that they do not meet the requirements for consideration of subsequent claims under Article 11 .071, Section 5."  *Ex parte Ruiz*, No. 27,328-03,  2007 WL 2011023, 1 (Tex. Crim. App. 2007).

Although the Fifth Circuit noted that the "boilerplate dismissal" was "itself uncertain," the circuit panel did not rest its decision on this ground. *Ruiz*, 504 F.3d at 527.  Instead, the circuit panel considered a number of additional factors before it concluded that the state court's plurality "decisional path" differed from one involving only a "boilerplate dismissal."  The circumstances that the

court found made the "decisional basis uncertain" were as follows: (1) the dismissal order was perfunctory; (2) the dismissal order was issued by a divided court in that only five of seven Court of Criminal Appeals judges voted to dismiss the application as abusive and two judges joined a dissenting statement in favor of review; (3) Judge Womack wrote a concurring opinion which, according to the panel, indicated there was debate about the merits of the federal claim; (4) the four-judge plurality agreeing to dismiss as abusive was "not controlling" and (5) the "unanswered language" in the concurring and dissenting statements by the state court's perfunctory order "strongly suggest that the Court of Criminal Appeals debated and reached the federal merits question, not the independent state law ground." *Id.* at 527-528.

Ibarra's case therefore differs from that of Ruiz. Ibarra raised his claims in state court in a successive state habeas application (his fourth). The state court rejected these claims in a per curiam order. One judge dissented, but unlike in *Ruiz*, her vote was not necessary to constitute a majority in favor of dismissal. In short, none of the circumstances appearing in *Ruiz* appear here.

Indeed, post-*Ruiz,* the Fifth Circuit has applied the principles announced in *Coleman* and reached a different conclusion than the one arrived at by Ibarra. In *Hughes*, for example, the Court of Criminal Appeals' order read: "Dismiss as an abuse of the writ." *Ex parte Hughes*, No. 45, 876-02 (Tex. Crim. App. 2001).

When Hughes sought federal review, Hughes argued that because Article 11.071 Section 5 contains federal components, to invoke the state procedural rule, the Court of Criminal Appeals's order had to invoke the state rule more specifically and clearly. *Hughes*, 530 F.3d at 342. The Fifth Circuit rejected the argument, saying, "there is nothing in its perfunctory dismissal of the claims that suggests that [the state court] actually considered or ruled on the merits." *Id*. at 342.

Thus, Ibarra fails to justify not applying the long-standing rule against reviewing claims denied by state courts on state law grounds.

### B. Alternatively, Ibarra Has Failed to Show Counsel Did Not Adequately Investigate Ibarra's Mitigating Evidence.

#### 1. Standard of Review

The familiar two-prong standard by which a claim of ineffective assistance of counsel is weighed is set forth in *Strickland*. That is, to establish that counsel performed ineffectively, Ibarra must show both that his attorney's performance was deficient and the deficient performance prejudiced his defense. 466 U.S. at 687. Furthermore, because a convicted defendant must satisfy both prongs of the *Strickland* test, a failure to establish either deficient performance or prejudice makes it unnecessary to examine the other prong. *Id*. at 697.

In order to establish that counsel's performance was constitutionally deficient, a convicted defendant must show that trial counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the

Sixth Amendment." *Id.* at 687.  In so doing, a convicted defendant must overcome a strong presumption that trial counsel's conduct fell within a wide range of reasonable professional assistance, and every effort must be made to eliminate the "distorting effect of hindsight." *Id.* at 689.  To render effective assistance, the Sixth Amendment requires counsel "to make a reasonable investigation of defendant's case or to make a reasonable decision that a particular investigation is unnecessary." *Ransom v. Johnson*, 126 F.3d 716, 723 (5th Cir. 1997) (citing *Strickland*, 466 U.S. at 691); *see Nealy v. Cabana*, 764 F.2d 1173, 1177 (5th Cir. 1985); *Martin v. Maggio*, 711 F.2d 1273, 1280 (1983). When assessing effectiveness at the sentencing stage of a capital trial, counsel's "investigations into mitigating evidence should comprise efforts to discover all reasonably available mitigating evidence." *Wiggins*, 539 U.S. at 524. "[C]ounsel should consider presenting . . . [the defendant's] medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experience, and religious and cultural influences." *Id.* That is, "[g]enerally accepted standards of competence require that counsel conduct an investigation regarding the accused's background and character." *Id.* Yet *Strickland* does not "require defense counsel to present mitigating evidence at sentencing in every case." *Miniel v. Cockrell*, 339 F.3d 331, 344 (5th Cir. 2003).

With respect to counsel's duty to investigate, the Supreme Court has observed:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland*, 466 U.S. at 690-91; *see Bell v. Lynaugh*, 828 F.2d 1085, 1088 (5th Cir. 1987); *Lowenfield v. Phelps*, 817 F.2d 285, 290 (5th Cir. 1987).  When a petitioner argues that his counsel failed to adequately investigate mitigation evidence, the proper inquiry is "not whether counsel should have presented a mitigation case . . . [but] whether the investigation supporting counsel's decision not to introduce mitigating evidence of [the defendant's] background was itself reasonable." *Wiggins*, 539 U.S. at 523 (emphasis in original).

The reasonableness of an attorney's investigation must be determined by considering not only the evidence already known to counsel, but also whether such evidence would lead a reasonable attorney to investigate further. *Id.* at 527.  The reasonableness of an investigation depends in large part on the information supplied by the defendant. *See Ransom*, 126 F.3d at 123; *McCoy v.*

*Lynaugh*, 874 F.2d 954, 964 (5th Cir. 1989);  *Mattheson v. King,* 751 F.2d 1432, 1440 (5th Cir. 1985) (in denying ineffective-assistance claim based on failure to investigate and pursue insanity defense, court noted defendant's failure to tell counsel that he either was presently insane or so intoxicated at time of offense as to be incapable of forming requisite intent).  At a minimum, counsel should interview potential witnesses and independently investigate the facts and circumstances of the case.  *Bryant v. Scott*, 28 F.3d 1411, 1415 (5th Cir. 1994).

Furthermore, "any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution." *Strickland,* 466 U.S. at 692.  In order to establish that he has sustained prejudice, Ibarra "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  *Id.* at 694.  A reasonable probability is a probability sufficient to undermine the confidence in the outcome." *Id.*  A mere allegation of prejudice is not sufficient to satisfy the prejudice prong of *Strickland*; rather, Ibarra must "affirmatively prove" prejudice.  *Id.* at 693. Where counsel is alleged to have been ineffective at the punishment phase, the inquiry is whether the "additional mitigating evidence [is] so compelling that there is a reasonable probability at least one juror could have reasonably determined that, because of

[Petitioner's] reduced moral culpability, death was not an appropriate sentence."
*Neal*, 286 F.3d at 241.

> ### 2.  Ibarra has failed to show counsel's investigation and presentation were deficient.

Ibarra asserts that counsel failed to present evidence of Ibarra's difficult childhood and upbringing.  As summarized later in Ibarra's petition, Ibarra suggests that a more thorough investigation would have revealed the following:

- Ibarra was one of thirteen children born to his parents.

- Ibarra grew up in poverty.

- Ibarra had to begin working at a young age.

- Ibarra's family frequently lacked adequate food.

- Ibarra's family moved frequently and lived in substandard housing.

- Ibarra's father would beat his children and wife.

- Ibarra and his siblings were emotionally abused by their father.

- Ibarra witnessed episodes of domestic violence between his mother and father and the abuse of his siblings.

- Ibarra's mother lacked adequate nutrition and prenatal care while she was pregnant with Ibarra.

- Ibarra had a traumatic birth.

- Ibarra suffered from developmental delays as a child.

- Ibarra's performance in school was substandard.

- Ibarra exhibited limitations in adequate functioning as a child.

- Ibarra was victimized by other children.

- Ibarra sustained a head injury as a minor.

- Ibarra suffers from mental retardation and post-traumatic stress disorder.[17]

Petition at 157-58.

However, a proper evaluation of these allegations is difficult due to Ibarra's procedural default. Because Ibarra did not present his claim to the state court in a procedurally correct manner, there was no hearing on this matter in the trial court. Had the state court conducted hearing, presumably there would have been affidavits or testimony from counsel detailing the extent of their investigation and the strategic considerations that guided it. This information is crucial for evaluating Ibarra's claim, and Ibarra still has not secured it.[18] Without this evidence (or other firsthand accounts of counsel's

---

[17]    Pablo Stewart, M.D., suggests that Ibarra suffers from Post-traumatic Stress Disorder. Petitioner's Exhibit 21. Like Carol Romey, it does not appear that Dr. Stewart is properly licensed to practice in Texas. *See* Section XI, *infra*.

[18]    It is telling that Ibarra has not presented affidavits from counsel. But perhaps it is even more telling that Ibarra does not even present *his own recollections*. As noted earlier, the reasonableness of an investigation depends in large part on the information supplied by the defendant. *See Ransom*, 126 F.3d at 123. Ibarra is presumably aware of his own personal history and could have related it to counsel.

-78-

investigation and decision-making process), Ibarra's assertions of deficient performance must necessarily be conclusory in nature.

Moreover, to the extent that there is evidence on this count, the record demonstrates that an investigation was indeed undertaken by counsel. For instance, counsel filed numerous motions for investigative funding and assistance. 1 CR 19 (motion for miscellaneous investigative assistance); 1 CR 40 (motion to discover extraneous offenses); 1 CR 61 (motion to discover victim impact testimony); 1 CR 154 (motion for psychological evaluation). Ibarra was also examined by Dr. Stephen Marks, a psychiatrist, who found no evidence of mental retardation. 44 RR 1525-1531; 45 RR 1533; Petitioner's Exhibit 3; DE 27 at Appendix O. And counsel must have necessarily been aware of some of this information as it was presented to the jury. As noted in the Statement of Facts, Sabina Ibarra Rubi, Ibarra's youngest sister, testified for the defense that Ibarra had come to the United States to find work and help their father support a family of eleven children.[19] 47 RR 1764-67. Her family "worked on the land"; their house was very "humble." *Id*. Their father had to work hard to ensure that they had enough to eat. *Id*. at 1765. Maria Gandara Ibarra, Ibarra's wife, was also called to testify. 47 RR at 1785-1801.

---

[19]     Sabrina Ibarra's brief testimony at trial contrasts greatly with the more detailed affidavit provided by Sabina Gonzales (nee Ibarra) in conjunction with his fourth state application.

The Supreme Court has admonished that judicial scrutiny of counsel's performance "must be highly deferential," with every effort made to avoid "the distorting effects of hindsight." *Strickland*, 466 U.S. at 689-90; *Rector v. Johnson,* 120 F.3d 551, 563 (5th Cir. 1997); *Belyeu v. Scott*, 67 F.3d 535, 538, 540 (5th Cir. 1995). In evaluating counsel's investigation, a court must conduct an objective review measured for "reasonableness under prevailing professional norms," which includes a context-dependent consideration of the challenged conduct as seen "from counsel's perspective at the time." *Wiggins*, 539 U.S. at 523 (quoting *Strickland*, 466 U.S. at 688-89). A reviewing court must be also wary of "argument[s] [that] essentially come[] down to a matter of degrees. Did counsel investigate enough? Did counsel present enough mitigating evidence? Those questions are even less susceptible to judicial second-guessing." *Kitchens v. Johnson*, 190 F.3d 698, 703 (5th Cir. 1999). By not presenting any evidence concerning the actual scope of counsel's investigation or the strategic considerations guiding it, Ibarra has failed to rebut the strong presumption that trial counsel's conduct fell within a wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689. This claim should be denied.

### 3.    In the alternative, Ibarra cannot show prejudice.

Even if the jury had learned more about Ibarra there is no reasonable likelihood that the outcome at punishment would have been different. With

respect to errors at the sentencing phase of a death penalty trial, the relevant inquiry is "whether there is a reasonable probability that, absent the errors, the sentencer [] would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695; *see also Riley v. Cockrell*, 339 F.3d 308, 315 (5th Cir. 2003) ("If the petitioner brings a claim of ineffective assistance with regard to the sentencing phase, he has the difficult burden of showing a reasonable probability that the jury would not have imposed the death sentence in the absence of errors by counsel." (internal quotation marks omitted)).

Ibarra's allegedly mitigating evidence does not compare to the mitigating evidence the Supreme Court has found to be prejudicially omitted in other cases. In *Wiggins*, for example, counsel focused on Wiggins's direct responsibility for the murder, but asked the jury to also consider his "difficult life" during opening statement. But *no* evidence was presented as to Wiggins's life history. 539 U.S. at 526. And as the Court described, "[t]he mitigating evidence counsel failed to discover and present in this case is powerful[:]"

> Wiggins experienced severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother. He suffered physical torment, sexual molestation, and repeated rape during his subsequent years in foster care. The time Wiggins spent homeless, along with his diminished mental capacities further augment this mitigation case.

*Id.* at 534-35. *See also id.* at 516-17, 525.

In *Rompilla v. Beard*, the case for mitigation was composed of the testimony of five family members who "argued in effect for residual doubt, and beseeched the jury for mercy, saying that they believed Rompilla was a good man." 545 U.S. 474, 378 (2005). But the evidence that was readily available to trial counsel included "a range of mitigation leads that no other source had opened up." *Id*. at 390. As the Court wrote:

> The prison files pictured Rompilla's childhood and mental health very differently from anything defense counsel had seen or heard. An evaluation by a corrections counselor states that Rompilla was "reared in the slum environment of Allentown, [Pennsylvania]. vicinity. He early came to the attention of juvenile authorities, quit school at 16, [and] started a series of incarcerations in and out of [Pennsylvania], often of assaultive nature and commonly related to over-indulgence in alcoholic beverages." . . . The same file discloses test results that the defense's mental health experts would have viewed as pointing to schizophrenia and other disorders, and test scores showing a third grade level of cognition after nine years of schooling. . . . The accumulated entries would have destroyed the benign conception of Rompilla's upbringing and mental capacity defense counsel had formed from talking with Rompilla himself and some of his family members, and from the reports of the mental health experts.

*Id*. at 390-91 (citations omitted). Still other evidence established that Rompilla's mother drank during her pregnancy, that his father had a "vicious temper," that Rompilla and his siblings "lived in terror," that he and a brother were locked "in a small wire mesh dog pen that was filthy and excrement filled," that they were isolated from other children, that their home had no indoor plumbing, and that they slept in an attic with no heat. *Id*. at 392. Ultimately, the Supreme Court

said of the later-discovered evidence, it "adds up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury[.]" *Id.* at 393.

Furthermore, in assessing the relative weight of the new mitigating evidence, a reviewing court compares and contrasts the new evidence with that from the trial. The Fifth Circuit has indicated that it will look to see if the petitioner's new evidence will "lessen the impact of the other evidence against him[,]" *Conner v. Quarterman*, 477 F.3d 287, 294 (5th Cir. 2007), because "overwhelming aggravating factors" can outweigh unpresented mitigating evidence. *Sonnier v. Quarterman*, 476 F.3d 349, 360 (5th Cir. 2007). For instance, the "brutal and senseless nature of the crime," *Smith v. Quarterman*, 471 F.3d 565, 576 (5th Cir. 2006), or the "cruel manner in which he killed," *Miniel v. Quarterman*, 339 F.3d 331, 347 (5th Cir. 2003), may weigh heavily against a finding of *Strickland* prejudice. *See also Strickland*, 466 U.S. at 700; *Knight v. Quarterman*, 186 Fed. App'x 518, 535 (5th Cir. 2006); *Ladd v. Cockrell*, 311 F.3d 349, 360 (5th Cir. 2002); *Andrews v. Collins*, 21 F.3d 612, 624 n.23 (5th Cir. 1994); *Russell v. Lynaugh*, 892 F.2d 1205, 1213 (5th Cir. 1989).

In the instant case, Rafael Gandera, Ibarra's nephew, testified that Ibarra sexually assaulted him several times as a young child. 45 RR 1547-56. Olga Gandera, Ibarra's sister-in-law, testified that Ibarra's reputation for truth and

veracity was bad and that his reputation for sexually inappropriate behavior was also bad. *Id.* at 1573-78, 1585. She also testified to circumstances suggesting that Ibarra had sexually abused her own son, Peter. *Id.* at 1582-83. Tanya Diaz testified that Ibarra had touched her inappropriately when she was eleven years old. 46 RR 1673-74. Maria Luna Diaz, Tanya's mother, testified she confronted Ibarra about the way he had treated Tanya, and he reacted by arguing and beating her. *Id.* at 1654, 1656, 1674, 1715. Maria Luna also testified to several violent and sexually assaultive incidents with Ibarra in 1986 and 1987. *Id.* at 1685-91, 1709. The State also elicited testimony from Ibarra's wife on cross-examination that Ibarra had severely beaten her on several occasions, including hitting her while she was pregnant. 47 RR 1791-92. She also testified that Ibarra had brought an eighteen-year-old girl whom he claimed to be his daughter up from Mexico to live with them, but that Ibarra treated the girl like his wife, including kissing her on the mouth and taking the girl into the bedroom and spending hours with her there behind closed doors.[20] *Id.* at 1794-96.

The State also introduced certified copies of the judgments for Ibarra's prior convictions for unlawfully carrying a weapon, and a judgment of probation for driving while intoxicated. 46 RR at 1667. The State then presented multiple

---

[20]     Ibarra submits an affidavit from his daughter contesting this version of events.

witnesses to show that Ibarra did not behave while incarcerated. Dr. Richard Coons, a psychiatrist, also testified for the State and opined that an offender with Ibarra's history and sexual proclivities would constitute a continuing threat to society. 46 RR 1734-36, 1752-53.

When the allegedly missing evidence, coupled with the evidence that was actually offered by the defense, is weighed against the aggravating evidence, including the circumstances of the crime, there is simply no reasonable likelihood that the outcome of the proceeding would have been any different in this case. For these reasons, even if this Court finds deficient performance, Ibarra is not entitled to relief on this claim. *Ramirez v. Dretke*, 398 F.3d 691, 697 (5th Cir. 2005) (reiterating that both prongs of the *Strickland* test must be satisfied in order to be entitled to relief).

## XI.   Ibarra fails to demonstrate that he is mentally retarded. (Ground Nine)

In his ninth claim, Ibarra argues his execution would violate the Eighth Amendment's prohibition against cruel and unusual punishment because he is mentally retarded. Petition at 104-127. However, Ibarra failed to present his evidence in support of this claim to the state court, rendering it unexhausted and procedurally defaulted. Nevertheless, even if this evidence were properly before the Court, Ibarra's petition does not demonstrate that he is within the category of mentally retarded offenders to whom *Atkins* applies. Ibarra does not show

that he suffers from significantly sub-average intellectual functioning and concurrent deficits in adaptive functioning prior to the age of eighteen as defined under Texas law.  After considering the record, the state court concluded that Ibarra was not entitled to relief.[21]  *Ex parte Ibarra,* No. 48,832-02, -03 at "Order." In view of the evidence, this Court should likewise deny Ibarra's claim.

### A.   Ibarra's evidence in support of his claim is unexhausted and procedurally defaulted.

Ibarra submits numerous affidavits in support of this claim that were not originally presented to the state court.  Petitioner's Exhibits 5-20.  The Fifth Circuit has held that evidence introduced for the first time in federal court in support of a federal habeas application are should be analyzed under the 'exhaustion' rubric of § 2254(b).

> Under § 2254(b), "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State".  This exhaustion requirement is satisfied if the substance of petitioner's claims have been fairly presented to the state court.  *Anderson v. Johnson*, 338 F.3d 382, 386 (5th Cir. 2003).  The exhaustion requirement is not satisfied if the petitioner "presents *material*

---

[21]     The Court of Criminal Appeals did not explicitly adopt the findings of fact or conclusions of law promulgated by the trial court.  Nevertheless, this Court must be mindful that AEDPA deference extends not only to express findings of fact, but to the implicit findings of the state court.  *Garcia v. Quarterman*, 454 F.3d 441, 444 (5th Cir. 2006).  These implicit state court determinations of underlying factual issues are presumed correct, and the petitioner has the burden to rebut the presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

> additional evidentiary support to the federal court that was not
> presented to the state court". *Dowthitt*, 230 F.3d at 745 (emphasis
> in original).  Evidence is material if it *fundamentally alters, not
> merely supplements*, the claim presented in state court.  *Anderson*,
> 338 F.3d at 386-87.

*Lewis v. Quarterman*, 272 F.App'x 347, 351 (5th Cir. 2008) (unpublished).

The Director submits that the evidence presented by Ibarra in his federal petition fundamentally alters—rather than supplements—the mental retardation claim that he presented in state court.  Here, Ibarra relies on Carol M. Romey's affidavit to show that he has significantly subaverage intellectual functioning, and Romey's affidavit as well as affidavits from individuals that knew Ibarra as a child to show that he possesses adaptive deficits and onset before the age of eighteen.  In state court, Ibarra presented no witnesses at all and submitted no affidavits from family members. 3 SHRR-02 at 20-28.  Ibarra did attempt to submit an affidavit from Romey attesting that Ibarra was retarded; however, Ibarra did not produce Romey for cross-examination, and the affidavit itself was unnotarized and therefore not accepted by the trial court.  *Id.*  The affidavits from his family members, teacher, and high school girlfriend were never submitted to the state court.[22]  *See generally* SHCR-03, SHRR-03.  As a

---

[22]      The hearing transcript is approximately nine pages long. 3 SHRR-02 20-28.  This unusually abbreviated hearing appears to be the result of the defense's inability to muster witnesses and evidence in a timely fashion.  Ibarra's mental retardation claim was first raised in a successive state application on June 20, 2003. 4 SHCR-02 915.  It was sent to the trial court on September 10, 2004, for a hearing.

consequence, Ibarra's new evidence, presented for the first time on federal habeas review, has fundamentally altered Ibarra's claim and should be found unexhausted and procedurally defaulted. 28 U.S.C. §§ 2254(b), (c); *Vega*, 149 F.3d at 362; *Nobles*, 127 F.3d at 422.

### B.    Alternatively, this claim fails on the merits.

#### 1.    Standard of Review

The *Atkins* Court held that "the Constitution places a substantive restriction on the State's power to take the life of a mentally retarded offender." 536 U.S. at 321 (internal quotation omitted). The Court noted that, "[t]o the extent there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded." *Id.* at 317. "Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus." *Id.* Although the Supreme Court left "to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon its

---

*Id.* at 916. A subsequent writ was filed in the state court on March 24, 2005. *Id.* There was communication between the parties regarding the scheduling of a hearing during the later part of 2005 and the early part of 2006. *Id.* On June 28, 2006, the CCA ordered, in view of the length of time that had elapsed, that the trial court hold its hearing before September 26, 2006. *Id.* at 917. A hearing was scheduled for September 18, 2006. *Id.* Defense counsel submitted two motions attempting to continue the hearing, but the trial court denied these motions—noting that Ibarra had thirty-eight months to prepare—and proceeded with the hearing. *Id.* at 918.

execution of sentences," *id.,* it cited with approval the following definitions of

mental retardation:

> The American Association of Mental Retardation (AAMR) defines
> mental retardation as follows: "*Mental retardation* refers to
> substantial limitations in present functioning. It is characterized
> by significantly subaverage intellectual functioning, existing
> concurrently with related limitations in two or more of the following
> applicable adaptive skill areas: communication, self-care, home
> living, social skills, community use, self-direction, health and safety,
> functional academics, leisure, and work. Mental retardation
> manifests before age 18."

> The American Psychiatric Association's definition is similar: "The
> essential feature of Mental Retardation is significantly subaverage
> general intellectual functioning (Criterion A) that is accompanied by
> significant limitations in adaptive functioning in at least two of the
> following skill areas: communication, self-care, home living,
> social/interpersonal skills, use of community resources, self-
> direction, functional academic skills, work, leisure, health, and
> safety (Criterion B). The onset must occur before age 18 years
> (Criterion C). Mental Retardation has many different etiologies and
> may be seen as a final common pathway of various pathological
> processes that affect the functioning of the central nervous system."
> "Mild" mental retardation is typically used to describe people with
> an IQ level of 50-55 to approximately 70.

*Id.* at 309 n. 3 (internal citations omitted), 317 n. 22.

### 2. Ibarra has not demonstrated he suffers from subaverage general intellectual functioning.

The IQ testing provided by Carol M. Romey, Ph.D., which reports a Full

Scale IQ score of 65, does not aid Ibarra's cause. Petitioner's Exhibit 19. It is

unclear from Ibarra's pleadings whether the test was properly administered or

scored. Indeed, Ibarra fails even to provide this Court with the raw data from

which his expert reached her conclusion so that it might be reviewed for evidence of malingering—a likely occurrence given Ibarra's current knowledge of its import to his case. *Id.*

What is clear, however, is that Carol M. Romey, Ph.D., is not licensed or permitted to conduct or evaluate any such IQ test in this state. The Texas State Board of Examiners of Pyschologists is the legislatively authorized licensing body for the State of Texas. *See* http://www.tsbep.state.tx.us (last visited July, 3, 2009). It requires that individuals who engage in the practice of psychology in this state satisfy certain requirements and be licensed. *See* Mission Statement of the Texas State Board of Examiners of Psychologists located at http://www.tsbep.state.tx.us/what.html (last visited July, 3, 2009). The Board's licensing requirements are intended to "protect the public by ensuring that psychological services are provided to the people of Texas by qualified and competent practitioners who adhere to established professional standards." *Id.* Carol M. Romey is not licensed to perform a WAIS-III examination in this state or to interpret its results. In contrast, Dr. Stephen L. Mark, a psychiatrist who is duly licensed to practice in Texas, and who examined Ibarra mid-trial, found no evidence of mental retardation which might warrant further evaluation by a psychologist, but rather concluded that Ibarra was malingering in an attempt to manipulate his situation. 44 RR 1525-1531; 45 RR 1533; Petitioner's Exhibit

3; DE 27 at Appendix O.  Moreover, Ibarra has failed to present any evidence of an IQ score that was taken before the age of eighteen.

Thus, Ibarra's assertion of mental retardation fails in the first instance because he fails to conclusively demonstrate subaverage intellectual functioning with an onset prior to age eighteen.

### 3.   Ibarra has not demonstrated related limitations in two or more adaptive skill areas.

Texas law describes adaptive behavior as "the effectiveness with or degree to which a person meets the standards of personal independence and social responsibility expected of the person's age and cultural group."  Tex. Health & Safety Code § 519.003(13).  The AAMR and APA also describe the factors in evaluating adaptive functioning.  *Atkins,* 536 U.S. at 309, n.3.  For example, the AAMR Ninth edition refers to "limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work."  *Id.*  The APA guidelines require "significant limitations in adaptive functioning" in at least two of its list of similar skill areas.  *Id.*

Even if Ibarra's IQ score was sufficient to establish subaverage intellectual functioning, he nevertheless fails to demonstrate related limitations in two or more of the relevant adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional

academics, leisure, and work.  Ibarra submits that his procedurally-defaulted affidavits show lifelong poor academic performance; impairments in self-direction; impairments in language; inability to express emotions with words; frequent victimization by others; impaired social relations; and substandard hygiene.  Petition at 113-18.  However, these affidavits are largely from family and friends of Ibarra who presumably have an interest in seeing him saved from the death penalty.  None of the affiants have been submitted to cross-examination by the State regarding their assertions nor have any of the affiants had their credibility in this matter judged by a court.  The evidentiary weight of their assertions should be discounted accordingly.

Indeed, a cursory review of information from non-biased sources reveals a very different picture of Ibarra's capabilities.  Ibarra is perfectly capable of communicating with others.  Although Spanish is Ibarra's native language and he prefers it for communication, Ibarra nevertheless has also demonstrated that he understands English and can speak it when necessary.  DE 27 at Appendix U (TDCJ Case Summary).  At a minimum, he reads and writes in Spanish.  His written communications are coherent and goal-oriented.  For example, Ibarra filed a written request with TDCJ in which he indicated a desire to go on the work program.  DE 27 at Appendix P (Work Request).  For instance, Ibarra

communicates with his now ex-wife, Maria, via written letter.  One such letter

translates into English as follows:

> Dear Maria:
>
> I'm writing you and hoping this finds you well.  I called you and
> spoke to your mother.  She told me you were at the hospital with our
> son and she told me what happened to him.  It saddens me very
> much but what can we do.  She also told me that the doctor wanted
> to talk with me because he possibly would need another operation.
> I told your mother that since I am here and you are over there alone
> you could make a decision.  I love you very much and that is why
> you have to be ready and do what is right for our son.  Let God do
> his will and we have to leave it in the hands of the doctor.  I told
> your mother that I called to let you know that I was getting out on
> the 18th, Lord willing.  I hope and pray that God will let me return
> to all of you.  The letter you wrote on the 5th, I received it on the
> 14th.  I love you all very much and you all are my life.  Kisses to my
> son.  I wish you well.
>
> Randy[23]

DE 27 at Appendix R (footnote added).

Ibarra demonstrates no adaptive deficits in the areas of self-care, home

living, social skills, community use, self-direction, health and safety, leisure, and

work.  Indeed, the evidence demonstrates otherwise.  According to TDCJ records

and testimony at trial, at the time of his arrest, Ibarra was the married father

of four and maintained employment as a laborer.  During his incarceration,

TDCJ-CID's   Mental   Health   Services   Committee   approved   Ibarra

---

[23]     Ibarra often calls himself "Randy."

"psychologically as a candidate for the work capable program" at its Ellis Unit. DE 27 at Appendix S (Memo from Mental Health Services to Death Row Classification Committee). Notably, the industry at the Ellis Unit at that time was a garment factory wherein the inmates used state-of-the-art fabric-cutting machines and industrial sewing machines to construct uniform slacks for officers. In addition, a prior arrest record indicates Ibarra was capable of driving a car. DE 27 at Appendix T (Temple Police Offense Report # 8810309); Appendix U (TDCJ-CID Case Summary providing Ibarra's Texas Driver's License Number as 05973136).

According to TDCJ records, aside from his status as a death-row inmate, Ibarra has no special restrictions on his unit of assignment or housing such as a need to be placed in either an extended care or psychiatric facility, no restrictions on work assignment, and no restrictions on disciplinary process requiring prior consultation with TDCJ-CID's mental health department. Ibarra is capable of bathing himself, utilizes a hot pot to make coffee, and owns a wristwatch. In addition, TDCJ-CID officers have confiscated nail clippers and a long handled toothbrush from his cell. DE 27 at Appendix V. All of these demonstrate that Ibarra is capable of self-care, home living, self-direction, and maintaining his own health and safety. In addition, TDCJ-CID officers have confiscated scissors, a ruler and excess envelopes and stationery from his cell,

*see id.*, all of which, when taken together with his personal plea for pen pals,
demonstrates that at least one of Ibarra's "leisure" activities while incarcerated
is writing. TDCJ officers have also confiscated a piddling tool, which is utilized
by wood and stone carving hobbyists.  *Id.*

Ibarra likewise fails to demonstrate adaptive deficits in the area of
functional academics.  Ibarra did not complete high school or college, but that
should not necessarily be taken as a sign of mental retardation.  Uneducated
does not necessarily equate with retarded.  Moreover, the educational system in
Mexico where Ibarra reportedly attended school is different from what we are
accustomed to here in the United States.  It is reported that many primary- and
secondary-school-age students, especially those in rural areas like Ibarra, fail to
complete even a limited educational program.
http://www.nationsencyclopedia.com/Americas/Mexico-EDUCATION.html.  In
addition, instructional quality in Mexican schools is traditionally quite low.  *Id.*
Given this, it is notable for purposes of Ibarra's claim of mental retardation that
despite the fact that he was one of thirteen children in an impoverished rural
community with limited access to formal education, his intellectual capacity was
such that he reached and completed the ninth grade and is quite literate.
Indeed, it stands to reason that in such a social and educational environment,
had Ibarra been deemed mentally retarded, he would not have been permitted

to remain in school so long nor had the necessary mental resources to accomplish so much.

### 3. Ibarra has not demonstrated onset before the age of eighteen.

Ibarra asserts that his purported mental retardation is traceable to his childhood.  Petition at 119.  Specifically, he argues that a traumatic birth, maternal malnutrition and inadequate prenatal care, a brain injury incurred as a boy, his family's poverty, his own malnutrition, domestic violence in his household, inadequate familial support, and abuse by his father all served to caused his purported disabilities.  *Id.* at 119-27.  However, Ibarra presents no IQ scores before the age of eighteen—or other objective evidence[24]—that might verify the affidavit testimony of his family.  Ibarra thus fails to meet his burden on this final prong as well.  Thus, the state court's determination that Ibarra is not mentally retarded does not conflict with clearly established federal law as determined by the Supreme Court.  28 U.S.C. § 2254(d).  Nor is it "based on an

---

[24]     Ibarra does present the affidavit of a childhood teacher, Victor Jasso, but this teacher merely avers that Ibarra was quiet and slow—*not* mentally retarded. Petitioner's Exhibit 15.

unreasonable determination of the facts in light of the evidence." *Id.* Ibarra's claim for relief should be denied.

## XII. Ibarra's Claim that He Was Entitled to a Jury Determination of His Mental Retardation Claim Is Foreclosed By Clear Supreme Court Precedent. (Claim Ten)

Ibarra argues that he is entitled to a jury determination of his mental retardation status.  Petition at 128-30.  As noted earlier, this claim is procedurally defaulted.  However, this claim is also  foreclosed by Supreme Court precedent.  There is no constitutional or other mandate for a jury determination of mental retardation. *Schriro v. Smith,* 546 U.S. 6, 9 (2005) (*per curiam).*  Further, binding Fifth Circuit authority utterly rejects his proposition that *Atkins* is entangled with the Court's *Apprendi*[25]/*Ring*[26] jurisprudence. *See United States v. Webster,* 421 F. 3d 308, 311-12 (5th Cir. 2005) ("Nor does anything in *Atkins* require, as a constitutional matter, the government to prove—again, by any standard, much less beyond a reasonable doubt—that a capital defendant is not mentally retarded."); *see also In re Johnson,* 334 F.3d 403, 405 (5th Cir. 2003) ("[N]either *Apprendi* and *Ring* nor *Atkins* renders the absence of mental retardation the functional equivalent of an element of capital murder which the state must prove beyond a reasonable doubt.").  The Court of

---

[25]  *Apprendi v. New Jersey,* 530 U.S. 466 (2000).

[26]  *Ring v. Arizona,* 536 U.S. 584 (2002).

Criminal Appeals has also noted that, "the majority of states which have provided a statutory exemption from capital punishment for the mentally retarded have made the finding of mental retardation a matter for the trial judge as opposed to the jury." *Ex parte Briseño,* 135 S.W.3d 1, 10 (Tex. Crim. App. 2004). Thus, clearly-established law and binding precedent forecloses Ibarra's claim.

## XIII. Ibarra's Claim that the State Violated His Rights under the Vienna Convention on Consular Relations Is Procedurally Barred. Moreover, Even If this Claim Were Not Barred, Ibarra Fails to Show Any Resulting Prejudice. (Ground Eleven)

Ibarra claims that the State violated his rights under the Vienna Convention because he was a citizen of Mexico at the time of his arrest but was allegedly not advised of his right to consult with the Mexican consulate when arrested. Petition at 132-61. Article 36 of the Vienna Convention provides that local authorities must notify all detained foreigners "without delay" of their right to have their consulate informed of their detention. At the request of the national, the authorities must then notify the consulate without delay, facilitate unfettered consular communication and grant consular access to the detainee. Consuls are empowered to arrange for their nationals' legal representation and to provide a wide range of humanitarian and other assistance, with the consent of the detainee. Local laws and regulations must give "full effect" to the rights enshrined in Article 36.

Ibarra has already twice raised claims relating to the violation of his Vienna Convention rights in state court.   Ibarra first raised a Vienna-Convention claim on direct appeal, but the Court of Criminal Appeals found that it was barred for lack of a contemporaneous objection. *Ibarra v. State,* 11 S.W.3d 197.   Ibarra also raised his Vienna-Convention claim in his third state application for a writ of habeas corpus.   The Court of Criminal Appeals dismissed this application as an abuse of the writ pursuant to Texas Code of Criminal Procedure Article 11.071, Section 5.   *Ex parte Ibarra*, Nos. 48,832-02, -03 at "Order."  As a consequence, this claim is procedurally defaulted.  But even if this claim were not procedurally defaulted, no prejudice accrued as a result of Ibarra's lack of consular access.

### A.   Ibarra cannot circumvent the procedural bar because the Vienna Convention and the *Avena* case do not create individually enforceable law in a domestic court.

Ratified treaties are the law of the land on par with federal statutes. *See* U.S. Const. art. VI, cl. 2.  They are construed according to their terms. *See United States v. Alvarez-Machain*, 504 U.S. 655, 663 (1992).  When the terms of a treaty operate without legislative provision, the treaty is self-executing. *See Medellín v. Texas*, 128 S. Ct. 1346, 1356 (2008).  Where a treaty is not self-executing, it can be enforced only pursuant to legislation to carry it into effect. *Id.*

The Optional Protocol to the Vienna Convention provides a venue to resolve disputes arising under the convention. Optional Protocol Concerning the Compulsory Settlement of Disputes to the Vienna Convention (Optional Protocol or Protocol), Apr. 24, 1963, [1970] 21 U.S.T. 325, T.I.A.S. No. 6820. Under the protocol, such disputes lie within the jurisdiction of the International Court of Justice (ICJ). *See Sanchez-Llamas v. Oregon*, 548 U.S. 331, 339 (2006) (citing Optional Protocol, 21 U.S.T. at 326). The ICJ is the principle judicial organ of the United Nations. *Medellín*, 128 S. Ct. at 1353 (citing United Nations Charter, art. 92, 59 Stat. 1051, T.S. No. 993 (1945).) "The ICJ statute—annexed to the U.N. Charter—provides the organizational framework and governing procedures for cases brought before the ICJ." *Id.* at 1353-354 (citing Statute of the International Court of Justice, 59 Stat. 1005, T.S. No. 993 (1945)). Neither the optional protocol nor the ICJ statute is self-executing and neither operates absent legislation as binding federal law. *See id.* at 1357. No such legislation exists. *Id.*

In 2003, Mexico sued the United States on behalf of Mexican citizens who had been sentenced to death without having their national consulate notified. *Case Concerning Avena and Other Mexican Nationals (Mex. v. U.S.A.)*, No. 128, 2004 I.C.J. 12, 2004 WL 2450913 (Mar. 31, 2004) (*Avena*). Ibarra was one of the *Avena* defendants. The ICJ found that the police erred by failing to tell Ibarra

of his notification rights. *Id.* at 59-60. As a remedy, the court said, the United States should require courts to review Ibarra's claim to determine whether the error prejudiced the petitioner "in the process of administration of criminal justice." *Id.* at 60.

However, as explained above, the ICJ's *Avena* decision is not binding domestic law. *Medellín*, 128 S. Ct. at 1357. Absent legislation, an ICJ order requiring review and consideration is binding on neither a Texas nor a federal court. *Id.* The state court has twice denied relief on Ibarra's Vienna-Convention claim on procedural grounds.[27] *Ibarra,* 11 S.W.3d 197; *Ex parte Ibarra*, Nos. 48,832-02, -03 at "Order." Thus, Ibarra cannot receive relief unless he demonstrates cause and prejudice or a fundamental miscarriage of justice.[28]

---

[27]     While Ibarra presented his Vienna-Convention claim to the state court, he did not present the affidavits upon which he now relies to establish that he was prejudiced by the lack of consular access. Thus, these affidavits are unexhausted as well as procedurally defaulted.

[28]     Ibarra contends that this Court should defer ruling on this claim because of the possibility that the federal or state legislature will act to provide a mechanism for Ibarra and the other *Avena* defendants to contest their claims unfettered by their procedural defaults. Petition at 144-45. However, to this date, both the federal and state legislature have failed to act in this respect, and there is absolutely no guarantee that they will do in the future. The Court should decline to provide Ibarra an open-ended reprieve based on the vain hope that the federal or state legislature may someday provide him relief. Should such legislation ever be enacted in the future, Ibarra can return to the courts to urge his claim at that time. The Supreme Court held as much in *Medellín*, 129 S. Ct. 360 (2008). The Fifth Circuit also rejected a similar argument in *In re Fiero*, 281 Fed. Appx. 263 (2008).

### B.   The Director has not waived these procedural bars.

As noted earlier, Ibarra has never had a review on the merits of his Vienna-Convention claim.  On July 18, 2008, in response to entreaties from then Secretary of State Condoleezza Rice and Attorney General Michael Mukasey, Governor Perry issued a letter acknowledging the "concerns from a federal standpoint about the importance of international law" and stating his belief that the "international obligation" to comply with *Avena* is properly a matter within the province of the federal executive branch and Congress.  Petitioner's Exhibit 25.  Nevertheless, Governor Perry further stated that the "if any individual under Texas custody and subject to *Avena* has not previously received a judicial determination of his claim of prejudice and seeks such review in a future federal habeas proceeding, the State of Texas will ask the reviewing court to address the claim of prejudice on the merits."  *Id.*   Based on Governor Perry's pronouncement, Ibarra asserts that the State has agreed to waive the procedural default, and this Court should conduct a merits review of his claim.  Petition at 147.

However, Ibarra is only partially correct.  The State has indeed agreed to invite federal courts to provide a prejudice review for any *Avena* defendant who had not previously had such a review.  And in light of Ibarra never having such a review, the Director will ask this Court to conduct one now.  However,

Governer Perry's letter never waived the procedural bar, and the Director continues to rely on it now.

### C. Nevertheless, should this Court conduct a harm analysis, it would not find Ibarra entitled to relief.

In the instant case, if the Court were to conduct a prejudice analysis, it would find no harm arising from Ibarra's lack of consular access. *See, e.g., Leal v. Quarterman*, No. SA-07-CA-214-RF, 2007 WL 4521519 (W.D. Tex. Dec. 17, 2007) (unpublished). Even had the consulate been notified "without delay" after Ibarra's arrest, the consulate's aid would not have changed the trial's outcome. *See, e.g., Leal,* 2007 WL 4521519 at *10.

In fact, Ibarra has had access to the consulate's assistance *since the day after he was sentenced to death.* Petition at 132; 2 CR 325. Thus, while Ibarra may not have had access to consular assistance before and during trial, he has had access at all times and in all stages of litigation since then. This access has not helped him. For instance, Ibarra could have raised his Vienna-Convention claim in conjunction with an ineffective-assistance-of-counsel claim during Ibarra's first state habeas proceeding. Had he done so, the state court could have considered it—and all the affidavits provided by Ibarra in these proceedings—without regard to any procedural default. However, it does not

appear that Mexico took an active interest in the case until federal habeas proceedings began.[29]  Petition at 134; Petitioner's Exhibit 8.

And even if this Court assumes that the evidence of personal background offered by Ibarra in these habeas proceedings reflects the evidence that could have been generated with more timely consular notification, the Court can determine that the evidence would not have altered the punishment phase's outcome.[30]  To begin, the Director notes again that these affidavits are after-the-fact and presented by family members, friends, and teachers of Ibarra who presumably have an interest in seeing him saved from the death penalty.  The State has never had any opportunity to provide rebuttal evidence or cross-examine these witnesses regarding their statements, and the evidentiary weight

---

[29]  Ibarra asserts ineffective assistance of state habeas counsel as an excuse for his failure to utilize Mexican assistance at that time.  However, that does not explain why Ibarra failed to procure and submit the affidavits supporting his claim to the state court in his third application.  *See generally* SHCR-03.  Indeed, it was not until 2008 that Ibarra's supporting affidavits made their first appearance—over ten years after the Mexican consulate's notification of Ibarra's predicament.  SHCR-04 at 59.

[30]  To the extent that Ibarra contends that the lack of consular notification prejudiced Ibarra at guilt-innocence, the Director notes in rebuttal that the evidence against him was overwhelming.  Testimony revealed that Ibarra had access to the exact type of wire used to murder Maria de la Paz Zuniga.  Various witnesses described Ibarra and his unusually-painted vehicle present by the Maria de la Paz Zuniga's home the morning of the murder.  Maria de la Paz Zuniga had skin and blood under her fingernails, and upon arrest Ibarra had what appeared to be fresh scratch wounds on his face and chest.  Finally and most importantly, tests established that Ibarra's DNA matched that of sperm recovered from Maria de la Paz Zuniga and her clothing.

of their statement must be discounted accordingly.   Furthermore, as explained in connection to Ibarra's *Wiggins* claim, the State's case against Ibarra at punishment was both compelling and disturbing.  Ibarra's nephew testified for the State that Ibarra had twice anally raped him when he was eight years old, threatened to kill him if he told anyone, forced Rafael  to "masturbate" him in the shower, and later tried to force him to "grab [Ibarra's] penis." 45 RR 1547-56. Olga Gandera, Ibarra's sister-in-law, testified that his reputation for truth and veracity was bad and that his reputation for sexually inappropriate behavior was also bad.  *Id.* at 1573-578, 1585.  She also testified to circumstances suggesting that Ibarra had sexually abused her own son, Peter.  *Id.* at 1582-583.  Tanya Diaz testified that Ibarra had touched her inappropriately when she was eleven years old.  46 RR 1673-674.  Maria Luna Diaz, Tanya's mother, testified she confronted Ibarra about the way he had treated Tanya, and he reacted by arguing and beating her.  *Id.* at 1654, 1656, 1674, 1715.  Maria Luna also testified to several violent and sexually assaultive incidents with Ibarra in 1986 and 1987.  *Id.* at 1685-691, 1709.  The State also elicited testimony from Ibarra's wife testified that Ibarra had severely beaten her on several occasions, including while she was pregnant.  47 RR 1791-792.

The State also introduced certified copies of Ibarra's prior convictions for unlawfully carrying a weapon, and a judgment of probation for driving while

intoxicated.  46 RR at 1667.  The State then presented multiple witnesses to show that Ibarra did not behave while incarcerated.  Dr. Coons, a psychiatrist, opined that an offender with Ibarra's history and sexual proclivities would constitute a continuing threat to society.  *Id.* at 1734-736, 1752-753.

With respect to the substance of Ibarra's affidavits, Ibarra claims that the personal background presented would have alerted the jury to the following themes.  But the jury was loosely aware of Ibarra's difficult upbringing by the testimony of his sister.  His sister testified that she and Ibarra was part of a family of eleven brothers and sisters.  47 RR 1764.  Her family "worked on the land" and their house was very "humble."  *Id.* at 1765.  Their father had to work hard to ensure that they had enough to eat.  *Id.* at 1765.  As for the issue of mental retardation, Ibarra has failed to carry his burden and the doctor that examined him at the time of trial stated that he was not mentally retarded. *See* Section XI, *supra.*  The additional evidence, therefore, would not have altered the punishment phase's outcome.

In sum, Ibarra does not show that any presumed Vienna Convention violation led to harm.  *See Avena*, 2004 I.C.J. at 60.  Any relief on this claim must be denied.

## CONCLUSION

For the foregoing reasons, Ibarra's amended petition for writ of habeas corpus should be denied.

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

ANDREW WEBER
First Assistant Attorney General

ERIC J.R. NICHOLS
Deputy Attorney General
for Criminal Justice

EDWARD L. MARSHALL
Chief, Postconviction
Litigation Division


  /s/  Stephen M. Hoffman    

\* Attorney-in-charge                         \*STEPHEN M. HOFFMAN
Assistant Attorney General
Texas Bar No. 24048978
P. O. Box 12548, Capitol Station
Austin, Texas   78711
Tel:  (512) 936-1400
Fax: (512) 320-8132
Stephen.Hoffman@oag.state.tx.us

ATTORNEYS FOR RESPONDENT

-107-

## CERTIFICATE OF SERVICE

I do hereby certify that on June 6, 2009, I electronically filed the foregoing pleading with the Clerk of the Court for the U.S. District Court, Western District of Texas, using the electronic case-filing system of the Court.  The electronic case-filing system sent a "Notice of Electronic Filing" to the following attorneys of record, who consented in writing to accept this Notice as service of this document by electronic means :

Russell David Hunt, Jr.
Attorney at Law
811 Nueces Street
Austin, Texas 78701
(512) 930-0860


  /s/  Stephen M. Hoffman
STEPHEN HOFFMAN
Assistant Attorney General