# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS, WACO DIVISION

_____

| | |
|---|---|
| **RAMIRO RUBI IBARRA** § | |
| § | |
| **Petitioner,** § | |
| § | |
| **vs.** § | **HABEAS CORPUS** |
| § | |
| **JANIE COCKRELL, Director,** § | **NO.  02-CV-52** |
| **Texas Department of Criminal** § | |
| **Justice, Institutional Division** § | |
| § | |
| **Respondent.** § | |

_____

## PETITIONER'S REPLY TO RESPONDENT QUARTERMAN'S ANSWER

## THIS IS A CAPITAL CASE

Russell D. Hunt, Jr.,
Attorney for Petitioner
310 South Austin Avenue
Austin, Texas 78626
(512) 930-0860
(512) 857-0746 Facsimile
Texas Bar # 00790937

Naomi E. Terr
Attorney for Petitioner
P.O. Box 421398
Houston, TX 77242
(713) 782-7024
(713) 782-7026 Facsimile
Texas Bar # 24033379

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

I.      RELEVANT PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     RESPONDENT IS IN ERROR IN ASSERTING THAT SIX CLAIMS SET FORTH IN
        MR. IBARRA'S PETITION ARE UNEXHAUSTED AND THUS DEFAULTED.. . . . 1

III.    CLAIM EIGHT: INEFFECTIVE ASSISTANCE OF COUNSEL AT THE
        PUNISHMENT PHASE OF TRIAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
        A.      The Texas Court's Dismissal of this Claim was Not Clearly
                Independent of Federal Law  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        B.      Trial Counsel's Performance was Deficient  . . . . . . . . . . . . . . . . . . . . . . . . . 10

        C.      Counsel's Deficient Performance Prejudiced Mr. Ibarra . . . . . . . . . . . . . . . . . 11

IV.     CLAIM NINE:  MR. IBARRA IS A PERSON WITH MENTAL RETARDATION
        AND THUS EXEMPT FROM EXECUTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
        A.      Mr. Ibarra's Atkins Claim is Fully Exhausted . . . . . . . . . . . . . . . . . . . . . . . . 18

        B.      If the Court Should Conclude That Mr. Ibarra Failed to Exhaust the
                Available State-court Remedies, it Should Excuse Exhaustion Because
                Circumstances Rendered the State Corrective Process Ineffective to
                Protect His Federal Constitutional Rights.  . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

        C.      Mr. Ibarra is a Person with Mental Retardation  . . . . . . . . . . . . . . . . . . . . . . . 34

V.      CLAIM ELEVEN: MR. IBARRA'S RIGHTS UNDER ARTICLE 36 OF THE
        VIENNA CONVENTION ON CONSULAR RELATIONS WERE VIOLATED.  . . . . 42
        A.      Neither the Legal nor the Factual Bases of this Claim are
                Procedurally Defaulted  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

        B.      Petitioner is Entitled to a Merits Determination of his
                Vienna Convention Claims  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

        C.      Mr. Ibarra was Harmed by the Denial of his Vienna
                Convention Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45


CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

# TABLE OF AUTHORITIES

## UNITED STATES CONSTITUTION

United States Constitution, Eighth Amendment . . . . . . . . . . . . . . . . . 2, 21-24, 27, 28, 30, 33, 35
United States Constitution, Fifth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
United States Constitution, Fourteenth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
United States Constitution, Sixth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 31, 43

## FEDERAL STATUTE

Title 28 U.S.C. § 2254 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 28, 34

## FEDERAL CASES

*Adams v. Texas*, 448 U.S. 38 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
*Aguilar v. Dretke*, 428 F.3d 526 (5th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
*Ake v. Oklahoma*, 470 U.S. 68 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 33
*Anderson v. Johnson*, 338 F.3d 382, 387 n.8 (5th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . 21
*Atkins v. Virginia*, 536 U.S. 304 (June 20, 2002) . . . . . . . . . . . . . 4, 7, 8, 18-26, 28, 30-36, 41
*Baldwin v. Reese*, 541 U.S. 27 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21
*Brown v. Estelle*, 530 F.2d 1280 (5th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
*Carter v. Estelle*, 677 F.2d 427 (5th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28
*Carter v. Procunier*, 755 F.2d 1126 (5th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985) . . . . . . . . . . . . . . . . . . . . . . . 37
*Coleman v. Thompson*, 501 U.S. 722 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 7, 8, 44
*Duckworth v. Serrano*, 454 U.S. 1 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
*Estelle v. Smith*, 451 U.S. 454 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
*Ex parte Campbell*, 226 S.W.3d 418 (Tex.Crim.App. 2007) . . . . . . . . . . . . . . . . . . . . . 3, 4, 6
*Ex parte Royall*, 117 U.S. 241, 251 (1886) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
*Ford v. Wainwright*, 477 U.S. 399 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29, 31
*Gideon v. Wainwright*, 372 U.S. 335 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
*Hughes v. Dretke*, No. 4:01cv04073 (S.D. Texas) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
*Hughes v. Quarterman*, 530 F.3d 336 (5th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
*Leal Garcia v. Quarterman*, 573 F.3d 214 (5th Cir 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
*Medellin v. Texas*, _ U.S. _, 128 S.Ct. 1346 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 44, 45
*Michigan v.* Long, 463 U.S. 1032 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 10
*Morris v. Dretke*, 413 F.3d 484 (5th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 22-25
*Panetti v. Quarterman*, 127 S.Ct. 2842 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28-30
*Penry v. Lynaugh*, 492 U.S. 302 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 30, 43
*Picard v. Connor*, 404 U.S. 270, 275 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
*Ransom v. Johnson*, 126 F.3d 716 (5th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
*Rivera v. Quarterman*, 505 F.3d 349 (5th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . 7, 28, 33
*Rompilla v. Beard*, 545 U.S. 374 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13, 14, 17, 46
*Ruiz v. Quarterman*, 504 F.3d 523 (5th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 8, 9
*Vasquez v. Hillery*, 474 U.S. 254 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 44
*Washington v. Texas*, 388 U.S. 14 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Wiggins v. Smith*, 539 U.S. 510 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13-15
*Williams v. Collins*, 989 F.2d 841 (5th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
*Williams v. Taylor*, 529 U.S. 362 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13, 16, 17
*Wood v. Quarterman*, 491 F.3d 196 (5th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

### STATE STATUTES

Texas Code of Criminal Procedure, Article 11.071 . . . . . . . . . . . . . . . . . 4-10, 26, 27, 32, 42-44
Texas Code of Criminal Procedure, Section 37.071 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

### STATE CASES

*Black v. State*, 816 S.W.2d 350 (Tex. Crim. App. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
*Cuevas v. State*, 641 S.W.2d 558 (Tex. Crim. App.1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
*Ex parte Blue*, 230 S.W.3d 151 (Tex. Crim. App. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 25
*Ex parte Brooks*, 219 S.W.3d 396 (Tex. Crim. App. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
*Ex parte Chambers*, 688 S.W.2d 483 (Tex. Crim. App. 1984) . . . . . . . . . . . . . . . . . . . . . . . 43
*Ex parte Gonzales*, S.W.3d , 2006 WL 2956225
      (Tex. Crim. App. Oct. 18, 2006) (slip op) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
*Ex parte Hearn*, 418 F.3d 444, 445447 (5th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
*Ex parte Ibarra*, 2008 WL 4417283 (Tex. Crim. App. 2008) . . . . . . . . . . . . . . . . . . . . 9, 34, 43
*Ex parte Ibarra*, No. 48,83202, slip op. (Tex. Crim. App. Nov. 10, 2004) . . . . . . . . . . . . . . . 24
*Ex parte Ibarra*, Trial Court Cause No. 1996634CB,
      54th Judicial District Court of McLennan County . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20
*Ex parte Lewis*, 223 S.W.3d 372 (Tex. Crim. App. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
*Ex parte Medellin*, 223 S.W.3d 315 (Tex. Crim. App. 2006) . . . . . . . . . . . . . . 5, 6, 9, 42, 44
*Ex parte Morris*, No. WR-43,550-03 (Tex. Crim. App. Mar. 4, 2009) . . . . . . . . . . 4, 25, 26, 33
*Ex parte Reed*, No. WR-50,961-06 (Tex. Crim. App. July 1,2009) . . . . . . . . . . . . . . . . . . . . . . 5
*Ex parte Ruiz*, 2007 WL 2011023 (Tex. Crim. App. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
*Ex parte Turner*, 542 S.W.2d 187 (Tex. Crim. App.1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
*Ibarra v. State*, 11 S.W.3d 189 (Tex. Crim. App. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
*Marquez Burrola* v. State, 157 P.3d 749 (Okla. Crim. App. 2007) . . . . . . . . . . . . . . . . . . . . . 46
*Williams v. Taylor*, 163 F.3d 860 (4th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

### INTERNATIONAL COURT OF JUSTICE

*Avena and Other Mexican Nationals* (Mex. v. U.S.), 2004 I.C.J. 128 (Mar. 31) . . . . . . 42, 44, 46

### OTHER RESOURCES

American Association on Mental Retardation: Mental Retadation: Definition, Classification, and
Systems of Support (10th ed. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 42
American Psychiatric Association, *Manual of Diagnosis and Professional Practice in Mental
Retardation* (John W. Jacobson and James A. Mulick eds., 1996) . . . . . . . . . . . . . . . . . . . 38, 40
Angeline M. Jacobs, *et. al.*, HANDBOOK FOR JOB PLACEMENT OF MENTALLY RETARDED
WORKERS: TRAINING, OPPORTUNITIES, AND CAREER AREAS (Eileen M. Oullette ed., Garland
STPM Press 3d ed. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1994) . . . . . . . . . . . . . . . 37, 39

I. Hall, *et. al.*, *Social Outcomes in Adulthood of Children with Intellectual Impairment: Evidence from a Birth Cohort*, 49 J. INTELL. DISABILITY RES. 171 (2005) . . . . . . . . . . . . . . . . . . . . . . . . 40

*Presidential Determination of February 28, 2005* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 44

COMES NOW PETITIONER, RAMIRO RUBI IBARRA, by and through his attorney of record, and submits this Reply to Respondent Quarterman's Answer with Brief in Support (hereinafter "Respondent's Answer"), and in support states as follows:

## I.  RELEVANT PROCEDURAL HISTORY

A full procedural history is set forth in Mr. Ibarra's Petition for Writ of Habeas Corpus (hereinafter "Federal Petition"), filed on Jan. 5, 2009.  Respondent filed their Answer on June 6, 2009.  With one unopposed extension request, Petitioner now timely files this Reply.

In this Reply, Petitioner only addresses arguments raised in Respondent's Answer and relies on his previous pleadings to respond to Respondent's earlier arguments, as well as those in Respondent's Answer that do not call for additional briefing.

## II.     RESPONDENT IS IN ERROR IN ASSERTING THAT SIX CLAIMS SET FORTH IN MR. IBARRA'S PETITION ARE UNEXHAUSTED AND THUS DEFAULTED.

Respondent contends that Claims one, five, six, eight, ten, and eleven are unexhausted, and, thus procedurally defaulted.  These contentions are not supported by the record or the law.

This contention with respect to claims one, five, and six are addressed here; the contention with respect to claims eight, ten, and eleven are addressed in the context of the discussion of the claims themselves, *infra*.

Claim One (failure to suppress search warrant) was presented in the direct appeal as Point of Error One, and the Texas Court of Criminal Appeals (hereinafter "CCA") addressed the claim on the merits. *See Ibarra v. State*, 11 S.W.3d 189, 191193 (Tex. Crim. App. 1999).

Claim Five (admission of statements victim made to her brother) was presented in the direct appeal as Point of Error Seven, and the CCA addressed the claim on the merits. *See Ibarra v. State*, 11 S.W.3d at 196197 (Tex. Crim. App. 1999). Mr. Ibarra concedes, however, that the 8th and 14th Amendments were not presented as bases for the claim in the state court.

Claim Six (admission of testimony regarding defendant's reputation for sexually inappropriate behavior) was presented in the direct appeal as Point of Error Nine, and the CCA addressed the claim on the merits. *See Ibarra v. State*, 11 S.W.3d at 197198 (Tex. Crim. App. 1999).

## III.   CLAIM EIGHT: INEFFECTIVE ASSISTANCE OF COUNSEL AT THE PUNISHMENT PHASE OF TRIAL.

Respondent asserts that Mr. Ibarra's claim of ineffective assistance of counsel is procedurally defaulted. Many of Respondent's contentions are already addressed in Mr. Ibarra's Federal Petition, which sets forth the case law making clear that the state court's dismissal of Mr. Ibarra's successor petition raising his ineffectiveness claim was not based on independent and adequate state law grounds. See Federal Petition pp.97104. Respondent's contentions to the contrary as set forth in his Answer are in error.

A.    **The Texas Court's Dismissal of this Claim was Not Clearly Independent of Federal Law**

Respondent argues that the presumption of nonindependence that arises from an ambiguous state court dismissal only applies where it "fairly appears" that the "relevant state court decision" rested on federal law (Answer at 69), and, second, that the CCA only reviews the federal merits in certain limited situations. (Answer at 71).  These assertions are incorrect.

As previously briefed, *Michigan v.* Long, 463 U.S. 1032 (1983) established that if the state court fails to state clearly the adequate and independent state law ground for its decision, the federal court must presume the state court decision is ***not*** based upon an independent and adequate state ground.  Respondent attempts to argue that the *Long* presumption does not apply to Mr. Ibarra's case, relying heavily on *Coleman v. Thompson*, 501 U.S. 722 (1991) (Answer at 6869).  Contrary to Respondent's argument, however, *Coleman* did not reject the *Long* presumption in habeas cases.  *Id*. at 73435.  Rather, the *Coleman* court rejected Coleman's plea to expand the presumption to incorporate every case in which a state petitioner presented federal claims to a state court.  The Court refused to do so in a case like Coleman's, in which the state court dismissed based solely on his failure to timely file a notice of appeal.  *Id*. at 740.  Nothing in the *Coleman* order, or the Virginia court's jurisprudence, suggested that a dismissal for failing to timely appeal involved any review of federal constitutional claims.

1.    **The CCA's Incorporation and Application of Federal Law in Section 5.**

The CCA, in contrast to the Virginia courts that formed the backdrop to *Coleman*, has explicitly recognized that the review of a subsequent application necessarily entails review of the federal claims.  *Ex parte Campbell*, 226 S.W.3d 418, 421 (Tex.Crim.App. 2007).  Indeed, it has

recently become clear that federal law is deeply interwoven in the text of the statute, and how the CCA interprets and applies Section 5.  The text of Article 11.071 sections 5(a)(2) and 5(a)(3), for example, both expressly invoke the federal question of whether a federal constitutional violation has been alleged. *See, e.g., Ex parte Blue*, 230 S.W.3d 151, 167-68 (Tex. Crim. App. 2007) ("an adequate threshold showing of [a federal constitutional violation] would meet the criteria of [Section 5(a)(3)]").

In recent cases, the CCA has announced the conditions under which Section 5(a)(l) can be met, importing a consideration of whether a "prima facie" showing of a federal constitutional violation has been alleged. *See Ex parte Campbell*, 226 S.W.3d 418 (Tex. Crim. App. 2007) ("We have interpreted [the language of Section 5] to mean that, to satisfy Art. 11.071, § 5(a), ... the specific facts alleged, if established, would constitute a constitutional violation that would likely require relief from either the conviction or sentence."); *Ex parte Brooks*, 219 S.W.3d 396, 400 (Tex. Crim. App. 2007) ("While Article 11.071, section 5(a)(l) does not state that the application must include facts establishing that the applicant has a prima facie *Atkins* claim, it would be absurd to consider applications in which the applicant does not show that the previously unavailable legal basis applies to his claim.").

Two CCA judges recently called importation of this requirement into Section 5(a) "a judicial gloss we have *de facto* placed upon the statutory authorization of subsequent writs in capital cases, namely, that they must also 'make a prima facie showing of possible merit'" as to the federal claim. *Ex parte Morris*, No. WR-43,550-03 (Tex. Crim. App. Mar. 4, 2009) (Price, J.,

dissenting).[1]  These requirements plainly weave federal law into the state court's Section 5(a) analysis.

An example of the CCA's wholesale incorporation of federal law into the Section 5 analysis can be seen in practice in a recently decided case.  In *Ex parte Reed*, No. WR-50,961-06 (Tex. Crim. App. July 1,2009) (unpublished),[2] the CCA dismissed the applicant's subsequent application raising *Brady* claims as an "abuse of the writ," holding, "[w]e find that this subsequent application fails to satisfy any of the exceptions provided in Article 11.071, § 5."  In the course of arriving at that legal conclusion, however, the CCA determined that "applicant has not shown that "the State violated *Brady* by withholding favorable material evidence" and that "[t]his application ... fails to show a *Brady* violation."  Thus, because Reed failed to "show a *Brady* violation," his application was dismissed pursuant to Section 5.  What is clear is that the CCA considered the merit of Reed's federal claim in the course of dismissing his application as an abuse of the writ.

In another recent case, *Ex parte Medellin*, 223 S.W.3d 315 (Tex. Crim. App. 2006), the CCA expressly resolved important and substantial federal constitutional questions-including (1) whether a particular International Court of Justice decision was binding federal law under the Supremacy Clause, and (2) whether a memorandum issued by the President of the United States violated federal constitutional separation of powers doctrine-in a lengthy order all in the course

---

[1]The dissent written in *Ex parte Morris*. No. WR-43,550-03 (Tex. Crim. App. Mar. 4, 2009), is available online at http://www.cca.courts.state.tx.us/opinions/pdfOpinionInfo2.asp?OpinionID=1804.

[2] *Ex parte Reed*, No. WR-50,961-06 (Tex. Crim. App. July 1, 2009), is available online at http://www.cca.courts.state.tx.us/opinions/pdfopin ioninfo2.asp?opinionid= 18577&filename=wr50,961-06.pdf.

of applying Section 5 to dismiss the application as an abuse of the writ.  *Medellin*, 223 S.W.3d,

at 330-48.[3]

Respondent is also mistaken in arguing that the CCA only reviews the merits of federal

claims in certain situations.  Answer at 7172.  In *Ex parte Campbell*, 226 S.W.3d 418,

421 (Tex.Crim.App. 2007), the CCA plainly stated its analysis of subsequent applications:

> We have interpreted this to mean that, to satisfy Art. 11.071, § 5(a), 1) the factual
> or legal basis for an applicant's current claims must have been unavailable as to
> all of his previous applications; and 2) **the specific facts alleged, if established,**
> **would constitute a constitutional violation that would likely require relief**
> **from either the conviction or sentence**.

*Id*. (internal footnotes omitted; emphasis added).

Respondent additionally asserts, without citation, that ". . . a boilerplate dismissal . . . has

traditionally meant, and continues to mean in state and federal court, that the state court is

refusing review because the factual and legal bases of the claims were previously available and

nothing else."  Respondent's Answer at 70.  This assertion is directly contradicted by the state

and federal cases cited in Mr. Ibarra's Federal Petition.  The CCA has simply never held that the

decision to conduct federal merits review is conditional upon a finding of previous legal or

factual unavailability of the claim.  The CCA could unambiguously make such a finding simply

---

[3] Respondent again cites *Hughes v. Quarterman*, 530 F.3d 336 (5th Cir. 2008) as purported proof that the
CCA's perfunctory orders are independent of federal law.  *Hughes* fails to support Respondent's
argument in Mr. Ibarra' case. First, according to the district court order,Hughes argued that, although
his claims were defaulted, the default should be excused because "his counsel was apparently unaware
of the applicable time limitations governing his ability to seek habeas relief…"  *Hughes v. Dretke,* No.
4:01-cv-04073 (S.D. Texas) at Dkt #34, pp.17-18.  Mr. Ibarra's argument is far different - and it can
hardly be said that the Fifth Circuit rejected Mr. Ibarra' assertions in *Hughes*.  Furthermore, the CCA
dismissed Hughes' subsequent application in state court in 2001, long before the CCA's jurisprudence
explicitly incorporated a federal merits review component.  *See Ruiz v. Quarterman*, 504 F.3d 523,
529 (5th Cir. 2007) (" On April 25, 2007, the CCA decided *Ex parte Campbell*,;4169;4169 which, as we
explained above, held that the Texas procedural bar based on factual unavailability incorporates a
question of federal constitutional law.").

by stating, for example, that it is dismissing because the basis of the claim was previously unavailable, either legally or factually.  Without such a clear and express statement, however, this Court is faced with an ambiguous dismissal and must presume that the dismissal is not independent of federal law.  *See Coleman, supra.*

That the CCA sometimes announces that it is conducting a federal merits review also fails to support Respondent's argument.  Indeed, that the CCA sometimes states the reason for its dismissal is further proof that it can, and should, plainly state the reason for the ruling if it seeks to insulate a purported state procedural bar from federal review.

> **2.      The Fifth Circuit Court of Appeals Recognizes that Section 5, as Interpreted and Applied by the CCA, Incorporates and is Interwoven with Federal Law.**

In years past, many decisions of the Fifth Circuit recognized Texas state court decisions applying Section 5 to constitute dispositions on an independent and adequate state law ground, thereby precluding federal review unless cause and prejudice could be established. *See, e.g., Aguilar v. Dretke*, 428 F.3d 526, 533 (5th Cir. 2005) (citing cases). But in recent years, and as the CCA's jurisprudence has evolved as described, *supra*, the Fifth Circuit has recognized that Section 5 is interwoven with federal law and that the state court's interpretation and application of that provision is therefore not always independent of federal law and is subject to the *Long* presumption.

In *Rivera v. Quarterman*, 505 F.3d 349 (5th Cir. 2007), this Court examined how the CCA applied Section 5(a)(I) in the "legal unavailability" context of an *Atkins* claims.  The Court held that the state court's consideration of whether a "prima facie" showing of the federal legal claim had been alleged rendered its procedural dismissal not independent of federal law.  *Id.*, 505

F.3d, at 359. This Section 5 requirement was "entangled in federal law in much the same way as Oklahoma's waiver doctrine was in *Ake*; in the *Atkins* context, Texas courts have imported an antecedent showing of "sufficient specific facts" to merit further review, rendering dismissal of such claims [as abuses of the writ] a decision on the merits."' *Id*., quoting *Morris v. Dretke*, 413 F.3d 484,500 (5th Cir. 2005) (Higginbotham, J., concurring). Accordingly, the Court found that "where the threshold a state sets turns on a merits determination of federal law or fails to make clear that it is procedural in nature, that decision is reviewable." *Id*. at 359-60.

It is beyond dispute that this Court is bound by the Fifth Circuit's *Ruiz* decision, discussed at length in Mr. Ibarra's Federal Petition. Respondent's belief that it was wrongly decided does not provide a basis for this Court to reject its reasoning. More importantly, however, Respondent's argument misses the mark. *Ruiz*, in large part, simply reaffirmed the principle that Mr. Ibarra asserts in this Court: a federal court must presume an ambiguous state court order is not adequate and independent and does not preclude federal merits review. Although Respondent attempts to minimize the decision by referring to it as a "twojudge circuit panel majority," *Response* at 18, Judge Benavides, in dissent, provide perhaps the strongest statement supporting Mr. Ibarra' argument. Judge Benavides dissented because of the majority's application of Rule 60(b) but noted:

> A *Coleman* petitioner typically brings his habeas claims to the state courts first. If relief is denied, then the district court may entertain a federal habeas claim unless the state court's judgment was based on adequate and independent state grounds. *Coleman,* 501 U.S. at 73032, 111 S.Ct. 2546. The *Coleman* presumption comes into play when evaluating whether the state court's previous opinion was based on independent state grounds**; it instructs courts to treat any ambiguous state decisional basis as a ruling on the merits, thereby permitting federal review**. *Id.* at 73435, 111 S.Ct. 2546.

*Ruiz*, 504 F.3d at 533 (emphasis added).

Judge Benavides, examining the TCCA's per curium *Ruiz* dismissal,[1] concluded:

I agree with the majority that the TCCA's "decisional basis here is uncertain," **and if we were reviewing that decision we would be required to treat it as merits based and, accordingly, reach the merits ourselves.**

*Id.* at 533 (emphasis added).

Lastly, it is worth noting that after *Ruiz* was decided, Respondent sought rehearing *en banc* before the Fifth Circuit arguing that the panel decision was erroneous.  The Fifth Circuit denied *en banc* rehearing on June 6, 2008 and Respondent did not seek *certiorari* review.

The Supreme Court itself no longer treats Section 5 as an independent and adequate state ground.  Following the CCA's Section 5 dismissal in *Ex parte Medellin*, described *supra*, the Supreme Court granted certiorari and decided the federal questions without so much as a comment on the Section 5 dismissal-demonstrating quite clearly that Section 5 is no longer independent.  *See Medellin v. Texas*, _ U.S. _, 128 S.Ct. 1346 (2008).  Had Section 5 been an independent and

---

[1] The pertinent language in the *Ruiz* dismissal was virtually identical to the dismissal in Mr. Ibarra' case:

We have reviewed these claims and find that they do not meet the requirements for consideration of subsequent claims under Article 11.071, Section 5. This application is dismissed as an abuse of the writ and the motion for stay of execution is denied.

*Ex parte Ruiz*, 2007 WL 2011023 (Tex. Crim. App. 2007).

We have reviewed Applicant's claim for relief and find that it does not meet the requirements for consideration of subsequent claims under Article 11.071, Section 5.  Therefore, we dismiss this subsequent application.

*Ex parte Ibarra*, 2008 WL 4417283 (Tex. Crim. App. 2008).

adequate state ground, the Supreme Court would have lacked jurisdiction to hear and decide the case.

Because Section 5 is interwoven with federal law, the *Long* presumption applies, and federal review is not precluded unless the state court clearly and expressly disclaims reliance on the federal components of Section 5.

Mr. Ibarra fully and fairly presented his *Wiggins* claim to the state court, which dismissed it in a perfunctory manner. Faced with the cursory order in Mr. Ibarra's case, this Court cannot speculate as to the basis of the state court's dismissal and must treat it as intertwined with federal law. Because the CCA's order does not clearly and expressly rely on a state procedural basis, this Court must review the merits of Mr. Ibarra's claim of ineffective assistance of counsel at the punishment phase of his capital trial.

### B.       Trial Counsel's Performance was Deficient.

Respondent argues that "a proper evaluation of these allegations is difficult due to Ibarra's procedural default" and "had the state court conducted [a] hearing, presumably there would have been affidavits or testimony from counsel detailing the extent of their investigation and the strategic considerations that guided it." These contentions are profoundly ironic. Respondent's assertions are based on the fact that this claim was presented in a successive state petition. That petition was filed only after the state of Texas violated Mr. Ibarra's rights under the Vienna Convention, and appointed him a state habeas lawyer who filed a five page habeas petition raising one record claim, having failed to conduct a single hour of investigation into this claim or any other. For Respondent to lament the difficulty of an evaluation, or the lack of an evidentiary hearing in light of these facts is ironic at best.

Mr. Ibarra agrees that an evidentiary hearing is warranted.  After bemoaning the results of the lack of one; perhaps Respondent will join his request.

Nonetheless, the evidence Mr. Ibarra has presented to this Court provides ample basis for concluding that his right to effective assistance of counsel at the punishment phase of his trial was violated.  The affidavits submitted in conjunction with his federal petition reveal that trial counsel failed to conduct any meaningful investigation in preparation for the punishment phase of trial.[2]  Every one of them verifies that counsel either never met with them, never contacted them, or, if they did meet, only did so very briefly.  Contrary to Respondent's contentions, this is evidence of the "actual scope of counsel's investigation"  Answer at 80  as it reveals and documents that there was no punishment phase investigation.   The two family members that did testify were utterly unprepared, as counsel had failed to meet with them, and thus unable to present the full weight of the compelling evidence they did have to offer.  Counsel's failure to conduct any reasonable investigation is well documented by the affidavits Mr. Ibarra offers in this Court; no affidavit by counsel could change the well founded conclusion: counsel's failed to perform the reasonable investigation mandated by the 6th Amendment, and the U.S. Supreme Court.[3]

---

[2]Respondent attempts to point to pretrial motions as proof that an investigation was undertaken. Answer at 79.  However, as detailed in Mr. Ibarra's Federal Petition at 74, those motions do not comprise the proof Respondent wishes for, and only serve as additional evidence of counsel's deficiencies.  *Id.*.

[3]Respondent further faults Mr. Ibarra for not presenting his "own recollections," and argues that "the reasonableness of an investigation depends in large part on the information supplied by the defendant," citing *Ransom v. Johnson*, 126 F.3d 716 (5th Cir. 1997).  Answer at 78, fn. 18.  As Respondent well knows, it is not incumbent on the defendant to provide such evidence - tho it would be interesting to read the easily anticipated arguments about credibility.  Moreover, none of the recent Supreme Court cases examining punishment phase ineffectiveness claims (*Williams v. Taylor*, 529 U.S. 362 (2000); *Wiggins v. Smith*, 539 U.S. 510 (2003); and *Rompilla v. Beard*, 545 U.S. 374 (2005)) consider the presence - or absence - of information from the defendant in making their reasonableness evaluation. "Strategic choices

### C.      Counsel's Deficient Performance Prejudiced Mr. Ibarra

Respondent's two primary contentions are that (1) Mr. Ibarra's evidence "does not compare to the mitigating evidence the Supreme Court has found to be prejudicially omitted in other cases" and (2) when weighed against the aggravating evidence, the scales simply cannot balance in Mr. Ibarra's favor.  Both arguments are misguided, and belied by Supreme Court case law.

### 1.      The Appropriate Prejudice Analysis Must Take into Account the Particular Inquiry made by Texas Capital Juries.

As this Court is aware, Texas law governing the punishment phase of a capital trial does not call for a strict "balancing" of the mitigation evidence against the aggravating factors in a given case.  At the time of Mr. Ibarra's trial, a Texas jury had to answer the following special issue related to mitigation evidence:

> Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

TEX. CRIM. PROC. CODE ANN. art. 37.071 § 2(e) (Vernon 1997). This statute, rather than mandating a simple weighing of the aggravating verses mitigating factors in the case, requires a jury to consider how the mitigating evidence impacts the personal moral culpability of the defendant.  Thus, applying the Texas statute (and in accordance with *Penry v. Lynaugh*, 492 U.S. 302 (1989) and its progeny), an appellate court deciding the question of whether trial counsel's

---

made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."  *Wiggins*, 539 U.S. at 521.  *See also Rompilla*, 545 U.S. 374 (2005); *Wood v. Quarterman*, 491 F.3d 196 (5th Cir. 2007).  Of course, *Ransom* predates the earliest of these by three years.

failure to investigate mitigation evidence was prejudicial must consider the extent that the omitted mitigation evidence would have informed the jury's appraisal of the petitioner's personal moral culpability, notwithstanding the severity of the aggravating evidence. *See Rompilla v. Beard,* 545 U.S. 374, 393 (2005); *Penry,* 492 U.S. at 31928.

In essence, Texas law requiring imposition of a life sentence if the jury is unable to unanimously agree on the answers to the special issues means that in a case in which the effect of trial counsel's errors is such that there is a reasonable probability it could have caused just *one juror* to be unable to answer special issue one "yes" or special issue two "no," then the prejudice burden has been satisfied.  *See Wiggins*, 539 U.S. at 537 (describing prejudice standard as "reasonable probability that at least one juror would have struck a different balance" in light of Maryland's requirement that the jury verdict supporting death be unanimous and imposition of life sentence in any other scenario).

The Supreme Court's *Williams* opinion is instructive for Texas cases.  In that case, this Court considered whether Williams was prejudiced during the punishment phase of his Virginia capital murder trial by his trial counsel's failure to discover and present relevant evidence. Although not identical, the standards governing the Virginia capital sentencing scheme are similar to Texas'.  At the time of Williams' capital murder trial, Virginia law required the jury's verdict to be in one of the following forms:

For a death sentence:

> We, the jury, on the issue joined, having found the defendant guilty of (here set out statutory language of the offense charged) and that (after consideration of his prior history that there is a probability that he would commit criminal acts of violence that would constitute a continuing serious threat to society) or his conduct in committing the offense is outrageously or wantonly vile, horrible or inhuman in that it involved (torture) (depravity of mind) (aggravated battery to

the victim), and having considered the evidence in mitigation of the offense, unanimously fix his punishment at death.

Va Code § 19.2264.4.  For a life sentence:

> We, the jury, on the issue joined, having found the defendant guilty of (here set out statutory language of the offense charged) and having considered all of the evidence in aggravation and mitigation of such offense, fix his punishment at imprisonment for life.

*Id*.

Unlike Texas, Virginia jurors were not given specific questions to which they must give yes or no answers.  Like Texas, however, Virginia did *not* require jurors to weigh aggravating factors against mitigating factors in order to make a decision, instead requiring them simply to find one of two aggravating factors and then to consider the mitigating evidence before making a decision.  Consequently, the Supreme Court was able to conclude that Williams suffered prejudice ***even while conceding that the undiscovered mitigating evidence "may not have overcome a finding of future dangerousness,"*** because that mitigating evidence "might well have influenced the jury's appraisal of his moral culpability."  Because Texas is like Virginia in that it does not require the jury to find one set of factors to *outweigh* another set, this standard is appropriate to review allegations of ineffective assistance of counsel in the punishment phase of Texas capital cases.  *See also Wiggins*, 539 U.S. at 538 (2003) ("available mitigating evidence, taken as a whole, might well have influenced the jury's appraisal of Wiggins' moral culpability" (internal quotations omitted)); *Rompilla*, 545 U.S. at 393  ("undiscovered mitigating evidence, taken as a whole, might well have influenced the jury's appraisal of Rompilla's culpability" (internal quotations and brackets omitted)).

The Texas Court of Criminal Appeals recently affirmed the above framework for analyzing the prejudice prong of an ineffective assistance claim in the punishment phase of a Texas capital trial in *Ex parte Gonzales*, S.W.3d , 2006 WL 2956225 (Tex. Crim. App. Oct. 18, 2006) (slip op). There, the Court wrote:

> Second, the applicant must show that counsel's performance prejudiced his defense at trial. In order to satisfy this prong, an applicant must show there was a reasonable probability that, absent the errors, the jury would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death. Texas' capital sentencing scheme does not involve the direct balancing of aggravating and mitigating circumstances. It asks the jury to answer a mitigation issue. We have adapted the Supreme Court's prejudice test to require a showing that there is a reasonable probability that, absent the errors, the jury would have answered the mitigation issue differently. "A reasonable probability is a probability sufficient to undermine confidence in the outcome."

*Gonzales*, 2006 WL 2956225 at *1 (footnotes omitted). In making the prejudice inquiry, the Court "consider[s] the totality of the evidence, 'both that adduced at trial, and the evidence adduced in the habeas proceeding.'" *Id*. at *4 (citing *Wiggins*, 539 U.S. at 534). The Court determined that Gonzales had suffered prejudice from his counsel's failure to locate and present mitigating evidence because "the applicant's mitigating evidence, taken as a whole, 'might well have influenced the jury's appraisal' of the applicant's moral culpability." *Id*. at *4 (quoting and citing *Wiggins*, 539 U.S. at 538).

### 2. Comparisons to the Mitigating Evidence in Other Cases is Inappropriate and Unhelpful

Comparisons between the nature, quality or extent of undiscovered mitigating evidence *as between* cases is of limited value for assessing prejudice in an individual case. Although the evidence discovered postconviction reveals that Mr. Ibarra "has the kind of troubled history [the Supreme Court] has declared relevant to assessing a defendant's moral culpability," *Wiggins*,

539 U.S. at 535, various case specific factors affect the prejudice analysis that make comparisons between cases—especially cases arising in different states—extraordinarily difficult.

Even the most compelling evidence of an abusive or disadvantageous childhood may not warrant relief if substantially similar evidence was presented at the trial.  By contrast, less dramatic mitigating evidence may *still* warrant a finding of prejudice if nothing at all was presented to the jury at the trial.  Consequently, the most important factor is generally not whether the mitigating evidence brought forth in postconviction is as compelling or dramatic as some other case in which relief was granted, but how that new information might have affected the underlying trial in light of all the evidence presented there.  This case presents the easy situation in which nexttonothing was presented at trial and significant mitigating evidence was presented in postconviction.

Likewise, the fact that Mr. Ibarra was convicted of an aggravated crime does not out of hand preclude relief.  In the *Williams* case, Mr. Williams was convicted of murder for beating a drunken, helpless man in the chest with a mattock (a tool for digging up stumps), apparently rendering the victim unable to breathe and thereby causing his death, after which Williams took three dollars from the man's wallet and walked out of the house as the victim lay dying, gasping for breath.  *Williams*, 529 U.S. at 367368.   In the months following the capital murder for which he was ultimately condemned to death, Williams "savagely beat an elderly woman, stole two cars, set fire to a home, stabbed a man during a robbery, set fire to the city jail, and confessed to having strong urges to choke other inmates and to break a fellow prisoner's jaw."  *See Williams v. Taylor*, 163 F.3d 860, 868 (4th Cir. 1998).  The elderly woman he assaulted barely survived, and at the time of Williams' sentencing was in a "vegetative state" and not expected to recover.

*Williams*, 529 U.S. at 368.  Williams also had prior convictions for armed robbery, burglary, and grand larceny.  *Id.*   In short, Williams both committed a highly aggravated (senseless, violent) crime and then went on a violent crime spree, repeatedly attacking innocent persons.  He acted alone in each incident.  He had a serious prior criminal history including a conviction for a violent crime.

The Supreme Court found that Williams had established "prejudice" under *Strickland*, despite these highly aggravating facts.   The Court emphasized the potential for mitigating evidence to "influence[] the jury's appraisal of the defendant's moral culpability," and thereby persuade the jury to impose a life sentence even where the jurors were also certain to find the existence of serious aggravating factors like future dangerousness.  *Williams*, 529 U.S. at 398 ("Mitigating evidence unrelated to dangerousness may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's deatheligibility case.").

### 3.     The Scales Tip in Mr. Ibarra's Favor

Mr. Ibarra's case is, like others, unique.  Whether or not the mitigating evidence that was never presented on his behalf "rises" to the "level" of evidence introduced in *Williams*, *Wiggins*, and *Rompilla*, is not the question, as that is not the test countenanced by the Supreme Court. Moreover, the evidence must be considered not only in its totality, but when placed next to the mitigating evidence that was presented – which, in this case, was near nothing.

The mitigating evidence that could have but was not presented by Mr. Ibarra's trial counsel "might well have influenced the jury's appraisal of [Mr. Ibarra's] moral culpability. *Rompilla*, 545 U.S. at 393.  This is particularly so when the unpresented mitigating evidence  a troubled and unstable childhood, severe poverty, neglect, and abuse  and empathy in kindness in

the face of those circumstances is viewed in light of the fact that almost no mitigating evidence was presented at trial. When the totality of the mitigating evidence is considered and weighed against the totality of the aggravating evidence, there is a reasonable probability that at least one juror would have found sufficient mitigating circumstances to warrant a sentence of life rather than death. *See* Federal Petition at 9297.

## IV.   CLAIM NINE: MR. IBARRA IS A PERSON WITH MENTAL RETARDATION AND THUS EXEMPT FROM EXECUTION.

### A.   Mr. Ibarra's Atkins Claim is Fully Exhausted

Respondent first contends that Mr. Ibarra "failed to present his evidence in support of this claim to the state court, rendering it unexhausted and procedurally defaulted." Answer at 85. Of course, as a bare statement, this is patently untrue. Mr. Ibarra presented his *Atkins* claim to the state courts, was authorized to proceed as a successive petitioner, and participated in a "hearing" before the trial court. Mr. Ibarra's claim is exhausted.

Respondent also argues that the evidence Mr. Ibarra presents to this Court "fundamentally alters" rather than "supplements" the claim presented to the state courts. This argument is in error, and ignores the extraordinary inadequacies of the process in which Mr. Ibarra was forced to litigate.

Of course, Respondent cannot disagree with the fact that Mr. Ibarra presented his *Atkins* claim to the state courts. He set forth the standard for determining mental retardation, and presented argument for why he met each one. *See* Application for Writ of Habeas Corpus filed in the 54th District Court of McLennan County, Texas, on June 19, 2003 (hereinafter "*Atkins* petition."). He attached the affidavit of Dr. Romey, who administered a WAISIII to Mr. Ibarra, and obtained a full scale IQ score of 67, and observed and identified certain adaptive behavior

deficits.[4]  She further articulated the risk factors Mr. Ibarra was subject to while growing up in

Mexico.  All of these allegations placed the State on full notice of the nature of the claim, and

the evidence in support.

Once the matter was remanded to the trial court for a hearing, Mr. Ibarra litigated at

length his right to and need for adequate funding and time needed to investigate and present all

the evidence necessary to a competently litigated Atkins claim  a task that is made that much

more complicated, time consuming, and and costly by the fact that Mr. Ibarra is a Mexican

National, and grew up in Mexico.  *See Ex parte Ibarra*, Trial Court Cause No. 1996634CB, 54th

Judicial District Court of McLennan County, Hearing Sept. 18, 2006 and Exhibits thereto;

Motion for Reconsideration and for Scheduling Order that Ensures Due Process of Law, filed

Aug. 3, 2006; Ex parte Confidential Motion filed Under Seal Aug. 17, 2006 (Investigator); Ex

parte Confidential Motion filed Under Seal Sept. 14, 2006 (Dr. Romey); Ex parte Confidential

Motion filed Under Seal Sept. 14, 2006 (Additional Funds for Fees and Expenses); Motion for

Continuance filed Sept. 14, 2006; Supplement to Motion for Continuance Filed Sept. 18, 2006.

Although the trial court granted Mr. Ibarra's initial funding request, those monies quickly ran

out, and Mr. Ibarra returned to the Court with a detailed request, supported by affidavits,

itemizing what had been done, what remained, and why this case, in particular, was complicated

and time consuming  and thus required additional funding.  *See Ex parte Ibarra*, Trial Court

---

[4]Respondent complains that Dr. Romey's affidavit was never admitted in state court.  An
affidavit from Dr. Romey was attached to Mr. Ibarra's state habeas petition raising his Atkins
claim.  During the hearing in the trial court, due to short notice of the denial of funding to bring
Dr. Romey to the hearing, counsel was unable to get Dr. Romey's newly executed affidavit
notarized in order to submit to the Court at the time of the hearing.  See ex parte Ibarra, RR Vol.
3 of 3, p.20.  However, later that same day counsel filed with the clerk the necessary notarized
signature page to Dr. Romey's affidavit.  Ten days later, counsel filed the original affidavit in
full.  *See* Exhibits 1 and 2, attached hereto (and part of the state court record).

Cause No. 1996634CB, Ex parte Confidential Motion filed Under Seal Sept. 14, 2006

(Additional Funds for Fees and Expenses).   The Court refused to grant those funds, and forced

Mr. Ibarra to proceed with the "hearing" (no witnesses were presented, as the Court would not

pay to get them there) despite repeated and well documented requests for more time, and despite

the fact that the Court refused, even, to grant funding to bring in Dr. Romey to testify.   *Ex parte*

*Ibarra*, Trial Court Cause No. 1996634CB, Motion for Continuance filed Sept. 14, 2006;

Supplement to Motion for Continuance Filed Sept. 14, 2006.  In short, Mr. Ibarra was not given

the resources or time essential to proper development and presentation of his claim.

　　In addition, Mr. Ibarra was represented by pro bono counsel, initially undersigned

counsel (for purposes of the filing of the successive petition in state court), and then Gregory

Kuykendal of the Mexican Capital Legal Assistance Program, who entered an appearance for

purposes of the *Atkins* "hearing."  Because the trial court insisted that Mr. Kuykendal appear

with a Texas attorney, Mr. Morris Moon was appointed to assist, but not until the day of the

*Atkins* hearing.

　　Respondent now faults Mr. Ibarra for the results of the state court's actions, and contends

that the state was not properly on notice of the nature of the claim being presented.

### 1.　　Mr. Ibarra exhausted the legal basis of his claim.

　　In *Baldwin v. Reese*, 541 U.S. 27 (2004), the Supreme Court explained that a litigant can

easily exhaust the legal basis of a federal claim in state court "by citing in conjunction with the

claim the federal source of law on which he relies or a case deciding such a claim on federal

grounds, or by simply labeling the claim 'federal.'"  *Id.* at 32.

　　Mr. Ibarra clearly satisfied the requirements of *Baldwin*.  He explicitly asserted, both in

the title of his state habeas application and in the text of that document, that his claim was based

on the Supreme Court's decision in *Atkins*.  He explained that *Atkins* held that the Eighth

Amendment prohibits the execution of the mentally retarded.  He alleged that he was mentally

retarded and that, therefore, his execution would violate the Cruel and Unusual Punishments

Clause of the United States Constitution.  See, generally, Mr. Ibarra's *Atkins* Petition. Under

*Baldwin*, Mr. Ibarra's petition was more than sufficient to give the state court notice of the legal

basis of his claim.

### 2.     Mr. Ibarra exhausted the factual basis of his claim.

In *Vasquez v. Hillery*, 474 U.S. 254 (1986), the Supreme Court held that supplemental

evidence that does not "fundamentally alter the ***legal*** claim already considered by the state

courts" does not require the habeas petitioner to return to state court to exhaust that evidence.  *Id.*

at 260 (emphasis added).  In applying this standard and finding the petitioner's new evidence

exhausted, the Supreme Court emphasized that the petitioner did not "attempt[] to expedite

federal review by deliberately withholding essential facts from the state courts."  *Id.* "[T]he

petitioner exhausts the factual basis of the claim as long as she did not either fundamentally alter

the legal claim already considered by the state courts or attempt to expedite federal review by

deliberately withholding essential facts from the state courts."  *Anderson v. Johnson*, 338 F.3d

382, 387 n.8 (5th Cir. 2003) (internal quotation marks and citation omitted).  *Anderson* explained

that new evidence may be presented in federal court as long as it does not place the claim in a

"significantly different ***legal*** posture."  *Id.* at 387 (emphasis added, internal quotation marks and

citation omitted).

The Fifth Circuit Court of Appeals applied the principles of *Vasquez* to an *Atkins* claim in

*Morris v. Dretke*, 413 F.3d 484 (5th Cir. 2005).  In *Morris*, the petitioner presented the state

court with evidence of his adaptive deficits but supplied no I.Q. scores in support of his *Atkins*

claim.  413 F.3d at 48788.  In federal proceedings, the petitioner developed extensive evidence

of mental retardation after the district court appointed counsel and granted funds for expert and

investigative assistance.  *Id.* at 489.  In his amended federal habeas petition, Morris presented

two affidavits from a clinical psychologist, who conducted adaptive behavior and intellectual

functional testing, found that Morris had an I.Q. of 53, and concluded that he was mentally

retarded.  *Id.* at 48990.  Morris also presented two affidavits from a disabilities and special

education expert, who diagnosed Morris with mental retardation.  *Id.*  Finally, Morris introduced

a new affidavit from Dr. Garnett, a psychologist who had previously provided an affidavit in the

state habeas proceedings and now asserted that his review of the new evidence strengthened his

opinion that Morris was mentally retarded.  *Id.* at 490.

   The district court dismissed the petition without prejudice for failure to exhaust state

court remedies.  *Id.* at 490.  The Fifth Circuit vacated the district court's decision and remanded

for an evidentiary hearing, holding that:

> [T]he new I.Q. evidence presented for the first time in federal court, although it
> indeed factually bolstered his sole *Atkins* claim, did not render Morris's *Atkins*
> claim – which same legal Eighth Amendment claim he presented to the state
> courts and supported with pertinent, if not conclusive, evidence of low intellectual
> functioning and adaptive deficits, from childhood on – as fundamentally altered
> and thus unexhausted.

*Id.* at 495.  Several factors weighed in favor of the finding of exhaustion.  Morris

"unquestionably" brought his Eighth Amendment claim pursuant to *Atkins*.  *Id.* at 496.  He

explained that the absence of I.Q. evidence in his state petition was due to his lack of funds, and

that, "given the opportunity and resources," he would prove his mental retardation through

intellectual testing.  *Id.*  Moreover, nothing in the record indicated that Morris "attempted to expedite federal review by deliberately withholding essential facts from the state courts," or "chose to forego any provided opportunity for the proper I.Q. testing."  *Id.*  The state court's failure to hold an evidentiary hearing caused Morris's facts to be undeveloped, not any lack of diligence on his part.  *Id.* at 496, 497.  Finally, the Court noted that "no binding authority . . . requires an I.Q. test specifically, that is, entirely alone, at the core, or as any singular threshold to provide the basis for a finding of mental retardation."  *Id.* at 497.  Under these circumstances, the Court explained that I.Q. evidence alone cannot provide the "180degree turn" that would significantly transform the legal posture of the *Atkins* claim in federal court.  *Id.*  In short, Morris had already presented to the state court "the crucial fact that [he] possessed sufficient indicators for a diagnosis of mental retardation."  *Id.* at 498.

### a.    Mr. Ibarra did not present his *Atkins* claim to the federal court in a significantly different legal posture than in the state court.

Mr. Ibarra's case is analogous to that of Mr. Morris.  Mr. Ibarra alleged in his state habeas application that he scored a 67 on a reliably administered IQ test, submitted an affidavit from the qualified psychiatrist who administered the test and obtained the score, and further alleged that there were preliminary indicators that he suffered from adaptive deficits.  He called to the state court's attention that the Supreme Court had ordered the states to enforce the Eighth Amendment categorical rule of *Atkins*, reminded the court of his indigence, and asked for the time and funding necessary to develop his claim.  He also sought appointment of counsel.

In this Court, Mr. Ibarra represented Dr. Romey's affidavit, as well as additional evidence of adaptive deficits in conceptual, social, and practical skill areas through the testimony

of family members, friends, and teachers.  *See* Petition Exhibits 520.  He still seeks additional

funds and resources in order to properly present this evidence  and more  at an evidentiary

hearing in this Court.

Like Morris' new I.Q. evidence, Mr. Ibarra's new adaptive deficit evidence "factually

bolsters" his claim, but does not fundamentally alter his ***legal*** claim and render it unexhausted.

Mr. Ibarra's federal claim was the same Eighth Amendment claim he unquestionably presented

to the state courts pursuant to *Atkins*.  It was the same claim he supported in state court with

"pertinent, if not conclusive, evidence of . . . [intellectual] deficits. . . ." *Morris*, 413 F.3d at 495.

Despite the new evidence of adaptive deficits in federal court, the evidence presented in state

court presented a prima facie case of mental retardation  indeed, it was on that basis that the

CCA remanded the matter to the trial court for further proceedings. *See Ex parte Ibarra*, No.

48,83202, slip op. (Tex. Crim. App. Nov. 10, 2004).  Because the additional adaptive deficit

evidence merely supplemented the existing statecourt evidence of mental retardation, the new

evidence alone did not place the *Atkins* claim in a significantly different legal posture.

**b.    Mr. Ibarra did not deliberately withhold
essential facts from the state court.**

Respondent faults Mr. Ibarra for not presenting his adaptive deficit affidavits to the state

court.  As detailed below, Mr. Ibarra was unable to obtain these at the time he was in state court,

without appointed counsel and without adequate resources or preparation time.  Morris also

sought the appointment of counsel in the state habeas proceedings, requested resources to

establish his claim, and argued that an evidentiary hearing "was necessary to develop and fully

present all available evidence supporting his claim." *Morris*, 413 F.3d at 488.  The State

disregards Mr. Ibarra's identical efforts to develop the facts of his *Atkins* claim in state court.

Mr. Ibarra had no statutory right to postconviction counsel in Texas to help him investigate and prepare his successive habeas petition – even one based on the retroactive rule of *Atkins*. *Blue*, 230 S.W.3d at 16667. While teachers, family members, and friends are sources of information about adaptive behavior, locating and contacting them, conducting appropriate interviews, and assessing the information obtained requires substantial time and resources (particularly when they live in Mexico), as well as the assistance of persons with specialized knowledge and skills.

Mr. Ibarra neither withheld essential facts from the state court in an attempt to expedite federal review, nor did he intentionally forego any opportunity provided by the state court to develop the facts of his claim. Without a statutory right to counsel, *pro bono* counsel prepares an *Atkins* successor. In motions filed in the trial court, Mr. Ibarra made it absolutely clear that he needed substantial additional time and resources to help him fully investigate and properly develop the facts in state court in support of his *Atkins* claim. He never suggested that he could prevail on his *Atkins* claim based solely on the evidence he presented in his successive state habeas petition. There is a difference between a petitioner who fails to take advantage of the opportunities for factual development provided by the state court and a petitioner who is never afforded those opportunities. *See Morris*, 413 F.3d at 500 (Higginbotham, J., concurring) (noting that, because Morris requested resources to further develop his *Atkins* claim, and specifically referenced the need for intellectual testing, he did not fail to develop the factual basis of his claim at the state level"). Mr. Ibarra falls in the latter category.

The crucial question in resolving the exhaustion issue is not whether Mr. Ibarra provided the state court with affidavits from family members confirming his limitations in two or more

areas of adaptive functioning, but whether he "exhausted the remedies *available* in the courts of the State." 28 U.S.C. § 2254(b)(1)(A) (emphasis added). The degree to which a claim will be developed in state court will depend on the scope of each state's available remedies. Although constrained by Texas's limited postconviction procedures, as well as the CCA decisions applying those provisions to successive *Atkins* claims, Mr. Ibarra prepared and filed a subsequent habeas application pursuant to Article 11.071, the available statecourt remedy. For purposes of satisfying the exhaustion requirement, it is enough that his application contained both law and fact to put the state court on notice that he "possessed sufficient indicators for a diagnosis of mental retardation." *Morris*, 413 F.3d at 498. Mr. Ibarra's state habeas application did just that.

> **B.**     **If the Court Should Conclude That Mr. Ibarra Failed to Exhaust the Available Statecourt Remedies, it Should Excuse Exhaustion Because Circumstances Rendered the State Corrective Process Ineffective to Protect His Federal Constitutional Rights.**

The State ignores the reality that Mr. Ibarra was trapped in. Although the CCA found that Mr. Ibarra had made a prima facie showing of mental retardation, upon remand to the trial court, Mr. Ibarra was hamstrung by the trial court's refusal to appoint counsel or provide adequate funding for the investigation and preparation essential to proper presentation of an *Atkins* claim. Under these circumstances, the state corrective process proved ineffective to protect Mr. Ibarra's Eighth Amendment right and exhaustion is not required.[5]

> **1.**     **The exhaustion doctrine encourages comity but,**

---

[5] It bears emphasizing that Mr. Ibarra is not asserting that the Texas remedy is ineffective to vindicate the *Atkins* right for the vast majority of death-sentenced prisoners. Prisoners who had yet to file their initial state habeas application on June 20, 2002, are entitled to the assistance of counsel and access to expert and investigative assistance under Article 11.071. However, Mr. Ibarra falls within a more limited category of prisoners who were sentenced to death **and** had already filed their first state habeas petition before the decision in *Atkins*. This class of prisoners was definitively closed on June 20, 2002.

**ultimately, seeks to ensure the vindication of federal constitutional rights.**

The exhaustion doctrine rests on principles of comity essential to the smooth functioning of a system of dual sovereignty: As a matter of judicial discretion, federal courts should allow the state courts the first opportunity to vindicate federal constitutional rights. *Picard v. Connor*, 404 U.S. 270, 275 (1971). By acknowledging that state courts are "equally bound to guard and protect rights secured by the Constitution," *Ex parte Royall*, 117 U.S. 241, 251 (1886), the doctrine encourages respect for state institutions and "serves to minimize friction between state and federal systems of justice." *Duckworth v. Serrano*, 454 U.S. 1, 3 (1981).

Although the exhaustion doctrine's comity principles involve "a delicate balance and compromise of both state and federal interests," they do not demand "unthinking subservience" to state sovereignty at the expense of protecting federal constitutional rights. *Carter v. Estelle*, 677 F.2d 427, 442-43 (5th Cir. 1982). To avoid blind deference to state interests, the federal courts created exceptions to the exhaustion requirement. The assumption at the core of the exhaustion doctrine is that state procedures are adequate and effective for correcting violations of a prisoner's federal constitutional rights. *Carter v. Procunier*, 755 F.2d 1126, 1131 (5th Cir. 1985). Consequently, exhaustion is not required where an unfairly applied state procedural rule or practice frustrates the vindication of federal rights. *Brown v. Estelle*, 530 F.2d 1280, 1284 (5th Cir. 1976). Under these circumstances, comity's delicate balance "tips in favor of immediate consideration of petitioner's claims through federal habeas proceedings." *Carter*, 677 F.2d at 445. Congress eventually codified the exceptions to exhaustion rule. The federal habeas corpus statute now provides that exhaustion of statecourt remedies is excused if "there is an absence of available State corrective process," or "circumstances exist that render such process

ineffective to protect the rights of the applicant."  28 U.S.C. § 2254(b)(1)(B).

### 2.    Ineffective procedures prevented Mr. Ibarra from vindicating his *Atkins* right in state court.

*Atkins* ordered the States to "'develop[] appropriate ways to enforce the constitutional restriction upon its execution of sentences.'"  *Atkins v. Virginia*, 536 U.S. 304, 317 (June 20, 2002) (quoting *Ford v. Wainwright*, 477 U.S. 399, 405, 41617 (1986)).  Because the Eighth Amendment rule categorically excluding the mentally retarded from capital punishment is retroactive, it applies equally to defendants awaiting trial on capital charges as well as those petitioners already sentenced to death.  Accordingly, it is imperative that Texas develop procedures at all stages of the criminal justice system to ensure that no person with mental retardation is sentenced to death.

The Supreme Court's recent decision in *Panetti v. Quarterman*, 127 S.Ct. 2842 (2007), provides a measuring stick for determining whether Texas's postconviction procedures adequately protect the *Atkins* rights of death row inmates like Mr. Ibarra.  *See Rivera*, 505 F.3d at 358 ("Even though *Atkins* did not specifically mandate any set of procedures, it was decided against the backdrop of the Supreme Court's and lower court's due process jurisprudence.").  *Panetti* involved a review of the minimum procedural due process requirements that a State must provide to a death row inmate raising a an execution competency claim under *Ford*.  The Supreme Court held that the due process guaranteed to *Ford* petitioners includes a "fair hearing in accord with fundamental fairness" and "an opportunity to be heard."  *Id.* at 2856 (internal quotation marks omitted).  In the specific context of developing evidence of incompetency for execution, *Panetti* found that "these basic requirements include an opportunity to submit evidence and argument from the prisoner's counsel, including expert psychiatric evidence that

may differ from the State's own psychiatric examination." *Id.* (internal quotation marks omitted).  After making the requisite threshold showing of incompetency, Panetti filed motions for appointment of counsel and funds to hire a mental health expert, along with a request for an evidentiary hearing in an attempt to develop the facts of his *Ford* claim.  *Id.* at 2857.  Because the state court denied these motions, and refused Panetti even the "rudimentary process" of "an opportunity to submit psychiatric evidence as a counterweight to the report filed by the courtappointed experts," the Supreme Court concluded that Texas deprived Panetti of "a constitutionally adequate opportunity to be heard."  *Id.* at 2858.

*Panetti*'s due process holding is derived directly from *Ford*.  In *Ford*, Justice Powell held in his controlling opinion that due process for the execution competency determination does not require the fullscale adversarial procedures that Justice Marshall advocated in his plurality opinion.  477 U.S. at 425.  Justice Powell provided two main reasons for this conclusion.  First, because an execution competency claim can arise only after the petitioner has been validly convicted of a capital crime and sentenced to death, the State's right to carry out the execution remains.  "[T]he only question raised is not ***whether***, but ***when***, his execution may take place." *Id.* (emphasis in original, footnote omitted).  Although the issue of when a petitioner may be executed is important, he said, "it is not comparable to the antecedent question ***whether the petitioner should be executed at all***." *Id.* (emphasis added).  Consequently, the heightened procedural due process requirements for death penalty trials do not apply in the competencyforexecution context.  *Id.*  Second, a *Ford* petitioner must already have been found competent to stand trial – or his competency was never at issue – before he could be convicted and sentenced to death.  *Id.* at 42526.  Therefore, "[t]he State may properly presume that

petitioner remains sane at the time sentence is to be carried out and may require a substantial

threshold showing of insanity merely to trigger the hearing process." *Id.* at 426 (footnote and

citation omitted).

*Atkins* is "a substantive restriction on the State's power" to take a life in punishment. 536

U.S. at 321. It imposes a categorical rule making mentally retarded offenders ineligible for

capital punishment precisely because of their impairments: "Mentally retarded defendants in the

aggregate face a special risk of wrongful execution." *Id.* at 321; *see id.* at 317 (explaining that

"some characteristics of mental retardation undermine the strength of the procedural protections

that our capital jurisprudence steadfastly guards"). For that reason, it is a right that attaches

before the mentally retarded offender can be put on trial for his life. Moreover, this Eighth

Amendment prohibition applies retroactively to all death row inmates, even those whose cases

were on collateral review, because:

> the Constitution itself deprives the State of the power to impose a certain penalty,
> and the finality and comity concerns underlying Justice Harlan's view of
> retroactivity have little force. As Justice Harlan wrote: "There is little societal
> interest in permitting the criminal process to rest at a point where it ought
> properly never to repose."

*Penry v. Lynaugh*, 492 U.S. 302, 330 (1989) (citation omitted).

Unlike a *Ford* claim, an *Atkins* claim involves the core question of **whether** – not **when** –

the State may put an individual to death. Consequently, the State does not have the same interest

in upholding a mentally retarded offender's death sentence that it does for a *Ford* claimant.

Moreover, if a mentally retarded offender's trial predated *Atkins*, the State cannot presume,

based on his capital conviction and death sentence, that the offender is not mentally retarded.

As in *Ford*, the *Atkins* Court left it to the states to devise procedures for enforcing the

right.  For potential *Atkins* claimants in Mr. Ibarra's specific procedural posture – those who had, prior to the *Atkins* decision, exhausted all state proceedings in which there is a right to counsel or resources – Texas's corrective procedure is ineffective to protect the right.

> **a.    The Fortuity of Timing Places Putatively Mentally Retarded Defendants Facing a Sentence of Death in Radically Different Positions, Thereby Violating Due Process.**

The fortuity of timing is the first circumstance that renders Texas's state successor procedure ineffective to protect Mr. Ibarra's *Atkins* right.  If he had been tried after *Atkins* was decided, he would have been able to raise the claim at trial.  Mr. Ibarra, as an indigent defendant, would have had the right to Sixth Amendment counsel in bringing the claim.  *Gideon v. Wainwright*, 372 U.S. 335 (1963).  The procedural due process principles of *Ake v. Oklahoma*, 470 U.S. 68 (1985), presumably would have given him the right to investigative and expert assistance to develop the claim upon "a factual showing sufficient to give the trial court reasonable ground to doubt [that he is not mentally retarded]."  *Williams v. Collins*, 989 F.2d 841, 845 (5th Cir. 1993).

If Mr. Ibarra had not yet filed his first state habeas application at the time *Atkins* was decided, he would not have been required to make ***any*** threshold showing to be entitled to counsel to prepare an initial application raising an *Atkins* claim.  *See* Tex. Code Crim. P. art. 11.071 § 2(a).  To obtain prepayment of funds for investigators or experts to assist in preparing an *Atkins* claim for a first petition, he would have had only to state "specific facts that suggest that a claim of possible merit may exist."  Tex. Code Crim. P. art. 11.071 § 3(b)(2).  Appointed counsel, of course, would have been able to assist Mr. Ibarra in making that showing.

Instead, through no fault of his own, Mr. Ibarra came in as a successive petitioner  and

thus faced the ambiguous and unfriendly territory of resources for successive claims requiring

intensive fact development and expert assistance.  Mr. Ibarra suffered the consequences of

operating in that land, as his reasonable and well documented requests for time, funding, and

assistance were denied by the trial court.

> **b.      It is fundamentally unfair to force
> indigent death row inmates to rely
> on volunteer attorneys to pay for
> factdevelopment resources to
> vindicate *Atkins*.**

The second circumstance that renders Texas's state corrective procedure ineffective to

protect Mr. Ibarra's *Atkins* right is his indigency.  Because Mr. Ibarra is indigent, he was unable

to hire an attorney or pay for the services of an investigator or expert to assist him.  His federal

habeas counsel, undersigned counsel, volunteered his services and prepared the successive

application *pro bono*.  When the matter was remanded to the state court, Gregory Kuykendal of

the Mexican Legal Assistance Project, entered an appearance pro bono.  Undersigned counsel,

however, was unable to continue on a pro bono basis.  Mr. Kuykendal sought the resources and

time necessary to adequately prepare for the hearing, but was denied, even, the funds to bring his

expert in to testify at the hearing.

As Judge Higginbotham pointed out in *Morris*, Texas has ignored the impediments its

postconviction process poses to indigent applicants:

> [T]he harsh reality is that [intellectual] testing is costly, and death row inmates
> typically lack independent financial means, as did Morris. . . .  [T]he record
> indicates that Morris, with the assistance of volunteer counsel, diligently sought
> to gather evidence of mental retardation during the time period after *Atkins* was
> decided, and prior to Morris' scheduled execution date.
>
> It is not a matter of an ***obligation*** to pay for intellectual testing of a prisoner
> raising a colorable *Atkins* claim warranting further development.  It is rather that

there was a barrier placed before the petitioner through no fault of his own – indigence.

413 F.3d at 500 (Higginbotham, J., concurring) (emphasis in original, footnotes omitted).  As the *Morris*, and *Rivera* cases illustrate, placing the onus of factdevelopment on *pro bono* counsel reduces the State's constitutional responsibility to vindicate a death row inmate's *Atkins* right to a lottery.  Serendipity, rather than the State, determines the enforcement of the Eighth Amendment.   Vindicating Mr. Ibarra's *Atkins* right requires more from Texas's corrective procedure than merely giving him the right to file a successive petition raising the claim.  It demands that the State provide putatively mentally retarded prisoners a meaningful opportunity to challenge their eligibility for capital punishment with the tools necessary to uncover evidence of mental retardation – appointed counsel, experts, and investigators:

> Meaningful access to justice has been the consistent theme of these cases.  We recognized long ago that mere access to the courthouse doors does not by itself assure a proper functioning of the adversary process, and that a criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense.

*Ake*, 470 U.S. at 77.

The State's arguments about Mr. Ibarra's supposed failure to exhaust rest on an implicit assumption: that Texas's corrective procedures were effective to protect his *Atkins* right.  Yet a system that refuses to appoint counsel or provide adequate resources and time to develop the claim gives the State no cause to complain in federal court about failure to exhaust.[6]

---

[6]As such, given the sham nature of the proceedings below, this Court should review this claim de novo, as the state court fact findings cannot be considered an "adjudication" within the meaning of 28 U.S.C. s.2254(d).  If it is considered an "adjudication," then it resulted in an "unreasonable determination of the facts in light of the evidence presented."  *Id*.  Moreover, the CCA did not adopt the trial court's findings, stating only that "we agree with the convicting court that applicant has not established that he is mentally retarded."  *Ex parte Ibarra*, 2007 WL 2790587 (Tex. Crim. App.).  Respondent's assertion that AEDPA

### C.    Mr. Ibarra is a Person with Mental Retardation

### 1.    Subaverage Intellectual Functioning

Respondent first takes Mr. Ibarra to task for failing to present evidence that the test was properly administered, and for failing to submit the raw data underlying the score obtained by Dr. Romey.[7]   These arguments are curious at best.   Dr. Romey's affidavit, reporting her testing methods and scores, are evidence of proper administration.   If Respondent is interested in challenging the testing methods, the appropriate time and place to do so is at an evidentiary hearing.   With respect to the raw data, it is not customary for the raw data or testing instruments to be submitted to the courts with the test results.   Moreover, on or about April 19, 2006, at the state's request, *Dr. Romey's raw data was turned over to state psychologist Susannah Rosin*. The fact that the State has not come forward with the results of Dr. Rosin's apparent review does not mean they can now complain about some lack of process.   All these matters are appropriately resolved in a fact finding proceeding in this Court.   Once again, undersigned counsel invites Respondent to join him in asking for a hearing.

Respondent also makes much of the fact that Dr. Romey (and Dr. Stewart) are not licensed to practice in Texas.[8]   Be that as it may, it does not bear on the validity of their testimony before this Court.

---

deference thus applies to the trial court's findings as "implied" findings is not supported by the case cited (*Garcia*).   Answer at p.86, fn. 21. While the CCA ultimately reached the same conclusion as the trial court, the fact that they did not adopt the trial court fact findings, as they usually do, must be given some weight.

[7]Respondent submits that such evidence must be reviewed for evidence of malingering.   As Respondent well knows, it is not his job to affirmatively disprove malingering.   If the evidence warrants, proof of same is Respondent's job.

[8]Dr. Romey has testified numerous times in the federal courts of Puerto Rico.   *See* Exhibit 19 to Amended Federal Petition (Curriculum Vitae of Dr. Romey).

> This Court has never stated or suggested that only a person who is licensed as a physician or psychologist in this state is competent to testify as an expert or to express an opinion on whether a capital murder defendant is or is not mentally retarded. . . .as I understand it, expert opinion testimony under *Atkins* or *Briseno* is not limited to one who is a statelicensed physician or psychologist. A diagnosis for qualification of social services under the PMRA [Persons with Mental Retardation chapter of the Texas Health and Safety code] *is* so limited, but an opinion for purposes of the Eighth Amendment prohibition against cruel and unusual punishment is *not* so limited. In the deathpenalty context, the factfinder may give whatever weight and credibility it deems appropriate to the opinions of either lay or expert witnesses. Licensure is not a litmus test for the admissibility or consideration of any witness's testimony in this context.

*Ex parte Lewis*, 223 S.W.3d 372, 375376 (Tex. Crim. App. 2006) (Cochran, J., concurring in judgment).  *See also Ex parte Hearn*, 418 F.3d 444, 445447 (5th Cir. 2007).

Finally, Respondent points to the findings of Dr. Stephen Mark, who examined Mr. Ibarra midtrial, and "found no evidence of mental retardation", but did find "evidence of malingering."  As Mr. Ibarra details in his Federal Petition in this Court, Dr. Mark was not an expert in mental retardation, and was asked by trial counsel only to do a general psychiatric evaluation.  Eventually, in fact, trial counsel asked him to focus on the unreliability of eyewitness testimony.  *See*, generally, Federal Petition p. 65.  Properly understood, Dr. Mark's observations about Mr. Ibarra's mental retardation status are effectively meaningless, particularly when compared to the mental retardation specific examination and testing conducted by Dr. Romey.

### 2.    Adaptive Deficits

Respondent's contentions regarding Mr. Ibarra's adaptive deficits reveal a profound misunderstanding of the nature of mild mental retardation (a class which falls within *Atkins'* protections).

First, Respondent contends that the affidavits of Mr. Ibarra's family and friends should not be relied upon, as they are somehow inherently incredible, and have not been subjected to cross examination. The first point begs the question: if not family and friends, who would be able to document adaptive deficits. Those are the people that, by definition, knew Mr. Ibarra in the developmental stages. With respect to the latter point, Mr. Ibarra once again invites Respondent to join him in requesting an evidentiary hearing.

The remainder of Respondent's arguments center around misconceptions about what people who are mentally retarded can and cannot do. Thus, as purported counterproof that Mr. Ibarra is not a person with mental retardation, Respondent points to the fact the Mr. Ibarra has been married, worked as a laborer, was approved for the prison work program at the Ellis Unit[9], could drive, could make coffee, bathe, own a watch, a toothbrush, and nail clippers, as well as scissors, a ruler, envelopes, and stationary. In addition to the proof problems (possession of paper and envelopes does not mean a person can write; the existence of a letter with Mr. Ibarra's name at the bottom does not mean he wrote the letter)[10], these are all skills that are not uncommon among persons who are mildly mentally retarded.

Respondent's arguments fail to take into account "the wide variation in the abilities … of the retarded," *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 445 (1985), and is based on a stereotype—including the "false stereotype that all [are] ineducable," *Id.* at 463 (Marshall, J.,

---

[9]Respondent asserts without support that the machines at the Ellis Unit garment factory, where work capable death row inmates used to work, were "state of the art." Undersigned counsel's understanding is that they used scissors.

[10]Respondent's assertions regarding the Mexican educational system, and its import with respect to Mr. Ibarra's education and *Atkins* claim, are entirely without documentation or support (other than a mysterious website which also fails to cite any supporting sources, resources, or documentation). *See* Answer at 95.

dissenting)—that excludes from protection the great majority of persons who are categorically mentally retarded. Steinbeck's Lennie may be the popular conception of a mentally retarded person, but it is not an accurate representation of mental retardation, at least not for the approximately 8589% of all mentally retarded persons who fall in the 'mild' class. *See id.* at 443 n.9 ("Mentally retarded individuals fall into four distinct categories. The vast majority—approximately 89%—are classified as 'mildly' retarded, meaning that their IQ is between 50 and 70. Approximately 6% are 'moderately' retarded, with IQs between 35 and 50. The remaining two categories are 'severe' (IQs of 20 to 35) and 'profound' (IQs below 20)."); Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1994) (hereinafter "DSMIV") at 41 (85% of those officially categorized as mentally retarded are classified as mild). To contend that those who can marry, or bathe, or clip their nails cannot be mentally retarded, only adopts "the ignorance, irrational fears, and stereotyping that long have plagued [the mentally retarded]." *City of Cleburne*, 473 U.S. at 464 (Marshall, J., dissenting).

As the *City of Cleburne* Court noted, although it "is undeniable … that those who are mentally retarded have a reduced ability to cope with and function in the everyday world," the mentally retarded nonetheless "range from those whose disability is not immediately evident to those who must be constantly cared for." 473 U.S. at 442. With respect to the class of mildly mentally retarded persons, the DSMIV states,

> Mild Mental Retardation is roughly equivalent to what used to be referred to as the educational category of "educable." … As a group, people with this level of Mental Retardation typically develop ***social and communication skills*** during the preschool years (ages 05 years), have ***minimal impairment in sensorimotor areas***, and often are not distinguishable from children without Mental Retardation until a later age. By their late teens, they can acquire academic skills up to approximately the sixthgrade level. During their adult years, they usually achieve ***social and vocational skills adequate for minimum selfsupport***, but may need supervision,

guidance, and assistance, especially when under unusual social or economic stress. With appropriate supports, individuals with Mild Mental Retardation can usually live successfully in the community, either independently or in supervised settings.

DSMIV at 43.  The *Manual of Diagnosis and Professional Practice in Mental Retardation*, prepared

by the American Psychiatric Association, describes this class of the mentally retarded in more detail:

> People classified with mild MR evidence small delays in the preschool years but often are not identified until after school entry, when assessment is undertaken following academic failure or emergence of behavior problems.  Modest expressive language delays are evident during early primary school years, with the use of 2 to 3 word sentences common.  During the later primary school years, these children develop ***considerable*** expressive speaking skills, ***engage with peers in spontaneous interactive play***, and can be guided into play with larger groups.  During middle school, they develop ***complex*** sentence structure, and their speech is ***clearly intelligible***.  The ability to use simple number concepts is also present, but practical understanding of the use of money may be limited. By adolescence, ***normal language fluency*** may be evident.  Reading and number skills will range from 1st to 6thgrade level, and social interests, community activities, and selfdirection will be typical of peers, albeit as affected by pragmatic academic skill attainments. Baroff (1986) ascribed a mental age range of 8 to 11 years to adults in this group. This designation implies variation in academic skills, and for a large proportion of these adults, persistent low academic skill attainment limits their vocational opportunities.  However, ***these people are generally able to fulfill all expected adult roles***.  Consequently, their involvement in adult services and participation in therapeutic activities following completion of education preparation is relatively uncommon, is often timelimited or periodic, and may be associated with issues of adjustment or disability conditions not closely related to MR.[1]

---

[1] The DSM-IV's characterization of moderate, severe, and profound mental retardation stand in stark contrast.

> **Moderate** Mental Retardation is roughly equivalent to what used to be referred to as the educational category of "trainable."  This outdated term should not be used because it wrongly implies that people with Moderate Mental Retardation cannot benefit from educational programs.  This group constitutes about 10% of the entire population of people with Mental Retardation.  Most of the individuals with this level of Mental Retardation acquire communication skills during early childhood years. They profit from vocational training and, with moderate supervision, can attend to their personal care.  They can also benefit from training in social and occupational skills but are unlikely to progress beyond the second-grade level in academic subjects.  They may learn to travel independently in familiar places. During adolescence, their difficulties in recognizing social conventions may interfere with peer relationships.  In their adult years, the majority are able to perform unskilled or semiskilled work under supervision in sheltered workshops or in the general workforce.  They adapt well to life in the community, usually in supervised settings.

American Psychological Association, *Manual of Diagnosis and Professional Practice in Mental Retardation* 1718 (John W. Jacobson and James A. Mulick eds., 1996) (emphasis supplied) [hereinafter "APA Manual"].

People with mild mental retardation are capable of living remarkably meaningful and fulfilling lives, including the capacity to live independently, to work, and to marry and have families. One recent British study that surveyed persons with intellectual functioning in the mild mental retardation range found that, "[a]lthough the mild intellectual impairment group were less likely to attain the following social outcomes than people with normal intellectual functioning, 67% had jobs, 73% were married, 62% had children and 54% owned their own homes.  12% participated in adult education."  I. Hall, *et. al.*, *Social Outcomes in Adulthood of Children with Intellectual Impairment: Evidence from a Birth Cohort*, 49 J. INTELL. DISABILITY RES. 171 (2005).

---

The group with **Severe** Mental Retardation constitutes 3%-4% of individuals with Mental Retardation.  During the early childhood years, they acquire little or no communicative speech.  During the school-age period, they may learn to talk and can be trained in elementary self-care skills.  They profit to only a limited extent from instruction in pre-academic subjects, such as familiarity with the alphabet and simple counting, but can master skills such as learning sight reading of some "survival" words.  In their adult years, they may be able to perform simple tasks in closely supervised settings.  Most adapt well to life in the community, in group homes or with their families, unless they have an associated handicap that requires specialized nursing or other care.

The group with **Profound** Mental Retardation constitutes approximately 1%-2% of people with Mental Retardation. Most individuals with this diagnosis have an identified neurological condition that accounts for their Mental Retardation. During the early childhood years, they display considerable impairments in sensorimotor functioning. Optimal development may occur in a highly structured environment with constant aid and supervision and an individualized relationship with a caregiver. Motor development and self-care and communication skills may improve if appropriate training is provided. Some can perform simple tasks in closely supervised and sheltered settings.

DSM-IV at 43-45 (emphasis supplied).

With respect to employment, mildly mentally retarded people often have adaptive deficits related to their occupational skills, but many are nevertheless able to seek, obtain, and even maintain work.  Indeed, employment is the *norm* among mildly mentally retarded persons.  While members of this class typically hold lowerlevel, manual, and lesserpaying jobs than nonmentally retarded persons, the jobs that they perform are nonetheless varied.  A handbook regarding "job placement of mentally retarded adults who are preparing for independent living and competitive employment" lists many kinds of employment that mentally retarded persons satisfactorily perform, including "typist; Library Assistant; Waiter / Waitress; Landscaping worker; Painting and Maintenance Worker; Sewing Machine Operator; Forklift Operator; and Factory Equipment Cleaner."  Angeline M. Jacobs, *et. al.*, HANDBOOK FOR JOB PLACEMENT OF MENTALLY RETARDED WORKERS: TRAINING, OPPORTUNITIES, AND CAREER AREAS (Eileen M. Oullette ed., Garland STPM Press 3d ed. 1979).

Once mild mental retardation is properly understood, it becomes clear that Respondent's contentions regarding Mr. Ibarra's purported skills, and their import for his Atkins claim, are uninformative at best.  The information collected and documented by Mr. Ibarra supports his claim. See Federal Petition at 113119 and Exhibits 520 attached thereto.

### 3.   Onset During the Developmental Period

With respect to this last factor, it is important to point out that the affidavits of family and friends submitted with Mr. Ibarra's Federal Petition (See Exhibits 520) identify adaptive deficits evident in the developmental period.  The fact that there might not be intellectual deficit testing from this period is neither unusual nor dispositive.

Lastly, Respondent appears to misunderstood the role played by the "risk factors' identified in Mr. Ibarra's Federal Petition.  Answer at 96.

The 2002 Manual of the American Association on Mental Retardation (hereinafter "AAMR") identifies four main categories of risk factors for mental retardation that can occur at the prenatal, perinatal, or postnatal stage of development.  See American Association on Mental Retardation: Mental Retadation: Definition, Classification, and Systems of Support (10th ed. 2002), (hereinafter "AAMR Manual) at 127 (Table 8.1).  In practical terms, it means that any individual with mental retardation not only has a measurable and substantial disability now, but that he also had it during childhood and adolescence, significantly reducing the ability to learn and gain an understanding of the world during life's formative years.  The four categories of risk factors that may interact to cause mental retardation are: (1) biomedical: factors that relate to biological processes, such as genetic disorders or nutrition; (2) social: factors that relate to social and family interaction, such as stimulation and adult responsiveness; (3) behavioral: factors that relate to potentially causal behaviors, such as dangerous (injurious) activities or maternal substance abuse; and (4) educational: factors that relate to the availability of educational supports that promote mental development and the development of adaptive skills.  *Id.* at 126

Thus, in Mr. Ibarra's case, the risk factors identified buttress the evidence of intellectual and adaptive deficits and likewise supports the argument that onset occurred in Mr. Ibarra's early years (a presumption that is raised by his current IQ testing).

## V.    CLAIM ELEVEN: MR. IBARRA'S RIGHTS UNDER ARTICLE 36 OF THE VIENNA CONVENTION ON CONSULAR RELATIONS WERE VIOLATED.

### A.    Neither the Legal nor the Factual Bases of this Claim are Procedurally Defaulted.

Respondent contends that this claim is procedurally defaulted because of the manner in which it was addressed by the state courts.  Mr. Ibarra first identified the violation failure to inform

him of his right to consular notification and access  in a Motion for New Trial, which was denied

without comment.  He raised the claim again on direct appeal, where it was rejected because of trial

counsel's failure to raise a contemporaneous objection.  After the decision in *Avena and Other*

*Mexican Nationals* (Mex. v. U.S.), 2004 I.C.J. 128 (Mar. 31) (hereinafter "*Avena*") and the issuance

of the *Presidential Determination of February 28, 2005* (hereinafter "Presidential Determination")

(Exhibit 21 to Federal Petition), the claim was raised again in a successive state habeas petition, and

denied by the CCA for failure to meet Texas Code Criminal Procedure 11.071, Section 5:

> During the pendency of applicant's first subsequent application, a second subsequent
> application was filed in which applicant asserted that his rights under the Vienna Convention
> on Consular Relations had been violated and that the International Court of Justice and
> President George W. Bush had directed that his case be again reviewed for harm that may
> have arisen from this alleged treaty violation. In *Ex parte Medellin,* S.W.3d , AP75,207
> (Tex.Crim.App. November 15, 2006), we held that these arguments do not meet the
> requirements for consideration of subsequent claims under Article 11.071 Section 5.
> Applicant raises the same issues we considered and rejected in *Medellin.* We therefore hold
> that applicant has not met the requirements of Section 5 and dismiss this second subsequent
> application.

*Ex parte Ibarra*, 2007 WL 2790587 (Tex. Crim. App.).

Neither treatment by the state courts amounts to a procedural default precluding review

by this Court.

Even if trial counsel did not preserve Mr. Ibarra's claims by objecting at trial, the Texas

waiver doctrine may not be invoked  here.  The waiver doctrine, like the procedural bars set forth

in Art. 11.071, is a state procedural rule whose application is expressly prohibited by the presidential

determination and the *Avena* judgment.  Moreover, wellsettled Texas law incorporates an exception

to the otherwise applicable general requirement that a defendant, in order to raise a claim of error

in some later proceeding, must make a contemporaneous objection at trial.  This is the familiar "right

not recognized" doctrine; *i.e.,* if a right has not yet been recognized by the Texas courts, a failure

to object at trial does not bar raising the claim later for appellate or postconviction review. *Black v. State*, 816 S.W.2d 350, 364 (Tex. Crim. App. 1991) (permitting review of unpreserved claims of error under *Penry v. Lynaugh*, 492 U.S. 302 (1989)). *See also, e.g., Ex parte Chambers*, 688 S.W.2d 483 (Tex. Crim. App. 1984) (same, respecting claims of Fifth and Sixth Amendment error under *Estelle v. Smith*, 451 U.S. 454 (1981); *Cuevas v. State*, 641 S.W.2d 558 (Tex. Crim. App.1982) (same, respecting claim based on *Adams v. Texas*, 448 U.S. 38 (1980)); *Ex parte Turner*, 542 S.W.2d 187 (Tex. Crim. App.1976) (same, respecting claim based on *Washington v. Texas*, 388 U.S. 14 (1967)).

Because the application of the contemporaneous objection rule is expressly prohibited by the presidential determination and the *Avena* judgment, and because the rights at issue in this application had not been recognized by the Texas courts at the time of Mr. Ibarra's trial, he is entitled to have his claims reviewed on the merits in this proceeding.

The CCA's rejection of the claim on Section 5 grounds likewise does not preclude this Court's review, for the CCA rests their decision on *Ex parte Medellin*, 2006 WL 3302639 (Tex. Crim. App.), a decision that is clearly entangled with federal law. As such, the Section 5 dismissal does not rest on independent and adequate state grounds. *Coleman,* 501 U.S. at 730.[2] Finally, Respondent argues that the affidavits presented to these federal but not the state courts are unexhausted and thus defaulted. As outlined in detail, *supra*, evidence which does not fundamentally alter the legal claim does not require Mr. Ibarra to return to state court to exhaust. *Vasquez v. Hillery*, 474 U.S. at 260. The affidavits presented to this Court do not in

---

[2] In the alternative, Mr. Ibarra asserts that his Vienna Convention claim may not be ripe until some point in the future, when either state or federal legislation is passed providing an explicit remedy for the violation asserted. *See Leal Garcia v. Quarterman*, 573 F.3d 214, fn. 54 (5th Cir 2009). He nonetheless presents it in these proceedings as a safeguard.

any way change the legal claim presented to the state courts.  Respondent's assertion is without

merit.

### B.     Petitioner is Entitled to a Merits Determination of his Vienna Convention Claims

Respondent argues that "the ICJ's *Avena* decision is not binding domestic law.  *Medellin*,

128 S.Ct. At 1357.  Absent legislation, an ICJ order requiring review and consideration is

binding on neither a Texas nor a federal court."  Answer at 101.

These arguments are in error.  The *Medellin* Court did not hold that the VCCR itself is

not binding federal law. Respondent conflates the VCCR Optional Protocol (which conferred

compulsory jurisdiction on the ICJ to resolve disputes over the meaning of the VCCR, and which

the Supreme Court found to be nonselfexecuting) with the VCCR proper.

In fact, the *Medellin* Court emphasized that it was *not* denying the existence of rights and

remedies flowing from the Vienna Convention itself:

> The question is whether the Avena judgment has binding effect in domestic courts under
> the Optional Protocol, ICJ statute, and U.N. Charter.  Consequently, it is unnecessary to
> resolve whether the Vienna Convention is itself "selfexecuting" or whether it grants
> Medellin individually enforceable rights...As in SanchezLlamas, 548 U.S., at 342343,
> 126 S.Ct. 2669, we thus assume, without deciding, that Article 36 grants foreign
> nationals 'an individually enforceable right to request that their consular officers be
> notified of their detention, and an accompanying right to be informed by authorities of
> the availability of consular notification.'

*Id*. at 1357, n. 4.  Further, "that an ICJ judgment may not be automatically enforceable in

domestic courts does not mean the particular underlying treaty is not . . . Our cases simply

require courts to decide whether a treaty's terms reflect a determination by the President who

negotiated it and the Senate that confirmed it that the treaty has domestic effect."  *Id*. at

13651366.  *See also id*. at 1372 (Stevens, J., concurring) (endorsing the proposition that the

VCCR "is itself selfexecuting and judicially enforceable"); *id*. at 1385 (Breyer, J., dissenting) (same)."

As such, there is no procedural bar precluding this Court from considering Mr. Ibarra's claim on its merits.

### C.     Mr. Ibarra was Harmed by the Denial of his Vienna Convention Rights

In all primary respects, Mr. Ibarra relies on the briefing on this question contained within his Federal Petition at pp. 149160.  However, Respondent presents two erroneous assertions that require correction.

First, in arguing lack of harm, Respondent asserts that "Ibarra could have raised his Vienna Convention claim in conjunction with an ineffective assistance of counsel claim during Ibarra's first state habeas proceeding.  The contention that Mr. Ibarra may have received the protections to which he was entitled under the United States Constitution  and that the discussion stops there  has been soundly rejected by the International Court of Justice:

> [I]n a situation of the violation of rights under Article 36, paragraph 1, of the Vienna Convention, the defendant raises his claim in this respect not as a case of "harm to a particular right essential to a fair trial" – a concept relevant to the enjoyment of due process rights under the United States Constitution – but as a case involving the infringement of his rights under Article 36, paragraph 1.  The rights guaranteed under the Vienna Convention are treaty rights which the United States has undertaken to comply with in relation to the individual concerned, irrespective of the due process rights under United States constitutional law.  In this regard, the Court would point out that what is crucial in the review and reconsideration process is the existence of a procedure which guarantees that *full weight* is given to the violation of the rights set forth in the Vienna Convention, whatever may be the actual outcome of such review and reconsideration.

*Avena* Judgment, para. 139 (emphasis added).  Thus, the fact that he might have raised a concomitant ineffectiveness claim does nothing to address or redress the Vienna Convention violation.

Second, Respondent complains again about the purported unreliability of "after the fact" affidavits of family members, friends, and teachers.[3]  Of course, it is precisely these family members, friends, and teachers who are in possession of the most relevant evidence.  It is also the evidence that is routinely and roundly relied upon by the Courts when determining the merits of such claims.  *See, e.g.*, *Marquez Burrola* v. State, 157 P.3d 749 (Okla. Crim. App. 2007) (according great weight to testimony from friends and family).  *See also Williams*; *Wiggins*; *Rompilla* (all relying on evidence from the family member, friends, and teachers who supplied the mitigating evidence that was not presented at trial).

Finally, Respondent again bemoans the fact that the state has not had an opportunity to "provide rebuttal evidence or cross examine these witnesses regarding their statements, and the evidentiary weight of their statements must be discounted accordingly."  Answer at 104105. Nothing stood in the way of Respondent submitting his own affidavits to counter the allegations raised by Mr. Ibarra.  The answer is not to lessen the evidentiary weight of the affidavits in evidence  but to provide a hearing at which such witnesses could be cross examined.

One last time, Mr. Ibarra invites Respondent to join him in his request for an evidentiary hearing.

## CONCLUSION

In view of the foregoing, RAMIRO RUBI IBARRA requests that this Honorable Court:

(1)    Issue a writ of habeas corpus, ordering the presence of Petitioner for a hearing at which proof may be offered as to the allegations of this petition;

(2)    Vacate Petitioner's conviction for capital murder and death sentence, or, in the

---

[3]One wonders how an affidavit such as those presented could or would have been obtained at any point in time but "after the fact."

alternative, vacate the judgment affirming his conviction and death sentence on direct appeal;

(3)     Grant any other relief as law and justice may require.

Respectfully submitted


/s/_____

RUSSELL D. HUNT, JR.
Texas State Bar Number 00790937
310 South Austin Avenue
Georgetown, TX 78626
Telephone: 512/930-0860
Fax: 512/857-0746

Naomi E. Terr
Texas State Bar Number 24033379
P.O. Box 421398
Houston, TX 77242
Telephone: 713/782-7024
Fax: 713/782-7026


## CERTIFICATE OF SERVICE

I hereby certify that I have this day caused a copy of this REPLY TO RESPONDENT'S

ANSWER to be mailed, by first class mail, to the following on September 2nd , 2009:

Attorney for Respondent:
Stephen M. Hoffman
Assistant Attorney General
209 West 14th, 7th Floor
Austin, Texas 78701


/s/_____
Russell D. Hunt, Jr.