**IN THE UNITED STATES DISTRICT COURT**

**FOR THE WESTERN DISTRICT OF TEXAS**

**WACO DIVISION**

| | | |
|---|---|---|
| **RAMIRO RUBI IBARRA,** | § | |
| **Petitioner,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. W-02-CA-052** |
| | § | |
| **RICK THALER, Director, Texas** | § | |
| **Department of Criminal Justice,** | § | |
| **Correctional Institutions Division,** | § | |
| **Respondent.** | § | |

<u>**MEMORANDUM OPINION**</u>
<u>**AND ORDER**</u>

Petitioner Ramiro Rubi Ibarra, an illegal alien, was convicted of capital murder in the brutal rape and strangulation of 16-year-old Maria De La Paz Zuniga, an acquaintance. He was sentenced to death. Petitioner asserts that his capital murder conviction and sentence are unconstitutional and should be vacated under the provisions of Title 28, United States Code, Section 2254 ("§ 2254"). Respondent, having been ordered to respond to Petitioner's application, has filed an answer and Motion for Summary Judgment requesting that Petitioner's application be denied. Having reviewed Petitioner's application, Respondent's answer and Motion for Summary Judgment, the parties' amended pleadings, as well as the entire record in this case, the Court has determined Petitioner's application for habeas relief should be denied.

## I.  Background

The facts as established from the trial reflect that 16-year-old Maria De La Paz Zuniga ("the Victim" or "Maria") was brutally raped, sodomized, and murdered on the morning of March 6, 1987.  She was discovered by her brother, who found her lying on a bed in the one of the bedrooms in her house.  She was bloody, beaten and partially nude, with a yellow-coated wire wrapped around her neck and shoulder.  Subsequent examination revealed that she had been sexually assaulted, including both vaginal and anal penetration.  Her clothing was ripped, and her underwear had been torn from her body.  Maria was beaten so severely in the face and the rest of her body, she was covered with numerous bruises and contusions, and she was also covered in and surrounded by significant amounts of blood.  There was blood under her fingernails, indicating she had scratched her attacker while trying to fight him off.  Further testing found sperm in Maria's body and on her underwear.  A number of facial, head and pubic hairs were also found on and around her body.[1]

The police discovered three witnesses at a business across the road from Maria's home -- RPM Manufacturing.  The witnesses told police that they had noticed a man leaving Maria's house at the approximate time of the murder.  They described a Hispanic male, approximately 30 years of age, with a medium, stocky build.  He had black, mussed hair, and a moustache.  They were unable to see much

---

[1]     Hairs found on the victim's clothes and bedding were not recovered the first time these items were examined by the Dallas County Sheriff's Department Physical Evidence Section. They were recovered when the evidence was re-examined in 1996.

of his face as he mostly kept his head down.   Two of the witnesses were subsequently able to pick Petitioner out of a line-up.   The witnesses observed Petitioner walking to a car, which was a late-model Chevrolet Camaro with mismatched rims, a bent antenna, dual exhaust pipes, and a fan mounted on the dashboard.  The car was red in color from primer or oxidization.  All three witnesses were able to identify the car.  When police provided the description to Maria's family, they named Petitioner, a family acquaintance, as a possible suspect.

The investigator assigned to the case, Ramon Salinas ("Salinas"), discovered Petitioner's address and went to his home to question him at approximately 6 p.m. on the day of the murder.  The Camaro identified by the witnesses and registered to Petitioner was parked on the street nearby.  Salinas noticed that Petitioner had scratches on his face and was wearing clothing fitting the description given by the witnesses.  Petitioner was placed under arrest and consented to a search of his home and car.  Found in Petitioner's car was yellow wire similar to that used to strangle Maria.[2]  Salinas also discovered that Petitioner had additional scratches on his chest under his shirt.

The police obtained a search warrant on March 10, 1987 to obtain blood and hair samples from Petitioner to compare to the hair and bodily fluids found at the crime scene.  An indictment for murder was issued against Petitioner on May 27,

_____

[2]        The yellow wire found in Petitioner's trunk was not of the same thickness as that used to strangle Maria.  However, testimony at trial revealed that Petitioner had access to the exact type of wire used to strangle her at his place of employment.

1987.  Subsequently, Petitioner filed a motion to suppress, which was granted because the search warrant was not issued by the appropriate court.  At that time, Texas law precluded the police from obtaining a second search warrant.[3]  Because it believed there was insufficient evidence without the blood and hair comparisons, the State dismissed the indictment on July 19, 1998, and Petitioner was released from custody.

Texas law changed in 1995,[4] allowing police to obtain the issuance of more than one evidentiary search warrant in a case.  The police obtained a second warrant for hair and blood samples from Petitioner on July 2, 1996 and were able to secure such evidence from Petitioner.  Examination of the evidence revealed that the facial and pubic hairs found on and around Maria were similar to those of Petitioner, and his DNA matched the semen recovered from her body and underwear, as well as the material under her fingernails.[5]  Petitioner was then reindicted for Maria's murder on September 18, 1996.  He was tried, found guilty, and sentenced to death.

_____

[3]      In 1987, Tex. Code Crim. Proc. Article 18.01(d) provided, in relevant part, "Subsequent search warrants may not be issued . . .to search the same person, place or thing subjected to a prior search. . . ."

[4]      The amendment to Article 18.02(d) provided, in relevant part, "A subsequent search warrant may be issued . . . to search the same person, place or thing subjected to a prior search . . . only if the subsequent warrant is issued by a judge of a district court, a court of appeals, the court of criminal appeals, or the supreme court."

[5]      DNA analysis was unsuccessful in 1988 and 1990, but was matched to Petitioner in 1996.

At the punishment phase, the jury heard evidence that Petitioner anally sodomized his eight-year-old nephew on two occasions, and threatened to kill him if he told.[6]  On another occasion, Petitioner had his nephew "masturbate" him in the shower, and he tried to force the nephew on a subsequent occasion to grab his penis.  Petitioner's sister-in-law testified that Petitioner had a bad reputation for truth and veracity, as well as a bad reputation for sexually inappropriate behavior.   She also testified that there was some indication Petitioner had sexually abused her son.  Maria Luna Diaz, with whom Petitioner had a relationship, testified that Petitioner beat her and sexually assaulted her.  On one occasion he forced her to undress at knife point and threatened to kill her if she ever failed to do as she was told.  Petitioner also threatened to strangle her, and wrapped a wire tightly around her neck and pushed her down.  He released her when she begged for her life.  Maria Luna's daughter testified that Petitioner touched her breast inappropriately when she was 11 years old.  She immediately told her mother of the incident.  When Maria Luna confronted Petitioner, he beat her.

The jury also heard that Petitioner had prior convictions for unlawfully carrying a weapon and driving while intoxicated.  There was also testimony regarding an arrest for misdemeanor theft, when Petitioner was spotted taking rope from the back of a pickup truck and placing it in his own vehicle.  Upon his arrest, police found the

---

[6]     Petitioner was convicted of aggravated sexual assault as a result of these acts and was sentenced to life in prison.

rope in Petitioner's car, along with several college-level criminal justice textbooks in English.

Other witnesses testified to Petitioner's misbehavior while incarcerated.  He got into a fistfight with another inmate, and he was observed by a Deputy Sheriff masturbating in front of a window where he could be seen by passers by.  There was also testimony regarding Petitioner's alleged suicide attempt, wherein he cut his neck.  Jail and hospital personnel testified about his uncooperativeness and feigned unconsciousness.

While Petitioner's wife, Maria Gandera Ibarra, testified on his behalf, the State elicited testimony from her on cross-examination that Petitioner had beaten her on several occasions, even while she was pregnant.  She also testified that Petitioner had brought an 18-year-old girl from Mexico to live with them.  Although Petitioner said she was his daughter, he treated her like a wife – kissing her on the mouth and spending hours with her alone in a bedroom behind closed doors.

The State also presented the testimony of Dr. Richard Coons, a psychiatrist, who gave his opinion that an offender with Petitioner's history and sexual proclivities would constitute a continuing threat to society.

## II.  PROCEDURAL HISTORY

Petitioner's sentence and conviction were affirmed on appeal.  *See Ibarra v. State of Texas*, 11 S.W.3d 189 (Tex. Crim. App., October 20, 1999), rehearing denied (Dec. 8, 1999).  His petition for *writ of certiorari* was denied.  *Rubi Ibarra v.*

6

*U.S.*, 531 U.S. 828 (2000).  Petitioner's first state writ of habeas corpus was denied. *Ex parte Ibarra*, No. 48,832-01 (Tex. Crim. App., April 4, 2001).  Petitioner then submitted the present application for federal habeas relief.  He requested a stay while he pursued additional claims in the State court as a result of the Supreme Court opinion in *Atkins v. Virginia*, 536 U.S. 304 (2002), which prohibited the execution of mentally retarded criminals.  While that petition was pending, Petitioner's present application was further abated while Petitioner pursued another petition in state court arising out of a Memorandum to the United States Attorney General by President George W. Bush which announcing that the United States would discharge its international obligations by having state courts give effect to an International Court of Justice opinion.  The *Case Concerning Avena and Other Mexican Nationals (Mex. v. U.S.)*, 2004 I.C.J. 12 (Judgment of March 31) held that Mexican nationals were entitled to review and reconsideration of their convictions due to the states' failure to abide by the Vienna convention requiring them to advise these defendants of their right to contact the Mexican consulate.  *See Medellin v. Texas*, 552 U.S. 491 (2008).

The Court of Criminal Appeals remanded Petitioner's *Atkins* claim to the trial court.  After a hearing, the trial court determined that Petitioner was not mentally retarded, which holding was adopted by the Court of Criminal Appeals.  *Ex parte Ibarra*, 2007 WL 2790587, Nos. WR-48832-02 and WR-48832-03 (Tex. Crim. App. September 26, 2007).  His third writ, considered at the same time, was dismissed

7

as a subsequent writ under Article 11.071, Section 5.  Petitioner's application for a *writ of certiorari* as to the *Avena* claim was denied.  *See Ibrra v. Texas*, 553 U.S. 1055 (2008).  A fourth state habeas action, raising an issue under *Wiggins v. Smith*, 539 U.S. 510 (2003), was also dismissed as a subsequent writ under Article 11.071, Section 5.  *Ex parte Ibarra*, 2007 WL 4417283, No. WR-48832-04 (Tex. Crim. App. October 1, 2008).

### III.  GROUNDS OF ERROR

Petitioner asserts the following claims for relief:

1)   The amendment to the Texas statute permitting a second search warrant constituted an ex post facto and retroactive law in violation of Article I, § 9 of the constitution and the due process clause of the Fourteenth Amendment.

2)   Petitioner's right to a speedy trial and effective assistance of counsel was violated due to the large amount of time between the original indictment and his trial in violation of the Sixth Amendment's right to a speedy trial, the Eighth Amendment prohibition of cruel and unusual punishment, and the Fourteenth Amendment right to due process.

3)   Petitioner's initial arrest and subsequent consent to search were in violation of the Fourth Amendment's prohibition of unreasonable searches and seizures.

8

4)   Petitioner's Sixth Amendment confrontation clause Fourteenth Amendment due process rights were violated by the improper identification procedures used by the police.

5)   Petitioner's Sixth, Eighth and Fourteenth Amendment rights were violated by the admission of testimony regarding the Victim's fear of Petitioner.

6)   Petitioner's Sixth, Eighth and Fourteenth Amendment rights were violated by the admission of testimony regarding Petitioner's sexually inappropriate behavior as it was based on only a single incident.

7)   The Texas capital sentencing scheme is in violation of the Eighth and Fourteenth Amendments in that there is no appellate review of the jury's ultimate decision to impose the death penalty.

8)   Petitioner received ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendments as a result of counsel's failure to investigate, develop and present available mitigation evidence, and evidence rebutting portion's of the State's case in aggravation.

9)   Petitioner's execution would violate the Eighth Amendment's prohibition against execution of individuals with mental retardation.

10)  The Texas capital sentencing scheme violates the Sixth Amendment in that the State is not required to prove that the Petitioner is not mentally retarded and the jury is not required to find that the Petitioner is not mentally retarded.

11)     Petitioner's conviction was in violation of the Vienna Convention on Consular

Relations as Petitioner was never advised of his right to consult with the

Mexican consul.

## IV.  DISCUSSION

A.  Standard for Habeas Review.  Title 28, United States Code, Section 2254

("§ 2254") provides:

> (d)     An application for a writ of habeas corpus on behalf of a
> person in custody pursuant to the judgment of a State court, shall not
> be granted with respect to any claim that was adjudicated on the merits
> in State court proceedings unless the adjudication of the claim–
>         (1)     resulted in a decision that was contrary to, or
> involved an unreasonable application of, clearly established Federal
> law, as determined by the Supreme Court of the United States; or
>         (2)     resulted in a decision that was based on an
> unreasonable determination of the facts in light of the evidence
> presented in the State court proceeding.

Federal courts must defer to a state court's adjudication of a claim if the claim

has been adjudicated on the merits in the state court proceeding unless the state

court decision was (1) "contrary to, or involved an unreasonable application of,

clearly established Federal law, as determined by the Supreme Court," or (2) "was

based on an unreasonable determination of the facts in light of the evidence

presented in the State court proceeding."  28 U.S.C. § 2254(d).  *Woodfox v. Cain*,

609 F.3d 774, 789 (5th Cir. 2010).

A decision is "contrary to federal law" if it is contradicts a decision of the

Supreme Court on a question of law or if it "resolves a case differently from the way

10

the Supreme Court has on a set of materially indistinguishable facts." *Reed v. Quarterman*, 504 F.3d 465, 471 (5th Cir. 2007), *quoting Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). *See also Woodfox v. Cain*, 609 F.3d at 789. "Clearly established" under § 2254(d)(1) is "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). "Clearly established" is limited to determinations by the Supreme Court and refers to actual holdings of the Supreme Court as opposed to dicta. *Williams v. Taylor*, 529 U.S. at 381.

A state court "unreasonably" applies federal law when it identifies the correct governing principle established by the Supreme Court, but unreasonably applies it to the facts of the case. *Williams v. Taylor*, 529 U.S. at 407; *Woodfox v. Cain*, 609 F.3d at 789. *See also Woodward v. Epps*, 580 F.3d 318, 325 (5th Cir. 2009); *Rogers v. Quarterman*, 555 F.3d 483, 488-89 (5th Cir. 2009). Unreasonableness is evaluated objectively rather than subjectively. *Williams v. Taylor*, 529 U.S. at 409-10. An unreasonable application of federal law is distinguished from a state court decision that is merely incorrect or erroneous. *Woodfox v. Cain*, 609 F.3d at 789. "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold." *Schirro v. Landrigan*, 550 U.S. 465, 473 (2007). Habeas relief is merited only when the state court decision is both incorrect and objectively unreasonable. *Williams v. Taylor*, 529 U.S. at 411.

11

It is the state court's ultimate decision that is to be tested for unreasonableness.  *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (*en banc*), *cert. denied*, 537 U.S. 1104 (2003) (focus should be "on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence").  Even in cases where the state court fails to cite applicable Supreme Court precedent, or is even unaware of such precedent, the state court decision is still entitled to deference "so long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent]." *Early v. Packer*, 537 U.S. 3, 8 (2002).

When evaluating an unreasonable determination of the facts, the state court's findings of fact are entitled to a presumption of correctness which a petitioner may overcome only by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Leal v. Dretke*, 428 F.3d 543, 548 (5th Cir. 2005), *cert. denied*, 547 U.S. 1073 (2006).  Relief may be granted only if "a factual determination is unreasonable based on the evidence presented to the state court."  *Busby v. Dretke*, 359 F.3d 708, 713 (5th Cir. 2004), *cert. denied*, 541 U.S. 1087 (2004).

In addition to the foregoing, the amendments to § 2254 contained in the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") did not overrule prior precedent which forecloses habeas relief in the following instances: (1) claims which are procedurally barred as a consequence of a failure to comply with state

procedural rules;[7] (2) claims for which the petitioner seeks retroactive application of a new rule of law on a conviction that was final before the rule was announced;[8] or (3) claims for which the petitioner asserts trial error that, although of constitutional magnitude, did not have a "substantial and injurious effect or influence in determining the jury's verdict."[9]

B. Exhaustion of State Remedies.  Under 28 U.S.C. § 2254(b)(1)(A), a federal court may not grant habeas relief unless the petitioner has exhausted his available state court remedies, which means having the issues addressed by the highest court in the state.  *Woodfox v. Cain*, 609 F.3d at 789-90.  Once failure to exhaust has been raised, the court must compare the petitioner's state and federal claims to determine whether the substance of those claims were presented to the state court, which is a "case- and fact-specific inquiry."  *Id*., *quoting Moore v. Quarterman*, 533 F.3d 338, 341 (5th Cir. 2008) (*en banc*).

> "It is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982) (internal citations omitted).  "Rather, the petitioner must afford the state court a 'fair opportunity to apply controlling legal principles to the facts bearing upon his constitutional claim.'" *Bagwell v. Dretke*, 372 F.3d 748, 755 (5th Cir. 2004) (*quoting Anderson*, 459 U.S. at 6, 103 S.Ct. 276).

---

[7]     *Coleman v. Thompson*, 501 U.S. 722 (1991).

[8]     *Teague v. Lane*, 489 U.S. 288 (1989).

[9]     *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

*Woodfox v. Cain*, 609 F.3d at 792 (footnote omitted).   "A petitioner fulfills the exhaustion requirement if 'all crucial factual allegations were before the state courts at the time they ruled on the merits" of the habeas petition.'" *Smith v. Quarterman*, 515 F.3d 392, 400 (5th Cir. 2008), *quoting  Dowthitt v. Johnson*, 230 F.3d 733, 746 (5th Cir. 2000).   The exhaustion requirement applies even if a petitioner's claims are now procedurally barred under state law.  *Gray v. Netherland*, 518 U.S. 152, 161 (1996).   In the present case, Petitioner's first, fifth, and sixth claims have not been presented to the State court for review and are unexhausted and procedurally defaulted.

C.  <u>Independent and Adequate State Grounds</u>.  Federal habeas review of a state court opinion is also precluded when the state court's decision was based upon an independent and adequate state law ground.  *Coleman v. Thompson*, 501 U.S. 722, 729 (1991);  *Rosales v. Dretke*, 444 F.3d 703 (5th Cir. 2006).   "This rule is grounded in concerns of comity and federalism.  It is designed to prevent federal courts from deciding cases on federal constitutional grounds regarding a petitioner's confinement that would be advisory because the confinement can be upheld on an independent and adequate state law basis." *Rosales v. Dretke*, 444 at 707.  One of these grounds is procedural default, where dismissal is based upon a petitioner's failure to abide by state procedural rules.  The procedural default rule prevents a habeas petitioner from avoiding exhaustion requirements by defaulting federal claims in state court.  *Id*.  "A state court expressly and unambiguously bases its

denial of relief on a state procedural default even if it alternatively reaches the merits of a defendant's claim." *Fisher v. Texas*, 169 F.3d 295, 300 (5th Cir. 1999).  A claim should be construed as one involving federal law when "the state court decision rests 'primarily on federal law' or the state and federal law are 'interwoven,' and if 'the adequacy and independence of any possible state law ground is not clear from the face of the opinion. . . .'" *Id., quoting Ruiz v. Quarterman*, 504 F.3d 523, 527 (5th Cir. 2007).

In order to be "adequate" to support the judgment, the state law ground must be both "firmly established and regularly followed." *Ford v. Georgia*, 498 411, 424, 111 S.Ct. 850, 112 L.Ed.2d 935 (1991).  "If the state law ground is not firmly established and regularly followed, there is no bar to federal review and a federal habeas court may go to the merits of the claim." *Rosales v. Dretke*, 444 at 707, citing *Barr v. Columbia*, 378 U.S. 146, 149, 84 S.Ct. 1734, 12 L.Ed.2d 766 (1964). The Fifth Circuit has held that Texas's abuse-of-the-writ doctrine has "provided an adequate state ground for the purpose of imposing a procedural bar." *Barrientes v. Johnson*, 221 F.3d 741, 759 (5th Cir. 2000).  *See also Emery v. Johnson*, 139 F.3d 191 (5th Cir. 1997), *cert. denied*, 525 U.S. 969 (1998); *Rocha v. Thaler*, 626 F.3d 815, 829-30 (5th Cir. 2010).

A petitioner may be excused from a procedural default only if he can demonstrate cause and prejudice for the default, or show that the failure to consider the claim will result in a miscarriage of justice. *Coleman v. Thompson*, 501 U.S. at

15

750.   Petitioner's eighth, tenth and elevenths claims, which were dismissed in relevant part as abuses of the writ, were procedurally defaulted because they were decided on adequate and independent state grounds, and he has presented nothing to excuse the procedural default.

D.  Specific Claims.

1.  Second Search Warrant.   Petitioner argues that his rights were violated when the trial court did not grant his second motion to suppress after his re-indictment.  He asserts that the amendment to Article 18.02(d) is in violation of the Ex Post Facto clause and is an impermissible retroactive enforcement of a new law. As previously noted, Petitioner has failed to exhaust his available state court remedies by not having this issue addressed by the highest court in the state.  He would also be procedurally barred from presenting this issue in a successive state habeas application under Article 11.071, Section 5(a) of the Texas Code of Criminal Procedure precluding successive writs.  This is an adequate state procedural bar which forecloses federal habeas review, unless the  petitioner shows cause and prejudice for his failure, or show that failure to consider the claims will result in a fundamental miscarriage of justice.  *Nobles v. Johnson*, 127 F.3d 409, 422 (5th Cir. 1997), *cert. denied*, 523 U.S. 1139 (1998).  "A claim of miscarriage of justice is limited to a claim of 'actual innocence,' which requires the prisoner to establish through new and reliable evidence 'that it was "more likely than not that no reasonable juror would have convicted him in the light of the new evidence."'"

16

*Woodfox v. Cain*, 609 F.3d at 793-95, *quoting Fairman v. Anderson*, 188 F.3d 635, 644 (5th Cir. 1999).  In the death penalty context, he must establish actual innocence by showing by clear and convincing evidence that, "but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law."  *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992).

Petitioner argues that this claim was presented to the state courts on direct appeal and was addressed on the merits by the Court of Criminal Appeals.  However, Petitioner's claim was framed in terms of violations of state law, not federal constitutional law.  A petitioner has not exhausted his state remedies when he relies on a legal theory different from that raised in the state court or when the same claim in federal court is supported by factual allegations not raised in the state court.  *Ogan v. Cockrell*, 297 F.3d 349, 358 (5th Cir.), *cert. denied*, 537 U.S. 1040 (2002); *Dispensa v. Lynaugh*, 847 F.2d 211, 217-18 (5th Cir. 1988).  As Petitioner's claims in the state court were not based upon violations of the federal constitution, they are barred.

Even if not barred, Petitioner's claim would be without merit.  The ex post facto clause[10] prohibits implementation of a law to a defendant if it creates a crime that did not previously exist, if it makes the punishment for a crime greater than existed when the act was committed, or deprives "one charged with crime of any defense available

---

[10]        There are actually two ex post facto clauses in the constitution.  Art. I, § 9, cl. 3 applies to the Federal government, while Art. I, § 10, cl. 1 applies to the States.  *Stogner v. California*, 539 U.S. 607 (2003).

according to law at the time when the act was committed."[11]  *Collins v. Youngblood*,

497 U.S. 37, 52 (1990).  A law that alters legal rules of evidence, requiring less proof

to obtain a conviction, also implicates the ex post facto clause.  *Carmell v. Texas*,

529 U.S. 513 (2000).  A statute does not run afoul of the ex post facto clause if it

merely alters a procedural rule.  *Id*. A procedural change is a change "in the

procedures by which a criminal case is adjudicated, as opposed to changes in the

substantive law of crimes."  *Collins v. Youngblood*, 497 U.S. at 42.  The statute in

this case clearly falls within the procedural category.   The elimination of the

prohibition against a second search warrant did not eliminate a defense to the

charges Petitioner faced, nor did it alter the quantum of proof necessary to convict

him.

Petitioner's argument that the amended statute implicates his substantive right

to be free from search and seizure is not supported.  The Constitution protects

against *unreasonable* searches and seizures, not all searches and seizures.  There

was, therefore, no due process or ex post facto violation in this case.

2.  Speedy Trial Violation.  Petitioner argues that his rights to a speedy trial

and the effective assistance of counsel were violated due to the lapse of time which

occurred between the first and second indictment.   Petitioner asserts that the

---

[11]     While the Ex Post Facto Clause limits the powers of legislatures, the Supreme Court "has acknowledged a similar limitation on the power of the judiciary to render decisions that retroactively criminalize previously legal conduct."  *Janecka v. Cockrell*, 301 F.3d 316, 322 n. 9 (5th Cir. 2002), *citing Marks v. United States*, 430 U.S. 188, 191 (1977) and *Bouie v. City of Columbia*, 378 U.S. 347, 353 (1964).

circumstances violated his Sixth and Eighth Amendment rights were violated, as well as his Fourteenth Amendment right to due process.

The Sixth Amendment provides the accused in a criminal prosecution the right to a speedy and public trial.  "This protection attaches when 'the defendant has been formally indicted or actually restrained accompanying arrest.'" *United States v. Jackson*, 549 F.3d 963, 971 (5th Cir. 2008), *quoting Dickerson v. Guste*, 932 F.2d 1142, 1144 (5th Cir. 1991).  *See also United States v. Marion*, 404 U.S. 307, 313 (1971).  When no indictment is outstanding, only the "actual restraints imposed by arrest and holding to answer a criminal charge . . . engage the particular protections of the speedy trial provision of the Sixth Amendment.  *Id.* at 320.  *See also United States v. Loud Hawk*, 474 U.S. 302, 310 (1986).  "Similarly, the Speedy Trial Clause has no application after the Government, acting in good faith, formally drops charges."  *United States v. MacDonald*, 456 U.S. 1, 7 (1982).  This is because the speedy trial guarantee "is designed to minimize the possibility of lengthy incarceration prior to trial, to reduce the lesser, but nevertheless substantial, impairment of liberty imposed on an accused while released on bail, and to shorten the disruption of life caused by arrest and the presence of unresolved criminal charges."  *Id.* at 8.  The appropriate means of protection for a defendant who alleges inordinate delay between arrest and trial is the applicable statute of limitations and the Due Process Clause.  *United States v. Marion*, 404 U.S. at 322; *United States*

*v. MacDonald*, 456 U.S. at 8.  As there is no statute of limitations for murder in Texas, Petitioner's basis for relief is under the Due Process Clause.

Any delay prior to charges being filed is scrutinized under the Due Process Clause, not the Speedy Trial Clause.  *United States v. MacDonald*, 456 U.S. at 7. The burden of proving a due process violation due to pre-indictment delay is upon the defendant, "who must prove that (1) the prosecutor intentionally delayed the indictment to gain a tactical advantage, and (2) the defendant incurred actual prejudice as a result of the delay." *United States v. Beszborn*, 21 F.3d 62, 65, 66 (5th Cir.), *cert. denied sub nom Westmoreland v. United States*, 513 U.S. 934 (1994). *See also United States v. Marion*, 404 U.S. at 324 (the Due Process Clause could require dismissal of an indictment if a defendant established that pre-indictment delay "caused substantial prejudice to [his] rights to a fair trial and that the delay was an intentional device to gain tactical advantage"); *United States v. Crouch*, 84 F.3d 1497, 1514 (5th Cir. 1996) (*en banc*), *cert. denied*, 519 U.S. 1076 (1997) ("[F]or preindictment delay to violate the due process clause it must not only cause the accused substantial, actual prejudice, but the delay must also have been intentionally undertaken by the government for the purpose of gaining some tactical advantage over the accused in the contemplated prosecution or for some other impermissible, bad faith purpose").  In order to demonstrate prejudice, "the defendant must offer more than mere speculation of lost witnesses, faded memories or misplaced documents; he must show an actual loss of evidence that would have

20

aided the defense and that cannot be obtained from other sources." *United States v. Gulley*, 526 F.3d 809, 819-20 (5th Cir. ), *cert. denied*, ___ U.S. ___, 129 S.Ct. 159 (2008). Petitioner has shown neither prejudice nor government misconduct.

Nor is there anything to indicate that the delay between the commission of the offense and Petitioner's conviction implicates the Eighth Amendment's prohibition against cruel and unusual punishment. Petitioner points to no clearly established Supreme Court authority that holds a lengthy delay between commission of an offense and date of execution constitutes cruel and unusual punishment.

Petitioner has failed to establish that the Court of Criminal Appeals' decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

3. Search and Seizure in Violation of the Fourth Amendment. Petitioner asserts that the consent to search he gave to police should be disregarded as it was elicited as a result of his illegal arrest. Petitioner argues that there was insufficient probable cause to arrest him. As the State notes, a state habeas petitioner may not obtain relief based upon a Fourth Amendment claim where the state has provided an opportunity for full and fair litigation of the claim. *Stone v. Powell*, 428 U.S. 465 (1976). *Stone* forecloses review "in the absence of allegations that the processes provided by a state to fully and fairly litigate fourth amendment claims are routinely

21

or systematically applied in such a way as to prevent the actual litigation of fourth amendment claims on their merits." *Williams v. Brown*, 609 F.2d 216, 220 (5th Cir. 1980). "[E]rrors in adjudicating Fourth Amendment claims are not an exception to *Stone's* bar." *Moreno v. Dretke*, 450 F.3d 158, 167 (5th Cir. 2006), *cert. denied*, 549 U.S. 1120 (2007). Petitioner presents no argument that Texas courts systematically and erroneously apply the state procedural bar rule to prevent adjudication of Fourth Amendment claims.

Even if Petitioner's Fourth Amendment claim were not barred, it would be without merit. There were sufficient circumstances known to the arresting officer to provide probable cause to arrest Petitioner. The descriptions of the suspect and his vehicle led police to Petitioner through Maria's brother, who was acquainted with Petitioner. A car fitting the description given by the witnesses was parked in front of Petitioner's residence, and a check revealed the car was registered to Petitioner. Petitioner matched the physical description given by the witnesses, including the clothes he was wearing. He also had scratches on his face, which the arresting officer knew could have come from the attack on Maria who had blood and skin under her fingernails. Additionally, Petitioner ducked his head when the arresting officer told him why he was there, indicating guilt to the officer.

Even if there were a Fourth Amendment violation, the evidence discovered during the search was, some yellow wire, could not have had only slight, if any, influence on the jury's decision, as the wire was not the same size as that used to

murder Maria.  The evidence linking Petitioner to Maria's murder was more than sufficient absent that piece of evidence.  Much more inculpatory was the evidence that Petitioner had access at his place of employment to wire that was the same size as that used in the murder.  Accordingly, Petitioner has no ground for relief under the Fourth Amendment as the Court of Criminal Appeals' decision was not  contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court, nor was it based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

          4.  Impermissibly Suggestive Identification Procedure.  During the investigation, police discovered three witnesses who had observed an individual leaving Maria's house on the morning of the murder – Troy Wells, Lori Peterson, and Doreen Kennedy.  All three witnesses identified Petitioner's Camaro as the car they had seen at Maria's house on the day of the murder.  Kennedy was unable to identify Petitioner from a photo array or from a live line-up.  Peterson was unable to identify Petitioner from the photo array, but did identify him at the live line-up.  Wells was unable to identify Petitioner from the photo array, although he pointed to Petitioner's picture and said he "looked familiar."   The individual Wells selected looked remarkably similar to Petitioner.  Wells was then shown two photographs of Petitioner looking downward, which was the position all the witnesses had described.  After looking at those photographs, Wells picked out Petitioner.  At the live line-up

23

almost a month later, Wells again identified Petitioner.  At the hearing on Petitioner's motion to suppress, Wells testified that he could identify Petitioner in court because he independently remembered him from the day of the murder, and that the photo line-up did not influence his decision in the live line-up.

Petitioner argues that the numerous photographs shown to Wells of Petitioner tainted his identification and constituted a violation of his Sixth Amendment right to confrontation and his Fourteenth Amendment due process rights.[12]  An in-court identification is inadmissible when it has been tainted by an impermissibly suggestive pre-trial photographic identification.  The test is whether, under the totality of the circumstances, "the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."  Simmons v. United States, 390 U.S. 377, 384 (1968).  Non-exclusive factors to be considered are: (1) the opportunity the witness had to view the defendant at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the defendant; (4) the level of certainty demonstrated by the witness at the time of the identification; and (5) the length of time which had elapsed between the commission of the crime and the identification. Neil v. Biggers, 409 U.S. 188, 199-200 (1972).  Only the reliability of Wells'

---

[12]     Although Petitioner appears to also question the identifications made by Peterson and Kennedy, there is nothing in the record to establish that either identified Petitioner after an impermissibly suggestive identification procedure.

identification at issue, as neither of the other witnesses was shown the additional photographs of Petitioner looking down.

The Court of Criminal Appeals noted the following when evaluating the Biggers factors:

> Wells, a reserve police officer at the time of the instant offense, stated he had one to two minutes in which to view [Petitioner]. He was dropping his wife off at work when they saw the primer-red Camaro and a man walking towards them from the direction of the victim's house. They felt the situation was unusual, so Wells waited with his wife until another employee arrived before she got out of their vehicle to open up the business. Viewing these deferentially, Wells' experience as a trained police officer and his concern for his wife could have heightened his ability to take in detail despite the fact that their infant sone was screaming in the car.
>
> Next, Wells' description of the suspect matched that of the other two witnesses who saw the suspect that morning, and matched [Petitioner's] general appearance. [Petitioner] points out that every witness was mistaken because, although they were correct about he height, hair, clothing, race, and weight, they did not notice he had a full beard instead of just a mustache. However, Wells noted that he saw a mustache that went past the corners of the suspect's mouth and the suspect had his head buried in his chest while he walked quickly toward the Camaro. It is conceivable that the positioning of the suspect's head prevented the witness from viewing the full extent of the suspect's facial hair.
>
> Wells' first confrontation with [Petitioner] was at the photo line-up, twenty-seven days following the crime. Wells indicated [Petitioner] looked familiar, but initially identified another individual – whose picture looked very similar to [Petitioner's] – because, he stated, of how the man was holding his eyes. Wells never changed his description of the suspect at any time. At both the live line-up and in court, Wells positively identified [Petitioner] and testified that the identification was based on what he observed the morning of the offense and not on any intervening photographs he may have viewed.

*Ibarra v. State of Texas*, 11 S.W.3d at 196.  The totality of the circumstances supports the Court of Criminal Appeals determination there was no substantial likelihood of misidentification.  Accordingly, Petitioner has no ground for relief under the Sixth and Fourteenth Amendments as the Court of Criminal Appeals' decision was not  contrary to, nor did it involve an unreasonable application of, clearly established Federal law as determined by the Supreme Court, nor was it based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

      5.  Improper Introduction of Testimony Regarding Victim's Fear of Petitioner.  As previously noted, Petitioner failed to exhaust his available state remedies as to this claim and it is barred from federal habeas review.  While Petitioner raised the same factual basis in his appeal, he argued that the testimony was irrelevant hearsay because he did not raise self defense or the defense of sudden passion, a state evidentiary claim.  The Court of Criminal Appeals' rejection of the claim was based solely on state law – he did not preserve the issue by failing to make a contemporaneous objection.

      Even if the claim were not otherwise barred, it would be without merit.  The Sixth Amendment protects a defendant's right to confront the witnesses against him.  The Confrontation Clause "reflects a judgment, not only about the desirability of reliable evidence. . ., but about how reliability can best be determined."  *Crawford v. Washington*, 514 U.S. 36, 61 (2004) (citation omitted).  Testimonial evidence

regarding the statements of another are not in conflict with the Confrontation Clause and Sixth Amendment if the declarant is unavailable and there was a prior opportunity for cross-examination of the declarant. The *Crawford* case established a new rule regarding the introduction of such testimony. Prior authority permitted such testimony if the declarant was unavailable and if the statement bore adequate "indicia of reliability." *See Ohio v. Roberts*, 448 U.S. 56 (1980). As a new rule, application of *Crawford* retroactively would run afoul of *Teague v. Lane*, 489 U..S. 288 (1989).

Even under *Crawford*, the evidence could be deemed admissible if it fell within an exception to the hearsay rule, such as the existing mental, emotional, or physical condition codified in Rule 803(3) of the Federal Rules of Evidence. The rule is currently widely recognized in both federal and state courts and has been recognized for a long time, establishing it as a "firmly rooted" hearsay exception. *See White v. Illinois*, 502 U.S. 346, 356 n. 8 (1992). Finally, even if erroneously admitted, this testimony could have little influence on the jury's verdict considering the overwhelming physical evidence against Petitioner. Petitioner's fifth ground is without merit.

6. Improper Introduction of Reputation Evidence. As previously noted, Petitioner's claim in this regard was not exhausted in the state courts. Petitioner argued on appeal that this testimony was inadmissible as reputation testimony under state law because it was based solely on specific bad acts. The Court of Criminal

Appeals determined that the testimony was properly admitted as character testimony under Rule 405(a) of the Texas Rules of Criminal Evidence. Even if not procedurally barred, this claim would be without merit.

Evidentiary rulings in particular are not generally subject to federal habeas review unless they violate some particular constitutional right or if such rulings impacted a defendant's due process rights to such as degree as to render the trial as a whole "fundamentally unfair." *Cupit v. Whitley*, 28 F.3d 532, 536 (5th Cir. 1994); *Trussell v. Estelle*, 699 F.2d 256, 259 (5th Cir. 1983).

Petitioner argues about the testimony of his sister-in-law, who testified concerning a sexually inappropriate incident she had observed between Petitioner and her sister. The witness did not testify to just this incident, but also about the fact that Petitioner had molested her son. Also, as reputation testimony it would be admissible because it was based not only upon the witness's observation, but also upon what she had heard, not only from her father, but from other family members and other people. As a result, Petitioner's sixth ground is without merit.

7. Unavailability of Appellate Review of the Death Penalty. Petitioner argues that Article 37.071 of the Texas Code of Criminal Procedure prevents meaningful appellate review as the Court of Criminal Appeals has held that it cannot review the jury's decision to impose the death penalty. He asserts that appellate review is unavailable as to the jury's decision on mitigation in violation of the Eighth and Fourteenth Amendments. The Court of Criminal Appeals rejected Petitioner's

argument under both state and federal law.  Petitioner's claim is foreclosed by federal law, which holds that the Eighth Amendment does not require a redetermination on appeal of the death sentence of one found to be death eligible. *McCleskey v. Kemp*, 481 U.S. 279 (1987); *Pulley v. Harris*, 465 U.S. 37, 45-46 (1984).  The Fifth Circuit has rejected Petitioner's argument, upholding the Court of Criminal Appeals' refusal to review the jurors' subjective determination on mitigation. *Moore v. Johnson*, 225 F.3d 495 (5th Cir. 2000), *cert. denied*, 532 U.S. 949 (2001). The *Moore* court determined that this refusal meets Constitutional muster. Therefore, the Court of Criminal Appeals' decision was not  contrary to, nor did it involve an unreasonable application of, clearly established Federal law as determined by the Supreme Court, nor was it based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

8.  Ineffective Assistance of Counsel.  Petitioner argues that his trial counsel was ineffective in failing to investigate, develop and present available mitigation evidence, as well as evidence which would rebut portions of the State's case in aggravation, relying upon the opinion in Wiggins v. Smith, 539 U.S. 510 (2003).  As previously noted, this claim was procedurally defaulted because it was raised in his fourth state habeas application and was dismissed under the Texas abuse of the writ statute, an adequate and independent state ground.  Petitioner responds that the

state dismissal was not clearly independent of federal law because  the opinion required the incorporation and application of federal law.

The State court order in this case was a per curiam order which went through Petitioner's various filings and concluded, "[w]e have reviewed Applicant's claim for relief and find that it does not meet the requirements for consideration of subsequent claims under Article 11.071, Section 5.  Therefore, we dismiss this subsequent application."  *Ex parte Ibarra*,, 2008 WL 4417283, No. 48,832-04 (Tex. Crim. App. 2008).  There is no indication in the order that the Court of Criminal Appeals relied upon anything other than abuse of the writ.  In cases where a state court is silent about the basis for its decision, or where federal law was not expressly invoked in the opinion, does not create a presumption that the state judgment rested on federal grounds. *Coleman v. Thompson*, 501 U.S. 722, 737 (1991).  A perfunctory dismissal does not suggest that the state court considered or ruled on the merits.  *Hughes v. Quarterman*, 530 F.3d 336, 342 (5th Cir. 2008).  While noting the distinctions in the *Ruiz*[13] case upon which Petitioner relies, the Fifth Circuit has distinguished it because of the dissension among the Court of Appeals judges.  *Balentine v. Thaler*, 626 F.3d 842 (5th Cir. 2010) ("We conclude that *Ruiz*, by relying on the fact that one of the state court judges clearly reached the merits, had a decision in which it did 'fairly appear' that the state court primarily relied on federal grounds"). *Balentine* specifically rejected the argument that a denial of relief under Section 5, without

---

[13]        *Ruiz v. Quarterman*, 504 F.3d 523 *(5th Cir. 2007).

30

more, would justify a presumption that the Court of Criminal Appeals reached the federal merits of the application. *Id*. at 851, 854.

The facts in this case are more akin to *Hughes v. Quarterman*, 530 F.3d 336 (5th Cir. 2008), in which the Fifth Circuit applied Texas' abuse of the writ doctrine. In the *Hughes* case, the Fifth Circuit identified two factors that discourage reading uncertainty into the Court of Criminal Appeals' terse order.  First, the factual basis for the barred claims was available well before the petitioner filed those claims. Second, there is nothing in the perfunctory dismissal that remotely suggests that the Court of Criminal Appeals "actually considered or ruled on the merits." *Id*. at 342. The same is true here.  The facts Petitioner raises in support of his ineffective assistance claim were available to him during the course of his first habeas application.  He has shown no cause and prejudice for failing to present them earlier, nor has he established that failure to consider this claim now would be a miscarriage of justice.

Even assuming that Petitioner's claim is not procedurally barred, it is without merit.  The Sixth Amendment to the Constitution provides that the accused in a criminal prosecution has the right to assistance of counsel for his defense.   In evaluating whether counsel's performance is inadequate, the Supreme Court has developed a two-prong test. *Strickland v. Washington*, 466 U.S. 668 (1984).  Under this test, the Petitioner must establish:  (1) that counsel's performance was deficient; and (2) that the deficient performance prejudiced the defense so as to deprive him

of a fair trial.  *Id.*  The proper standard for evaluating counsel's performance is that of reasonably effective assistance, considering all of the circumstances existing as of the time of counsel's conduct.  *Hill v. Lockhart*, 474 U.S. 52 (1985).  Scrutiny of counsel's performance is "extremely deferential;"  *Bell v. Lynaugh*, 828 F.2d 1085, 1088 (5th Cir. 1987); and counsel's conduct is "strongly presumed to fall within the wide range of reasonable professional assistance."  *Strickland*, 466 U.S. at 690. Counsel's advice need not be perfect -- it need only be reasonably competent within the "range of competence demanded of attorneys in criminal cases."  *McMann v. Richardson*, 397 U.S. 759, 771 (1970).  To establish prejudice, the defendant must show that his attorney's errors were so serious that they rendered "the result of the trial unreliable or the proceeding fundamentally unfair."  *Lockhart v. Fretwell*, 506 U.S. 362, 372 (1993).

Petitioner asserts that further investigation by counsel would have established numerous problems with his background, including desperate poverty, inadequate nutrition, disruptive family life, experience of and exposure to family violence, poor childhood development both mentally and physically, poor performance at school, and suffering a head injury as a child.  Petitioner further asserts that he suffers from mental retardation and post-traumatic stress disorder.  The facts, however, are one-sided.  Because these matters were not presented to the state court in a procedurally correct manner, there was no hearing on the issues before the trial

court and no fact findings.  Additionally, without the evidentiary hearing, there are no affidavits or statements from trial counsel which could explain strategic decisions.

Even assuming the foregoing deficiencies, the record establishes that there was at least some investigation made by counsel.  The record reflects motions for investigative funding and assistance, including evaluations by Dr. Stephen Mark, a psychiatrist.  Many of the facts identified by Petitioner were in fact presented to the jury through the testimony of Petitioner's sister and his wife, who testified that Petitioner came to the United States to find work to help support his family, that their family was poor, and that they lived in "humble" circumstances, working on the land, and the circumstances of his family situation in the United States.  Since the information was provided to the jury, Petitioner has failed to establish that counsel was ineffective for failing to investigate or present such evidence.

Even if counsel were determined to be ineffective, Petitioner must still show prejudice before he may prevail, which entails showing a reasonable probability that the jury would not have imposed the death penalty in the absence of counsel's errors.  In this case, the overwhelming aggravated factors, previously discussed, outweigh the possible mitigating evidence Petitioner could introduce, particularly considering the "brutal and senseless nature of the crime."  *Smith v. Quarterman*, 471 F.3d 565, 576 (5th Cir. 2006).  Petitioner's ineffective assistance claim is likewise without merit.

9. Mental Retardation. Petitioner asserts that he is mentally retarded and that his execution would be in violation of the Eighth Amendment ban on excessive and cruel and unusual punishment under the authority of *Atkins v. Virginia*, 536 U.S. 304 (2002). In support of this claim, Petitioner presents a number of affidavits. However, these were never presented to the state court. Such evidence is to be analyzed under § 2254(b), which requires exhaustion in the state courts. "The exhaustion requirement is not satisfied if the petitioner 'presents *material* additional evidentiary support to the federal court that was not presented to the state court.'" *Lewis v. Quarterman*, 541 F.3d 280, 285 (5th Cir. 2008), *quoting Dowthitt v. Johnson*, 230 F.3d 733, 745 (5th Cir. 2000) (emphasis in original). "Evidence is material if it fundamentally alters, not merely supplements, the claim presented in state court. *Id*.

In state court, Petitioner presented no witnesses at all and submitted no affidavits from family. In order to establish that he falls under the protection of *Atkins*, Petitioner must show that he possess significantly subaverage intellectual functioning, which impacts two or more adaptive skill areas (communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work), which manifested before the age of 18. *Atkins* at 309 n.3, 317 n. 22. Without the testimony or affidavits from Petitioner's family and teacher, which he submits in this court for the first time, Petitioner fails to establish that any impairment he may have in his intellectual functioning occurred

before the age of 18.  The affidavits are, therefore, material rather than merely supplementary and should have been presented to the state court for exhaustion prior to presentation in this Court.  Petitioner's claim in this regard is procedurally defaulted for failure to exhaust the claim in the state court.

Petitioner argues that he was unable to fully investigate or present evidence because he was not given sufficient time and resources to do so.  However, Atkins was decided in 2002.  The evidentiary hearing was scheduled in September of 2006. There was more than sufficient time to gather whatever evidence was needed to present to the state court.  Petitioner's argument that funds were not approved by the state court is without merit, as certain funds were approved.  Additionally, as there is no right to counsel in a habeas proceeding, there is also no right to funding of state habeas counsel.  *Roberts v. Dretke*, 356 F.3d 632, 640 (5th Cir. 2004). Finally, Petitioner presents nothing to establish why assistance was not requested from the Mexican consul, who was advised of Petitioner's case in September of 1997.  As the affidavit of Agustin Rodriguez De La Gala indicates, the Mexican consulate was available to provide assistance in mitigation investigations, as well as funds for expert and investigative assistance, interpreters, psychologists, mitigation specialists, psychiatrists and travel expenses.   There is, therefore, no excuse for Petitioner's procedural default.

Even if the Court were to consider the merits of this claim, the evidence that was presented to the state court would be insufficient to overcome the record in this

case. Dr. Stephen Mark evaluated Petitioner on two occasions, finding that he was competent to stand trial and that he was not mentally retarded. The expert opinion provided by Petitioner, which was completed in 2003 after *Atkins*, cannot carry as much weight as it was completed at a time when Petitioner had great incentive to appear as intellectually compromised as possible. This claim is without merit.

10.   Jury Verdict as to Mental Retardation. Petitioner next argues that his Sixth Amendment rights were violated because the State was not required to prove beyond a reasonable doubt and the jury was not required to make a factual finding that he was mentally retarded. As previously noted, this claim was also procedurally defaulted as it was dismissed by the Court of Criminal Appeals as an abuse of the writ. Even if not barred, the claim would be without merit.

Petitioner relies upon the holdings in *Ring v. Arizona*, 536 U.S. 584 (2002), *Apprendi v. New Jersey*, 530 U.S. 466 (2000), as well as *Atkins*. However, the Fifth Circuit has recently held that "neither *Ring* and *Apprendi* nor *Atkins* render the absence of mental retardation the functional equivalent of an element of capital murder which the state must prove beyond a reasonable doubt." *In re Johnson*, 334 F.3d 403, 405 (5th Cir. 2003). *See also Woods v. Quarterman*, 498 F.3d 580, 585 n. 3 (5th Cir. 2007). Accordingly, Petitioner's tenth claim is without merit.

11.   Violation of the Vienna Convention on Consular Relations. Petitioner asserts his rights under the Vienna Convention were violated because he was not advised of his right to consult with the Mexican consulate when arrested. This claim

36

is also barred be procedural default.  The Court of Criminal Appeals dismissed this claim in Petitioner's direct appeal due to lack of a contemporaneous objection.  As such, Petitioner's claim is barred.

Even if not procedurally barred, Petitioner's claim would be without merit.  The history of this particular claim is outlined in the Supreme Court's opinion in *Medellin v. Texas*, 552 U.S. 491 (2008).  Basically, the United States ratified the Vienna Convention on Consular Relations ("Vienna Convention" or "Convention") and the Optional Protocol Concerning the Compulsory Settlement of Disputes to the Vienna Convention ("Optional Protocol" or "Protocol") in 1969.  Article 36 of the Convention provides that if a person detained in a foreign country requests, that country should inform the consular post of the detained person's country of his detention and inform the detainee of the right to request assistance from his consulate.  The Optional Protocol provides that disputes arising out of the Convention would be brought before the International Court of Justice ("ICJ").   A number of Mexican nationals filed a claim before the ICJ, claiming violations of the Convention.  The ICJ held that the Mexican nationals were entitled to review and reconsideration of their state-court convictions and sentences in the United States.  *Case Concerning Avena and Other Mexican Nationals (Mex. v. U.S.)*, 2004 I.C.J. 12 (Judgment of Mar. 31) (*Avena*). The Supreme Court then ruled, contrary to Avena, that the Vienna Convention did not preclude the application of state default rules.  *Sanchez-Lamas v. Oregon*, 548 U.S. 331 (2006).   President George W. Bush then determined, through a

Memorandum to the Attorney General (Feb. 28, 2005), that the United States would "'discharge its international obligations'" under Avena 'by having State courts give effect to the decision.'" *Medellin v. Texas*, 552 U.S. at 498.  As Medellin filed his habeas action raising the Vienna Convention and the *Avena* case as a basis for relief, the Supreme Court determined that Avena was not binding federal law as ICJ judgments are not conclusive on American courts.  *Id*.  Nor was the President's Memorandum sufficient to bind *Avena* onto domestic courts.  As a result, Petitioner's claim is subject to procedural bar.  *See Leal Garcia v. Quarterman*, 5793 F.3d 214 (5th Cir. 2009).

Even if procedural default were somehow waived, to be successful Petitioner would need to show prejudice.  No additional assistance could have diminished the power of the evidence against him.  The DNA and witnesses that connected him to the murder, the brutality of the crime, and the continuing threat to society that he posed were of such weight that no reasonable jury would have made a different decision.  Accordingly, Petitioner's eleventh ground is likewise without merit.

In light of the foregoing, it is

**ORDERED** that Respondent's Motion for Summary Judgment is **GRANTED**. It is further

**ORDERED** that Petitioner's application for federal writ of habeas corpus is **DENIED** and this case is **DISMISSED**.  It is further

**ORDERED** that Petitioner's Motion for Evidentiary Hearing is **DENIED**.  It is further

**ORDERED** that any motions not previously ruled upon by the Court are **DENIED**.

Additionally, having considered the findings and conclusions set forth above and the requirements of 28 U.S.C. § 2253, the Courts finds, *sua sponte*, that a certificate of appealability should not issue, as Petitioner has failed to make a substantial showing of the denial of a constitutional right.

**SIGNED** on this 31st day of March, 2011.

_____
WALTER S. SMITH, JR.
UNITED STATES DISTRICT JUDGE