IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS, WACO DIVISION

_____

|  |  |  |
|---|---|---|
| | § | |
| RAMIRO IBARRA RUBI | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| vs. | § | HABEAS CORPUS |
| | § | |
| RICK THALER, Director, | § | No. 02-CV-52 |
| Texas Department of Criminal | § | |
| Justice, Institutional Division | § | |
| | § | |
| Respondent | § | |
| | § | |
| | § | |

_____

PETITIONER'S MOTION TO ALTER OR AMEND
PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 59(E)
(ORAL ARGUMENT REQUESTED)

Russell D. Hunt, Jr.
Attorney for Petitioner
811 Nueces Street
Austin, Texas 78701
(512) 930-0860
(512) 473-8804 – Facsimile
Texas State Bar # 00790937

Naomi Terr
Attorney for Petitioner
1927 Blodgett Street
Houston, Texas 77004
(713) 222-7788
(713) 222-0260 – Facsimile
Texas State Bar # 24033379

Comes now, Ramiro Ibarra Rubi ("Petitioner"), by his undersigned counsel, and hereby respectfully moves the Court, pursuant to Federal Rule of Civil Procedure 59(e), to alter or amend its Judgment issued April 21, 2011, dismissing Mr. Ibarra's Amended Petition for Writ of Habeas Corpus filed pursuant to 28 U.S.C. § 2254, granting Respondent's Motion for Summary Judgment, ordering that all motions not previously ruled upon, including the Motion for Evidentiary Hearing filed on June 21, 2010, be denied, and ordering that no Certificate of Appealability shall issue. Mr. Ibarra respectfully requests the opportunity to present oral argument on this Motion. In support of this Motion, Mr. Ibarra states the following:

## PROCEDURAL HISTORY

Mr. Ibarra was charged by indictment in the District Court of McLennan County, Texas, 54th Judicial District, with the felony of Capital Murder. He entered a plea of not guilty.

Jury selection commenced on August 12, 1997, the Honorable George H. Allen, presiding. The presentation of evidence began on September 8, 1997, and the jury returned a verdict of guilty on September 17, 1997. The jury then found Mr. Ibarra would be a continuing threat to society, and that there were not sufficient mitigating circumstances to warrant a life sentence.

Mr. Ibarra was then sentenced to death by lethal injection on September 22, 1997. Mr. Ibarra filed a Motion for New Trial, which was overruled on December 5, 1997. Mr. Ibarra then timely filed Notice of Appeal. The Texas Court of Criminal Appeals affirmed the conviction and sentence on October 20, 1999 in *Ibarra v. State*, 11 S.W.3d 189 (Tex. Crim. App. 1999). Mr. Ibarra filed a timely petition for writ of *certiorari* to the United States Supreme Court, which denied *certiorari* on October 2, 2000. *Ibarra v. Texas*, No. 99-894.

On June 21, 1999, Mr. Ibarra filed an "Application for Writ of Habeas Corpus Seeking Post-Conviction Relief from a Death Sentence" with the 54th Judicial District Court of McLennan County, Texas.  The petition asserted only one claim, that the delay from the date of conviction and sentence to the date of execution violates the Eighth Amendment to the U.S. Constitution's prohibition against cruel and unusual punishment.  The petition asserted no non-record claims.  The 54th Judicial District Court forwarded its recommendation that relief be denied on March 1, 2001.  The Texas Court of Criminal Appeals adopted those Findings and Conclusions and denied Mr. Ibarra relief on his claim.  *Ex Parte Ibarra*, No. 48,832-01 (Tex. Crim. App. 2001).  This Court appointed undersigned Attorney Hunt on March 12, 2002.

Mr. Ibarra's motion for leave to file an amended application in this Court was granted on April 5, 2002.  The order instructed Mr. Ibarra to file an amended application no later than July 1, 2002.  Mr. Ibarra's first amended Application for Writ of Habeas Corpus was timely filed.

On June 19, 2003, Mr. Ibarra filed an application for post-conviction writ of habeas corpus in the 54th District Court of McLennan County raising a claim under the new rule announced in *Atkins v. Virginia*, 536 U.S. 304 (2002).  On September 30, 2004, this Court granted Mr. Ibarra's motion to stay these proceedings to allow him to pursue his *Atkins* claim in state court.

On March 24, 2005, while his petition alleging mental retardation was pending before the convicting court, Mr. Ibarra filed a subsequent application for writ of habeas corpus asserting that his rights under the Vienna Convention on Consular Relations (VCCR) had been violated, and that this violation should be reviewed pursuant to *Case Concerning Avena and Other Mexican Nationals* (Mex. v. USA), 2004 I.C.J. 128 (Mar. 31, 2004), and the related *Presidential Detremination of February 28, 2005*.

3

After a hearing on September 18, 2006, at which the merits of Mr. Ibarra's *Atkins* claim were not addressed, the trial court entered findings of fact and conclusions of law holding that Mr. Ibarra is not an individual with mental retardation.

On November 15, 2006, the Court of Criminal Appeals decided *Ex Parte Medellin*, 223 S.W.3d 315, 352 (Tex. Crim. App. 2006), a case involving a functionally indistinguishable VCCR claim from Mr. Ibarra's.  In *Medellin*, the state court held that the ICJ decision does not preempt the state procedural requirements for consideration of a subsequent application for writ of habeas corpus.

On September 26, 2007, the Texas Court of Criminal Appeals issued an order adopting the convicting court's recommendation that relief be denied on the mental retardation petition, and dismissing the VCCR petition for failure to satisfy the Art. 11.071, § 5 requirements.  *Ex Parte Ibarra*, No. 48,832-02 & 03 (Tex. Crim. App. Sept. 26, 2007) (per curiam).  A petition for writ of *certiorari* seeking review of that order was filed with the U.S. Supreme Court on December 24, 207.  On May 19, 2008, the Supreme Court denied *certiorari* on Mr. Ibarra's claims.  *Ibarra v. Texas*, No. 07-9355.

On May 28, 2008, this Court again continued the stay of federal proceedings to allow Mr. Ibarra to exhaust his claim based on *Wiggins v. Smith*, 539 U.S. 510 (2003).  On October 1, 2008, the *Wiggins* claim was dismissed by the Texas Court of Criminal Appeals for failure to satisfy the requirements of Art. 11.071, § 5.  *See Ex Parte Ibarra*, No. WR-48,832-04 (Tex. Crim. App. Oct. 1, 2008).

On October 21, 2008, this Court granted an agreed motion to lift the stay of proceedings and entered an agreed briefing schedule for submission of an amended petition for writ of habeas corpus and subsequent proceedings.  The amended petition was timely filed on January 5, 2009.

4

The state filed its answer to the Amended Petition on July 6, 2009. Mr. Ibarra replied on September 2, 2009, and the state filed its Reply with brief in support on December 4, 2009.

Mr. Ibarra filed a Motion for Evidentiary Hearing on his *Atkins*, ineffective assistance of counsel, and VCCR claims on June 21, 2010. The State filed its Response opposing the Motion for Evidentiary Hearing on August 9, 2010.

On March 31, 2011, this Court issued an Order dismissing Mr. Ibarra's Amended Petition for Writ of Habeas Corpus filed pursuant to 28 U.S.C. § 2254, granting Respondent's Motion for Summary Judgment, ordering that all motions not previously ruled upon, including the Motion for Evidentiary Hearing filed on June 21, 2010, be denied, and ordering that no Certificate of Appealability shall issue. The Clerk of the Court issued a final Judgment in accordance with the Court's order on April 21, 2011.

## I.    STANDARD OF REVIEW

A motion to alter or amend a judgment under Rule 59(e) serves to "correct manifest errors of law or fact or to present newly discovered evidence." *Waltman v. Int'l. Paper Co.*, 875 F.2d 468, 473 (5th Cir. 1989). "The district court has considerable discretion in deciding whether to reopen a case under Rule 59(e)," keeping in mind "two competing imperatives: (1) finality, and (2) the need to render just decisions on the basis of all the facts." *Edward H. Bohlin Co. v. Banning Co.*, 6 F.3d 350, 355 (5th Cir. 1993). The exercise of the Court's discretion "is guided in the context of a capital case by considerations arising from the unique nature of the death penalty and the heightened reliability demanded by the Eighth Amendment in the determination whether the death penalty is appropriate in a particular case." *Hearn v. Quarterman*, 2008 U.S. Dist. LEXIS 19535, *8-*9 (N.D. Tex. 2008) (quoting *Sumner v. Shuman*, 483 U.S. 66, 72 (1987) (internal quotations omitted).

## II.   ARGUMENT

### a.  Mr. Ibarra's First Claim of Error

In its Memorandum Opinion and Order, this Court dismissed Mr. Ibarra's claim that his arrest, conviction and sentence were invalid because they resulted from a search warrant issued under a law that, as applied to Mr. Ibarra, violates the constitutional prohibitions against ex post facto and retroactive laws, finding that Mr. Ibarra had failed to exhaust the claim in state court. Specifically, this Court held that although Mr. Ibarra's direct appeal brief did challenge the issuance of the search warrant as an unconstitutional application of Texas' newly enacted law allowing subsequent search warrants, he did not base the claim on federal law.  Memorandum Opinion and Order, *Ibarra v. Thaler*, Civil Action No. W-02-CA-52 (W.D. Tex. Mar. 31, 2011) (hereinafter "Opinion and Order").

The record demonstrates that Mr. Ibarra did in fact present the federal grounds of his ex post facto claim in the highest state court, and the claim is accordingly not barred in this Court. Petitioner's Reply to Respondent Quarterman's Answer, *Ibarra v. Cockrell*, No. 02-CV-52 (Sept. 2, 2009) (hereinafter "Petitioner's Reply").  In his direct appeal brief filed in the Texas Court of Criminal Appeals, Mr. Ibarra cited and relied upon the United States Supreme Court's decision in *Collins v. Youngblood*, 497 U.S. 37 (1990), for its proposition that the ex post facto clause prohibits the retroactive application of laws that either make an act criminal that had previously not been criminal or increases the punishment for a crime already committed.  Brief for Appellant, Oral Argument Requested, *Ibarra v. Texas*, No. 72,974 (Sept. 15, 1998) at 15 (hereinafter "Direct Appeal Brief").

Not only did Mr. Ibarra cite to *Collins v. Youngblood* as the pivotal case on which Texas' ex post facto jurisprudence is predicated, but the only other case he cited for his ex post facto

6

argument was *Grimes v. State*, 807 S.W.2d 582 (1991 Tex. Crim. App.), an opinion that interpreted Texas' Ex Post Facto Provision based entirely on federal constitutional law as announced in *Collins v. Youngblood*, prior U.S. Supreme Court case law and predecessor Texas cases applying *Collins v. Youngblood*.  Direct Appeal Brief at 14-15; *See, e.g., Grimes v. State, Supra*, 807 S.W.2d at 586 ("[W]e, like the Supreme Court, adopt the Calder and Youngblood definition of 'ex post facto' and hold that such is to be used in interpreting the same term found in Article I, Section 16 of the Texas Constitution"); *id*. at 584 ("When interpreting our state constitution's Ex Post Facto Provision, Texas cases have followed the Supreme Court lead"); *id*. at 585-585 ("We have since adopted the *Collins v. Youngblood* analysis as proper in interpreting our state constitutional proscription of ex post facto legislation"); *id*. at 586 ("Since Texas first became a State, we have constitutionally prohibited the making of ex post facto legislation . . . and in doing so have followed the Supreme Court analysis in interpreting the Texas Constitutions") (citations omitted); *id*. at 586 ("*Holt* is consistent with a basic tenet of constitutional interpretation.  That is, 'If a term appears to have received a judicial construction prior to its use in a constitutional provision, the inference is that it bears that signification.' . . . 'Ex post facto' had a special significance prior to the adoption of the Texas Constitution") (citations omitted); *id*. at 587 (Court of Appeals analysis below was "an incorrect analysis under the Ex Post Facto Clause of the United States Constitution, the Ex Post Facto Provision of the Texas Constitution and our opinion today").

Indeed, as the *Grimes* Court acknowledged, even by virtue of having alleged a state ex post facto violation, Mr. Ibarra implicated federal law: "as early opinions of the United States Supreme Court have explained, 'ex post facto law' is a term of art that had an established

meaning at the time of the framing of the United States Constitution. " *Id.* at 584, (citing *Collins v. Youngblood*, *supra*, 497 U.S. 37).

Having presented the federal grounds for relief from conviction and sentence throughout his direct appeal, Mr. Ibarra has exhausted his ex post facto claim. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 844 (1999) ("we conclude that state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process"); *Shute v. Texas*, 117 F.3d 233, 237 (5th Cir. 1997) (requiring only that state prisoner properly present his federal claim to the highest state court on direct review). Respectfully, therefore, this Court's conclusion otherwise is in error.

In fairly presenting federal claims to the state court, "'a habeas petitioner need not spell out each syllable of his claim before the state courts in order to satisfy the exhaustion requirement of § 2254(b).' It suffices that the substantial equivalent of a petitioner's federal habeas claim has been argued in the state proceedings." *Spiegel v. Sandstrom*, 637 F.2d 405, 407 (5th Cir. 1981) (quoting *Lamberti v. Wainwright*, 513 F.2d 277, 282 (5th Cir 1975). The Fifth Circuit has found federal claims to be exhausted in state court by looking at the content of the cases cited in the state court pleadings and the "nature of [the challenge]," even when no federal cases are cited and the claim is not explicitly labeled federal. *See Taylor v. Cain*, 545 F.3d 327, 333-334 (5th Cir. 2008) (finding federal claim was exhausted despite petitioner not having labeled claim in state court as federal, when the "type of arguments" raised supported a federal constitutional claim, and when cases relied upon employed federal constitutional analysis); *see also Duncan v. Henry*, 513 U.S. 364, 369 (1995) (*per curiam*) (Stevens, J., dissenting) (federal claim was exhausted when the "standard for judging the [merits of the claim] under state law is the same as under federal law," reasoning that, "[i]f the state courts have considered and rejected

8

such a claim, on state-law grounds, nothing is to be gained by requiring the prisoner to present the same claim under a different label to the same courts that have already found it insufficient").

Because Mr. Ibarra's ex post facto argument in his direct appeal brief relied upon the United States Supreme Court's opinion in *Collins v. Youngblood* and the Texas Court of Criminal Appeals' opinion in *Grimes v. State*, which explicitly relied upon and applied *Youngblood* and other Supreme Court precedent in its state constitutional analysis, Mr. Ibarra's did in fact "fairly present" his federal claim to the Court of Criminal Appeals, thereby giving that Court the "opportunity to pass upon and correct" the lower court's violation of his federal constitutional right not to be prosecuted under an ex post facto law. *See, accord, Ramirez v. Attorney General*, 280 F.3d 87, 95-96 (2d Cir. 2001) (application for leave to appeal to state's highest court fairly presented federal Sixth Amendment claim despite apparently having framed the claim in state law terms because application presented "a pattern of facts that is well within the mainstream of constitutional litigation") (citations omitted).  Mr. Ibarra has accordingly exhausted his ex post facto claim in state court, and the claim was properly before this Court.

Under the same principles stated above, Mr. Ibarra has exhausted his claim that the search warrant executed against him was issued according to a law that, as applied to him, was a retroactive law imposed upon him in violation of the Fourteenth Amendment to the United States Constitution.  The preeminent case Mr. Ibarra cited to in his direct appeal brief was *Mellinger v. Houston*, 3 S.W. 249 (Tex. 1887), which, much like *Grimes v. State*, *supra*, relied on and applied federal constitutional law as pronounced by the U.S. Supreme Court in interpreting Texas' own Constitution.  Specifically, in construing Texas' prohibition against the retroactive application of laws, the Court held:

9

> The section of the Constitution which declares that "no citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disenfranchised, except by the due course of the law of the land," is written in plain language, but had not been so fully construed, as to its operation on laws retroactive in character, when the Constitution was adopted, as has it since been by the decision of the Supreme Court of the United States, to which we have referred; <u>but it must be held that the people intended, by that clause of the constitution, in so far as it is identical with the fourteenth amendment, to place thereby just such restrictions on the powers of the Legislature as the highest court in the nation has declared is the true construction of like language made a part of the Constitution of the United States for the purpose of placing a limitation on the power of the Legislature of the several States.</u>

*Id*. at 253-254; *see also id*. at 252 ("Rights based on contract are as fully protected by section 16, article 1, of the Constitution of this State, as are they by section 10, article 1, of the Constitution of the United States"); *id*. ("Such rights as are held to be protected by that part of the fourteenth amendment to the Constitution of the United States to which we have referred are as fully protected by the nineteenth section of article 1 of the Constitution of this State").  In addition to relying on federal constitutional law in its analysis and decision, *Mellinger* makes clear that the standards for judging the merits of Mr. Ibarra's retroactive claim under the Texas Constitution are the same as the standards for reviewing such a claim under the Fourteenth Amendment to the United States Constitution.

Accordingly, this Court has jurisdiction under 28 U.S.C. § 2254(b) to review Mr. Ibarra's claim that the State's retroactive application of Article 18.01 of the Texas Code of Criminal Procedure to obtain a second search warrant against him, which in turn was the operative basis for the indictment issued against him, violated his rights under the ex post facto and due process clauses of the United States Constitution.

Mr. Ibarra further moves this Court to reconsider its determination that Article 18.01, as applied to him, violates neither the ex post facto clause nor the fourteenth amendment.  It is

uncontested that the 1995 amendment to Article 18.01, which allows subsequent search warrants to issue, came into effect after Mr. Ibarra's initial search warrant was deemed invalid and the indictment against him was dismissed, and well after the relevant act was committed. This Court found that the change in law that resulted from the 1995 amendments, however, did not run afoul of the Constitution because, *inter alia*, "[t]he elimination of the prohibition against a second search warrant did not eliminate a defense to the charges Petitioner faced . . . ." Opinion and Order at 18 (citing *Collins v. Youngblood*, 497 U.S. 37, 52 (1990) (ex post facto clause prohibits application of a new law to a defendant if it deprives "one charged with crime of any defense available according to the law at the time when the act was committed").

In fact, there could be no clearer set of facts to support a finding that the 1995 amendments eliminated a defense to the charges against Mr. Ibarra, as is demonstrated on the record by the fact that the fruits of the original search warrant were excluded, and the initial indictment against Mr. Ibarra was accordingly dismissed, precisely because the first search warrant was invalid. Had Article 18.01 not been amended, the second search warrant would have also been invalid, the same defense that successfully got the fruits of the first search warrant excluded and resulted in a dismissal of the indictment. This Court found that absent the retroactive application of the Article 18.01 amendments, Mr. Ibarra could not have availed himself of the same defense that he successfully availed himself of following his initial indictment. Respectfully, that finding is not accurate.

Furthermore, this Court found that the amendment to Article 18.01 did not implicate "his substantive right to be free from search and seizure." Opinion and Order at 18. The Court limited its review of this claim to a literal consideration of the unfortunate typos in Mr. Ibarra's Amended Petition, which suggested that his "right to be free from search and seizure is a

11

substantive right." Petition for Writ of Habeas Corpus, *Ibarra v. Quarterman*, No. 02-CV-52 (Jan. 5, 2009) at 20 (hereinafter "Amended Petition"). Finding that individuals have no right to be free from search and seizure, but only a right to be free from <u>unreasonable</u> search and seizure, the Court dismissed Mr. Ibarra's argument as lacking merit without addressing whether the amendment to Article 18.01 implicates his substantive right to be free from <u>unreasonable</u> search and seizure, the argument that Mr. Ibarra clearly intended to make based on context and his citation to *Gordon v. State*, 640 S.W.2d 743 (Tex. Crim. App. 1982) ("The Fourth Amendment protects only reasonable expectations of privacy") (citations omitted). The amendment, while admittedly not implicating a substantive right that does not exist, clearly did implicate Mr. Ibarra's substantive right to be free from <u>unreasonable</u> search and seizure, because its purpose and effect was to change Texas' definition of "reasonable" in the context of search warrants. Tex. Code Crim. Proc. Art. 18.01(d). Whereas prior to the 1995 amendments, subsequent search warrants were deemed to be unreasonable in every case, the 1995 amendments expanded the scope of "reasonableness" to include subsequent search warrants that are "issued by a judge of a district court, a court of appeals, the court of criminal appeals, or the supreme court." *Id*. This changed Texas' substantive law on the right to privacy. Its retroactive application against Mr. Ibarra therefore violated his rights under the ex post facto and due process clauses of the United States Constitution.

For the reasons stated above, Mr. Ibarra requests that this Court alter its Judgment and grant Mr. Ibarra's requested first claim for relief. In the alternative, Mr. Ibarra requests that this Court alter its judgment and issue a certificate of appealability on this fundamental constitutional claim.

### b.  Mr. Ibarra's Second Claim of Error

12

This Court dismissed Mr. Ibarra's claim that the more than nine-year delay between the dismissal of the initial charges against him and the issuance of a second arrest warrant violated his right to due process under the Fourteenth Amendment and therefore invalidated his conviction and sentence.  This Court found that Mr. Ibarra failed to establish that the pre-indictment delay was due to government misconduct or that he was prejudiced.

As stated in Mr. Ibarra's Petition for relief, the state intentionally delayed issuing a second arrest warrant for more than nine years to gain a tactical advantage against Mr. Ibarra, and that delay substantially prejudiced Mr. Ibarra's right to a fair trial.  His conviction and sentence are therefore invalid under the due process protections afforded state defendants by the Fourteenth Amendment.

Mr. Ibarra is entitled to relief on this claim where he can show that the nearly decade-long delay between the dismissal of the initial indictment and the issuance of the second arrest warrant (1) caused substantial prejudice to his right to a fair trial, and (2) was an intentional device used to gain a tactical advantage over him.  *U.S. v. Marion*, 404 U.S. 307, 322 (1971); *U.S. v. Gouveia*, 467 U.S. 180, 192 (1984).  The Fifth Circuit has extended the second prong to include situations where the state intentionally delayed seeking an indictment "for some other impermissible, bad faith purpose."  *U.S. v. Crouch*, 84 F.3d 1497, 1514 (5th Cir. 1996) (en banc).

This Court found that Mr. Ibarra failed to prove that the Court of Criminal Appeals' opinion was either "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Opinion and Order at 21.  Mr. Ibarra asserts that this finding was in error.

The Fifth Circuit has indicated that the first issue to address when reviewing this claim is whether the petitioner has shown prejudice resulting from the state's delay in seeking the second indictment. *See U.S. v. Jackson*, 549 F.3d 963, 969 (5th Cir. 2008) ("Because the defendant must prove both bad faith and prejudice, a court need not hold a hearing on the government's motives for the delay where the court has determined that no prejudice resulted from it") (citing *U.S. v. Crouch*, *supra*, 84 F.3d at 1516). Contrary to this Court's prior finding, Mr. Ibarra has shown significant prejudice resulting from the state's delay. Had the state not delayed seeking an indictment until Article 18.01 was amended to allow subsequent search warrants, there would have been no indictment at all. This is evidenced by the fact that the state withdrew the initial indictment after it was denied the right to introduce the same evidence that it obtained from the first search warrant. Without that evidence, the state clearly believed, correctly, that there was insufficient evidence linking Mr. Ibarra to the offense.

Mr. Ibarra also presented ample evidence, including testimony from the state's principal investigating officer, that the state intentionally delayed seeking the second indictment "for the purpose of gaining some tactical advantage over [Mr. Ibarra] in the contemplated prosecution or for some other impermissible, bad faith purpose." *See U.S. v. Crouch*, *supra*, 84 F.3d at 1514. In Mr. Ibarra's case, unlike in other cases in which this question has been presented, the state already had in its possession all the evidence it would ultimately use against Mr. Ibarra at the time the initial indictment was dismissed. The nearly ten year delay in seeking a second indictment cannot be called an "investigative delay," because the state was no longer conducting investigations, nor was it in a position to seek any further information, evidence or witnesses. The state, therefore, made a tactical decision not to seek an indictment so that it could either exploit an injury or illness of Mr. Ibarra's to gather his DNA without his permission – which it

14

tried unsuccessfully to do – or take advantage of prospective changes in law that would allow the state to seek a subsequent search warrant – which ultimately resulted.  Stated another way, the state intentionally delayed seeking an indictment for the purpose of rendering unavailable to Mr. Ibarra a defense that he initially had to the introduction of already-secured DNA evidence.  In *Crouch*, the Fifth Circuit held that,

> Intentional delay for the purpose of gaining tactical advantage would include delay for the purpose of rendering unavailable evidence favorable to the defense or which would tend to undercut the government's case. But, it would not include delay to affirmatively strengthen the government's case such as delay until a potential witness for the government becomes available by reason of a plea bargain or the like even to a level well beyond that reasonably thought necessary to preclude the granting of a post-verdict motion for judgment of acquittal under Fed. R. Crim. P. 29(c) (and such a purpose would not be impermissible).

*Id*. at 1514, n. 23; *see U.S. v. Gulley*, 526 F.3d 809, 820 (5th Cir. 2008).  Mr. Ibarra asserts that his case fits into the former scenario, which the Fifth Circuit has held would be intentional and improper delay, warranting reversal if prejudice is also affirmatively shown.  The latter scenario does not fit Mr. Ibarra's case, because the state was not seeking to strengthen its case – it already had in its possession all evidence that it would introduce at trial when the initial indictment was dismissed.  The state was simply delaying seeking a subsequent indictment until there was a change in the law that would deprive Mr. Ibarra of his dispositive legal defense – that the evidence in the state's possession was illegally obtained.  Alternatively, the state was delaying seeking the subsequent indictment until Mr. Ibarra unintentionally injured himself or became ill so the state could, without his permission, re-gather the same evidence it had already illegally obtained.

15

Waiting to secure an <u>unavailable</u>, <u>known</u> and <u>reasonably believed to become available</u> piece of evidence prior to seeking an indictment is a common tactic among prosecutors and ensures that indictments will not issue before sufficient evidence exists to warrant a prosecution, and Mr. Ibarra never challenged that practice.  However, all of the evidence the state relied upon in this case was not only <u>available</u>, but actually <u>in the state's possession</u> from the date that the state sought the initial indictment, and for the entire nine and a half years between the dismissal of the initial indictment and the issuance of the second indictment.  The state was not waiting for evidence to become available, but rather waiting for Mr. Ibarra to lose his legal defense to its introduction.

The state intentionally delayed seeking an indictment "for the purpose of gaining tactical advantage," and that delay substantially prejudiced Mr. Ibarra.  Mr. Ibarra accordingly requests that this Court alter its Judgment and grant Mr. Ibarra's second claim for relief.

### c.  Mr. Ibarra's Fourth Claim of Error

This Court dismissed Mr. Ibarra's claim that the trial court erred in refusing to exclude Troy Wells' identification testimony because the photo identification process conducted prior to trial was impermissibly suggestive, violating Mr. Ibarra's Sixth Amendment right to confrontation and his Fourteenth Amendment right to due process.  This Court found that the totality of the circumstances supports the conclusion that there was no substantial likelihood of misidentification and that the Court of Criminal Appeals' decision must therefore stand.

The record in this case demonstrates unequivocally that the identification procedures that Officer Salinas employed with Wells were "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification," requiring reversal of Mr. Ibarra's conviction.  *Simmons v. U.S.*, 390 U.S. 377, 384 (1968).  In *Simmons*, the United States Supreme

16

Court explained the potential ramifications of impermissibly suggestive photographic

identification procedures:

> Even if the police subsequently follow the most correct photographic
> identification procedures and show him the pictures of a number of
> individuals without indicating whom they suspect, there is some danger
> that the witness may make an incorrect identification.  This danger will be
> increased if the police . . . show him the pictures of several persons among
> which the photograph of a single such individual recurs or is in some way
> emphasized.   The chance of misidentification is also heightened if the
> police indicate to the witness that they have other evidence that one of the
> persons pictured committed the crime.   Regardless of how the initial
> misidentification comes about, the witness thereafter is apt to retain in his
> memory the image of the photograph rather than of the person actually
> seen, reducing the trustworthiness of subsequent lineup or courtroom
> identification.

*Id*. at 383-384.  While refusing to prohibit the use of photographic identification procedures in

every situation, the Supreme Court held that, "each case must be considered on its own facts,"

and convictions based on impermissibly suggestive photo line-ups will be set aside when they

"give rise to a very substantial likelihood of irreparable misidentification."  *Id*. at 384.

In cases such as Mr. Ibarra's, where the state court acknowledged that the pre-trial

identification procedures employed were impermissibly suggestive, reviewing courts are directed

to look at the totality of the circumstances to determine whether the evidence suggests that those

procedures created a substantial likelihood of irreparable misidentification.  *Neil v. Biggers*, 409

U.S. 188, 199 (1972); *Woodard v. Thaler*, 2011 U.S. App. LEXIS 3912, at *7-8 (5th Cir. March

1, 2011).  In undertaking a "totality of the circumstances" review, courts should consider at least

the following factors:  1) the witness' opportunity to view the suspect at the time of the crime; 2)

the witness's attention at the time of the crime; 3) the accuracy of the witness' prior description;

4) the witness' level of certainty at the time of confrontation; and 5) the length of time between

the crime and confrontation.  *Neil v. Biggers*, *supra*, 409 U.S. at 199-200.  The Court of Criminal

Appeals acknowledged that some of the procedures utilized in the photo line-up with Wells were

suggestive, and therefore limited its inquiry to whether Mr. Ibarra had demonstrated a substantial

likelihood of misidentification.  (Direct Appeal Opinion, 12).

Regarding the first and second factor to be considered, the operative evidence establishes

that Wells was on the same street as the Zuniga house shortly after 8:00 in the morning on the

day of the offense, dropping his wife off at work.  He stated that he observed a Hispanic man

walking towards a late 1960's primer red Camaro, whom he watched periodically for one to two

minutes.  Amended Petition at 5.  Wells reported that the man he saw never raised his head, so he

did not get a clear view of his face.  Amended Petition at 36.  During the one to two minutes in

which he observed this man, Wells was distracted by trying to calm his infant son who had

started crying after having been startled by a passing train.  Amended Petition at 36.  He stated

that after the train upset his son, and within this one to two minutes, he looked back at the man

only "a couple of more times."  Amended Petition at 36.

Regarding the third factor, Wells' initial statement was that the man he observed had a

mustache that he specifically recalled went past the corners of his mouth.  Opinion, *Ibarra v.*

*Texas*, No. 72,974 (Oct. 20, 1999) at14 (hereinafter "Direct Appeal Opinion").  When Mr. Ibarra

was arrested on the same day that Wells claims to have witnessed him, he had a full beard.

Amended Petition at 36.  Only Wells' general descriptions of the man he saw matched a

description of Mr. Ibarra.  Amended Petition at 36.

Regarding the fourth factor, Wells tentatively identified someone other than Mr. Ibarra at

the initial photographic line-up.  Direct Appeal Opinion at 10-11.  Subsequent to that initial

identification of another individual, Officer Salinas showed Wells two Polaroid pictures taken of

18

Mr. Ibarra on the day of his arrest and told him that the man in the Polaroid pictures was the man in picture three in the photographic array. Direct Appeal Opinion at 11. Not surprisingly, Wells subsequently identified Mr. Ibarra from the photographic array. Direct Appeal at 11. After Officer Salinas emphasized the photographs of Mr. Ibarra, indicating by singling Mr. Ibarra out that separate evidence tied him to the crime, Wells never waivered from his identification of Mr. Ibarra. Direct Appeal Opinion at 14.

Finally, Wells' initial confrontation was a photographic line-up 27 days after the offense. Direct Appeal Opinion at 14. He also identified Mr. Ibarra in a live line-up nearly three months after the offense, and at trial. Direct Appeal Opinion at 14. However, as stated above, the first identification is nearly meaningless, resulting directly from Officer Salinas' suggestive display of the Polaroid pictures. The subsequent identifications are equally meaningless because, as the Supreme Court noted, "Regardless of how the initial misidentification comes about, the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent lineup or courtroom identification." *Simmons*, *supra*, 390 U.S. at 383-384.

Additional evidence was presented that should have alerted the state court and this Court to the very substantial likelihood of an irreparable misidentification. Neither of the other two eyewitnesses was able to identify Mr. Ibarra from a photographic line-up. Amended Petition at 34. Only one of the other witnesses, Peterson, identified Mr. Ibarra at the live line-up on May 22. Amended Petition at 34. Peterson was Wells' wife at the time, and the live line-up took place more than a month after Officer Salinas suggested to her husband that Mr. Ibarra was somehow worth singling out in the photo array. Amended Petition at 5. The third witness, Kennedy, identified another man at the live line-up. Amended Petition at 34). Despite the fact

19

that all three witnesses reported that the man they saw had a mustache, and one witness specifically stated that he did <u>not</u> have a full beard, only persons with full beards like Mr. Ibarra's were shown for identification in the photo array.  Amended Petition at 37.  Although all three witnesses identified Mr. Ibarra's car in the police parking lot, where it was the only red Camaro, that fact alone is only minimally probative of Mr. Ibarra's participation on the offense standing alone, and is negligible at best when contrasted with the overwhelming evidence of a misidentification.

A closer look at the Supreme Court's analysis of the facts in *Simmons* is also instructive. In *Simmons*, the FBI's photo identification procedures were held to comply with constitutional due process requirements for a number of reasons not present in Mr. Ibarra's case:  the photographic identification was necessary because the perpetrators were still at large and it was "essential for the FBI agents swiftly to determine whether they were on the right track;" the initial confrontation with the petitioner was during the day, in a well-lighted bank, and the witnesses were able to view the petitioner for up to five minutes; the witnesses were shown the photographs only one day after the commission of the crime; at least six photographs were shown to each witness, alone, and the photographs were mostly group photographs; no evidence had been presented at trial that the witnesses were informed of the progress of the investigation; and no evidence had been presented at trial that the FBI agents "in any other way suggested which persons in the pictures were under suspicion."  *Simmons v. U.S.*, *supra*, 390 U.S. at 384-385.

The procedures employed in Mr. Ibarra's case are not only factually distinct from each of the confirmative aspects of the procedures employed in *Simmons*, but Officer Salinas did exactly what the Supreme Court warned against in *Simmons* – emphasized a single individual within the

photographic array, thereby indicating to the witness that other evidence corroborates the suspect's guilt. *See Id*. at 383.

Wells testimony was also clearly prejudicial to Mr. Ibarra.  At the time of his testimony, Wells was a reserve police officer who a jury would be inclined to trust.  His spurious identification of Mr. Ibarra no doubt carried heavy weight in front of the jury and was a dominant factor in Mr. Ibarra's conviction, considering that Mr. Ibarra presented credible alibi evidence at trial, an explanation for his injuries, credible evidence that the offense could have been committed by two men later in the day, and the fact that the DNA evidence linking Mr. Ibarra to the scene was contested by experts.  Amended Petition at 8-9.

For the foregoing reasons, Mr. Ibarra requests that this Court alter or amend its Judgment and grant Mr. Ibarra's requested fourth claim for relief.

**d.  Mr. Ibarra's Fifth Claim of Error**

This Court dismissed Mr. Ibarra's claim that testimony at trial relating to Ms. Zuniga's fear of Mr. Ibarra was improperly introduced in violation of his Sixth Amendment right to confrontation.  This Court found that the claim was barred from federal review because it was unexhausted in state court.  Mr. Ibarra urges this Court to reconsider its finding because he raised a Sixth Amendment confrontation argument in his direct appeal brief.

On direct appeal, Mr. Ibarra's seventh point of error was that the trial court erred in admitting testimony from Ms. Zuniga's brother and sister that months before the offense occurred she had expressed her fear of Mr. Ibarra.  Direct Appeal Brief at 38-39.  After arguing that the testimony was improperly admitted because it was irrelevant hearsay, Mr. Ibarra submitted that the harm was,

21

> [E]ssentially one of confrontation.  That is, Appellant was denied the opportunity to confront and cross examine the victim concerning the statement she allegedly made to her brother.  As such, Appellant suggests the error must be reviewed under the constitutional harm analysis, to determine whether the state can establish beyond a reasonable doubt that it did not contribute to his verdict or sentence.  Rule 44.2(a) Tex. App. Proc.  See, *United States v. Martinez*, 588 F.2d 495 (5th Cir. 1971).  Appellant also suggests the admission of hearsay at least implicates a Constitutional right, which should be reviewed under the harmless error standard.  See, *Williams v. State*, 958 S.W.2d 186 (Tex. Crim. App. 1987) (denial of right to present claim for expert assistance *ex parte* reviewed for harmless error).

Direct Appeal Brief at 40-41.  The legal argument is the same as was made in Mr. Ibarra's petition before this Court:

> The error in this case was essentially one of confrontation.  That is, Petitioner was denied the opportunity to confront and cross examine the victim concerning the statement she allegedly made to her brother.  See *United States v. Martinez*, 588 F.2d 495 (5th Cir. 1971).

Amended Petition at 40.

Accordingly, while Mr. Ibarra did argue on direct appeal that the evidence violated Texas' evidentiary rules, his claim was that the evidentiary violation ran afoul of his Sixth Amendment Right to Confrontation, the same argument he made to this Court.  He therefore exhausted his Sixth Amendment claim in state court.  *See O'Sullivan v. Boerckel*, *supra*, 526 U.S. at 844 ("we conclude that state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process").

This Court further found that even if the claim were not barred in federal court, it would be without merit.  Opinion and Order at 26.  This finding is betrayed by the evidence in the record.  Under the law at the time of trial, the statement of an unavailable witness was admissible

22

only if it bore adequate "indicia of reliability." *Idaho v. Wright*, 497 U.S. 805, 814-815 (1990).

Reliability was established by showing that the evidence either fell within a "firmly rooted

hearsay exception" or otherwise bore "particularized guarantees of trustworthiness." *Id*. (citing

*Ohio v. Roberts*, 488 U.S. 56, 66 (1980)).  The test, according to the Supreme Court was that, "if

the declarant's truthfulness is so clear from the surrounding circumstances that the test of cross-

examination would be of marginal utility, then the hearsay rule does not bar admission of the

statement at trial." *Id*. at 820.

Statements by Ms. Zuniga that she was afraid of Mr. Ibarra could only be relevant if

admitted to prove the truth of the matter asserted, and were thus hearsay.  The truth of the matter

asserted would have been that she was afraid of Mr. Ibarra, an assertion that was not a material

issue in the prosecution, nor was it relevant to a material issue in the prosecution.  As stated in

Mr. Ibarra's direct appeal brief, "[s]uch testimony could only serve the purpose of creating

sympathy for the deceased, or prejudicing [Mr. Ibarra] before the jury."  Direct appeal Brief at

39.  The statements were therefore improperly admitted hearsay, and their admission violated

Mr. Ibarra's right to confront the witnesses against him as guaranteed by the Sixth Amendment.

*See Prather v. Prather*, 650 F.2d 88, 90 (5th Cir. 1981) ("it is clear that before a statement,

otherwise hearsay, can be admitted under 803(3)to show the  declarant's then existing state of

mind, the declarant's state of mind must be a relevant issue in the case").

The statements were also shown to have prejudiced Mr. Ibarra.  The evidence in the case

was hotly contested.  The eyewitness testimony was questionable.  Experts at trial sharply

criticized the state's assessment of the physical evidence that purportedly tied Mr. Ibarra to the

scene.  Both the hair analysis and the DNA testing procedures were called into question, and the

jury was left resolving a serious conflict among experts.  In such a case, any information can tip

the scale, and testimony as prejudicial as the hearsay testimony that Ms. Zuniga feared Mr. Ibarra would have certainly had a significant impact on the jury.

For the reasons stated above, Mr. Ibarra urges this Court to reconsider its finding that his claim challenging the introduction of Ms. Zuniga's hearsay statements is not exhausted, and further to amend its judgment and find that such testimony did violate Mr. Ibarra's Sixth Amendment right to confront the witnesses against him.

### e. Mr. Ibarra's Ninth Claim of Error

On this claim, the Court denied petitioner's motion for evidentiary hearing and noted that counsel was not precluded from developing and presenting evidence in state habeas corpus proceedings.  Respectfully, this conclusion was in error.

As a general matter, §2254(e)(2) limits a petitioner's right to develop evidence and facts and have an evidentiary hearing in federal court, but only under circumstances that do not apply here.  Section 2254(e)(2) limits a federal habeas petitioner's opportunity to develop facts in federal court only when the petitioner has "failed to develop the factual basis of a claim in state court proceedings."  28 U.S.C. § 2254(e)(2); *see also Williams v. Taylor*, *supra*, 529 U.S. at 430. The United States Supreme Court has interpreted the issue of petitioner's "failure" narrowly: "Under the opening clause of § 2254(e)(2), a failure to develop the factual basis of a claim is not established unless there is a lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel."  *Williams v. Taylor*, *supra*, 529 U.S. at 432.

The pertinent §2254(e)(2) question is whether Mr. Ibarra and his state habeas counsel were diligent in their efforts to develop and present facts on any of the three claims for which Mr. Ibarra seeks an evidentiary hearing before this Court at this time.  If Mr. Ibarra has

established that he exercised diligence in state court, he need not satisfy the standards set forth in § 2254(e)(2).

If state court diligence has been shown, then the law is clear that Mr. Ibarra is *entitled* to an evidentiary hearing in this Court so long as he satisfies a far more lenient three-prong test: (1) the alleged facts, if proven true, entitle him to relief; (2) there exists a genuine dispute as to the alleged facts; and (3) he was denied a full and fair hearing in state court. *See Martinez v. Dretke*, 111 Fed.Appx. 224, 229 (5th Cir. 2004) ("An evidentiary hearing is *required* where a state habeas petitioner did not receive a state court hearing and alleges facts which, if proved, would entitle him to relief, and the record reveals a genuine factual dispute as to the alleged facts") (emphasis added), *citing Murphy v. Johnson*, 205 F.3d 809, 815 (5th Cir. 2000) and *Townsend v. Sain*, 372 U.S. 293, 312-313 (1963).[1]

---

[1] The third prong of this test, focusing on the fairness of the state court process, is arguably the other side of the diligence coin.  That is, if a petitioner has shown that he has made diligent efforts to develop and present his facts in state court but nevertheless, for whatever reason, the state court did not provide a hearing or interfered with the development and presentation of facts at whatever hearing was provided, then the petitioner has also established that he was denied a full and fair hearing, which is the third prong of the test.  Hence, a showing of diligence as prescribed in *Williams* often will suffice for establishing the third prong of the test for a right to an evidentiary hearing in federal court.  And as pointed out in the initial motion, this is true regardless of whether the federal court finds any fault with how the state court handled the proceedings, i.e., in denying resources, experts, time, or other conditions necessary for a complete treatment of the facts in state court.  *See Morris v. Dretke*, 413 F.3d 484, 501 (5th Cir. 2005) ("The wisdom of it aside, the State was within its rights to deny Morris assistance in obtaining intellectual testing; however, it cannot deny him the ability to continue his diligent pursuit of such testing before the federal habeas court").  Here, "the wisdom of it aside", in denying of all of these necessary conditions to Mr. Ibarra in state court, Judge Allen thwarted petitioner's diligent efforts to present his *Atkins* claim in state court, and as a result deprived him of a full and fair opportunity to develop and present that claim.

Mr. Ibarra alternatively argued that even if the Court were to find a lack of diligence at the state court level, it should exercise its discretion to grant an evidentiary hearing because §2254(e)(2) does not bar such a hearing.  Given his palpable (and largely unrebutted) claim of mental retardation, a fact which under governing federal law excludes him altogether from execution eligibility, the state court record in this case cries out for a full and fair evidentiary process here, in federal court, at which it should be finally determined, after the development of a full and complete factual record, whether Mr. Ibarra is indeed mentally retarded.

Mr. Ibarra was and is entitled to develop the facts on his *Atkins* claim, as well as to an evidentiary hearing on this claim, because he has demonstrated that he and his counsel were diligent in their attempts to develop and present this claim in state court and because he has further demonstrated both that there is a genuine factual dispute underlying his claim of entitlement to relief, and that he was denied a full and fair hearing in state court.  Mr. Ibarra is entitled to discovery for the same reasons, and, as set forth in his motion for a hearing, such discovery and eventual hearing should encompass the facts and circumstances underlying not only the question of counsel diligence, but also that of the fairness of the state court process in which the trial court judge signed the prosecutor's findings and conclusions verbatim under questionable circumstances and in any event prior to counsel for petitioner having ever received or responded to them.

To the extent that the Court's ruling relies upon the assumption that the "hearing" in state habeas corpus proceedings on the *Atkins* claims was a full and fair hearing (thereby precluding further fact development and arguably an evidentiary hearing), respectfully, the record simply does not support this view.  The state court's September 2006 process was a "hearing" in name only; petitioner and his counsel were denied adequate time and resources to prepare for and

present the *Atkins* claim, despite repeated and well-documented requests for both, and the state court refused even to consider documentary expert evidence despite having created the very conditions which prevented the expert from appearing live.  In fact, neither side presented any testimony.  These problems, coupled with the litany of unfair obstacles and other irregularities marking the state court process for this indigent and imprisoned petitioner, resulted in a "hearing in name only" at which the merits of Mr. Ibarra's claim were not addressed by either party.

While the state court purported to hold a hearing on Mr. Ibarra's *Atkins* claim, it never addressed the merits of the mental retardation claim during the hearing, nor did it consider the crucial testimony of identified but as yet unavailable family members and life history witnesses in Mexico, nor did it consider or even allow into evidence the expert report finding that Mr. Ibarra is mentally retarded, a report which also detailed the reasons for that diagnosis.  The only issue the state court addressed at the hearing was Mr. Ibarra's second motion to continue the evidentiary hearing to allow for adequate preparation time.  There is no fair way to characterize this as a "full and fair hearing" on Mr. Ibarra's *Atkins* claim.  *See e.g. Dixon v. Caldwell*, 471 F.2d 767, 770 (5th Cir. 1972) (reversing a district court finding that relied on a state court record that never resolved the merits of the petitioner's factual contentions).

Petitioner previously highlighted for the Court how the state court process was anything but full or fair, and how Mr. Ibarra's counsel did everything possible to develop his claim in the face of overwhelming barriers created by the state court.  Included among the irregularities in the state court process was the fact that Judge Allen adopted the prosecution's proposed factual findings verbatim despite numerous inaccuracies.  In addition, Judge Allen's actions in his signing of the State's document(s) are even more troubling from a fairness perspective.

27

The state court record demonstrates that Judge Allen signed the prosecution's amended proposed findings verbatim and without modifying a single assertion made by the prosecution, including the inaccuracies discussed in Petitioner's Motion for Evidentiary Hearing. *See* Exhibits (hereafter "Exh.") 2 (Court-signed copy of "The State of Texas's Amended Proposed Findings of Fact, Conclusions of Law and Recommendations of the Trial Court on Application of Writ for Habeas Corpus," stamp-filed at 4:35 pm on 09/25/2006, signed by Judge Allen on 09/26/2006) and 3 (Court-signed "Findings of Fact, Conclusions of Law and Recommendations of the Trial Court on Application of Writ for Habeas Corpus," stamp-filed at 4:35 pm on 09/25/2006, signed by Judge Allen on 09/26/ 2006).

In point of further fact, Judge Allen's collusion with the State is even more troublesome than the mere signing of a verbatim order written by the prosecutor.  The available documentary record reveals a disturbing, albeit confusing set of circumstances that should require further exploration by this Court should there be any question whatsoever about whether the state court process was full and fair.  The facts as best can be gleaned from the paper record are set forth here, however factual clarity is elusive based on the documents at hand.

The paper record indicates that on Friday, September 22, 2006, the state prosecutor was permitted to file an initial proposed findings of fact and conclusions of law after hours.  *See* Exh. 1 (Court-signed copy of "The State of Texas's Proposed Findings of Fact, Conclusions of Law and Recommendations of the Trial Court on Application of Writ for Habeas Corpus," received by the trial court at 5:15 pm on 09/22/2006 and stamp-filed at 4:35 pm on 09/25/2006, signed by Judge Allen on 09/25/2006).  The front page of this filing contains a clerk's handwritten notation indicating it was received for filing by the court at 5:15 PM on September 22, 2006.  Curiously, however, the clerk's stamp-filed seal on the same front page shows a filing date of September 25,

2006, at 4:35 P.M.  In addition, the signature page contains a signature with the name of Judge Allen, "George Allen", however it is crossed out; just above the signature is a handwritten notation indicating the date "9/25/06."  The paper record is thus unclear just exactly when this document was either filed or signed, or why the signature is crossed out.  Additional documents only serve to blur the narrative, but in no event do they provide any comfort about the fairness of the state court process.

Even though Judge Allen had initially signed the aforementioned prosecutor-prepared document (Exh. 1), the prosecutor nevertheless drafted an amended proposed findings of fact and conclusions of law.  Exh. 2.  This document also bears a signature of "George Allen".  The clerk's stamp-filed seal on this document is the same as the first document, namely September 25, 2006, at 4:35 P.M.  Despite the stamp-filed date and time, however, there is again a handwritten notation on the signature page indicating it was signed on "9/26/06", a day later.  Unlike the first document, this "George Allen" signature has not been crossed out.

Finally, there exists in the court file yet another signed order, also prepared by the prosecutor, identical to the second (the prosecutor's proposed amended findings).  Exh. 3.  This document, like the second, was also stamp-filed on September 25, 2006, also at 4:35 P.M, and yet it contains the same handwritten date above the "George Allen" signature of 9/26/06.  These second and third orders are identical in content, the only difference being that the prosecutor's cover page is removed from the third signed order.

In addition to the confusion raised by the signing of three separate orders all purporting to resolve finally the same lawsuit, several important points are noteworthy and create further concerns about the integrity of the state court process.  First, a comparison of the September 22nd version, Exh. 1, and the second and third versions, Exhs. 2 and 3, all three of which purport to

have been signed by Judge Allen, reveals the prosecutor's decision to soften the more condemnatory language in version one, especially as respects its characterization of the very facts regarding counsel diligence at issue before this Court.[2]  One clear question that arises here is why the prosecutor made the decision to change the tone of the order in these respects, and whether, and to what extent there were communications between Judge Allen and the prosecutor about these changes.

Second, the paper record cries out for an explanation as to why Judge Allen signed three separate orders all purporting to address and resolve the same underlying issues.  Similarly, this record also seeks an answer to the question of why Judge Allen crossed out his signature on the first one, but not on the latter two.[3]

---

[2]  For example, in version one filed on September 22nd the prosecution had asserted that "Ibarra presented *no evidence* disclosing the identity of prospective witnesses"; in the second two versions this language was amended: "Ibarra presented *insufficient evidence* of the identity of prosecution witnesses."  See Exhs. 1-3 at para. 2.22.  Similarly, in highlighting Dr. Romey's absence from the hearing, the prosecution in version 1 originally proposed a finding that, "the affiant *failed to appear* to restate the conclusions in a court of law."  In its amended findings, the prosecution deleted the language attributing Dr. Romey's absence to either her or Mr. Ibarra and stated that, "no expert appeared to offer any testimony."  See Exhs. 1-3 at para. 3.32.

[3]  The plot may be even thicker than that set forth in text.  A comparison of the three "George Allen" signatures on the three separate, signed orders, Exhs. 1-3, suggests that more than one person's handwriting is involved here, perhaps as many as three different individuals.   The undersigned have prepared a separate document extracting and juxtaposing the three signatures from the three separate orders for this Court's consideration in this regard.  *See* Exh. 4 (Document prepared by Petitioner juxtaposing Judge Allen's signatures on the three Orders resolving Petitioner's *Atkins* claim (Exhibits 1-3), all stamp-filed at 4:35 pm on 09/25/2006).  Should the Court deem it appropriate for further factual development on this whole area, Petitioner's counsel would respectfully seek funding for a Court handwriting expert to advise the Court and the parties on whether more than one individual may have been involved in the signing of these documents.

Third, an explanation is needed as to why all three signed orders are file-stamped by the clerk at exactly the same date and time, yet at least with respect to the first one, it was filed on the Friday before the date-stamped seal indicates.  Related to that question is how and why the handwritten date notation on the signature page of the first order has the same date as the stamp-filed seal (namely 9/25/06), but the handwritten date notation on the second two orders indicates they were signed the day *after* the orders were filed with the clerk's office.

Finally, and perhaps most troubling of all, is the fact that all of this order-signing, forward- (or back-) dating, order softening, and signature-making/crossing-out was conducted by the prosecutor and Judge Allen unbeknownst to Petitioner's counsel and without any notice, opportunity to be heard, or input from counsel.  Petitioner's counsel did not even receive a copy of the prosecutor's proposed order until September 28, 2006, days after the order was signed, sealed and filed in the court record.  Exh. 5 (Copy of "The State of Texas's Amended Proposed Findings of Fact, Conclusions of Law and Recommendations of the Trial Court on Application of Writ for Habeas Corpus," received by counsel for Petitioner on 09/28/2006).

These record facts underscore Mr. Ibarra's request for discovery, fact development, and an eventual evidentiary hearing not only on his underlying constitutional claims, but also on the process by which the state court rendered its decision in this case.  To the extent this Court must scrutinize that process for its "fullness and fairness" as a part of the inquiry presented here, Mr. Ibarra urges the Court to allow a full airing of all of the facts surrounding precisely how Judge Allen came to sign three separate orders written by a party to the proceedings, without any knowledge or involvement by the other party or his counsel.  Of particular concern in light of the new information set forth herein is just why Judge Allen signed three different orders purporting to resolve the same lawsuit, and whether and to what extent Judge Allen collaborated with the

prosecution in making the changes that came about between the September 22nd order and the later September 25th orders, all without any knowledge of, or participation by, counsel for Mr. Ibarra. (Of course should the Court conclude that Mr. Ibarra has met his burdens and is entitled to an evidentiary hearing on the underlying claims, then further factual development on these issues may well be unnecessary).

These facts bear particular relevance and significance in light of the U.S. Supreme Court's recent decision in *Jefferson v. Upton*, ___ U.S. ___, 2010 U.S. Lexis 4168 (May 24, 2010), and its order requiring a full federal court evidentiary hearing in that case.

The fact that the U.S. Supreme Court's opinion in *Jefferson* does not overrule existing law minimally tolerating a state judge's wholesale adoption of findings of fact and conclusions of law is unavailing to the issue presented here, namely, an assessment of the overall fairness of state court process. *Jefferson v. Upton*, *supra.* Whether or not, after *Jefferson*, it remains *legal* or even appropriate for a state court judge to sign the prosecutor's document, even before defense counsel has received it, let alone responded to it, surely the opinion is germane, indeed highly relevant, to the question of whether such a process deserves deference as a matter of fundamental fairness in federal court. Indeed, the Supreme Court's action in remanding the case for a full evidentiary hearing suggests the precise resolution currently sought by Petitioner here, namely, a full factual airing of the issues surrounding both the state court process and the conclusions reached by it on the underlying constitutional claims. And the Supreme Court's opinion in *Jefferson* makes clear that the practice of judges signing verbatim orders written by a prosecutor without giving the Petitioner notice or an opportunity to respond warrants little or no weight whatsoever on the scale of fairness by which the state court process here is to be judged.

32

Equally questionable was Judge Allen's wholesale adoption of the prosecutor's use of trial testimony, taken entirely out of context and misrepresented, to make it appear that Mr. Ibarra's mental functioning had already been considered and adjudicated at the original trial, despite *Atkins* not having been decided until five years after Mr. Ibarra's trial, and Mr. Ibarra neither having investigated nor presented a claim of mental retardation in the trial proceeding. *See* Motion for Evidentiary Hearing, *Ibarra v. Thaler*, No. 02-CV-52 (Jun. 21, 2010) at 41 (hereinafter "Motion for Evidentiary Hearing").  Adding to the inherent unfairness of the state court process was the fact that Judge Allen adopted the prosecution's recollections from the original, pre-*Atkins* trial, to assess Mr. Ibarra's mental capabilities and adaptive functioning prior to the age of 18, thereby making himself a witness to the underlying factual dispute.

So too, the judiciousness of Judge Allen's conduct in drafting his findings of fact is still relevant to the issue of whether the state court process was full and fair despite the fact that "the Court of Criminal Appeals did not explicitly adopt the findings of fact or conclusions of law promulgated by the trial court."  Respondent Thaler's Response to Petition Ibarra's Motion for an Evidentiary Hearing with Brief in Support, *Ibarra v. Thaler*, No. 02-CV-52 (Aug. 9, 2010) at 17 (hereinafter "Response to Motion for Evidentiary Hearing").  While it is true that Judge Allen's findings may not be the final decision of the state court, the trial-level judge's behavior prior to, during, and after the purported evidentiary hearing, including his issuance of three separate orders denying Mr. Ibarra's *Atkins* claim, each of which were written by the prosecutor, are clearly relevant and material facts on the pertinent question here, namely, whether Judge Allen provided Mr. Ibarra a full and fair hearing.  Judge Allen issued a last-minute denial of adequate funding to bring the petitioner's sole expert witness to the court to testify; he denied Mr. Ibarra's investigator adequate time to identify and interview witnesses and secure their

33

presence in Texas; he refused to consider the expert report presented on Mr. Ibarra's behalf (on the heels of refusing funds to allow live expert testimony); he adopted wholesale the State's proposed findings of fact without correcting misstatements of law and fact; and he supported his findings with only characterizations of trial witness testimony that was offered for purposes having nothing to do with the issue of Mr. Ibarra's mental retardation.  His management of the proceedings is not only highly relevant, but constitutes conclusive evidence that Judge Allen did not provide Mr. Ibarra a full and fair hearing in state court, irrespective of the fact that the appellate court did not ultimately adopt all of his findings.

In a capital case such as this one, increased scrutiny, and an even higher standard of "fairness" are the required benchmarks for this Court's assessment of the state court process. Indeed, the U.S. Supreme Court has applied the "death is different" jurisprudence, requiring especial attention to the factfinding procedures afforded a capital litigant, not only at the trial level, but also when determining whether post-conviction evidentiary hearings in state court are "full and fair":

> The adequacy of a state-court procedure under *Townsend* is largely a function of the circumstances and the interests at stake.  In capital proceedings generally, this Court has demanded that factfinding procedures aspire to a heightened standard of reliability.  This especial concern is a natural consequence of the knowledge that execution is the most irremediable and unfathomable of penalties; that death is different.
>
> Although the condemned prisoner does not enjoy the same presumptions accorded a defendant who has yet to be convicted or sentenced, he has not lost the protection of the Constitution altogether; **if the Constitution renders the fact or timing of his execution contingent upon establishment of a further fact, then that fact must be determined with the high regard for truth that befits a decision affecting the life or death of a human being.**  Thus, the ascertainment of a prisoner's

34

> sanity as a predicate to lawful execution calls for no less stringent
> standards than those demanded in any other aspect of a capital proceeding.

*Ford v. Wainwright*, 477 U.S. 399, 411-412 (1986) (citations omitted) (emphasis added).  Any fair reading of the state court record in this case overwhelmingly points to but one conclusion, namely, that the process afforded Mr. Ibarra in his efforts to show that he is mentally retarded and therefore exempt from execution under the Eighth Amendment was neither full nor fair.

Moreover, to the extent this Court determined that counsel for Mr. Ibarra was not diligent in presenting his *Atkins* claim in state court, Mr. Ibarra previously demonstrated in his evidentiary hearing motion the extensive amount of preparation that his counsel undertook from the very date that Judge Allen granted Mr. Kuykendall leave to appear as volunteer counsel on Mr. Ibarra's behalf.  Those efforts are discussed fully in the motion and include: the filing of an affidavit from Dr. Carol Romey stating that Mr. Ibarra is mentally retarded; multiple requests for adequate funding to conduct a life history investigation and secure the presence of Dr. Romey at the hearing; multiple requests for adequate time to effectively investigate the claim and present live witness testimony, including arguing at 3 different times that a continuance was necessary to effectively present Mr. Ibarra's *Atkins* clam; hiring an investigator the day Judge Allen granted him leave to appear, who travelled to remote areas of Mexico to interview numerous life history witnesses, and who detailed to the court the importance of locating and interviewing 15 additional identified witnesses; and, filing notarized affidavits from experts attesting to the difficulty that defense teams have in securing the presence of crucial life history witnesses in U.S. courts.  Considering that the Fifth Circuit has indicated that a mere request for evidentiary hearing may satisfy the test for diligence, the efforts of Mr. Ibarra and volunteer counsel are clearly sufficient.  *See Harrison v. Quarterman*, 496 F.3d 419, 429 n. 6 (5th Cir. 2007) (Finding

that petitioner was diligent in his attempt to develop the factual basis of his claim, noting that,

"The Williams court also stated, 'Diligence will require in the usual case that the prisoner, at a

minimum, seek an evidentiary hearing in state court in the manner prescribed by state law.'  In

this case, Harrison requested a hearing in his November 20, 2003 objection to the state's

response to his habeas petition").

Indeed, Mr. Ibarra's counsel acted completely reasonable in his attempts to present

evidence once Mr. Kuykendall was granted leave to appear.  Under U.S. Supreme Court and

Fifth Circuit case-law, this qualifies as diligence for the purposes of exempting petitioners from

the strict limitations imposed by § 2254(e)(2).  *See Morris v. Dretke*, 413 F.3d 484, 500 (5th Cir.

2005).

Counsel for Mr. Ibarra also attempted to submit an affidavit from Dr. Romey on the date

of the evidentiary hearing, which related her findings on Mr. Ibarra's mental retardation.  Her

failure to appear live at the hearing was not due to the fault of Mr. Ibarra or his counsel.  The

reality is that Judge Allen's last-minute ruling on a Friday afternoon denying the second request

for funding to deliver Dr. Romey for cross-examination fully explains both her absence from the

courtroom and her inability to have the affidavit notarized in Puerto Rico over a weekend before

faxing it to Waco on a Sunday night in time for it to be presented at the hearing.  In addition, Mr.

Kuykendall filed a notarized version of exactly the same affidavit on the same day as, and

shortly after, the hearing, which Judge Allen could have considered, but chose not to.  *See* Exh.

6 (Copy of the signature page of Dr. Romey's signed affidavit, stamp-filed at 2:14 pm on

09/18/2006).  These facts do not prove a "lack of diligence," but instead prove that Judge Allen

apparently had a dog in the fight and continually frustrated Mr. Ibarra and his counsel's diligent

efforts.  As the case-law makes clear, it is not the success of a petitioner's efforts to prepare and

36

present his claim in state court that is relevant to a diligence determination, but rather the

reasonableness of the petitioner's attempts to present the claim.  Mr. Ibarra and his counsel's

attempts in this regard were infinitely reasonable.  *See v. Dretke*, *supra*, 413 F.3d at 501(granting

an evidentiary hearing because, "[t]he wisdom of it aside, the State was within its rights to deny

Morris assistance in obtaining intellectual testing; however, *it cannot deny him the ability to

continue his diligent pursuit of such testing before the federal habeas court*") (emphasis added).

In reality, Mr. Kuykendall made numerous requests for funding, both to conduct the

investigation and to secure Dr. Romey's presence at the hearing, and demonstrated his diligence

in obtaining that funding by immediately altering his accounting practices to mirror Judge

Allen's expressed concerns.  Judge Allen issued an order denying Mr. Kuykendall's request for

funds for Dr. Romey on September 13, 2006, and Mr. Kuykendall filed a motion for

reconsideration on September 14, detailing Dr. Romey's airfare, hotel, rental car and *per diem*

expenses down to the dollar.  Also on September 14, Mr. Kuykendall filed a detailed motion for

additional investigative funds, along with an affidavit from the investigator describing in detail

the work that had been completed and the work that remained, including the name and

relationship to Mr. Ibarra of 15 additional witnesses that she was attempting to locate and

interview.  Again, Judge Allen rebuffed Mr. Kuykendall's attempts to obtain funding, but the

simple fact of Judge Allen's intransigence does not contradict the record facts that establish that

Mr. Ibarra and his counsel diligently sought funding to present his *Atkins* claim.

In sum, state habeas counsel's diligence is not nullified *post-facto* simply because Mr.

Ibarra and his counsel ultimately failed in their persistent attempts to develop and present

evidence and facts to the state habeas court.  The Fifth Circuit has clarified this important

difference:

> When a prisoner diligently seeks to develop a colorable *Atkins* claim by requesting funding for intellectual testing and his request is rejected by the state court, § 2254(e)(2) will not bar him from developing such evidence in federal court.  A petitioner "is not at fault when his diligent efforts to perform an act are thwarted, for example, by the conduct of another or by happenstance.  Fault lies, in those circumstances, either with the person who interfered with the accomplishment of the act or with no one at all."

*Morris v. Dretke*, *supra*, 413 F.3d at 501 (citing *Williams v. Taylor*, *supra*, 529 U.S. at 432); *see also Williams v. Taylor*, 529 U.S. at 432 ("Diligence for purposes of the opening clause [of § 2254(e)(2)] depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court; *it does not depend . . . on whether those efforts could have been successful*") (emphases added); *see also Guidry v. Dretke*, 397 F.3d 306, 323 (5th Cir. 2005) ("Restated, if a petitioner develops a factual basis for a claim in state court (*or sufficiently attempts to do so*), subpart (e)(2) does not bar an evidentiary hearing in district court") (emphasis added).

This Court's ruling on the *Atkins* claim and the denial of any factual development on this claim in federal habeas corpus proceedings may be construed as relying upon the fact that Mr. Ibarra was represented by counsel in state court from the date that the subsequent state habeas petition was filed, thus suggesting a failure to prosecute his case during that period of time leading up to the summer of 2006.  Federally appointed counsel Russell Hunt (the undersigned) did in fact sign the March 24, 2005 Subsequent Application for Post-Conviction Writ of Habeas Corpus in the trial court.  However, this fact does not mean that he was qualified to act as counsel for Mr. Ibarra in his subsequent state habeas proceedings and, although no appointment ever occurred and Mr. Hunt never sought nor obtained payment for any activity in the state court, his signature on a single and necessary document should not be treated by this Court as a *de facto* appointment of Mr. Hunt as Mr. Ibarra's state habeas attorney.  Judge Allen never appointed

state habeas counsel to represent Mr. Ibarra and he explicitly acknowledged that he did not appoint Mr. Hunt to represent Mr. Ibarra: "I haven't – I have never appointed him [Mr. Hunt]. He was appointed by the United States Federal District Judge."  Transcript of Oral Argument, Hearing on Motion for Continuance at 08:16-18, August 17, 2006.  Even if Judge Allen had wanted to appoint Mr. Hunt, Mr. Hunt was not on the Court of Criminal Appeals' list of eligible attorneys, was ineligible for appointment in state habeas proceedings, and could not ethically have accepted appointment even if Judge Allen had done the opposite of what he asserted in open court and appointed Mr. Hunt as state habeas counsel.  Mr. Hunt also never expressed to any party, and most importantly never expressed to Mr. Ibarra, that he would undertake his state habeas representation as volunteer counsel and never sought leave from the state court to appear as volunteer counsel, nor could he have requested or received funds to investigate the pending *Atkins* claim.  Regardless of how the Court views Mr. Hunt's role in the filing of Mr. Ibarra's subsequent state petition, it is incontrovertible that the state court never appointed him to represent Mr. Ibarra, he was not eligible to be appointed to represent Mr. Ibarra, he never volunteered to assist Mr. Ibarra in securing the appointment of state habeas counsel or in gathering evidence to support his *Atkins* claim, and he never sought nor was granted leave to appear as volunteer counsel.

Judge Allen did find in paragraph 2.14 of the state court's findings (as drafted by the prosecutor) that when Mr. Hunt appeared at the July 18, 2006 hearing, he did not ask to be relieved as counsel, and filed a Motion requesting that volunteer counsel be granted leave to appear.  However, Mr. Kuykendall explained on the record at that same hearing that Mr. Hunt was not representing Mr. Ibarra in his state court proceedings, that he was not on the list of eligible attorneys for appointment, that Mr. Kuykendall was not seeking the appointment of Mr.

Hunt as co-counsel, and that he would instead be seeking the appointment of a qualified post-conviction attorney as co-counsel.  Transcript of Hearing at 13:13-15:13 (July 18, 2006).

If neither the state court, nor Mr. Hunt, Mr. Ibarra or Mr. Kuykendall believed that Mr. Hunt was the appointed or volunteer counsel for Mr. Ibarra's state proceedings, and if Judge Allen himself asserted that he had never appointed Mr. Hunt, the fact that Mr. Hunt did not request to be relieved as counsel is not surprising, and it is certainly not sufficient evidence to establish that he was representing Mr. Ibarra such that Mr. Ibarra's ignorance of the steps necessary to investigate his *Atkins* claim indicates a lack of diligence: "a petitioner cannot be said to have 'failed to develop' a factual basis for his claim unless the undeveloped record is a result of his own decision or omission."  *McDonald v. Johnson*, 139 F.3d 1056, 1059 (5th Cir. 1998).

This is especially true here, where it is undisputed that Mr. Ibarra was indigent throughout the time between the filing of his subsequent habeas petition and the purported evidentiary hearing on his mental retardation claim, and where he is a person with mental retardation.  Under §2254(e)(2), both of these qualities excuse any perceived failure by Mr. Ibarra to pursue investigations to support his mental retardation clam during the period before the summer of 2006.  *See Morris v. Dretke*, *supra*, 413 F.3d at 500 (excusing a delay in petitioner's diligent investigation of his mental retardation claim because "[w]hile it is true that [petitioner] could have sought testing earlier, the harsh reality is that such testing is costly, and death row inmates typically lack independent financial means"); *Harrison v. Quarterman*, *supra*, 496 F.3d at 429 ("Quarterman apparently wants this court to read § 2254(e)(2)'s diligence requirement as mandating that a habeas petitioner act 'as soon as possible,' but that is not the law").

Since Mr. Hunt was never appointed as Mr. Ibarra's state habeas counsel, Mr. Hunt's diligence or lack thereof may not be attributed to Mr. Ibarra for the purposes of determining whether Mr. Ibarra diligently pursued his *Atkins* claim.  Instead, the issue of diligence here must be assessed in light of the fact that up until Mr. Kuykendall volunteered his services on behalf of Mr. Ibarra in July 2006, Mr. Ibarra was not being actively represented by counsel.  Thus only Mr. Ibarra's own actions are relevant to the question of diligence prior to Mr. Kuykendall's leave to appear on Mr. Ibarra's behalf.  *See Williams v. Taylor*, *supra*, 519 U.S. at 432 ("[A] failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, *attributable to the prisoner or the prisoner's counsel*") (emphasis added).

Mr. Ibarra admittedly did not personally seek to have counsel appointed in the years between the filing of his *Atkins* claim in state court and the date on which Mr. Kuykendall was granted leave to appear on his behalf.  However, Mr. Ibarra was indigent and unrepresented during those years.  Furthermore, Mr. Ibarra is mentally retarded (or at least his counsel claims he is), and surely cannot be expected to appreciate the intricacies of state habeas corpus process, at least not so as to be labeled "non-diligent" for federal court purposes.  In fact the Fifth Circuit has previously recognized indigence as a valid excuse for a prisoner's untimely diligence in pursuing his claim in state court.  *See Morris v. Dretke*, *supra*, 413 F.3d at 500.  In this case, as in *Morris*, once volunteer counsel entered his appearance, he sought funding and assistance from the court, including the appointment of qualified state habeas counsel.  And as Respondent acknowledges, once Mr. Kuykendall was granted leave to appear as volunteer counsel, he immediately and diligently began efforts to prepare Mr. Ibarra's *Atkins* claim.

To the extent the Court chooses to rely upon the fact of Mr. Hunt's presumed "representation" of Mr. Ibarra from the filing of the state habeas corpus petition in March 2005

41

as a basis for finding a lack of diligence, Petitioner would direct the Court to the section of this Motion addressing recent activity in the U.S. Supreme Court which appears to indicate that Court is reviewing its own jurisprudence in this area, in a manner that could render this Court's ruling in error. *See* section "g" of Motion, incorporated herein by express reference.

In short, Mr. Ibarra presented exhaustive evidence of his counsel's diligence in pursuing his *Atkins* claim. Section 2254(e)(2) is therefore inapplicable to this case. The only remaining contested issue, then, is whether he received a full and fair hearing on the claim in state court. As discussed above, he did not receive a full and fair hearing, either in open court or in the process that obtained off the record.

Finally, the Court alternatively ruled that Petitioner's *Atkins* claim is without merit. In doing so, the Court refuses to consider all of the available evidence of Mr. Ibarra's mental retardation (instead only considering that presented to the state habeas court), and relies upon the purported opinion of a Dr. Mark, who did not even evaluate Mr. Ibarra for mental retardation and who spent hardly more than 1 hour of time with him in a pre-trial competency examination. See Exhibit 1 to Amended Petition. On the first point, the totality of the evidence available to the Court on this issue demonstrates overwhelmingly, and without any meaningful rebuttal, that Mr. Ibarra suffers from mental retardation. At the very least the evidence available demonstrates the need for further evidentiary development and exploration before this Court.

On the second point, the record demonstrates that prior to trial defense counsel hired Dr. Stephen Mark, a general psychiatrist, to conduct a general examination of his client, and to assist with development of evidence as to the unreliability of eyewitness testimony.   On the day of the evaluation counsel provided Dr. Mark only with information relating to the state's case, but nothing regarding Mr. Ibarra's life history, school or medical records, or any other information

42

whatsoever about his client.  *See* Exhibits 1 and 2 to Amended Petition.  Dr. Mark met with Mr. Ibarra briefly and on one occasion on August 29, 1997.  Dr. Mark conducted no testing of any sort, including any related to Mr. Ibarra's cognitive abilities.  *Id*.  During trial, when Mr. Ibarra attempted to kill himself, Dr. Mark again attempted to examine Mr. Ibarra to ascertain if he was competent to proceed.  Trial Transcript at 1533.  According to trial counsel, however, Mr. Ibarra was completely unresponsive, so no further examination was conducted.  *Id*.

Reliance upon any suggestion by Dr. Mark as to the issue of whether Ramiro Ibarra is mentally retarded, therefore, is completely unfounded and untenable.  Dr. Mark never hinted that he had conducted any examination or testing relevant to that issue.  His sole, pre-trial meeting was brief and in no way focused on or directed to the question of Mr. Ibarra's mental retardation.  Thus this Court, respectfully, simply cannot in good faith place its complete reliance upon Dr. Mark in its merits conclusion that Mr. Ibarra is not mentally retarded.  This is especially true where the record contains ample, unrebutted evidence that he is mentally retarded, included the report of a qualified mental health professional who did in fact conduct an appropriate evaluation to make such determination.

For these reasons, this Court's order denying relief on this claim, refusing to countenance the unrebutted evidence of Mr. Ibarra's mental retardation, and denying an evidentiary hearing, is, respectfully, in error.  In any event, Petitioner urges the Court to withhold final ruling in the case until the U.S. Supreme Court has rules in *Maples* and related cases on the issue of whether, and to what extent the purported failings of state habeas counsel can still be blamed on a capital habeas corpus petitioner such as Mr. Ibarra.

**f.  Mr. Ibarra's Ninth and Eleventh Claims of Error**

The Court's rulings on Mr. Ibarra's claim that his trial and appellate counsel rendered ineffective assistance in contravention of the Sixth Amendment, and his claim under the Vienna Convention on Consular Relations, rested on the conclusion that they were subject to valid procedural defaults arising from orders entered by the Texas Court of Criminal Appeals which in turn cited to Section 5 of the Texas Code of Criminal Procedure, Art. 37.071 §5 et seq.  Because the default issues are related, Petitioner herein combines his Motion as to these two issues.  He will treat the joint procedural issues first, and then turn to the merits of each claim.

In effect, the Court's ruling on these two claims concedes that, but for the procedural default finding, otherwise litigable claims are presented.  For this reason, any further showing that the CCA's rulings on these two claims do not present a valid impediment to this Court's merits treatment of this issue would require a revision of this Court's ruling.  The primary issue currently before the Court, then, is whether the Texas Court of Criminal Appeals ("CCA") relied on independent and adequate state-law grounds when it denied relief on Mr. Ibarra's ineffective assistance of counsel and VCCR claims.

The most that can be said specifically about current federal law on this issue is that, due to a rash of conflicting and highly contested Court of Appeals decisions in the Fifth Circuit during the past nine months, the state of the law is in flux in ways that directly impact the Court's procedural default finding.  For this reason, Mr. Ibarra urges the Court either to grant an evidentiary hearing on both of these issues (as none was allowed in state court on either the VCCR or the ineffective assistance of counsel claims), or at the very least postpone its decision on this motion until the law is clarified in either in the Fifth Circuit or by the U.S. Supreme Court.

Since June 18, 2010 the U.S. Court of Appeals for the Fifth Circuit has issued, withdrawn and re-issued opinions in two different cases addressing the appropriate federal treatment of summary state court dismissals under Texas's section 5 (Texas Code of Criminal Procedure, Art. 37.071 §5 et seq.); it has also issued an opinion in a third case, and it has issued opinions relating to the denial of rehearing and rehearing en banc in these same cases. Vociferous dissents pointing to prior Fifth Circuit precedent directly on point have accompanied these decisions. At present, the three cases at issue here all have active petitions for writs of *certiorari* pending before the U.S. Supreme Court. *See* Exh. 7 (Petition for Writ of Certiorari, *Maldonado v. Thaler* (No. 10-A-898) (Mar. 14, 2011));  exh. 8 (Petition for Writ of Certiorari, *Rocha v. Thaler* (No. ____ )); exh. 9 (Petition for Writ of Certiorari, *Balentine v. Thaler* (No. ____ ) (Mar. 25, 2011)). None of this extensive recent case history is even mentioned by this Court in its order denying Petitioner relief.

The saga began with the Fifth Circuit's initial decision in *Balentine v. Thaler*, 609 F.3d 729 (5th Cir. June 18, 2010) (hereinafter "*Balentine I*"), *withdrawn*, *Balentine v. Thaler*, 626 F.3d 842 (5th Cir.  November 17, 2010) (hereinafter "*Balentine II*").  In *Balentine I*, the Court relied upon its prior decision in *Ruiz v. Quarterman*, 504 F.3d 523 (5th Cir. 2007), and held that a CCA dismissal under section 5, standing alone and without a clear indication that it was based on independent and adequate state-law grounds, does not deprive federal courts of jurisdiction to review the underlying claims.  In *Balentine II*, the Court held that "[t]here must be more than silence.  In some form, the state court has to make a fair indication that the merits of the claims were reached."  626 F.3d at 854.

After the issuance of *Balentine I*, the Court returned to similar issues in two subsequent Texas cases; the decisions in those two cases blatantly conflicted with *Balentine I*, and arguably

45

with the much earlier precedent in *Ruiz*.  In *Maldonado v. Thaler*, 625 F.3d 229 (5th Cir. Aug. 16, 2010), the Court found, after reviewing the entire federal record, that Maldonado had never argued in his pleadings that he satisfied any of Section 5's enumerated sate-law-based exceptions and that there was no basis otherwise present in the record to conclude that he had in fact satisfied those state-law exceptions.  Based on the record's complete lack of evidence that the petitioner had argued or satisfied the state-law prong of Section 5, and the fact that the Texas Court of Criminal Appeals gave no indication that it had proceeded to reach the federal-law prong of Section 5, the Fifth Circuit found that the Court of Criminal Appeals must have dismissed the claim on independent and adequate state-law grounds.  *Id*.

In *Rocha v. Thaler*, 628 F.3d 218 (5th Cir. December 17, 2010), (denying rehearing en banc), the Court found that in a scenario in which the Texas Court of Criminal Appeals summarily dismisses a subsequent application for state habeas relief under Section 5(a)(3), the Court's determination that the petitioner has failed to prove that he is innocent of the death penalty does not constitute a decision on the merits of the federal constitutional question, and therefore operates as an independent and adequate state-law ground for dismissal.

While *Balentine*, *Rocha*, and *Maldonado* ultimately resulted in the Fifth Circuit upholding District Court decisions to dismiss their respective federal habeas petitions for lack of jurisdiction, none of those opinions – read separately or in conjunction – articulates a clear standard for determining when a Section 5 dismissal results from a federal merits review and when it is based on an independent and adequate state-law ground.  The closest the Court came was to indicate that "something more than silence" presented "in some form" must give a "fair indication" that the court reached the merits of the claim.  *Balentine II*, *supra*.  What satisfies the "more than silence" test has not been answered by the Fifth Circuit; what satisfies the "in some

46

form" test has not been answered by the Fifth Circuit; and what is sufficient to satisfy the federal courts that the state court gave a "fair indication" that the federal merits were reached has not been answered by the Fifth Circuit.

Perhaps more importantly for our inquiry, none of the decisions addresses whether and how the answer to those questions depends upon whether the petitioner sought review in state court under Section 5(a)(1), 5(a)(2) or 5(a)(3).[4]  Unlike Mr. Ibarra, none of the petitioners in *Balentine*, *Rocha* or *Maldonado* asserted a Section 5(a)(1) claim.  The Fifth Circuit in *Rocha* did indicate, however, that it may treat a Section 5(a)(1) dismissal differently than it did the Section 5(a)(3) dismissal presented in that case:

> When the CCA determines that a state habeas application does not satisfy § 5(a)(1) and dismisses it as an abuse of the writ, it sometimes does so because it has concluded that the federal constitutional claim on which the application seeks relief is meritless.  We have previously held that in such

---

[4] Article 11.071 Section 5(a) reads as follows:

(a) If a subsequent application for a writ of habeas corpus is filed after filing an initial petition, a court may not consider the merits of or grant relief based on the subsequent application unless a petitioner can show that the application meets one of three statutory standards:

(1) the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application filed under this article . . . because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application;

(2) by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt; or

(3) by clear and convincing evidence, but for a violation of the United States Constitution no rational juror would have answered in the state's favor one or more of the special issues that were submitted to the jury in the applicant's trial.

Tex. Code Crim. Proc. art. 11.071(a).

cases the CCA's decision is interwoven with the merits of the federal constitutional claim and thus does not rest on an independent state-law ground.  By contrast, when the CCA determines that a successive state habeas application does not satisfy § 5(a)(3), it does so because it has concluded that the habeas applicant cannot establish that he is factually innocent of the death penalty.  To arrive at that conclusion, the CCA need not, and does not, consider the merits of the underlying federal constitutional claim [with limited exceptions such as mental retardation and being younger than 18 at the time the crime was committed].

*Rocha v. Thaler*, 626 F.3d 815, 819 (5th Cir. November 17 2010) (denying panel rehearing).

Beyond that, no clear standard has been articulated for Section 5(a)(1) dismissals, and in fact it is reasonable to believe that Fifth Circuit case law may be tending toward vacating its generalized "Section 5" jurisprudence in favor of case- and fact-specific analyses under Section 5(a)(1), Section 5(a)(2) and Section 5(a)(3) separately.

Because of the current confusion that exists in the Fifth Circuit on the proper treatment of "boilerplate" Section 5 dismissals; the fact that Mr. Ibarra seeks review of his claims under Section 5(a)(1), a subsection of the rule that was largely untouched in the recent outpouring of Fifth Circuit opinions; and because the Circuit Courts themselves are split on whether state-law exceptions to habeas procedural bars negate what would otherwise be independent state-law grounds for dismissal,[5] the issue currently before this Court is likely to be further clarified in the Fifth Circuit and is ripe for final adjudication in the U.S. Supreme Court.  Accordingly, Mr. Ibarra respectfully requests that this Court withhold final ruling on this motion pending the U.S. Supreme Court's resolution of the pending *certiorari* petitions in *Balentine*, *Maldonado*, and *Rocha*.

---

[5] See *Rocha v. Thaler*, *supra*, 619 F.3d 387, at 403-404 (5th Cir. September 9, 2010) (original panel opinion).

Should the Court be so inclined, however, Petitioner also submits here that a complete synthesis from reading the varying opinions, dissents, and the like from these three cases requires a different outcome on the procedural issues on these two claims than the one reached by the Court here.  It should be noted that even the Fifth Circuit acknowledged that the issue was a bit murky and required case-by-case analysis.  Thus the Court in *Rocha* held that "whether state court invocation of § 5(a) of Article 11.071 of the Texas Code of Criminal Procedure or its parts clearly rests a decision upon independent state grounds does not yield a universal answer. Rather, the answer will often turn on contextual and case specific inquiries laid on the federal blanket of *Michigan v. Long* and *Coleman v. Thompson* . . . ."  *Rocha v. Thaler*, *supra*, 619 F.3d at 407 (5th Cir. 2010).  *Michigan v. Long* espoused the fundamental rule that,

> When . . . a state court decision fairly appears to rest primarily on federal law, or to be interwoven with federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion, we will accept as the most reasonable explanation that the state court decided the case the way it did because it believed that federal law required it to do so.

*Michigan v. Long*, 463 U.S. 1032, 1040-1041 (1983).  *Coleman* elaborates on the Supreme Court's prior case law, reiterating the need for federal courts to engage in case-by-case review of state court dispositions to determine whether they relied upon independent and adequate state law grounds or whether they appear to rest primarily on federal law or to be interwoven with federal law.  *Coleman v. Thompson*, 501 U.S. 722, 736 (1991) ("federal habeas courts must ascertain for themselves if the petitioner is in custody pursuant to a state court judgment that rests on independent and adequate state grounds").

Factually and procedurally, none of the scenarios in *Balentine*, *Rocha* or *Maldonado* is analogous to the scenario in which Mr. Ibarra finds himself.  Mr. Ibarra explicitly argued in state

court proceedings that his VCCR claim satisfied Section 5(a)(1) because of two developments –

the ICJ issuance of the *Avena* Judgment on March 31, 2004 and the presidential determination

issued by President Bush on February 28, 2005 – which post-dated the Texas Court of Criminal

Appeals' final adjudication of his first application for post-conviction relief on April 4, 2001.

Subsequent Application for Post-Conviction Writ of Habeas Corpus at 27, Ex Parte Ramiro Rubi

Ibarra, No. 1996-634-CB (Tex. Crim. App. March 24, 2005) (hereinafter "State VCCR Habeas

Corpus Application").  He supported that claim with record evidence.  *Id*. at 25-28.  More

importantly, the Court did not issue a "boilerplate" dismissal of Mr. Ibarra's VCCR claim, but

dismissed because it had already "considered and rejected" the merits of the claim in its previous

ruling in *Ex Parte Medellín*, a state court decision which the Fifth Circuit recently acknowledged

"*explicitly* reach[ed] the merits."  *See Ex Parte Ramiro Rubi Ibarra*, 2007 Tex.Crim.App.

Unpub. LEXIS 385 (2007); *Balentine* II, *supra*, 2010 U.S. App. LEXIS 12605 at *31-32

(distinguishing the claim in *Ex Parte Medellín* from the claim in *Balentine II* because *Medellín*

"explicitly reach[ed] the merits"); *Ex Parte Medellín*, 22 S.W.3d 315 (Tex. Crim. App. 2006)

(emphasis added).

    The Court of Criminal Appeals' dismissal in *Medellín*, which was explicitly referenced as

the basis for its dismissal of Mr. Ibarra's VCCR claim, is arguably a prototype for a Section 5

decision that "fairly appears . . . to be interwoven with federal law."  *See Michigan v. Long*,

*supra*, 463 U.S. at 1040-1041.  In addition to finding that the applicant in *Medellín* failed to

prove the merits of his federal constitutional claim, the Court of Criminal Appeals also based its

dismissal on state procedural grounds; however, the Court's resolution of the procedural question

was based almost entirely on its interpretation of federal constitutional law and its determination

that neither of the VCCR claims raised by *Medellín* (and now by Mr. Ibarra) qualified as a new

law under the U.S. Constitution, inextricably intertwining its interpretation of state procedural law with federal constitutional law. *Ex Parte Medellín, supra*, 22 S.W.3d 315. As the U.S. Supreme Court has repeatedly held, a state decision to dismiss based on a resolution of state law that requires the court to interpret federal constitutional law is not based on an independent and adequate state-law ground. *See Ake v. Oklahoma*, 470 U.S. 68, 75 (1985); *Smith v. Texas*, 127 S.Ct. 1686, 1698 (2007); *Delaware v. Prouse*, 440 U.S. 648, 652-653 (1979).

In *Zacchini v. Scripps-Howard Broadcasting Co.*, the Supreme Court held that, "Even if the judgment in favor of respondent must nevertheless be understood as ultimately resting on [state] law, it appears that at the very least the [state] court felt compelled by what it understood to be federal constitutional considerations to construe and apply its own law the way it did. In this event, we have jurisdiction and should decide the federal issue . . . ." *Supra*, 433 U.S. at 568; *see also Caldwell v. Mississippi*, 472 U.S. 320, 327 (1985). The Supreme Court further found that the portion of the state court's decision that could arguably be construed as a dispositive state-law ground for dismissal "did not mention the [state] Constitution, citing instead this Court's First Amendment cases as controlling. It appears to us that the decision rested solely on federal grounds." *Id*. Similarly, in *Medellín*, the Court of Criminal Appeals based its procedural state-law decision on the underlying issues concerning the federal principle of separation of powers and previous U.S. Supreme Court cases interpreting the Supremacy Clause of the U.S. Constitution as well as the meaning and effect to be afforded international treaties under the U.S. Constitution. *Ex Parte Medellín, supra*, 22 S.W.3d at 324-330.

Because the dismissal of Mr. Ibarra's VCCR claim cites as its sole reasoning the fact that his claim had already been "considered and rejected in *Medellín*," Mr. Ibarra's VCCR claim cannot have been dismissed on independent and adequate state-law grounds.

51

Moreover, this Court's citation to the CCA's direct appeal procedural rejection of this claim is also, respectfully, in error.  Federal law is clear that the procedural ruling to which this Court must defer, or not, is the last ruling of the highest state court to consider the claim.  *Harris v. Reed*, 488 U.S. 255 (1989).   In this case, the VCCR claim was squarely presented in a state post-conviction petition to the CCA, and the CCA's ruling on that claim was, as noted above, a section 5 ruling citing to its prior decision in *Medellín*.   It is that procedural ruling, and not the previous one on direct appeal, that governs this Court's treatment of the claim in federal habeas corpus proceeding.  *Id*.  For these reasons, respectfully, this Court's rejection of Petitioner's VCCR claim on procedural grounds is, respectfully, in error.

Mr. Ibarra's IAC claim was also raised under Section 5(a)(1), an area of Section 5 law that the recent opinions in *Balentine*, *Rocha* and *Maldonado* hardly discussed and shed little light upon.  The Fifth Circuit's prior decision in *Ruiz v. Quarterman* is therefore most helpful in determining whether the federal court may take jurisdiction.  As numerous courts have acknowledged previously, the Court of Criminal Appeals has clarified that, to satisfy Article 11.071 § 5(a)(1) "1) the factual or legal basis for an applicant's current claims must have been unavailable as to all of his previously applications, and 2) the specific facts alleged, if established, would constitute a violation that would likely require relief from either the conviction or sentence."  *Ex Parte Campbell*, 226 S.W. 3d 418, 421 (Tex. Crim. App. 2007). The Fifth Circuit accordingly held in *Ruiz* that it cannot determine whether "boilerplate" dismissals under Section 5(a)(1) were based on state or federal law.  *Supra*, 504 F.3d at 527.

In *Ruiz*, the Fifth Circuit found that federal courts did have jurisdiction over the petitioner's ineffective assistance of counsel claim under such a "boilerplate" dismissal.  *Id*. at 528.  Other than the fact that the Court of Criminal Appeals' reasons for dismissing the claim

52

were uncertain, the Fifth Circuit based its decision to exercise federal jurisdiction primarily upon

its determination that three of the seven participating judges in the Court of Criminal Appeals

decision reached the merits of Ruiz's claim. *Id*. at 527-528.  The four-judge plurality did not

indicate whether it reached the merits of Ruiz's claim, but the requisite fifth vote by Judge

Womack did address the merits. *Id*.  It therefore stands to reason that if the opinions of only

three out of seven judges constitute sufficient evidence that the claim was dismissed on the

federal merits, then the unanimous decision of all of the judges in Mr. Ibarra's case, which may

just as reasonably have been dismissed on the merits as on state procedural grounds, is also

sufficient to determine that the claim was dismissed on the merits.

     The recent opinion in *Balentine II* indicates that this is the kind of reasoning that the Fifth

Circuit would like to avoid.  Similarly, in *Rocha*, the Fifth Circuit indicates that it no longer finds

that federal courts have jurisdiction over Section 5(a)(1) claims in the face of uncertain

ambiguity:

> When the CCA dismisses a successive habeas application on the grounds
> that it does not satisfy § 5(a)(1), we can – and should – read its order of
> dismissal to determine which of the two elements of § 5(a)(1) was the
> basis of the court's dismissal.  A boilerplate dismissal might be ambiguous
> on this point, but finding clarity in ambiguity is the bread-and-butter work
> of a federal court of appeals.

*Rocha v. Thaler*, *supra*, 2010 U.S. App. LEXIS 23696 at *59-60.  However, as previously

discussed, neither *Rocha* nor *Balentine* addressed a Section 5(a)(1) claim, so while the Court

assigned itself the future task of finding "clarity in ambiguity" under Section 5(a)(1), it did not

offer any insight into how it will go about that task, or how the lower courts should go about that

task.  It also did not indicate what to do when, despite the courts' best efforts, they can find

absolutely no indication which of the two prongs of Section 5(a)(1) was the basis for the state

court dismissal. *Ruiz* did, however, offer insight into the latter question when it found a reasonable likelihood that the judges dismissed *after* reaching the federal merits based on the not very enlightening fact that less than half of the Court reached the federal merits. In Mr. Ibarra's case, the question is more staunchly ambiguous than in *Ruiz*, as it is just as likely that all of the judges reached the federal merits as it is that none of them did so.

Based on the above analysis, the most prudent course of action appears to be to delay deciding Mr. Ibarra's motion, and final ruling on his multiple requests for an evidentiary hearing on his IAC and VCCR claims, until the Fifth Circuit or the U.S. Supreme Court clarifies the lingering questions surrounding Section 5(a)(1) dismissals. However, until that clarification comes, *Ruiz* remains good law, as does the Fifth Circuit's conclusion in that case that when the "decisional path [falls] far short of the clarity insisted upon in *Michigan v. Long* . . . of which the CCA is acutely aware . . . [the petitioner's] *Wiggins* claim was properly before the federal district court." *Ruiz v. Quartman*, *supra*, 504 F.3d at 528.

This Court also alternatively ruled on the merits of both the ineffective assistance of counsel and the VCCR claims. Respectfully, however, Petitioner suggests that these rulings, too, were in error.

On the ineffective assistance of counsel claim, the Court relied on the fact that the presentation in both state and federal courts on this issue was based on a cold record without the benefit of any hearing or rebuttal evidence from the State. Of course this is true, but it is also a direct result of a procedural ruling by the state courts which, as the above demonstrates, should not deprive this Court of full merits-treatment of the claim. In other words, while it is true that the federal record on Petitioner's ineffective assistance of counsel claim is the product of an undeveloped state court record, the appropriate outcome should not be to deny the claim on that

basis, but rather it should be to allow the very factual development (discovery, evidentiary hearing) Petitioner has asked this Court to conduct. The only reason no record was developed in state court was due to the CCA's decision to apply its section 5 analysis to the state petition raising this claim; the state courts were thus given an opportunity to do more, and chose not to. Here, then, the appropriate course for this Court is to conduct whatever factual development it deems appropriate, and then rule on the merits on this claim. Once it reviews this claim on the merits, unimpeded by procedural concerns, it will become clear that Petitioner is entitled to relief.

On the VCCR claim, this Court ruled that the U.S. Supreme Court's decision in *Medellín v. Texas*, 552 U.S. 491 (2008), barred merits relief. Again, respectfully, the Supreme Court's *Medellín* decision is not appropriately interpreted in this way. The Supreme Court in *Medellín* involved a case arising directly from a lower state court decision by the CCA applying section 5 to a state habeas petitioner's VCCR claim. There, the Court held that neither the ICJ's decision in *Avena* (*Case Concerning Avena and Other Mexican Nationals (Mex. v. U.S.)*, 2004 I.C.J. 12 (Judgment of March 31)), nor President Bush's directive, were valid authority for overriding a state procedural rule applied by the CCA that avoided a merits ruling on petitioner's state habeas corpus petition. It neither addressed, nor was presented with, the issue presented here, namely, whether a state court's section 5 ruling was a valid, adequate and independent state ground that is to be honored in federal habeas corpus proceeding so as to bar merits treatment in those proceedings? These are two very distinct inquiries, and this Court's reliance on the Supreme Court's ruling in *Medellín* is, respectfully, not relevant to the merits issue presented here. Instead, because, as set forth above, the CCA's section 5 ruling does not bar merits treatment of Petitioner's VCCR claim, this Court must review the claim on the merits, and the Supreme

55

Court's decision (refusing to override the CCA's bar in that context) has no bearing on the proper merits treatment here.

As with the claim of ineffective assistance of counsel, so too with this claim, it arrives in federal court based on an factually undeveloped state court record, due to the CCA's chosen path of applying its section 5 analysis to the claim.  For this same reason, the appropriate course here is to allow factual development in this Court, grant an evidentiary hearing, and provide the full merits review and consideration of Petitioner's VCCR claim as required by the ICJ in *Avena*.

> **g.   The Supreme Court has Granted *Certiorari* to Decide Whether a Petitioner can Establish "Cause" to Excuse Procedural Default When, Among Other Things, his State Habeas Counsel Was No Longer Functioning as His Agent at the Time of Default**

In *Maples v. Thomas*, No. 10-63, the Supreme Court recently granted *certiorari* on the following question:

> Whether the Eleventh Circuit properly held – in conflict with the decisions of this Court and other courts – that there was no "cause" to excuse any procedural default where petitioner was blameless for the default, the State's own conduct contributed to the default, and petitioner's attorneys of record were no longer functioning as his agents at the time of any default.

*See Maples v. Thomas*, 2011 U.S. LEXIS 2314 (Mar. 21, 2011) (order granting *certiorari*); exh. 10 (Petition for Writ of Certiorari, *Maples v. Thomas* (No. 10-63) (Jul. 9, 2010)).  The Petition raises the issue whether the rule announced in *Coleman v. Thompson*, 501 U.S. 722 (1991), that petitioners bear the risk of attorney error so long as the attorney is not constitutionally ineffective, governs "where, as here, an attorney no longer functions as an agent at the time of the alleged default.  As other courts have recognized, in such circumstances, a client is not responsible for an attorney's malfeasance."  Exh. 10 at 11.

This Court relied upon the Supreme Court's holding in *Coleman* in rejecting several of Petitioner's claims on procedural grounds, including his claims of ineffective assistance of counsel and his claim arising under the Vienna Convention on Consular Relations.  In addition, in rejecting Petitioner's claim of mental retardation pursuant to *Atkins v. Virginia*, this Court cited to failures on the part of state habeas counsel as a basis for refusing to entertain otherwise unrebutted evidence that Petitioner is in fact mentally retarded and therefore not subject to the death penalty under governing constitutional authority.  Because the U.S. Supreme Court has now granted *certiorari* on an issue that is at the core of this Court's rejection of these otherwise meritorious claims, Petitioner respectfully requests that this Court either grant relief, or at the very least refrain from final ruling on this Motion, and the case, until the Supreme Court has rendered its decision in *Maples*.

As noted in Maples' Petition, the Supreme Court has held that principles of agency law apply to the state habeas attorney-client relationship, such that "the attorney is the petitioner's agent when acting, or failing to act, in furtherance of the litigation, and the petitioner must 'bear the risk of attorney error.'"  *Coleman v. Thompson*, *supra*, 501 U.S. at 753.  Maples argues, however, that such agency principles do not apply when the agency relationship ended prior to the running of the time in which the petitioner may act, and in situations where the attorney has "committed a serious breach of loyalty."  Petition for Writ of Certiorari, *supra*, at 28.

In a related context, the U.S. Supreme Court has held that attorney malfeasance in missing the federal deadline for filing a petition for writ of habeas corpus under AEDPA may not be attributed to a petitioner when the attorney has "essentially 'abandoned' him."  *Holland v. Florida*, 130 S.Ct. 2549, 2568 (2010) (Alito, J., concurring in part and concurring in the judgment).  In *Holland*, the Supreme Court revisited its two-part test for equitable tolling of the

filing deadline under AEDPA:  (1) that the petitioner establish that he pursued his right diligently; and (2) that extraordinary circumstances stood in his way, preventing timely filing of his petition.  *Id*. at 2562.  In that case, the Eleventh Circuit Court of Appeals had held that an attorney's representation that falls below "professional standards of care," even when "grossly negligent," does not constitute extraordinary circumstances warranting tolling absent "bad faith, dishonesty, divided loyalty, mental impairment or so forth on the lawyer's part."  *Id*. at 2562-2563 (citing *Holland v. Florida*, 539 F.3d 1334, 1339 (11th Cir. 2008)) (quotations omitted).  The Supreme Court reversed, holding that equitable relief cannot be based on an "overly rigid *per se* approach," and that an attorney's misconduct that constitutes more than "garden variety" or "excusable neglect" may "indeed constitute extraordinary circumstances sufficient to warrant equitable relief."  *Id*. at 2565.  As Maples points out in his *certiorari* petition, even the dissenting Justices in *Holland* recognized that attorney error could not be attributed to the petitioner if the attorney-client relationship terminated prior to the closing of the relevant filing window.  Exh. 10 at 29.

The Supreme Court's analysis in *Holland* placed heavy emphasis on the distinction between the circumstances in that case and *Coleman*.  In *Coleman*, like in *Maples*, the issue was when federal courts may excuse procedural default in state court, an issue that heavily implicates notions of comity and federalism, whereas *Holland's* equitable tolling question did not implicate federalism.  *Holland v. Florida*, *supra*, 130 S.Ct. at 2563.  This is the very issue at stake in the present case under the existing order of this Court.  By granting *certiorari* in *Maples*, the Supreme Court has at the very least signaled a willingness to consider extending the principles in *Holland* to cases of state procedural default where "the petitioner's attorneys of record were no longer functioning as his agents at the time of any default."  Exh. 10.

58

As Maples' Petition indicates, there is strong support for such an extension in federal and state courts, and in the Supreme Court's case law emphasizing that habeas corpus is "governed by equitable principles."  Petition for Writ of Certiorari, at 29-32 (quoting *Munaf v. Geren*, 553 U.S. 674, 693 (2008)).  In particular, the Second, Fourth, Eighth and Ninth Circuits have all held that an attorney's "utter abandonment" of his client would constitute "extraordinary circumstances *external* to the party's own conduct."  Exh. 10 at 29-30 (citing *Rouse v. Lee*, 339 F.3d 238, 250 n.14 (4th Cir. 2003) (en banc) (citation omitted), *cert. denied*, 541 U.S. 904 (2004); *Baldayaque v. U.S.*, 338 F.3d 145, 154 (2d Cir. 2003) (Jacobs, J., concurring) ("[W]hen an 'agent acts in a manner completely adverse to the principal's interest,' the 'principal is not charged with [the] agent's misdeed.'") (citation omitted); *Manning v. Foster*, 224 F.3d 1129, 1135 (9th Cir. 2000) (attorney's errors not attributable to client when attorney "does not actually represent the client"); *Jamison v. Lockhart*, 975 F.2d 1377, 1380 (8th Cir. 1002) (acknowledging that attorney's alleged conflict-of-interest would be "external" cause for default because attorney would have "effectively ceased to be [the client's] agent")).

Mr. Ibarra respectfully submits that if the U.S. Supreme Court adopts Maples' argument that attorney malfeasance can constitute "cause" for excusing a state procedural default, the same principles should, and will, apply equally to several of the procedural issues identified by the Court in Petitioner's case.  This would include not only the procedural default findings at the heart of this Court's rejection of Petitioner's *Atkins* and VCCR claims, but also the attorney failures cited by the Court in its refusal to consider otherwise available and unrebutted evidence that Mr. Ibarra is mentally retarded.  A different result in the *Maples* case would undermine this Court's holdings on at least these three claims, and would also provide further support for Petitioner's request for an evidentiary hearing on each of these claims.

59

On the issue of the right to an evidentiary hearing, as noted in Mr. Ibarra's Motion for Evidentiary Hearing, the threshold question presented is whether Petitioner has demonstrated that he diligently sought to establish the factual basis of his claim in state court.  Motion for Evidentiary Hearing; *Williams v. Taylor*, 529 U.S. 420, 432 (2000) ("Under the opening clause of § 2254(e)(2), a failure to develop the factual basis of a claim is not established unless there is a lack of diligence, or some greater fault, attributable to the prisoner or prisoner's counsel").  If a federal habeas corpus petitioner does demonstrate diligence, he is entitled to an evidentiary hearing if he can satisfy a three-prong test:  that he did not receive a full and fair hearing in state court; that the petition alleges facts which, if proven, entitle him to relief; and that the record establishes that there is a genuine factual dispute.  *See Martinez v. Dretke*, 111 Fed.Appx. 224, 229 (5th Cir. 2004) ("An evidentiary hearing is required where a state habeas petitioner did not receive a state court hearing and alleges facts which, if proved, would entitle him to relief, and the record reveals a genuine factual dispute as to the alleged facts") (citing *Murphy v. Johnson*, 205 F.3d 809, 815 (5th Cir. 2000) and *Townsend v. Sain*, 372 U.S. 293, 312-313 (1963)).  Mr. Ibarra has exhaustively demonstrated to this Court that he satisfies the three prongs of this test.  Thus, the issue whether he is entitled to an evidentiary hearing rests primarily on whether he was diligent in pursuing his *Atkins* claim in state court.  Whether Mr. Ibarra was diligent, in turn, rests primarily on whether undersigned federal counsel's actions can be attributed to him when federal counsel no longer represented him after the case returned to state court.

This Court did not specifically address Mr. Ibarra's request for an evidentiary hearing on his *Atkins*, ineffective assistance of counsel, or VCCR claims; however, in its Order dismissing Mr. Ibarra's *Atkins* claim, this Court held that the claim had not been exhausted in state court because material additional evidence was presented to this Court that had not been presented to

the state court.  The Court emphasized that Mr. Ibarra had four years from the time that *Atkins* was decided until his evidentiary hearing to gather evidence and submit it to the state court.  It is unambiguously clear, though, that any such failure to gather and present evidence was due in significant part to the fact that undersigned counsel was no longer representing Mr. Ibarra after his case returned to state court, and no state counsel was appointed until the day of his hearing. As Mr. Ibarra has already pointed out to this court, not only was undersigned counsel not acting as Mr. Ibarra's agent in state court, but he could not have legally acted as Mr. Ibarra's agent in state court because he was not on the Court of Criminal Appeals' list of eligible attorneys, was ineligible for appointment in state habeas proceedings, and could not ethically have accepted appointment even if Judge Allen had attempted to appoint him as state habeas counsel.  Under the reasoning advanced in the petition for *certiorari* in *Maples*, therefore, undersigned counsel's actions in state court should not be attributed to Mr. Ibarra.

The Fifth Circuit has already held that an unrepresented indigent petitioner is not held to the same standards of diligence as are represented petitioners.  *See*, *e.g.*, *Morris v. Dretke*, 413 F.3d 484, 500 (5th Cir. 2007) (refusing to find that petitioner was not diligent in state court because, "While it is true that [petitioner] could have sought testing earlier, the harsh reality is that such testing is costly, and death row inmates typically lack independent financial means"); *McDonald v. Johnson*, 139 F.3d 1056, 1059 (5th Cir. 1998) ("a petitioner cannot be said to have 'failed to develop' a factual basis for his claim unless the undeveloped record is the result of his own decision or omission").  Accordingly, the Supreme Court's determination whether courts can attribute to petitioners attorney malfeasance that takes place <u>after</u> the attorney-client relationship has terminated will bear directly on the determination whether Mr. Ibarra has a right to an evidentiary hearing on his *Atkins* claim.  Given the Court's broad discretion in permitting

motions for reconsideration under Rule 59(e), Mr. Ibarra respectfully requests that this Court grant this Motion, or alternatively stay consideration of the Motion pending the Supreme Court's disposition of *Maples*.

The pending decision in *Maples* will also have a bearing on this Court's holdings that Petitioner's VCCR and ineffective assistance of counsel claims were procedurally defaulted. The Court of Criminal Appeals' findings on both of these claims are a direct result of attorney malfeasance by the first state habeas counsel, who was virtually absent as an advocate for his client. Mr. Ibarra's first state habeas counsel filed a one-issue petition raising a so-called "Lackey" claim that the undue delay between conviction and execution violates the Eighth Amendment to the United States Constitution's prohibition against cruel and unusual punishment, a claim that has been repeatedly rejected by every state and federal court in the United States, and was not even applicable to Mr. Ibarra's case at the time it was presented.

Counsel's failure to perform any investigation or present any evidence substantiating Mr. Ibarra's meritorious ineffectiveness and VCCR claims, nor indeed to investigate or present evidence of any non-record claims, fell far below "professional standards of care," and was "grossly negligent," indicating that equitable relief is appropriate under the argument in Maples' *certiorari* petition. Not only is such sub-standard representation nearly indiscernible from attorney abandonment, but Maples' argument on *certiorari* is not limited to situations of attorney abandonment, but includes situations where the "agent has committed a serious breach of loyalty." Exh. 10 at 28. Under the reasoning advanced in the petition for *certiorari*, Mr. Ibarra's initial state habeas counsel's malfeasance should not be attributed to Mr. Ibarra. Mr. Ibarra respectfully requests that this Court grant this Motion, or alternatively stay consideration of the Motion pending the Supreme Court's disposition of *Maples*.

Beyond the issue raised in *Maples*, the U.S. Supreme Court has indicated by issuing two recent execution stay orders that it may grant *certiorari* to revisit the question whether the Sixth Amendment entitles state prisoners to constitutionally effective representation in state post-conviction proceedings. *Foster v. Texas*, 2011 U.S. LEXIS 2819 (Apr. 5, 2011); *Cook v. Arizona*, 2011 U.S. LEXIS 2817 (Apr. 4, 2011). Based in part on the Supreme Court's grant of *certiorari* in *Maples*, Cleve Foster, a condemned inmate in Texas, petitioned the U.S. Supreme Court for a stay of execution of sentence and leave to file a petition for rehearing, both of which the Supreme Court granted. Mr. Foster's petition for rehearing raises the question,

> Whether the rights to equal protection, due process, and access to the courts demand that condemned prisoners be afforded the effective assistance of counsel in pursuing state habeas remedies with respect to claims, such as innocence and ineffective assistance of trial counsel, that can only be raised in state habeas proceedings and if not raised there are thereafter barred?

Exh. 11 (Petition for Rehearing of Order Denying Petition for Writ of Certiorari, *Foster v. Texas* (No. 10-8317) (Apr. 1, 2011)). Mr. Cook, a death row inmate in Arizona for whom the Supreme Court also issued a stay of execution, has a similar petition for *certiorari* pending in the Supreme Court:

> Whether a prisoner is entitled under the Sixth Amendment to have constitutionally effective representation of counsel in a state post conviction proceeding which is an integral and mandatory phase of Arizona capital prosecutions, and which present the only forum in which to challenge the effectiveness of his trial and direct appellate counsel.

Exh. 12 (Application for Stay of Execution, *Cook v. Arizona* (No. 10-9742) (Mar. 28, 2011)).

The U.S. Supreme Court has not yet granted *certiorari* on either of these petitions, but the fact that it has issued execution stay orders for both petitioners and granted Mr.

Foster leave to file a petition for rehearing indicates that the Court will likely address these crucial issues, which have a clear bearing on the procedural posture of Mr. Ibarra's ineffectiveness and VCCR claims.  If, as both the *Foster* and *Cook* petitions assert, state habeas petitioners do have the constitutional right to the effective representation of counsel, Mr. Ibarra's rights were clearly violated.  In addition, if Mr. Ibarra did have a right to effective representation during his initial state habeas proceeding, the argument advanced in *Maples* indicates that the ineffective representation of his court-appointed counsel should <u>not</u> be attributed to him, and such ineffective representation constitutes cause to excuse the state procedural default.

For the reasons advanced above, Mr. Ibarra respectfully requests that this Court grant this Motion, or alternatively stay consideration of the Motion pending the Supreme Court's disposition of *Maples* and its decisions whether to grant *certiorari* in *Cook* and *Foster*.

### III.   CONCLUSION

The need to ensure reliable decisions in the context of a death penalty case should weigh in favor of granting a motion to alter or amend a judgment where there is any possibility that an incorrect standard has been applied.  Mr. Ibarra respectfully requests that this Court grant this Motion, or, in the alternative, stay consideration of the Motion pending the U.S. Supreme Court's consideration of *Maldonado*, *Rocha*, *Balentine*, *Maples*, *Foster* and *Cook*.  Mr. Ibarra specifically asks the Court to provide the following relief:

a.   Alter, amend and set aside its Judgment on all issues addressed herein; and,

b.   Grant Mr. Ibarra factual development via discovery and/or an evidentiary hearing; or,

64

c.  Stay its ruling on this motion pending the U.S. Supreme Court's consideration of

*Maldonado*, *Rocha*, *Balentine*, *Maples*, *Foster* and *Cook*; or,

d.  Reopen the proceedings to grant Mr. Ibarra discovery and/or an evidentiary

hearing on his *Atkins*, ineffective assistance of counsel and/or VCCR claims; or,

e.  Reopen the proceedings to grant whatever relief this Court deems just.

Respectfully submitted,

RUSSEL D. HUNT, JR.
Attorney at Law
Texas State Bar Number 00790937
811 Nueces Street
Austin, Texas 78701
Telephone:  (512) 930-0860
Fax:  (512) 857-0746

/s/ Russell D. Hunt
RUSSEL D. HUNT, JR.

NAOMI E. TERR
Attorney at Law
Texas State Bar Number 24033379
1927 Blodgett Street
Houston, Texas 77004
Telephone: (713) 222-7788
Fax: (713) 222-0260

/s/ Naomi E. Terr

ATTORNEYS FOR MR. IBARRA

## CERTIFICATE OF CONFERENCE

I certify that on April 28, 2011, I spoke to Stephen M. Hoffman, counsel for Respondent, and am authorized to state that he is opposed to this motion.

/s/  Russsell D. Hunt

## CERTIFICATE OF SERVICE

On April 28, 2011, I electronically filed the forgoing motion with the clerk of the court for the U.S. District Court, Western District of Texas, using the electronic case filing system of the court.  A "Notice of Electronic Filing" was sent to Stephen M. Hoffman, counsel for Respondent, at his e-mail address, stephen.hoffman@oag.state.tx.us.

/s/ Russell D. Hunt